IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.

JOSEPH MEEHAN,

Defendant.

CRIMINAL ACTION
NO. 11-440-1

## OPINION

Slomsky, J.                                                      September 15, 2016

## TABLE OF CONTENTS

I.   INTRODUCTION .................................................................................................. 3

II.  BACKGROUND .................................................................................................. 4

    A.    Events Leading to Defendant's Trial ........................................................ 4

    B.    The Trial .................................................................................................... 5

    C.    Post-Trial Procedural History .................................................................. 15

III. STANDARD OF REVIEW ................................................................................. 17

IV.  ANALYSIS .......................................................................................................... 17

    A.    Brady Claims and Leah Sabatino's Testimony ....................................... 17

    B.    Ineffective Assistance of Counsel Claims ............................................... 24

        1.    Ineffective Assistance of Counsel Claims Are Assessed Under the
            Strickland Standard ............................................................................ 24

        2.    Trial Counsel for Defendant Was Not Ineffective in Disclosing
            Defendant's Criminal History to the Jury and in Cross-Examining
            Witnesses Consistent With This Disclosure ...................................... 26

            a.   Evidence of Other Crimes and Wrongful Acts Elicited at Trial ........ 27
            b.   Defense Counsel's Strategy ................................................................. 29
            c.   Challenge to a Jury Instruction ........................................................... 32

        3.    Trial Counsel for Defendant Was Not Ineffective in Failing to
            Move to Compel Disclosure of "Rough Notes" of Interviews ...................... 33

4.   Trial Counsel for Defendant Was Not Ineffective in Failing to
Retain An Expert Witness on The Effects of Drug Use .............................. 38

5.   Trial Counsel for Defendant Was Not Ineffective in Failing to
Retain A Cell Site Location Expert and in Failing to Challenge the
Government's Cell Site Evidence ................................................................ 44

    a.   Agent Shute's Trial Testimony ......................................................... 45
    b.   Post-Trial Hearing Testimony of Defense Expert and
       Agent Shute ...................................................................................... 46
    c.   Defendant's Trial Counsel Was Not Ineffective In Failing to
       Retain A Cell Site Expert ................................................................. 47

6.   Trial Counsel for Defendant Was Not Ineffective in Failing to
Retain An Expert Witness on the Cause of Defendant's Ankle
Injury or to Offer Other Witnesses to Testify About the Injury .................. 49

    a.   Trial Counsel Made a Strategic Decision Not to Call Expert
       Witness Dr. Steven Cancell to Testify as to How Defendant
       Sustained His Ankle Injury ............................................................... 50
    b.   Trial Counsel Was Not Ineffective in Failing to Call Other
       Witnesses Who Would Have Testified About the Injury .................. 53

7.   Trial Counsel for Defendant Was Not Ineffective in Failing to
Excuse Juror Number 44 ............................................................................ 55

8.   Trial Counsel for Defendant Was Not Ineffective in Explaining to
Defendant His Right to Testify .................................................................... 69

    a.   Defendant's Right to Testify Was Adequately Explained ................. 69
    b.   Trial Counsel Did Not Misinform Defendant Regarding
       the Motion to Preclude Prior Testimony .......................................... 71
    c.   Defendant's Trial Counsel Exercised Reasonable Judgment
       in Advising Defendant Not To Testify .............................................. 73

9.   Defense Counsel's Decisions at Trial Do Not Rise to the Level of
Constitutionally Ineffective Assistance Under Strickland ........................... 75

V.  CONCLUSION .................................................................................................. 76

## I.        INTRODUCTION

Before the Court is the Motion for Judgment of Acquittal or for a New Trial of Defendant Joseph Meehan.[1]  (Doc. No. 189.)  On June 14, 2013, a jury convicted Defendant of various offenses, including interference with interstate commerce by robbery in violation of 18 U.S.C. § 1951(a) and 2 (Count I), attempted interference with interstate commerce by robbery in violation of 18 U.S.C. § 1951(a) and 2 (Count III), attempted carjacking in violation of 18 U.S.C. § 2119 (Count V), using and carrying a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1) (Counts II, IV, VI), attempted witness tampering in violation of 18 U.S.C. § 1512(b)(3) (Count VII), possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count VIII), and being a convicted felon in possession of ammunition in violation of 18 U.S.C. §§ 922(g)(1), 924(e), and 2 (Count IX).  The convictions stem from an armed robbery of drugs and cash from the Blue Grass Pharmacy located in Philadelphia, as well as an attempted robbery of drugs and cash from a CVS Pharmacy also located in Philadelphia.

---

[1]   Although Defendant styles the motion to include a request for a judgment of acquittal, his numerous attacks on his conviction do not challenge the sufficiency of the evidence to support the conviction on each count.  For this reason, the Court has concentrated in this Opinion on Defendant's arguments on why he should be afforded a new trial.

In any event, a defendant bears a heavy burden to prevail on a motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29.  See United States v. Haywood, 363 F.3d 200, 204 n.3 (3d Cir. 2004).  When considering a Rule 29 motion, a court must view the evidence and the reasonable inferences drawn therefrom in the light most favorable to the Government in order to determine whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt.  See United States v. Brodie, 403 F.3d 123, 133 (3d Cir. 2005); United States v. Gonzalez, 918 F.2d 1129, 1132 (3d Cir. 1990).  In determining the sufficiency of the evidence, the Court does not weigh the evidence or determine the credibility of witnesses.  Haywood, 363 F.3d at 204 n.3.

This Court presided over Defendant's trial and is well aware of the evidence presented by the Government against him.  The evidence was sufficient to sustain the jury's guilty verdict on each count and is described in this Opinion.

Defendant now argues that he should be granted a new trial because: (1) the Government withheld information from Defendant in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963) in regard to the testimony of a witness, Leah Sabatino; and (2) trial counsel was ineffective for ten different reasons.[2]   (<u>See</u> Doc. Nos. 189, 196, 224, 284, 292.)   The Government has filed responses to the Motion and to the subsequent filings by Defendant.  (Doc. Nos. 195, 233, 287.) For reasons that follow, the Court will deny Defendant's Motion for Judgment of Acquittal or for a New Trial.

## II.   BACKGROUND[3]

### A.  Events Leading to Defendant's Trial

On December 1, 2011, the Government filed a Second Superseding Indictment against Defendant Joseph Meehan and his co-defendant, Jonathan Andrews, charging them with crimes involving robbery of the Blue Grass Pharmacy on February 9, 2011 and attempted robbery of a CVS Pharmacy on February 14, 2011.  (Doc. No. 28.)  As noted, Defendant Meehan was charged with the following nine offenses:  interference with interstate commerce by robbery in violation of 18 U.S.C. § 1951(a) and 2 (Count I); attempted interference with interstate commerce by robbery in violation of 18 U.S.C. § 1951(a) and 2 (Count III); attempted carjacking in violation of 18 U.S.C. § 2119 (Count V); using and carrying a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1) (Counts II, IV, VI); attempted witness tampering in violation of 18 U.S.C. § 1512(b)(3) (Count VII); possession with intent to distribute controlled substances in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C), and 18 U.S.C. § 2 (Count VIII); and being a

---

[2]   Several of Defendant's ineffective assistance claims will be considered together.

[3]   The factual background is taken from the Second Superseding Indictment (Doc. No. 28), the trial transcripts (Doc. Nos. 177-186), the post-trial hearing transcripts (Doc. Nos. 243, 275-281), Defendant's Motion for Judgment of Acquittal or for a New Trial (Doc. No. 189), and subsequent responses and supplemental briefs by Defendant and the Government (Doc. Nos. 195, 196, 224, 233, 284, 287, 292).

convicted felon in possession of ammunition in violation of 18 U.S.C. §§ 922(g)(1), 924(e), and 2 (Count IX).  (Doc. Nos. 28, 163.)

Defendant was arrested on February 17, 2011 in Pennsauken, New Jersey.  Leah Sabatino, his girlfriend, was arrested along with him.  Ms. Sabatino subsequently entered a guilty plea on charges brought against her and agreed to cooperate with the Government against Defendant pursuant to a grant of immunity.  She testified before the grand jury and at Defendant's trial.  Meehan's co-defendant, Jonathan Andrews, pled guilty to Counts I, III, and IV of the Second Superseding Indictment on January 11, 2013, and also testified against Defendant at his trial.

### B.    The Trial

Defendant's jury trial began on June 4, 2013 and lasted nine days, concluding on June 14, 2013.  The evidence presented against Defendant was substantial.  The Government has summarized correctly the evidence presented at trial as follows:

> John Andrews testified that both he and the defendant robbed the Blue Grass pharmacy together on February 9, 2011 at 2:04 pm, (trans. 6.6.2013, p 73) and that he, the defendant and Randall ("Randy") Parsons robbed the CVS pharmacy together on February 14, 2011 at 8:30 pm.  The defendant approached Andrews to commit the Blue Grass robbery.  Andrews explained that at the time of the robberies, he was using drugs, and agreed to the robbery to get drugs.  Id. at 80.  The defendant had gone to the Blue Grass pharmacy to scope it out.  Andrews identified surveillance video of the defendant scoping out the Blue Grass pharmacy, in which the defendant was wearing Nike sneakers.  Id. at p. 81, lns 15-22.  The defendant told Andrews that this pharmacy was a good place to rob because it was small, with few customers.  Id. at p. 80.  Prior to the robbery, the men obtained guns.  Id. at 84.  They also made garments to mask their identity.  The defendant cut the sleeve of a tan shirt and wore it around his face.  Id. at p. 83, 1-11.  The men also stole a getaway car to escape from the robbery.  Id. at lns 14-17.  Mr. Andrews watched [a] surveillance video of the robbery and explained to the jury what he and the defendant were doing during the robbery.  Id. at 89-93.  He also pointed out that the defendant wore the same sneakers during the robbery that he wore when scoping out the pharmacy.  Id. at p. 91.
>
> A few days after the Blue Grass robbery, the defendant approached Andrews about robbing a CVS pharmacy.  He needed one last robbery to get the money he

needed to run away from parole.  Id. at p. 111, lns. 16-23.  Originally, the plan included the defendant, Andrews and a man named Tony.  Id. at p. 99.  However, after the stolen getaway car broke down on the morning of the robbery, the robbery was called off.  Id. at p. 100, 104, 106.  Andrews testified that later in the day, the defendant asked Randy Parsons to be the look-out for the robbery.  Id. at pp. 99, 109.  Parsons agreed, but required that he had a real gun. Andrews gave Parsons his gun.  (Id. at 114).  Meehan had the same gun he used in the Blue Grass robbery, and Andrews carried a BB gun.  Id.

While the jury saw surveillance video of the robbery, Andrews explained what each robber was doing.  He again pointed out that the defendant wore the same tan mask and Nike sneakers that he wore in the Blue Grass robbery.  Id. at 118.

Parsons fled the scene prior to police arriving.  Neither Andrews nor the defendant realized the police were in [the CVS pharmacy] until they attempted to leave through the front door and saw the police approaching.  Id. at 120.  Andrews and the defendant retreated to the pharmacy [area] and attempted to shoot their way through the drive through window.  Id.  They jumped out the window.  By this time, other police officers arrived.  Andrews and the defendant attempted to jump over a fence and flee down an alleyway.  Id. at 123.  The defendant shot at the police.  [Footnote 3: Officer Boccalupo testified that one of the robbers shot at him after the defendant jumped over the fence.  Trans. 6.7.2013 at p. 104.] [Defendant] was also shot in the foot by police.  The bullet did not penetrate the sneaker but it hurt his foot.  [Footnote 4:  A childhood friend, Nancy Quinn, testified that the day after the CVS robbery, February 15, 2011, the defendant came to her house.  Trans. 6.10.2013, at pp 73-74.  His foot was injured.  Id.  The defendant was limping.  Id. at 75.  Ms. Quinn gave the defendant crutches to help him with the pain in his foot.  Id. at 79.]  Id. at 143.  The men separated as they fled.  Andrews got in his car that was parked at the end of the alleyway and drove around to clear his head.  Id. at 126.  Later, [sic] Andrews talked to the defendant, who told him that after the CVS robbery, he hid in the bushes until Chuck Rhoads [came] and picked him up.  Id. at 141.

Various police officers testified about the CVS pharmacy robbery and the fact that shots were fired.  Richard Smith, a civilian witness, testified that a man, who was wearing the same clothing that the jury heard the robber wore during the CVS robbery, held a gun to [Mr.] Smith's head and demanded his car.[4]  See trans. 6.7.2013 at pp. 138-143.  After [Mr.] Smith refused, the defendant fled over a fence in the direction of Benson Street.

---

[4]   The driveway to Mr. Smith's house was adjacent to the CVS drive-thru window.  (Tr. 136:3-12, June 7, 2013.)  He testified that on the night of February 14, 2011, at around 8:35 p.m., he was backing out of his garage when a man approached him and told him to get out of his car.  (Tr. 136:13-137:6, June 7, 2013.)  He testified that the man was wearing a mask and was waving a gun at him.  (Tr. 138:14-24, June 7, 2013.)

Charles "Chuck" Rhoads found it so difficult to testify against his good friend Joseph Meehan that he broke down and sobbed during his testimony. <u>See</u> Trans. 6.7.2013, p. 170. Rhoads testified that he was very good friends with the Defendant, and friends with John Andrews and Randy Parsons. <u>See</u> Trans. 6.7.2013, p. 149. Rhoads lived very close to the CVS that the defendant, Andrews and Parsons robbed. Shortly after the defendant robbed the CVS, Mr. Rhoads called Andrews to ask where the defendant was. <u>Id.</u> at 156. Andrews responded that he thought that the defendant and Parsons "got caught." <u>Id.</u> In the early morning after the robbery, between 12:20 a.m. and 12:24 a.m., the defendant called Mr. Rhoads and asked him to pick him up [at] Benson Street, which is one block away from the CVS. <u>Id.</u> at pp. 157-159. The defendant "hopped" into Mr. Rhoads's car. <u>Id.</u> at 163. The defendant appeared to be "freezing," and mentioned that he was shot in the foot. <u>Id.</u> at 163, 169. The defendant told Mr. Rhoads that Parsons and Andrews "fucked up." <u>Id.</u> at 164. The defendant told Rhoads that he shot his way out of the CVS window and then jumped a fence. <u>Id.</u> at 165-66.

Leah Sabatino testified on June 11, 2013. She had originally been subpoenaed to testify on June 10, 2013. <u>See</u> Trans. 6.11.13 at p. 5. Although she came to the courthouse on June 10, 2013, Ms. Sabatino fled from the courthouse prior to testifying. <u>Id.</u> at pp. 5-6. The government contacted Ms. Sabatino's counsel, federal defender Felicia Sarner, for assistance in trying to locate Ms. Sabatino. The government called other witnesses out of order while FBI agents and Ms. Sarner searched for Ms. Sabatino. The government prepared a material witness warrant for the arrest of Ms. Sabatino, which was signed by the Court. Late in the afternoon, Ms. Sarner brought Ms. Sabatino back to the courthouse.

The Court and the parties discussed whether Ms. Sabatino should be held overnight in the Federal Detention Center. The government requested that Ms. Sabatino be detained because she fled from the courthouse. <u>See</u> 6.10.2013 trans., p. 225, lns. 23-25. Ms. Sabatino's counsel argued against detention reasoning that Ms. Sabatino was simply scared. <u>Id.</u> at pp. 227-228. Ms. Sarner explained that she discussed the ramifications of failing to appear in court with Ms. Sabatino and attested that Ms. Sabatino could be trusted to show up to trial the next day. <u>Id.</u> at p. 228. The government requested that if Ms. Sabatino were permitted to leave the courthouse, that the Court place Ms. Sabatino under oath and administer warnings to her about the repercussions of failing to appear in court the following day. <u>Id.</u> pp. 225, lns. 22-25, 226, lns. 1-11. The Court gave Ms. Sabatino such warnings and permitted her to leave that afternoon. Both attorneys for the defense remained silent as to whether Ms. Sabatino should have been held in custody overnight. <u>Id.</u> at pp. 223-225. At no point did defense counsel suggest that Ms. Sabatino be detained pending her testimony.

The following day, Ms. Sabatino was driven to the courthouse by FBI agents who were not involved in the case. Neither the government attorneys, nor Special

Agent Coyle, the case agent, had any communication with Ms. Sabatino prior to her testimony.  Id. at p. 100, lns. 14-23.

Ms. Sabatino told the jury that as of the day she testified, she continued to view Mr. Meehan as her "superman" because he had tried to help her detoxify from her heroin addiction when they dated in January 2011.  Ms. Sabatino told the jury that she still had deep feelings for the defendant, who treated her like a princess.  See 6.11.13, trans., p. 71.  She explained that she fled the courthouse the day prior because she was scared and nervous.  See 6.11.13, trans., p. 6.  Ms. Sabatino testified that she felt like "I'm putting [Meehan] away for the rest of his life" by testifying in court.  Id.

Prior to any testimony about Mr. Meehan's crimes, Ms. Sabatino told the jury that she had battled a drug addiction for 17 years and that despite completing detox programs, she recently relapsed.  She told the jury that she had relapsed into heroin, crack cocaine and marijuana use.  Id.  Ms. Sabatino then admitted that she had used a bag of heroin that morning prior to her testimony.  Id. at p. 7.  Prior to that point, the government had no knowledge that Ms. Sabatino had used drugs that morning.  The defendant did not object at any point to Ms. Sabatino's drug use or mental state.  Id.  The government asked competency questions.  Id.  Ms. Sabatino explained that she could understand the government's questions.  Id.  She also explained to the jury what would happen to her if she did not take heroin, that is, she would become "dope sick."  Id.  Ms. Sabatino explained that when she is in drug withdrawal, she cannot concentrate or focus and experiences great physical pain.  Id.

On direct, Ms. Sabatino testified, among other things, (1) that the defendant told her about committing the Blue Grass and CVS pharmacy robberies; (2) that she saw Mr. Meehan's gun that he kept in his bag full of prescription pills; (3) in her journal entry that was admitted into evidence, she wrote on the night of the CVS robbery about her fears of the defendant being arrested or killed after she saw on the news that there had been a police shoot-out at the CVS during the robbery; (4) she was arrested at the Riviera motel with the defendant;[5] (5) the defendant had a large duffle bag of stolen prescription pills that was recovered from the motel room and identified in Court by Ms. Sabatino; and (6) about the various letters that the defendant wrote her from prison, in which he asked Ms. Sabatino to tell police that the pills were hers so that the defendant could avoid a lengthy jail sentence.

On cross-examination by Meehan's counsel, Ms. Sabatino explained that when using heroin "you become physically dependent on it . . . if you don't have heroin in your system you can't do anything, you're practically like dead to the world. You're willing to do anything and everything to get it.  Like I never would have thought that I would be standing on the corner, selling myself for drug money or

---

[5]   The Riviera Motel is located in Pennsauken, New Jersey.

just for drugs, and that's what it does." <u>Id.</u> at 73.  During Ms. Sabatino's cross, defense counsel also elicited testimony that drugs make people "do irrational things," potentially "black out" from an overdose, and create major problems within a family.  <u>Id.</u> at 76-77.  Ms. Sabatino explained that although she has a daughter, whom she loved "more that my life itself," she still could not stop using drugs.  <u>Id.</u> at 77-79.  She moved out of the house, rather than expose her daughter to her drug use.  <u>Id.</u>

Ms. Sabatino admitted that at the time that she dated Mr. Meehan, during which he committed pharmacy robberies, she smoked crack, took heroin and eventually attempted to come off of heroin by using methadone that Mr. Meehan provided.  <u>Id.</u> at pp. 84-85.  She admitted that taking drugs can sometimes affect one's memory.  <u>Id.</u> at 86, lns 1-5.

Defense counsel questioned Ms. Sabatino about whether she spoke with FBI agents either the day she fled from court or the day she testified.  <u>Id.</u> at p. 100, lns. 14-23.  She explained that she did not.  <u>Id.</u>  Ms. Sabatino testified that during the investigation of Mr. Meehan, she had she met with the prosecutors twice.  <u>Id.</u> at 7-11.

After lengthy questioning, Ms. Sabatino asked for a break to speak with her attorney.  <u>Id.</u> p. 106, lns. 18-25.  The parties and the Court thought that she may have been getting sick from lack of drugs in her system.  <u>Id.</u> at pp. 107-108. When discussing whether to allow Ms. Sabatino a break, defense counsel voiced the opinion that the jury should see the "anguish" of drug withdrawal if, in fact, that is why she was taking a break.  <u>Id.</u>, at p. 108, lns 6-14.  When Ms. Sabatino returned to the stand, however, she explained that she needed a break only because she was "angry" at defense counsel's questions.  <u>Id.</u> at p. 111, lns 1-14.

Before the jury returned, defense counsel told the Court that he had 15-20 minutes of questioning left.  <u>Id.</u> at 107, lns 3-11.  When the jury returned, defense counsel continued to question Ms. Sabatino about her addiction and the effects of withdrawal.    She explained why she relapsed after completing her drug rehabilitation program.  <u>Id.</u> at 114.  The jury then heard the following testimony about the torment of drug addiction and drug withdrawal:

> Q:  Explain to the –explain to the jury why –why can't you just say, that's enough, I'm not doing it anymore. I want to go back and be with my daughter. Why doesn't that work?
>
> A:  Because I give up to easily and I don't want to live.
>
> Q:  What happens if you try and quit cold shoulder [sic]?
>
> A:  I couldn't.

Q:  Have you tried to quit?

A:  Yes.

Q:  And what happens?

A:  I couldn't deal with the pain.

Q:  Well, I don't mean like why would you do it again, but what are the symptoms –you go through withdrawal, correct?

A:  Yeah.

Q:  Tell the jury what that's like, what the symptoms are.

A:  It's like having contractions but worse, having like an alien inside you. You just feel like you're dying and the only way to get rid of it is to die or get high."

Id. at p. 114, lns. 7-257.

Defense counsel continued to question Ms. Sabatino about how drugs affect her memory.  Defense counsel also asked questions about Ms. Sabatino's knowledge of John Andrews and about the letters exchanged between Ms. Sabatino and the defendant.  After this lengthy questioning, the Court suggested a lunch break.  Id. at p. 127, lns. 7-16.  At sidebar, the government stated: "With all due respect, your Honor, earlier Counsel said he had about 15 minutes left.  She said that she wasn't having physical issues, but we do know that she's a heroin addict.  I know that Mr. Shapiro[6] put on the record that he'd like the jury to see her if she has any ill effects.  If they're prolonging cross to see if she has ill effects, then that's really not appropriate."  Id. at p. 128, lns. 18-24.  Defense counsel explained that he had about ten minutes of questioning left.  Id. at lns. 22-25.  The Court then proposed that defense counsel would continue with Ms. Sabatino, followed by a lunch break.  Id. at p. 129, lns. 4-5.  Defense counsel did not object to the Court's proposal.

Later in the trial, the government called Detective William Wheeler of the Pennsauken Township Police Department, who testified that he participated in the search of the defendant's motel room at the Riviera motel.  Trans. 6.6.2013, p. 149, lns 10-20.  Detective Wheeler testified about the evidence recovered from the defendant's motel room, including: thousands of white pills in a plastic bag, (p. 154, lns 13-17), a yellow, plastic bag containing "the most amount of pills [Detective Wheeler has] ever seen" since being an officer.  Id. at p. 157, lns 1-9.

---

[6]  David Shapiro, Esquire, was trial counsel for Defendant.  He was assisted by his co-counsel, Michael Shapiro, Esquire.

He also testified about recovering Ms. Sabatino's notebook (Id. at 159, lns 17-18), and drug ledgers (Id. at 162).

The government called Scott Davis, a narcotics expert and drug diversion investigator with the Drug Enforcement Agency (DEA). He testified that the quantities and types of drugs found in the defendant's motel room were consistent with distribution. Trans. 6.6.2013, pp. 190-02, 196-197. This opinion was bolstered by the fact that the defendant kept drug ledgers near the pills, which itemized the sales made to various customers of the defendant. Trans. 6.6.2013. pp. 192, lns. 4-25, 193-94.

[F.B.I.] Case Agent John Coyle testified about various aspects of the case. He explained that the defendant gave what was proven to be a false alibi when arrested at the Riviera motel. The defendant told Agent Coyle that on February 14, 2011, he spent a romantic day with Ms. Sabatino at an abandoned apartment on Hegerman Street from noon until midnight, after which he went to his ex-wife's place at 4922 Longshore Avenue. See, trans. 6.10.2013, 185, lns. 2-13. The alibi was proven false by the cell site analysis conducted by William Shute, who is an expert in cell site technology (Special Agent Shute also testified). [Footnote 9: Agent Shute testified as an expert in cell site technology. His testimony included explaining on what cell phone tower locations various, relevant cell phones were registering before, during and after the robberies.] Using the cell site information, the jury could see that the defendant was geographically nowhere near where the defendant claimed he was during the day and night of the CVS robbery. Id. 185-86. Agent Coyle also testified that the phone records showed "quite a bit of contacts and attempted contacts with Randy Parsons, with Jonathan Andrews, with Chuck Rhoads and some other witnesses." Id. at 186.

On cross-examination, Agent Coyle testified that Leah Sabatino's drug addiction was "baggage" in terms of her credibility. See 6.12.2013, p. 32, lns 15-25. Agent Coyle explained that addicts can be craving their next "fix" of drugs, but still be lucid and coherent and able to answer questions. Id. at p. 33, lns 9-14. He also explained that when a person is highly intoxicated on a drug it can interfere with his or her ability to be lucid and coherent. Id. at lns 15-16. Agent Coyle echoed Ms. Sabatino's testimony (and, later the jury instructions) when he testified that "any kind of intoxicant can affect a person's ability to recall events, to answer questions, to understand the questions that they're being asked and these are all consideration that you should bear in mind when you're dealing with a person with an addiction." Id. at p. 34, lns 7-11.

Moreover, Agent Coyle explained to the jury what Ms. Sabatino's demeanor was like during various phases of intoxication and when he saw her dope sick on a prior occasion. Id. at pp. 36-37. Defense counsel asked questions about Ms. Sabatino fleeing from the court house, and brought to light the fact that the

government originally requested the Court to hold Ms. Sabatino in custody overnight.  Id. at pp 39-40.

Agent Coyle explained that neither he nor any FBI agent had knowledge about when or where Ms. Sabatino took the heroin prior to trial.  Id. at 43.  Agent Coyle also testified that the Government first knew about Ms. Sabatino using heroin when Ms. Sabatino testified that she used heroin that morning.  Id. at 43-44.

Agent Coyle and several other witnesses gave testimony in which they matched the names, and strengths of pills and drug patches found in the defendant's motel room with the names and strengths of pills and patches that were reported stolen from the Blue Grass pharmacy robbery.[7]

After both parties rested, the Court charged the jury.  Not only was the jury given the routine instructions about witness credibility, but the Court also instructed the

---

[7]  Daniel Ginecki, a pharmacist at the Blue Grass Pharmacy, testified that he completed a DEA-106 form to report the drugs that were stolen on February 9, 2011.  (Tr. 25:15-26:21, June 6, 2013.)  Mr. Ginecki compared the stolen drugs on the DEA-106 to drugs shown in photographs introduced by the Government that were recovered at the Riviera Motel when Defendant was arrested.  (See Tr. 25:38, June 6, 2013.)

Mr. Ginecki was shown a photograph of tablets of Hydromorphone (generic for Dilaudid), 4 milligrams, and testified that the DEA-106 form listed 87 tablets of Hydromorphone, 4 milligrams, stolen from the Pharmacy.  (Tr. 27:3-28:2, June 6, 2013.)  He was shown a photograph of 30 tablets of Roxicodone (a.k.a. Oxycodone), 5 milligrams, and testified that the DEA-106 form listed 30 5-milligram tablets of Roxicodone were stolen from the Pharmacy.  (Tr. 28:4-29:11, June 6, 2013.)  He was shown a photograph of 209 2-milligram tablets of Hydromorphone, and testified that 210 2-milligram tablets of Hyromorphone were stolen from the Pharmacy.  (Tr. 29:17-31:1, June 6, 2013.)  He was shown a photograph of packaging for the drug Fentanyl, 12 micrograms per hour strength, National Drug Code (NDC) number 0781724055, and testified that 12 microgram patches of Fentanyl with the same NDC number were stolen from the Pharmacy.  (Tr. 33:1-35:10, June 6, 2013.)  Similarly, photographs of (1) Fentanyl, 25 micrograms, NDC number 0781724155, and (2) Fentanyl, 50 micrograms, NDC number 0781724255, were introduced, and Mr. Ginecki testified that the same types of Fentanyl were listed on the DEA-106 form as having been stolen from the Pharmacy.  (Tr. 35:11-38:12, June 6, 2013.)  Finally, Mr. Ginecki testified that methadone, a pain killer used to ease addictive issues coming off heroin, was also stolen from the Pharmacy.  (Tr. 42:17-43:21, June 6, 2013.)

Agent Coyle also testified that some of the drugs that were found in the Riviera Motel matched drugs that were stolen from the Blue Grass Pharmacy, as indicated on the DEA-106 form.  (Tr. 60:16-61:15, June 12, 2013.)  No drugs were taken from the CVS pharmacy during the attempted robbery on February 14, 2011, which was aborted due to police presence in the store.  (Tr. 124:5-18, June 6, 2013.)  As noted, Defendant and Andrews fled through the drive-thru window.

jury that: "Evidence was introduced during the trial that witnesses were using drugs, or addicted to drugs, or using alcohol when the events took place.  There is nothing improper about calling such a witness to testify about events within his or her personal knowledge.  On the other hand, his or her testimony must be considered with care and caution.  The testimony of a witness who uses drugs, [is] addicted to drugs or using alcohol may be less believable because of the effect the drugs or alcohol may have on his ability to perceive, remember or relate the events in question."  Trans. 6.13.2013, p. 22, lns. 16-25.  The defendant did not object to this charge.

After the Court finished the jury instructions, defense counsel asked the Court to also charge the jury about the credibility of a witness who testified while under the influence of drugs or alcohol.  Accordingly, the Court instructed as follows: "You may recall I said that in deciding what to believe you may consider a number of factors, and I listed the factors, and I want to add this factor: You can consider whether the witness was under the influence of an addictive drug during his or her testimony.  In addition, when I charged you on the credibility of an addict or substance abuser, I want you to consider also the following instruction: The testimony of a witness who admits to having taken drugs just prior to his or her testimony may be less believable because of the effect addictive drugs may have on his or her ability to perceive, remember or relate events in question or the witness's appearance, behavior or manner while testifying." See Id. at p. 65, lns 2-14.  The defendant did not object to this charge.

(Doc. No. 195 at 3-14 (footnotes omitted).)

The defense's position at trial was that Defendant did not commit any of the offenses charged.  (Doc. No. 189 at 6.)  At trial, defense counsel argued, in part, that the individuals who testified lied in order to frame Defendant, to protect themselves and their family and to make the best deal they could with the Government in their own criminal cases.  The following are excerpts from defense counsel's closing argument:

. . . You have to figure out if there was reasonable doubt as the conscience of the community, what kind of system do you want?  Do you want a system in which, not then, but the criminals figure what they want to hear and they give back a story.  Because that's what happened here.  That's what happened here.  Jon Andrews knew by 9:30, at the latest, he was in deep trouble. . . . And he knew that he was going to take a hit and he had to figure out what's the best way to lessen that hit?  When I say he knew he was going to take a hit, he knew he was going to do some time. . . . So, real fast, he concocted a scheme and that was to put it on

Joe.[8] Joe was a good target.  He's easy.  A sophisticated criminal knows, a man with his background, that's exactly what they want.  Spent a good number of years in jail.  He's a parole violator now.  He's going back to jail no matter what happens and he's going back for a long time.  I think it was Andrews said something about 12 years.  So, Joe was a good target. . . .

. . .

. . . It's not whether it's true or not, it's what part of Andrews' -- what part of Chuckie Rhodes [sic] and what part of Leah's testimony are you not comfortable with?  And let me be specific.  When I say testimony, testimony not only includes the explanations, blaming Joe or putting it on Joe, it's the I don't knows and I don't remember.  It's real convenient.  It's real convenient and think about it.  Is I don't remember, so convenient, because they're trying to curry favor. . . .

. . .

. . . But what it is that motivates, what is it that motivates people?  Think about it.  Think about your own life experiences.  It's that personal stuff.  It's the inability to take care of your children.  It is the inability to be able to affect the lives of your family. . . . A guy like Jon Andrews, Chuckie Rhodes [sic] had been down long enough that he knows how little his life means.  How his life, this is what goes on in prison and how to make the best of it.  That, ladies and gentlemen, is probably something that you never thought about when you thought about the criminal justice system and that's how people play it.  Those are the things that end up motivating them, those that cooperate, because life has become just prison. . . .

. . .

You have the right to see the real Leah Sabatino.  . . . You have the right to weigh her credibility as to what it is that she said.  . . . You have to decide whether she should have been in here without heroin, without a bag of heroin before she testified.  That's indicative of the case. . . . If the evidence is so strong, if the evidence is so strong, why?   Why did that happen?  Was it to get her and make sure she was in good shape to testify?  I don't blame her one iota.  Not one iota.  She's fighting for her life, she's fighting not to go to jail, she's fighting to keep them on her side.  . . .

(Doc. No. 184, Tr. 151:4-152:6, 155:2-10, 161:19-162:9, 166:19-167:15, June 12, 2013.)

At the close of the Government's case, Defendant waived his right to testify in a colloquy

conducted by his counsel.  Following closing arguments and before the jury was instructed on

---

[8]  "Joe" is Defendant Joseph Meehan.

the law, Defendant stated that he wanted to testify.  He said that his lawyer, Michael Shapiro, Esquire, told him that a pending motion to preclude prior testimony, which he gave in a civil case was denied when that was not accurate.[9]  The Court then reviewed the colloquy and found that Defendant's decision not to testify was knowing and voluntary, and that it would be inappropriate for Defendant to testify after the close of evidence and closing arguments.  (Doc. No. 185 at 10:9-11:25.)  Next, the Court charged the jury on the law, which included instructions regarding witness credibility and the effect of drug use on witness testimony.

After the nine-day trial, on June 14, 2013, the jury convicted Defendant on all Counts. (Doc. No. 163.)

### C.     Post-Trial Procedural History

On November 18, 2013, while still represented by trial counsel, David Shapiro, Esquire, and Michael Shapiro, Esquire, Defendant filed the Motion for Judgment of Acquittal or for a New Trial.  (Doc. No. 189.)  On April 4, 2014, the Government filed a Response.  (Doc. No. 195.)  On April 25, 2014, Defendant filed a Memorandum in Support of the Motion for Judgment of Acquittal or for a New Trial.  (Doc. No. 196.)  Thereafter, at the request of Defendant, who now was having a conflict with his trial counsel, the Court held a hearing on September 2, 2014. (Doc. Nos. 213, 215.)  At the hearing, the Court determined that irreconcilable differences existed between Defendant and his two counsel, and found that the interest of justice should permit withdrawal by defense counsel.  Defense counsel subsequently filed a Motion to Withdraw as Attorney, which the Court granted.  (Doc. Nos. 218, 219.)  On September 5, 2014, Defendant's present counsel, J. Michael Farrell, Esquire, was appointed by the Court to represent Defendant Meehan.  (Doc. No. 217.)

---

[9]  At the post-trial hearing, Michael Shapiro, Esquire, testified that he did not tell Defendant that the motion was denied.  The Court credits this testimony over that of the Defendant.

15

On February 20, 2015, Defendant filed a Memorandum in Reply to Government's Response, in which Defendant raised new claims that his trial counsel was ineffective. (Doc. No. 224.)  On June 2, 2015, the Government filed a Reply to Defendant's Motion for a New Trial. (Doc. No. 233.)  The Court held hearings on the Motion for Acquittal or for a New Trial on June 15, 2015, April 6, April 7, April 18, and April 19, 2016.[10]  (Doc. Nos. 243, 275-281.)

At the post-trial hearing, Defendant's trial counsel, David Shapiro, Esquire, and Michael Shapiro, Esquire, testified.   Additionally, Defendant retained the following individuals who offered expert opinion testimony at the hearing to support the ineffective assistance of counsel claims:  (1) Dr. Steven Cancell testified about his treatment of Defendant's foot injury, which the Government asserted was the result of Defendant being shot in the foot escaping from police after the CVS robbery; (2) Dr. Kenneth Weiss testified about the effects of long term, chronic, and contemporaneous abuse of narcotics, including heroin, crack cocaine, Xanax, and methadone on the ability of Government witness Leah Sabatino to perceive, to form memories, and to testify about events in an accurate manner; and (3) Joseph Kennedy testified about cell-site locations to refute Agent Shute's testimony on the same subject.  In response, the Government called Agent Shute to counter the testimony of Joseph Kennedy.  Finally, Agent Coyle testified once again.

Following the hearings, on May 27, 2016, Defendant filed a Memorandum of Law in Supplement to Defendant's Previous Filings in Support of Motion for a New Trial.  (Doc. No. 284.)  The Government filed Proposed Findings of Fact and Conclusions of Law on June 17, 2016.  (Doc. No. 287.)  Defendant filed a Memorandum of Law in Reply to the Government's Proposed Findings of Fact and Conclusions of Law on June 28, 2016.  (Doc. No. 292.)  The

---

[10]  The hearings began on June 15, 2015.  They were postponed, in part, due to the medical needs of one of Defendant's trial counsel.

defense post-trial motion is now ripe for a decision by the Court.  For reasons that follow, Defendant's Motion will be denied.

## III.    STANDARD OF REVIEW

Under Federal Rule of Criminal Procedure 33, a court may vacate a criminal judgment and grant a new trial "if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  "Unlike an insufficiency of the evidence claim, when a district court evaluates a Rule 33 motion it does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case."  United States v. Johnson, 302 F.3d 139, 150 (3d Cir. 2002) (citing United States v. Lacey, 219 F.3d 779, 783-84 (8th Cir. 2000); United States v. Ashworth, 836 F.2d 260, 266 (6th Cir. 1988)).  A court may "order a new trial only if it believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted. . . . Such motions are not favored and should be granted sparingly and only in exceptional cases."   United States v. Silveus, 542 F.3d 993, 1004-05 (3d Cir. 2008) (citing Johnson, 302 F.3d at 150; Gov't of Virgin Islands v. Derricks, 810 F.2d 50, 55 (3d Cir. 1987) (internal citations omitted)).

## IV.    ANALYSIS

As noted previously, in his Motion and in subsequent filings, Defendant raises a number of arguments, including that: (1) the Government withheld information from Defendant in violation of Brady v. Maryland, 373 U.S. 83 (1963), in regard to the testimony of Leah Sabatino; and (2) trial counsel was ineffective for ten different reasons.  (See Doc. Nos. 189, 196, 224, 284.)  The Court will discuss each claim seriatim.

### A.  Brady Claims and Leah Sabatino's Testimony

Defendant first argues that the manner in which the Government handled witness Leah Sabatino regarding her drug addiction violated Brady and the Due Process clause of the Fifth

Amendment.[11]   Defendant asserts that the Government knew or had reason to know that Ms. Sabatino would testify at trial while high on heroin.   Defendant essentially argues that Agent Coyle had a deeper knowledge of Ms. Sabatino's drug addiction than the Government revealed to defense counsel prior to and during trial.   Defendant contends that the Government's disclosure regarding her drug use was untimely and incomplete, in that the Government failed to disclose the degree of her drug addiction, in particular, that she used heroin on a daily basis. Defendant argues that it therefore benefited the Government to allow Ms. Sabatino to take drugs before testifying and to time her testimony to occur in the morning before the heroin wore off, because she would not appear to be "dope sick" before the jury.   Defendant also asserts that this sequence of events deprived the jury of the opportunity to accurately assess Ms. Sabatino's credibility, whose testimony was critical to support the Government's case on several counts of the indictment.   More specifically, Defendant claims that her testimony was necessary to find Defendant guilty on all Counts, and was the only evidence to support Count VII, which charged attempted witness tampering.   Finally, Defendant argues that the late disclosure of Ms.

---

[11] In trial counsel's initial Memoranda of Law (Doc. Nos. 189, 196) in support of the post-trial Motion, numerous arguments are made, including, but not limited to the following: (a) the Government's failure to timely disclose that Sabatino was testifying while high on heroin interfered with Defendant's Sixth Amendment right to effective representation because counsel was unfairly deprived of the ability to timely consult with Defendant regarding how to strategically respond to Sabatino's admission that she was testifying while high; (b) the Government's failure to disclose the extent of its knowledge concerning the reasonable probability that Sabatino could be high on heroin when she testified which artificially and improperly bolstered Sabatino's credibility, violating Defendant's due process rights, making the trial unfair, and leaving the verdict unworthy of confidence; (c) Government witness Leah Sabatino's use of heroin impeded Defendant's Sixth Amendment right to cross-examine her; (d) the Government's failure to respond to the Court's questions during the hearing to enforce the material witness warrant "infected the trial with unfairness"; and (e) Defendant's due process rights were violated by the Government's prosecutorial misconduct.   Defendant's current counsel focuses on the alleged Brady violation raised in the initial filings.   The Due Process violation asserted is that Defendant was deprived of a fair trial, and this right was violated by the Brady violation.   The Court has considered all of these arguments of trial counsel and current defense counsel.   They are discussed infra and are without merit.

Sabatino's relapse deprived trial counsel of time to adequately prepare for cross-examination and to consider retaining an expert on the effects of drug use.

Pursuant to Brady v. Maryland, 373 U.S. 83 (1963), and its progeny, the Government must disclose evidence that is favorable to the accused and material to either guilt or punishment. Brady, 373 U.S. at 87 ("the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."). The duty applies even when there is no request. United States v. Agurs, 427 U.S. 97, 107 (1976). "Impeachment evidence" as well as "exculpatory evidence, falls within the Brady rule." U.S. v. Bagley, 473 U.S. 667, 676 (1985) (citing Giglio v. United States, 405 U.S. 150, 154 (1972)). "Evidence favorable to the accused" is such that "if disclosed and used effectively, it may make the difference between conviction and acquittal." Id. Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id. at 682. The Government also has a duty to learn of and disclose "any favorable evidence known to the others acting on the government's behalf in the case, including the police." Kyles v. Whitley, 514 U.S. 419, 437 (1995).

"To establish a Brady violation, it must be shown that 1) evidence was suppressed; 2) the evidence was favorable to the defense; and 3) the evidence was material to guilt or punishment." United States v. Risha, 445 F.3d 298, 303 (3d Cir. 2006) (citing United States v. Pelullo, 299 F.3d 197, 209 (3d Cir. 2005)). In other words, "[t]here are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State,

either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999).

Here, no evidence was suppressed. The Government produced the F.B.I. 302 reports of interviews with Leah Sabatino to defense counsel prior to trial. These reports described her drug addiction. For example, as of February 17, 2011, the first time the Government interviewed Ms. Sabatino, Agent Coyle documented that, "SABATINO has been using illegal drugs, including crack cocaine, for several years. For the past two years, SABATINO has been addicted to heroin." (Ex. G395 (FBI 302). In a later 302 report of interviews, recording a September 1, 2011 interview with Ms. Sabatino, Agent Coyle documented, "At age 14, SABATINO was struck by a car and suffered a severe injury to her knee. For her pain, doctors prescribed, Percocet and Dilaudid pain-killers. SABATINO developed a dependency on the drugs, and supplemented the pills prescribed by doctors with pills she bought on the street. SABATINO eventually began using illegal drugs, including marijuana, cocaine, and heroin. By the summer of 2010, SABATINO was a heroin addict." (Ex. D-21.)

Moreover, an F.B.I 302 report of a May 2013 interview with Ms. Sabatino further noted that her drug addiction was serious. (Ex. G366.) The report included the following paragraph:

> SABATINO continued to struggle with her addiction to illegal drugs. SABATINO is using heroin on a daily basis. She takes the drug once when she gets up and once before bed to help her feel "normal." SABATINO knows she needs to check herself into a detox facility, in order to deal with the inevitable physical sickness she will experience when she stops taking the drug.

(Ex. G366.) At the post-trial hearing, trial counsel Michael Shapiro testified that he received this document prior to trial.[12]   (Tr. 112:2-116:25, Apr. 18, 2016.)

---

[12] Michael Shapiro attempted to recant this testimony the next day, with the Defendant strongly contending that the defense never received the F.B.I. 302 report from May 2013 until April 2016. (See Doc. No. 292 at 4-11.) Agent Coyle testified that Mr. Shapiro received the F.B.I.

In addition, the Government sent an email to defense counsel on June 7, 2013, before Leah Sabatino testified, advising that she had relapsed, stating: "Finally, Leah Sabbatino [sic] told us in pre-trial preparation that she has started using heroin again, after her sponsor died.  We instructed her to tell the truth about her heroin use if she is asked about it, and encouraged her to go into a rehab program."  (Ex. D-16.)

There is no evidence that the Government knew that Ms. Sabatino would appear in Court to testify high on heroin.   Rather, the Government learned during her testimony that Ms. Sabatino had used heroin the morning of her court appearance.  In any event, at trial, this was confirmed by Agent Coyle, who testified that "neither he nor any FBI agent had knowledge about when or where Ms. Sabatino took the heroin prior to trial."  (Doc. No. 195 at 13 citing Tr. 43:1-44:25, June 12, 2013.)  In addition, Agent Coyle testified that the Government first knew about Ms. Sabatino using heroin when Ms. Sabatino testified that she had used heroin that morning.  Ms. Sabatino testified in response to the Government's questions:

Q  Ms. Sabatino, have you battled a drug addiction for some portion of your life?

A  Yes, I have.

Q  About how long have you had different addictions to drugs?

A  For the past 17 years.

Q  Are you currently battling a drug addiction?

A  Yes, I've currently relapsed.

Q  And what are you using currently?

A  Heroin, crack cocaine and marijuana.

Q  Have you gone to any – gone through any detox programs before?

---

302 report prior to trial and acknowledged receipt.  (Tr., 47:4-20, Apr. 19, 2016.)  Agent Coyle's testimony was credible on this point.

A Last year I was on the Net, the methadone program, and while I was incarcerated in Camden County in 2011, and last year I was in the Second Chance Program, which is part of Genesis.

Q But you have since relapsed?

A Yes, ma'am, I have.

Q Did you use any heroin this morning?

A Yes, I used one bag this morning.

Q Okay. And when you use heroin as recently as this morning, does affect your ability to understand my questions?

A Not at all.

Q What happens – can you explain to the jury that when you're addicted to heroin, what happens if you don't use heroin –

A I would be –

Q  – without – let me say this – without being on methadone or something else?

A I become really sick, like I get pains and stuff and I can't stay out of the bathroom. I wouldn't be able to concentrate and I wouldn't be able to focus everything, like I would just be more concerned about being sick and trying to get well.

Q Can you explain to the jury what it means to be dope sick?

A Withdrawal from heroin.

Q So if you don't take it – so in order for you to feel normal, right now you have to take the heroin –

A Yes.

(Doc. No. 183, Tr. 6:8-7:23, June 11, 2013.)

Defendant and his trial counsel knew beforehand that Ms. Sabatino had a drug addiction.

They knew, therefore, that it was possible that Ms. Sabatino would use drugs before she testified.

The credible evidence shows that the Government was not privy to any confidential information not disclosed to the defense that Ms. Sabatino would use drugs before she testified.

The evidence does not show that Ms. Sabatino had a "plan" to take heroin to improve her demeanor at trial and that the Government knew or supported this plan. Moreover, Agent Coyle's testimony that Ms. Sabatino would be "a mess" without heroin while testifying was well known to defense counsel as well.

Michael Shapiro testified at the post-trial hearing: "that once an addict, and if in fact [Ms. Sabatino] had returned to using, that it was a reasonable inference that she was using on a daily basis." He admitted that he knew before trial, "from the 302s, [and] the reports of Agent Coyle that Ms. Sabatino was a very severe drug addict," knew "from Mr. Meehan, who was Ms. Sabatino's boyfriend, that she was a very severe addict," and was "made aware that Ms. Sabatino's addiction was still very serious in the days before trial." (Tr. 111:2-10, 113:23-24, 24:1-7, Apr. 19, 2016.) He further admitted that his cross-examination elicited testimony that "made the jury fully aware that she was and has been a serious addict at all times relevant to the investigation and even through the trial." (Tr. 116:23-25, Apr. 19, 2016.) Therefore, the defense was in possession of the same information regarding Ms. Sabatino's drug use as the Government when she arrived to testify at trial.

Defendant has failed to show that evidence was withheld regarding Ms. Sabatino's addiction, and has failed to show a "reasonable probability" that, had any additional evidence been disclosed or had information been shared earlier, the result of the proceeding would have been different. For these reasons, there was no Brady violation in regard to Leah Sabatino's heroin addiction about which she was extensively cross-examined.

**B.  Ineffective Assistance of Counsel Claims**

With regard to claims of ineffective assistance of counsel, Defendant argues initially that "the entire manner in which counsel represented the defendant was constitutionally ineffective and, as a result, there can be no confidence in the outcome of the trial and the verdict of the jury" (Doc. No. 224 at 8), and then asserts his individual claims.  But in order to prove his trial counsel was ineffective, Defendant must show that, under <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), counsel's performance was unreasonable under prevailing professional standards and that this performance prejudiced his case.  Accordingly, the Court will analyze Defendant's arguments under the <u>Strickland</u> standards as more fully discussed below.

**1.  Ineffective Assistance of Counsel Claims Are Assessed Under the <u>Strickland</u> Standard**

In evaluating a defendant's claims of ineffective assistance of counsel in violation of the Sixth Amendment, the Court must consider the two-prong test enunciated by the Supreme Court in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  Under this test, trial counsel is presumed to have acted reasonably and effectively unless Defendant can show that: (1) trial counsel's "representation fell below an objective standard of reasonableness[;]" and (2) there was a "reasonable probability that, but for [trial counsel's] unprofessional errors, the result of the proceeding would have been different."  <u>Id.</u> at 687-88, 694.  "Judicial scrutiny of counsel's performance must be highly deferential . . . [and] a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]"  <u>Id.</u> at 689.

Under the first prong, Defendant must show that defense counsel fell short of "reasonably effective assistance" by overcoming the presumption that defense counsel's decisions were "sound trial strategy."  <u>Id.</u> at 686.  The appropriate measure of attorney performance is reasonableness under prevailing professional norms.  <u>Id.</u>  In other words, counsel's

representation must fall below an objective standard of reasonableness.  Hale v. Gibson, 227 F.3d 1298, 1319 (10th Cir. 2000).  There is a strong presumption that counsel rendered adequate assistance and that all significant decisions were made while exercising reasonable professional judgment.  Strickland, 466 U.S. at 686.  "'[T]he Constitution guarantees criminal defendants only a fair trial and a competent attorney.  It does not insure that defense counsel will recognize and raise every conceivable constitutional claim.'"  United States v. Travillion, 759 F.3d 281, 289 (3d Cir. 2014).  Indeed, the Court "must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance."  Id.  The Third Circuit further summarized this requirement as follows:

> In short, Strickland directs that "[j]udicial scrutiny of counsel's performance must be highly deferential" and every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."
>
> . . .
>
> . . . As the Supreme Court has reiterated, "[s]urmounting Strickland's high bar is never an easy task."  Because an ineffective assistance-of-counsel claim can "function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial [or in pretrial proceedings]," courts must apply the Strickland standard "with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve."

Id. (citations omitted).

Under the second prong, Defendant must show prejudice.  Specifically, Defendant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 687, 689, 694.  A "reasonable probability" is a probability "sufficient to undermine confidence in the outcome."  Id. at 694.

Defendant must show that counsel's error caused more than just some conceivable effect on the outcome of the proceeding.  Id. at 693.

"[T]here is no reason for a court deciding an ineffective assistance claim to . . . address both components of the inquiry if the defendant makes an insufficient showing on one" of the prongs.  Id. at 697.  In other words, "a court need not first determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed."  Id. at 668.  The Court will now turn to whether the instances of defense counsel's challenged conduct amount to ineffective assistance under the Strickland standard.

> ### 2. Trial Counsel for Defendant Was Not Ineffective in Disclosing Defendant's Criminal History to the Jury and in Cross-Examining Witnesses Consistent With This Disclosure

Defendant argues that trial counsel was ineffective in their decision to advise the jury of Defendant's history of prior bad acts, and in conducting cross-examination of Government witnesses concerning their knowledge of Defendant's other crimes including his prior convictions and uncharged criminal conduct.  (Doc. No. 224 at 10-16.)  Defendant asserts that there was no reasonable strategic value in including Defendant's history of bad acts when opening to the jury and in eliciting testimony on cross-examination of witnesses regarding Defendant's drug use, prior armed robberies, parole violations, time in jail, and drug sales.  (Id.)

In particular, Defendant argues that trial counsel's opening statement was highly prejudicial, and "could never be considered part of a sound strategy" because there was no reasonable or tactical basis to advise the jury of Defendant's prior bad acts, and emphasize them in the opening statement.  (Doc. No. 224 at 11; Doc. No. 284 at 12.)  He argues that the opening

statement was essentially a guilty plea, advising the jury that Defendant was a bad person with the propensity to commit crimes just like the one he was being tried for.  (Doc. No. 224 at 13.)

### a.   Evidence of Other Crimes and Wrongful Acts Elicited at Trial

During defense counsel's opening statement at trial, counsel stated the following:

> All of us, the Government and the defense and the Judge wanted to be sure that you, as the jury, would not jump to a conclusion that Joe is guilty just because he's a convicted felon.  It's worse.  Joe has spent a big part of his life in jail, a big part of his life in jail.  And what has he been in jail for?  He's been in jail for armed robberies, just like the Government described.  But we wanted to be sure that the 14 of you would wait and hear the evidence, because there's another story.
>
> . . .
>
> This case is different, different than a lot of cases that come along, because usually, usually, the defendant is blaming the Government and saying the Government made it up.  That's not going to happen here, these people didn't make up anything.  You're not going to hear me say once that the Government did anything wrong in this case, made anything up.  Be it FBI Agent Coyle or either one of the prosecutors.  They didn't, they didn't.  They were doing their job. They were doing their job.
>
> We're going to try to establish reasonable doubt through the cross-examination of Andrews, Rhodes [sic] and if the Government wants to call Manichello, they can, that they worked together to frame Joe on these robberies.  Not only to put John [sic] Andrews into the best position possible to get a break from this Judge at his sentencing. Well, because they wanted, they had their own agenda trying to protect themselves, their families and the actual perpetrators.  That's what this case is about.

(Doc. No. 179, Trial Tr., 34:9-17, 35:24-36:16, June 5, 2013.)  In essence, at trial, the primary theory of defense counsel was that witnesses including Jonathan Andrews, Leah Sabatino, and Charles Rhoads, fabricated the Defendant's involvement in the pharmacy robberies, all in an effort to make a better deal with the Government in their own criminal cases.  It was contended that these witnesses believed they could pin the robberies on the Defendant because he had a prior criminal history, making him an easy target.  Putting forth this defense theory would be futile without an explanation of Defendant's criminal background.

In cross-examining Jonathan Andrews, Defendant's trial counsel elicited the following testimony:  Defendant was wanted for a parole violation and felt like the United States Marshals were closing in on him (Doc. No. 180, Tr. 77:19-22, June 6, 2013); Andrews did not believe Defendant was working, but "wasn't dead broke" (Id. at 78:6-10); Defendant and Andrews did drugs together, including Xanax, cocaine, and alcohol (Id. at 78:15-24); Andrews got Xanax from Defendant, who told Andrews that he got it "from a previous robbery he did," and that robbery was of "another pharmacy" "previous to the Blue Grass" (Id. at 78:25-79:11); and Defendant was selling pills, and they sold drugs together.  (Id. at 96:10, 195:23-24.)

Defendant's trial counsel further elicited testimony that Defendant needed money because "he wanted to actually leave the country" because of his parole violation. (Id. at 111:18-24.) Moreover, Andrews testified that he told Agent Coyle that Ms. Sabatino drove the getaway car for Defendant in a RiteAid robbery, an earlier robbery apparently committed by Defendant. (Doc. No. 181, Tr. 11:6-10, June 7, 2013.)   Defense counsel asked if Andrews knew that Defendant had been in prison "a big part of his life" (Id. at 50:1-5), and asked if Defendant was "the kind of person the government wants to prosecute."  (Id. at 50:21-22.)

In cross-examining Charles Rhoads, Defendant's trial counsel elicited testimony that Rhoads and Defendant took cocaine together.  (Doc. No. 181, Tr. 150:18-151:4, June 7, 2013.) Trial counsel further elicited testimony that Mr. Rhoads knew about Defendant's history of armed robberies, knew that Defendant had been in jail for a long time, knew that he had been in trouble with the police before, and knew that people were looking for him related to a parole violation.   (Id. at 196:4-20.)   Trial counsel further asked Mr. Rhoads if he knew about the previous robbery Defendant did (Id. at 173:6-8), and whether he knew if Mr. Andrews gave Defendant cocaine to sell and that Defendant was having money problems (Id. at 197:7-12).

Additionally, witness Bill Callahan, an acquaintance of Defendant, testified on direct that he purchased drugs from Defendant, that those drugs had been stolen from a pharmacy, and that Defendant gave Sabatino methadone during the months prior to the robberies. (Doc. No. 182, Tr. 159:22-160:18, 162:2-10, June 10, 2013.)    Finally, without any objection of defense counsel, the Government questioned Leah Sabatino regarding Defendant's possession of cash, the amount of cash he would carry, his provision of prescription medication to her, that he got pills from pharmacies, that he was "hitting pharmacies," and that he robbed pharmacies in the Northeast. (Doc. No. 183, Tr. 13:18-14:6, 14:20-25, 16:3-7, June 11, 2013.)    The Government also questioned her about whether she sold pills for Defendant, and whether she saw Defendant in possession of a firearm.[13]   (Id. at 23:12-13, 24:8-9.)

### b. Defense Counsel's Strategy

David Shapiro, Esquire, testified at the post-trial hearing that the theory of defense was that Defendant was framed by the participants of the robberies, and that his prior criminal history provided a reason for why they chose to frame him, i.e., that he made for a believable "fall guy." (See Doc. No. 243, Tr. 36:16-38:5, June 15, 2015.)  Trial counsel acknowledged that the strategy of introducing Defendant's prior bad acts was risky and unconventional.  David Shapiro, Esquire, stated, "This was a case that he – if he got – if Joe got convicted, he's getting a mandatory life sentence and that responsibility weighed on me greatly, and I had to find a way, anything.  Did I know it was risk laden?  Absolutely, but that's all I had."  (Doc. No. 276, Tr. 145:21-25, Apr. 6, 2016.)  He further testified that his strategy had to "embrace and account for [the] worst evidence in order come up with a theory that the jury is going to believe . . . [because] you can't run away

---

[13]   In his closing, defense counsel argued his theory of the defense, in which Andrews, Rhoads, and Sabatino falsely implicated Defendant in the pharmacy robberies because he was a prime target due to his criminal background.  In this way, these witnesses curried favor with the Government and made a better deal for themselves.  Defense counsel's closing argument is set forth in detail, supra.

from bad evidence."  (Doc. No. 276, Tr. 140:11-17, Apr. 6, 2016.)  Trial counsel knew that the Government had substantial evidence against Defendant, and decided to embrace this approach to attempt to create reasonable doubt.  Under Strickland, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."  466 U.S. at 690.

David Shapiro further testified that Defendant approved their theory of defense before trial.  (Doc. No. 277, Tr. 42:6-20, Apr. 7, 2016; Doc. No. 243, Tr. 37:17-38:5, June 15, 2015.)  Prior to trial, defense counsel advised the Court that he wanted to notify the jury during voir dire that Defendant was a convicted felon and used drugs.  The Government objected, noting that it would not go into Defendant's prior convictions in its case-in-chief.  Defense counsel advised the Court that he intended to say things in the opening that had "been approved by Mr. Meehan," including "his prior record . . . police shootings . . . drugs . . . stolen cars . . . [and] that he's a convicted felon."  (Tr. 7:2-23, June 4, 2013.)  Defendant was present in Court at this time.  (Tr. 2:11-13, June 4, 2013.)

Defendant asserts in his post-trial motion that he never approved trial counsel's theory of the case.  (Doc. No. 284 at 11 n.5.)  Defendant relies in part on a communication from him to Michael Shapiro stating, ". . . Mike, I need to see what you two got planned.  As it stands, I have no idea what our plan is.  We start in two weeks.  I gotta be informed."  (Ex. D-13; Doc. No. 276, Tr. 85:20-22, Apr. 6, 2016.)   David Shapiro acknowledged this e-mail, but testified that Defendant "knew what was going on."  (Doc. No. 276, Tr. 86:8-11, 86:21-88:23 Apr. 6, 2016.)

Defendant claims that he always maintained a different defense, which was that Andrews was framing him because Leah Sabatino stole drugs from Andrews when he failed to pay her for sex.  (Doc. No. 284 at 10.)  However, David Shapiro, Esquire, testified that he was aware of

Defendant's theory, but did not think the jury would believe it.  (Doc. No. 276, Tr. 80:2-21, Apr. 6, 2016.)  Mr. Shapiro stated, "I thought that Joe needed more. . . . I had to tell the story of Joe's life, and that's what I thought the trial was about, Joe's life."  (Doc. No. 276, Tr. 80:6-8, Apr. 6, 2016.)  Defense counsel made a strategic decision because he did not think that the jury would believe this retaliation theory as a motive to frame Defendant. (Doc. No. 276, Tr. 81:16-18, Apr. 6, 2016.)  He considered all of the Government's evidence and believed the risk of advising the jury of Defendant's prior criminal record was a risk worth taking.  (Id. at 81:23-82:6.)  Defense counsel made the strategic decision to tell Defendant's life story, including how he tried to help Leah Sabatino, with the intention that it might exhibit a "spark of decency" in Defendant.  (Id. at 82:20-83:11.)   It is clear from David Shapiro's testimony that trial counsel considered the evidence against Defendant in this case and put substantial effort into choosing a sound trial strategy.

Moreover, defense counsel's cross-examination of Government witnesses at trial was consistent with this theory of defense.  Counsel asked questions about Defendant's criminal and parole history to support the defense theory that Defendant was being framed by friends and prosecuted by the Government not because he was guilty in this case, but because he was an easy target.  Trial counsel effectively elicited testimony that Mr. Andrews and other witnesses were well aware of Defendant's criminal history, supporting the trial theory.

In attacking the defense trial strategy, Defendant has not overcome the strong presumption that his trial counsel exercised reasonable professional judgment in framing the defense theory and in presenting it to the jury.  Therefore, regarding this challenge, defense counsel was not constitutionally ineffective.

### c.   Challenge to a Jury Instruction

Defendant challenges a portion of the jury instructions given at trial.  He argues that trial counsel should have objected to certain language contained in the jury instructions, which were read to the jury. The Court charged the jury on the permissible uses of evidence under Rule 404(b) of the Federal Rules of Evidence, regarding Defendant's crimes, wrongs, or other acts. The jury charge was as follows:

> You have heard the testimony that the Defendant committed certain crimes and bad acts prior to the charges in this case.  The evidence of other acts and prior crimes was admitted only for limited purposes.  You may consider this evidence only for the purpose of deciding the knowledge and motives of certain witnesses, Jonathan Andrews, Chuck Rhoads and Leah Sabatino, in deciding whether the Defendant had a motive to commit the crimes charged in the indictment, or was preparing or planning to commit the acts charged in the indictment.  Do not consider this evidence for any other purpose.  Of course it is for you to determine whether you accept it for the purpose offered.  You may give it such weight as you feel it deserves, but only for the limited purpose that I described to you.

(Doc. No. 185, Tr. 25:1-15, June 13, 2016).  Defendant contends in his post-trial motion that trial counsel should have objected to the portion of the Fed. R. Evid. 404(b) jury instruction that prior criminal history could be used "in deciding whether the defendant had a motive to commit the crimes charged in the indictment or was preparing or planning to commit the acts charged in the indictment."  (Doc. No. 284 at 11-12.)  This jury instruction was agreed to by the Government and the defense at a conference during which jury instructions were discussed.  The reason for the agreement was noted by counsel for the Government in the following exchange with the Court:

> THE COURT:  . . . Counsel have you conferred about the jury charge?
>
> MR. LLORET [FOR THE GOVERNMENT]:  Yes, your Honor, I've conferred with Mr. Shapiro and he with me.  Well, there are several suggestions.  One is with respect to other crimes and other acts which were referred to during the course of the trial by several witnesses, uncharged acts and crime [sic].  We believe that the Court should give an instruction to the jury about the proper use of those and I've tendered a charge that is

adapted slightly from the 3rd Circuit's Model Charge to deal with the particulars of this case.  In essence, your Honor, the parties agree that those acts were introduced for just a few purposes.  One was to deal with the motives of some of the witnesses. The other was to deal with the defendant's motive, in particular, his robbery of pharmacies was motived by his drug dealing.  . . . So, that's one and I think counsel and I have agreed on the content of that.

(Doc. No. 184, Tr. 81:2-19, June 12, 2013.)

Under Rule 404(b), one permitted use of evidence of crimes, wrongs, or other acts is for the purpose of proving motive, intent, preparation, or planning of the crime charged.  Fed. R. Evid. 404(b).  In this case, as noted by the prosecutor, Defendant had a motive to rob the pharmacies in order to obtain drugs for illegal distribution.  In addition, he recruited conspirators who participated in other crimes with him as part of his preparation and planning of the pharmacy robberies.  For these reasons, it was appropriate to charge on the contested language. When David Shapiro, Esquire, was confronted with this language on April 6, 2016, more than two years after the trial, and asked whether he should have objected to the language, he said that he should have objected, but he was not questioned in detail about the bases for agreeing to include the language in the jury instructions.  In any event, the charge was consistent with the evidence in the case, and admissible under Fed. R. Evid. 404(b).

### 3.    Trial Counsel for Defendant Was Not Ineffective in Failing to Move to Compel Disclosure of "Rough Notes" of Interviews

Defendant next argues that trial counsel was ineffective in failing to move for an order compelling the disclosure of the "rough notes" of all of Agent Coyle's interviews with government witnesses.  Defendant argues that the rough notes that were provided to trial counsel were inconsistent with the F.B.I. 302 interview reports provided by the Government.  (Doc. No. 284 at 12.)  Defendant claims that there are a number of differences between Agent Coyle's rough notes of interviews with Ms. Sabatino and the F.B.I. 302 interview reports, which were produced.  (Doc. No. 224 at 16.)  Defendant contends that the rough notes would have been

important for cross-examining and impeaching Agent Coyle.  (Doc. No. 284 at 13; Doc. No. 292 at 15.)

First, Defendant asserts the rough notes of the February 17, 2011 interview with Ms. Sabatino indicate she saw Defendant limping on the Sunday prior to the CVS robbery, which occurred on Monday, February 14, 2011, and his foot was swollen with an ACE bandage on that Sunday.  The rough notes include:

> - Tuesday night - I saw his foot - Left foot
>   Sun. he had been limping
>   His foot very swollen, ACE Bandage
>   He said he did it working

(Ex. D17; Tr. 118:6-14, Apr. 6, 2016.)   Regarding these notes, the corresponding F.B.I. 302 report states:

> When Sabatino saw Meehan late in the day on Tuesday, February 15th [2011], he was using crutches, and his left foot was swollen and bandaged.  Meehan said he hurt his foot while working, but did not otherwise elaborate regarding the cause of the injury.  Meehan changed the subject when Sabatino pressed him for details of how he received his injury.  Sabatino recalled Meehan may have been limping slightly on Sunday, February 13th [2011], but he was not using crutches at that time.

(Ex. G395; Tr. 118:15-24, Apr. 6, 2016.)  The rough notes are not inconsistent with the F.B.I. 302 interview report.  The 302 report reflects that she saw him limping on Sunday because he injured his foot while working.  The rough notes state the same thing: "Sun. he had been limping . . . he said he did it working."  (Ex. D17; Tr. 118:6-14, Apr. 6, 2016.)

Although Defendant claimed he hurt his foot working, he has changed his story several times.  Defendant gave the same story to Agent Coyle about hurting his foot by falling off a ladder at work.  Defendant initiated a civil lawsuit against the U.S. Marshals during the criminal investigation and willingly gave sworn testimony during a deposition in that case.  He testified that he lied to Agent Coyle, and that he actually injured his foot while he was committing

34

burglaries.   The Government agreed before trial not to introduce Defendant's deposition testimony in its case-in-chief, unless Defendant opened the door through questioning of witnesses.  The Government also reserved the right to cross-examine Defendant if he testified inconsistently.  (Doc. No. 233, Exs. C, D.)  Thus, there was a danger to the defense in referring to this episode at trial of how Defendant injured his foot.  In any event, there was no discrepancy between the rough notes and the 302 report, and no prejudice to Defendant.

Second, Defendant argues that the rough notes and 302 report from the February 17, 2011 interview with Sabatino differ regarding who put the drugs in the black bag:  the rough notes state Sabatino had a black shopping bag in the motel room containing various drugs, but the 302 report states that Meehan placed the drugs in her bag.  (Doc. No. 224 at 17; Doc. No. 284 at 13.) Specifically, the rough notes state, "In my bag, black shopping bag, methadone, crack stems, prescript ibuprofen, percosets [sic] (he took them), I put his pot in my purse."  (Ex. D17.)  The 302 report states:

> Among her possessions in the room, Sabatino had a black shopping bag, containing crack stems (glass crack pipes), methadone pills, prescription ibuprofen pills, and percoset [sic] pills.  Meehan had put the pills in her bag. Meehan had been taking percosets [sic] and ibuprofen pills for the pain in his foot.  Marijuana, which belonged to Meehan, was in her purse inside the motel room.

(Ex. G395.)  The F.B.I. 302 interview report is not inconsistent with the rough notes.  The rough notes do not state the Sabatino placed the drugs in the black bag.  The sentence in the F.B.I. 302 interview report regarding Meehan having put the pills in her bag is additional information which does not conflict with the rough notes.   Rough notes are necessarily memory aids for the interviewers and not verbatim transcripts.   (See Tr. 61:16-21, Apr. 19, 2016; Goldberg v. United States, 425 U.S. 94, 126 (1976) ("Typical interview notes are selective – even episodic.").)

Defendant has not shown that the rough notes contain or may contain exculpatory information.   See also United States v. Georgiou, 777 F.3d 125, 141 (3d Cir. 2015) ("Pure speculation that exculpatory information might exist is insufficient to sustain a Brady claim."). There are no inconsistencies between the rough notes and F.B.I. 302 interview reports and no prejudice to the defense in not having them before trial.   Therefore, the Shapiros had no good faith basis to make what would have been an unsuccessful motion for all rough notes.

Despite the fact that there were no inconsistencies and no real Brady evidence, Defendant still claims all of the rough notes should have been made available.   However, Brady only requires the production of exculpatory information that is "material," which creates a reasonable probability of an acquittal.   Kyles, 514 U.S. at 433-34; United States v. Bagley, 473 U.S. 667 (1987).   Additionally, interview reports have been held not to be Jencks material.   See United States v. Allegrucci, 299 F.2d 811, 813-14 (3d Cir. 1962); United States v. Starusko, 729 F.2d 256, 263 (3d Cir. 1984).   Even David Shapiro, Esquire, testified that although Defendant requested that he obtain the rough notes, he did not believe a request would have met the Third Circuit standard.  (Tr. 117:21-118:5, Apr. 6, 2016.)

In United States v. Vella, which is relied upon by Defendant, the court held that Government agents should preserve their rough notes of interviews for prospective trial witnesses.  562 F.2d 275 (3d Cir. 1977).  In Vella, the court held that "the rough interview notes of F.B.I. agents should be kept and produced so that the trial court can determine whether the notes should be made available to the [defendant] under the rule of Brady. . . or the Jencks Act."  Id. at 276; see also United States v. Ramos, 27 F.3d 65 (3d Cir. 1994) (reaffirming the rule

in the Third Circuit).[14]   Rough notes must be produced to the defendant where there is the likelihood that the rough notes contain impeachment material under Brady.   See Brady v. Maryland, 373 U.S. 83 (1963); United States v. Bagley, 473 U.S. 667 (1985); Ramos, 27 F.3d at 70; United States v. Pelullo, 105 F.3d 117, 122 (3d Cir. 1997).

Vella does not require that the Court make an inquiry for Brady or Jencks material every time the defendant requests it.  In Pennsylvania v. Ritchie, the United States Supreme Court held:

> In the typical case where a defendant makes only a general request for exculpatory material under Brady [], it is the State that decides which information must be disclosed. Unless defense counsel becomes aware that other exculpatory evidence was withheld and brings it to the court's attention, the prosecutor's decision on disclosure is final.  Defense counsel has no constitutional right to conduct his own search of the State's files to argue relevance.

480 U.S. 39, 59 (1987).  "A defendant seeking an in camera inspection to determine whether files contain Brady material must at least make a 'plausible showing' that the inspection will reveal material evidence.  Mere speculation is not enough."  Riley v. Taylor, 277 F.3d 261, 301 (3d Cir. 2001) (citing Ritchie, 480 U.S. at 58 n.15).

Because the rough notes do not show a material variance, it is evident that they would not have been subject to production under Third Circuit law.  Therefore, Defendant has failed to show that trial counsel fell short of an objective standard of reasonableness, and has failed to show that if trial counsel had moved for the production of the rough notes, that there is a reasonable probability the request would have been granted and the result of the proceeding would have been different.  Accordingly, trial counsel was not ineffective for not moving to compel disclosure of the rough notes Defendant claims were pertinent here.

---

[14]  The Government notes that Vella is the minority view among the Circuit Courts and is inconsistent with Supreme Court authority.  (Doc. No. 233 at 18-21.)  The Court need not address this argument.

**4.      Trial Counsel for Defendant Was Not Ineffective in Failing to Retain An Expert Witness on The Effects of Drug Use**

Defendant claims that his trial counsel were constitutionally ineffective in failing to retain an expert witness to testify on the effects of drug use.  In particular, Defendant argues that an expert witness should have been called to testify on the general effects of drug use in order to undermine Ms. Sabatino's credibility as a witness.  During the post-trial hearing, the defense presented an expert witness, Dr. Kenneth Weiss, to testify regarding the effect of drugs on the brain, memory, and perception.  Dr. Weiss testified about the effects of long-term, heavy, chronic, and contemporaneous abuse of narcotics including heroin, crack cocaine, Xanax, and methadone on the ability of Government witness Leah Sabatino to perceive and form memories of events, and to recall them in an accurate manner.  He testified that:

> [T]he prolonged and multiple drug use by Leah Sabatino would have effects on her cognition, that is her higher mental functions, her recall, her ability to retrieve information and to store information within her perception, to perceive things themselves, to be susceptible to the specific effects of certain drugs that tend to interfere with the formation of memories or the retrieval of memories to one degree or another, because she used several types of drugs.

(Tr. 8:5-13, Apr. 6, 2016.)  He testified that heavy drug users like Ms. Sabatino are susceptible to outside influence to fill in the gaps in their memory, and are susceptible to suggestion in filling in their memory.  (Tr. 10:1-12:24, 15:2-17:25, Apr. 6, 2016.)  Further, an occurrence is best remembered when the person is in the same state when attempting to recall as they were at the time of the occurrence, which includes using the same combination of drugs.  (Tr. 10:1-12:24, Apr. 6, 2016.)  Defendant contends that Dr. Weiss should have been called at trial, as an expert witness, to testify on these matters.

Although Defendant asserts that trial counsel's failure to present Dr. Weiss as an expert witness constitutes ineffective assistance, this argument is not persuasive.  Trial counsel for Defendant made a strategic decision not to call an expert to testify on the effects of drug use.

Rather, he reasonably believed that it was in the best interest of Defendant to extensively cross-examine Ms. Sabatino to support the defense theory that she was fabricating the story to make a better deal with the Government, and to allow the jury to hear about the effects of prolonged drug use on her memory. This trial strategy of cross-examining Ms. Sabatino extensively, instead of calling an expert witness, was reasonable and did not prejudice Defendant.

First, trial counsel extensively cross-examined Ms. Sabatino about her drug use, establishing that she suffers from a long addiction to mind-altering drugs, such as heroin. (Tr. 75:16-77:2, June 11, 2013.) For instance, she testified on cross-examination that she is an intravenous drug user and has a seventeen year history of using drugs. (Tr. 71:23-25, 73:20-24, June 11, 2013). She has repeatedly attempted to get clean but has been unsuccessful. (Tr. 81:19-21, June 11, 2013). Trial counsel also elicited from Ms. Sabatino that part of living with a heroin addiction involves attempting to hide the addiction and making people believe things that are not true. (Tr. 79:10-16, June 11, 2013.) Such testimony was elicited for the purpose of showing Ms. Sabatino's willingness to fabricate her story against Defendant in exchange for immunity.

Second, trial counsel cross-examined Ms. Sabatino extensively about the effects her drug use has on her ability to form memories and recall events, which called into question her credibility as a witness against Defendant. For example, on cross-examination, Ms. Sabatino testified that she ordinarily remembers things when she is questioned closer to the event (Tr. 102: 7-23, June 11, 2013); and her memory would be better if she had not taken drugs. (Tr., 101:24-103:2, June 11, 2013.) To illustrate how drug use impairs Ms. Sabatino's memory, trial counsel elicited the following testimony:

> Q  One of the things about addiction is it causes people to – you might remember things, but it's hard to put them into place exactly when they happened, right?
>
> A  Yes.

Q  Okay.  Sometimes, you may only have partial memories, it's distorted?

A  Yes.

Q  Sometimes you might hear things and they kind of become part of your story, right?

A  Yes.

(Tr. 103:11-16, June 11, 2013.)  She also admitted that at times her drug use caused her to black out, and often caused her to lose track of the days, or to be up all hours of the day.  (Tr. 85:8-24, June 11, 2013.)  In reference to the instant case, Ms. Sabatino testified that she was intoxicated when she was at the Riviera Motel.  (Tr. 86:4-11, June 11, 2013).  She also explained that, when she testified before the grand jury about the events at the Riviera Motel, she did not remember everything because she was high on methadone at the time.  (Tr. 104:5-8, June 11, 2013.)  The extensive cross-examination demonstrated to the jury that Ms. Sabatino's prolonged drug use impaired her ability to remember events relevant to Defendant's case.

Trial counsel for Defendant made a strategic decision to cross-examine Ms. Sabatino in this manner, demonstrating her inability to recall the alleged events accurately, and calling into question her credibility as a witness testifying against Defendant.  In particular, he stated that his cross-examination was "designed to elicit [that her] credibility was suspect and her description of events was suspect."  (Tr. 71:18-20, April 7, 2016.)

Given his extensive cross-examination of Ms. Sabatino, trial counsel made a strategic decision to forego calling an expert witness to testify about the general effects that drug use has on a person's memory.  Trial counsel explained that he,

> . . . did not think that the use of an expert was as a strategic matter in Mr. Meehan's best interest.  But the issue of the bad memory was absolutely an issue and as a strategic matter, I didn't think that an expert was necessary.  And, I

thought that the use of an expert on a subject like that would be offensive to the jury because it was so obvious.

(Tr. 14:3-12, 14:22-25, Apr. 6, 2016.)  He further testified that he "was also convinced in the trial preparation stages that Ms. Sabatino was going to acknowledge all of that, which she did."  (Tr. 14:19-21, Apr. 6, 2016.)  During the post-trial hearing, as David Shapiro, Esquire, was cross-examined about his decision to forego calling an expert witness to testify on the effects of drug use.  The following exchange occurred:

> Q  Okay.  You were also questioned extensively on why you did not call a drug expert, correct?
>
> A  Yes.
>
> Q  Now, you prepared for and handled Ms. Sabatino's cross-examination, correct?
>
> A  I did.
>
> Q  And you felt like you could handle the issue of her drug addiction – drug addiction on the cross-examination, correct?
>
> A  Yes.
>
> Q  You felt that the effects of addiction were not outside the common sense of the jury to understand, correct?
>
> A  Correct.
>
> Q  That they would understand the side effects of being heavily intoxicated with drugs, correct?
>
> A  Yes.
>
> Q  And if [sic] fact – you spent a really long time on cross-examination on these issues, correct?
>
> A  Yes.

(Tr. 109:15-110:7, Apr. 18, 2016.)  In essence, trial counsel made a strategic decision to elicit from Ms. Sabatino, on cross-examination, the effects of her drug use on her memory.  He explained that he,

> did not think that an expert – as a strategic matter, I made a decision that I didn't think that an expert on that subject was in Mr. Meehan's best interest.  I thought that those points which you're making are – they were points that were made.  I thought that they were common knowledge and that was partially – partially the theory of the defense.

(Tr. 16:6-12, Apr. 6, 2016.)  Through a lengthy cross-examination of Ms. Sabatino, trial counsel was able to demonstrate to the jury the effects of drug use on Ms. Sabatino's memory.  Trial counsel reasonably believed that the effects of drug use could be elicited through Ms. Sabatino, and need not be covered by an expert witness.

At the post-trial hearing, Dr. Weiss conceded that the effects of drug use are common knowledge.  He agreed that the "concept of being under the influence alter[ing] the brain is well ingrained in our society as a whole," and that "it's common knowledge even that people can black out from too much alcohol or too much drugs," and "not form memories for the events, even though they were conscious at the time." (Tr. 62:15-23, Apr. 6, 2016.)  He also agreed that the average adult "understands that heroin is a serious drug . . . often a deadly drug."  (Tr. 62:24-63:4, Apr. 6, 2016.)  Dr. Weiss confirmed that the "average adult understands that chronic heroin use could effect [sic] memory." (Tr. 63:8-12, Apr. 6, 2016.)  He also agreed that an average adult could understand that Ms. Sabatino would black out from drug use. (Tr. 64:3-23, Apr. 6, 2016.)  He stated that Ms. Sabatino's account of her heroin addiction and its effects was "powerful testimony." (Tr. 70:8-10, Apr. 6, 2016.), and agreed that "the average adult is able to process and comprehend that testimony . . . ."  (Tr. 70:21-23, Apr. 6, 2016.).  Moreover, Dr. Weiss agreed

that one does not "need a medical degree to understand the testimony that Ms. Sabatino admitted to on the stand." (Tr. 70:24-71:1, Apr. 6, 2016.)

Ms. Sabatino's testimony adequately informed the jury that she was addicted to drugs, that she was on drugs at relevant times to this case, that those drugs affected her memory and perception, that she has committed crimes to support her addiction, and that she was motivated to testify against Defendant to avoid further jail time. Ms. Sabatino testified about the subjects that Dr. Weiss would have covered. Under all these circumstances, defense counsel at trial made a reasonable strategic decision not to call an expert such as Dr. Weiss to testify at trial. Moreover, under Strickland's second prong, Defendant has failed to show prejudice by trial counsel not having Dr. Weiss testify at trial. Dr. Weiss's testimony fails to show that there is a reasonable probability that expert testimony regarding the effects of drug use would have produced a different trial result. The evidence against Defendant was overwhelming. The Government presented testimony from co-conspirator Jonathan Andrews, childhood friend Charles Rhoads, and girlfriend Leah Sabatino, all of whom implicated Defendant in the pharmacy robberies. Their testimony was corroborated by, among other things, other testimony or physical evidence, such as the drugs found in the hotel room where Defendant was arrested after the robberies, the clear photographs of Defendant in the Blue Grass Pharmacy the day it was robbed, wearing the same shoes that the robber wore in two robberies, the cell site location evidence, the prison tape recordings between Defendant and Ms. Sabatino, Defendant's letters from prison, and Ms. Sabatino's diary entries. Thus, Defendant has not shown that trial counsel was ineffective in

their decision not to retain an expert regarding the effects of drug use on perception and memory.[15]

### 5. Trial Counsel for Defendant Was Not Ineffective in Failing to Retain A Cell Site Location Expert and in Failing to Challenge the Government's Cell Site Evidence

Defendant raises several arguments related to the Government's use of cell phone location expert, F.B.I. Agent William B. Shute. First, Defendant argues that trial counsel was constitutionally ineffective in failing to retain an expert witness to assist in the cross-examination of Agent Shute, to testify to the limitations of cell phone location evidence, and to assist the defense in moving to bar cell phone location evidence as inadmissible under the <u>Daubert</u> standards. <u>Daubert v. Merrill Dow Pharm., Inc.</u>, 509 U.S. 579, 585-86 (1993). Second, Defendant argues that counsel was ineffective in failing to move to suppress Defendant's cell phone records obtained by subpoena and not a warrant.

---

[15] Moreover, as the Government points out, calling Dr. Weiss would have highlighted evidence strengthening the Government's argument that Ms. Sabatino was worthy of belief. (Doc. No. 287 at 23-24.) Defense Exhibit 21, a F.B.I. 302 report of interview, indicated that Ms. Sabatino knew that Mr. Meehan had planned to rob the CVS on February 14, 2011. When she was wakened early in the morning on February 15th, she heard that the CVS pharmacy had been robbed and the police had fired shots. After calling Mr. Meehan's phone and getting no answer, she wrote her fears about Mr. Meehan's safety in a notebook. (<u>See</u> Exs. D21, D99.) Dr. Weiss admitted that her journal was written days before anyone was arrested, or any outside source could have influenced Ms. Sabatino. (Tr. 45:1-16, Apr. 6, 2016.) He admitted "it was written on that day, and it was not tainted by subsequent evidence, it couldn't be." (<u>Id.</u> at 45:14-19.) He admitted that "[n]o one from the government was telling [Ms. Sabatino] to write" the journal entry, [b]ecause the government was not involved yet." (<u>Id.</u> at 45:20-22.) Moreover, there is no chance that Ms. Sabatino wrote this down with fear of imprisonment in her mind. (<u>Id.</u>) Dr. Weiss not only admitted that the journal "memorialized Sabatino's contemporaneous state of mind when she thought that the defendant was shot after the robbery," but he also added that it was a good thing that she "wrote it down, because that's a good way to remember." (<u>Id.</u> at 46:4-8.) This testimony would have hurt the defense's "government suggestion" theory.

### a. Agent Shute's Trial Testimony

During trial, Agent Shute testified regarding analysis of historical call detail records. Agent Shute is an agent with the Federal Bureau of Investigation's Cellular Analysis Survey Team ("CAST").[16]   In this role, he conducts historical cellular site analysis, which consists of using call detail records to geographically map where a person was located when they made a particular call.  (Doc. No. 182, Tr. 102:21-103:21, June 10, 2013.)  He testified regarding his analysis of Defendant and Mr. Andrews' cellular data from February 9, 2011 to February 16, 2011, covering the two days on which the robberies occurred, using a presentation that included maps.  He testified that in the relevant area, most cellular towers including Nextel, which was Defendant's provider, were no further than one mile apart.  (Id. at 115:18-19.)

---

[16] A Daubert challenge to Agent Shute's qualifications and testimony at trial would not have been successful.  Agent Shute was a founding member of CAST, which provides historical cell site analysis in investigations, case consultation, and training to law enforcement.  He assists with active ongoing cases involving violent crimes and missing children.  (Doc. No. 280, Tr. 142:2-23, Apr. 18, 2016.)  He also has received extensive training from major cell phone companies almost every year for the past six years, and teaches courses on historical cell site analysis.  (Id. at 145:6-149:25.)  He has been accepted as an expert over a hundred times, and CAST Agents in general have qualified as experts over 900 times.  (Id. at 142:25-143:5.)  At the time Agent Shute testified in 2013, he had been accepted as an expert in cell phone location over 50 times and testified at criminal trials. (Doc. No. 233 at 28.)  See also United States v. Allums, 2009 WL 806748 (D. Utah 2009) (holding Agent Shute was qualified as an expert in historical cell site analysis and his methodology was reliable); United States v. Machado-Erazo, 950 F. Supp. 2d 49, 53 n.4, 56 (D.D.C. 2013) (citation omitted) (holding that a member of the CAST team had qualifications which were "robust and establish[ed] him as well educated, well practiced, and well trained in the proffered area of expertise," and that "the use of cell phone location records to determine the general location of a cell phone has been widely accepted by numerous federal courts.").

Moreover, it was a reasonable and strategic decision by defense counsel not to highlight Agent Shute's qualifications through voir dire, as it would have likely resulted in greater credibility assigned to Agent Shute and strengthened the Government's case.  Defendant has not established that he was prejudiced by trial counsel not asserting a Daubert challenge and not engaging in vigorous cross-examination during voir dire of Agent Shute.

He testified that on February 9, 2011, Defendant's phone was within the same "geographical area" as the Blue Grass Pharmacy between the time of 2:16 p.m. and 2:53 p.m. (Id. at 112:10-116:14.)  He further testified that on February 9, 2011 between 2:13 p.m. and 2:42 p.m., Andrews' phone was using a different cell tower in approximately the same location as Defendant.  (Id. at 116:15-117:6.)  Both phones were active during this time in the geographical area that included the Blue Grass Pharmacy and Andrews' apartment.  (Id. at 117:20-118:8.)  On February 9, 2011, Defendant and Andrews' phones "interacted or attempted to interact" 29 times. (Id. at 118:15-19.)

Regarding February 14, 2011, the date of the attempted CVS robbery, he testified that Defendant's phone was near the CVS between 7:43 p.m. and 7:55 p.m., and that Defendant repeatedly called Andrews' phone during that time.  (Id. at 125:1-25.)  Andrews' phone was also in the vicinity of the CVS between 8:23 p.m. and 8:41 p.m. on February 14, 2011.  (Id. at 127:24-128:8.)  He also testified that Defendant's phone "attempted to interact with" Andrews' phone 28 times on February 14, 2011.  (Id. at 131:2-3.)  On February 15, 2011, between 12:15 a.m. and 12:28 a.m., Defendant's phone was near the CVS and moving away, and there were three calls with Mr. Rhoads's phone during that time.  (Id. at 131:17-23.)  Also on February 15, 2011, between 12:30 a.m. and 2:30 p.m., Defendant's phone was in the area of Heather Meehan's residence.  (Id. at 133:24-134:3.)  On February 16, 2011, Defendant's phone was in the area of Pennsauken, New Jersey.  (Id. at 134:17-135:11.)

### b.  Post-Trial Hearing Testimony of Defense Expert and Agent Shute

At the post-trial hearing, Defendant presented the testimony of Joseph Kennedy.  Mr. Kennedy was called for the purpose of showing the lack of reliability of opinions on cell phone location based only on a review of historical call detail records.  (Doc. No. 278, Tr. 23:17-20, Apr. 7, 2016.)  Mr. Kennedy reviewed Agent Shute's trial testimony.  He testified based on his

review of the testimony and the "mapping" exhibit presented, and contended that the exhibit was misleading.  (<u>Id.</u> at 30:21-32:3.)   Specifically, he testified that the Government "mapping" exhibit was "basically drawing an idealistic circle around the tower in a pie shaped area . . . and you can't really say that the call only – the cell phone only could be covered in that area," because the coverage would actually be in the shape of an oval.  (<u>Id.</u> at 33:3-16.)

He also testified that Agent Shute's exhibit limited the coverage area to a one mile radius from the tower, and there are no authoritative sources that would justify limiting the radius to only one mile.  (<u>Id.</u> at 34:19-35:1.)  He testified that a call tower's coverage may be up to twenty-one miles, depending on the height of the tower, existence of surrounding buildings and other factors.  (<u>Id.</u> at 35:12-15.)  He further testified that cell phones do not always connect to the closest tower, and the only thing that can be said is that a cell phone is within an area up to twenty-one miles from the tower.  Finally, he testified that there was no scientific justification for Agent Shute's testimony regarding Defendant's locations.  (<u>Id.</u> at 46-51.)

Agent Shute was recalled to testify at the post-trial hearing.  He testified at length with respect to his disagreement with Mr. Kennedy's analysis and conclusions, and to further bolster his experience, trial methods and conclusions.  (<u>See</u> Doc. No. 280, Tr. 141-283, Apr. 18, 2016.)

### c.  Defendant's Trial Counsel Was Not Ineffective In Failing to Retain A Cell Site Expert

Defendant's trial counsel made a strategic decision not to call an expert to testify at trial regarding cell site location evidence, and Defendant was not prejudiced by that decision.  As the Supreme Court of the United States has held:

> <u>Strickland</u> does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense.  In many instances cross-examination will be sufficient to expose defects in an expert's presentation.  When defense counsel does not have a solid case, the best strategy can be to say that there is too much to doubt about the [government's] theory for a jury to convict.

<u>Harrington v. Richter</u>, 562 U.S. 86, 111 (2011).  In fact, Michael Shapiro, Esquire, testified at the post-trial hearing that he and co-counsel David Shapiro "discussed the possibility of an expert, and I know [David Shapiro] discussed it with Joe, and we discussed it on several occasions.  And we thought strategically that it was – that we could discount [Agent Shute's] testimony on cross-examination, and that an expert would probably only serve to confuse the jury."  (Doc. No. 280, Tr. 50:1-9, Apr. 18, 2016.)

In fact, at trial, David Shapiro, Esquire, engaged in a rigorous cross-examination of Agent Shute.  He highlighted that Agent Shute could not tell which phone connections reflected substantive conversations.  He highlighted that Agent Shute could not tell the jury where Meehan and Andrews were when their phones were not in use.  (Doc. No. 182, Tr. 137:9-25, June 10, 2013.)   He also cross-examined Agent Shute about his word choice in his presentation, suggesting that Agent Shute was biased in favor of the Government.  (<u>Id.</u> at 144-48.)  He brought out that words used by Agent Shute, such as "close proximity" and "vicinity," were not defined. (<u>Id.</u>)  Defense counsel also highlighted that Agent Shute did not plot other relevant places that fell within the cell sectors of Defendant's location, such as bars, Defendant's father's house, and Mr. Andrews' house, where Defendant may have been at the relevant times.  (<u>Id.</u> at 146.) Defense counsel used the evidence not only to cast doubt on Defendant's location by highlighting that cell site evidence cannot pinpoint Defendant's exact location but also to show that there were places Defendant may have innocently been to exculpate Defendant from the robbery.  Given Agent's Shute's testimony on direct and cross-examination, Defendant's trial counsel made a reasonable strategic decision not to retain an expert on cell site analysis. Defendant also has not met his substantial burden of showing that but for trial counsel's decision

to refrain from calling a cell site expert, the outcome would have been different.[17]   Thus, Defendant's claim of ineffective assistance of counsel regarding the cell site location expert is without merit.

### 6.   Trial Counsel for Defendant Was Not Ineffective in Failing to Retain An Expert Witness on the Cause of Defendant's Ankle Injury or to Offer Other Witnesses to Testify About the Injury

The Government presented evidence showing that Defendant may have been struck in the foot by a bullet while escaping from the CVS robbery.   Defendant contends that defense counsel at trial was ineffective in not countering this evidence with the testimony of a doctor who had an expertise in the cause of an ankle injury.   Defendant's expert would have given a reason for the injury different from the Government's "bullet theory."

Jonathan Andrews, Defendant's co-defendant, testified that he and Defendant jumped through the CVS Pharmacy drive-thru window at the end of the robbery, and hopped a fence. (Tr. 124:6-22, June 6, 2013.)   He testified that they were being shot at while doing so.   (Tr. 125:16-22, June 6, 2013.)   He further said that the day after the CVS robbery, he met Defendant

---

[17] Defendant's second argument, that counsel was ineffective for failing to move to suppress Defendant's cell phone records seized by subpoena without a warrant, also fails.   (Doc. No. 224 at 34-37.)   Under Third Circuit precedent, a warrant is not required to obtain cell site location information for cell phone calls.   See In re Application of U.S. for an Order Directing a Provider of Elec. Comm'n Serv. to Disclose Records to Gov't, 620 F.3d 304, 313 (3d Cir. 2010) (citing 18 U.S.C. § 2703(d)) ("[cell site location information] from cell phone calls is obtainable under a § 2703(d) order and that such an order does not require the traditional probable cause determination.   Instead, the standard is governed by the text of § 2703(d), i.e., 'specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation.'"); see also United States v. Graham, 824 F.3d 421, 439 (4th Cir. 2016).

Moreover, two sets of call detail records were obtained in this case.   The first was obtained by court order to track Defendant.   The second, which Agent Shute relied on, was obtained by a search warrant.   (Tr. 117:5-20, Apr. 18, 2016.)   Since the historical call records were obtained by a search warrant, this argument fails for this reason alone.

who was "hopping on one leg." (Tr. 142:3-143:11, June 6, 2013.)  Meehan told Andrews that his leg was hurt because "one of the bullets struck the bottom of his sneaker and broke his foot." (Tr. 143:18-20, June 6, 2013.)  Andrews testified that Meehan took off his sneaker and Andrews "felt the inside and you can actually feel where the bullet had just barely pinched through."  (Tr. 143:21-24, June 6, 2013.)

Police Officer James Boccalupo testified that he pursued the robbers as they climbed out of the CVS window, ran down the driveway, and jumped over a fence.  The officer returned fire at the robbers as they ran down the driveway, and believed he fired at least one more shot as the offenders were jumping over the fence.  (Tr. 103:19-105:15, June 7, 2013.)  Police Officer Dimitrios Loizos also testified that he fired his weapon at the person who was shooting towards Officer Boccalupo.  (Tr. 123:22-124:18, June 7, 2013.)

Charles Rhoads testified that he picked Defendant up on the street at approximately 12:20 a.m. on February 15, 2011.  (Tr. 157:19-158:5, June 7, 2013.)  He testified that Meehan "hopped" into his car, and told Rhoads that he "thinks he got shot in the foot."  (Tr. 163:4-21, June 7, 2013.)

Additionally, Nancy Quinn, a friend of Defendant for approximately 20 years, testified that Defendant came to her house on February 15, 2011, "his foot was hurt" and he was limping. (Doc. No. 182, Tr. 73:8-75:10, June 10, 2013.)  She gave him crutches that belonged to her daughter and he left with them. (Doc. No. 182, Tr. 79:8-25, June 10, 2013.)

### a.   Trial Counsel Made a Strategic Decision Not to Call Expert Witness Dr. Steven Cancell to Testify as to How Defendant Sustained His Ankle Injury

Defendant argues that trial counsel was ineffective in failing to present medical evidence regarding the injury to his ankle or foot to show that the injury was inconsistent with the theory that it was caused by a gun shot, and in failing to request funds for the retention of an expert to

testify about this matter.  He argues that such testimony would have provided a non-incriminating theory to explain his foot injury.  In particular, Defendant would have offered at trial the testimony of Dr. Steven Cancell to refute the Government's theory that Meehan was shot fleeing from the CVS pharmacy.  (Doc. No. 284 at 20-21.)

Post-trial counsel presented the testimony of Dr. Steven Cancell, who was qualified as an expert as a podiatrist and podiatric surgeon.  (Tr. 6:11-18, Apr. 7, 2016.)  Dr. Cancell was Defendant's treating surgeon regarding a foot injury.  On March 1, 2011, Dr. Cancell treated Defendant, which included a review of his x-rays and emergency room report, and an examination.  (Tr. 9:6-21, Apr. 7, 2016.)  He diagnosed Defendant with a Lisfranc fracture dislocation, and a torn ligament associated with fractured metatarsals.  (Tr. 11:7-20, Apr. 7, 2016.)  A Lisfranc fracture is caused by direct or indirect trauma:  an example of direct trauma would be a fall from a height or an automobile accident; and an example of indirect trauma would be stepping in a pot hole or playing sports.  (Tr. 24:10-25:20, Apr. 7, 2016.)  Dr. Cancell testified that Defendant's foot injury could not have been caused by the impact of a bullet, and was "[o]ne hundred percent inconsistent with the impact of any high energy projectile."  (Tr. 26:1-5, Apr. 7, 2016.)  He testified that if a bullet had struck his foot, there would have been an entrance wound and massive shattering of the bone.  (Tr. 26:8-23, Apr. 7, 2016.)  He stated that even if a bullet hit his sneaker and did not penetrate the skin, it would not have caused the injury Defendant suffered.  (Tr. 26:24-27:6, Apr. 7, 2016.)  Furthermore, he testified that a person with Defendant's injury would not have been able to run and jump fences without a visible limp.  (Tr. 39:2-7, Apr. 7, 2016.)

Given the evidence in this case, trial counsel was not ineffective in failing to retain and call Dr. Cancell to testify at trial.  Trial counsel made sound strategic decisions in this regard.

Counsel knew that if they presented evidence regarding how Defendant injured his foot, the Government would have introduced rebuttal evidence on Defendant's inconsistent statements about how he injured his foot. This would have included the fact that he originally told Agent Coyle he injured his foot while working, but then during a civil deposition admitted he lied to Agent Coyle and actually hurt it when he was burglarizing buildings for scrap metal. (Doc. No. 126; Doc. No. 233, Ex. F at 148-49.) Therefore, David Shapiro, Esquire, stated that he made a conscious decision to "stay[] away from that issue" as part of the defense. (Tr. 26:12-24, Apr. 6, 2016.) In addition, he did not believe that Mr. Meehan having been shot in the foot was a central part of the Government's case (Id.), and testified that he did not believe there were any credible witnesses available to testify that Defendant's injury predated the robbery.[18] (Tr. 109:3-22, Apr. 7, 2016.)

David Shapiro, Esquire, testified at the post-trial hearing that he considered contacting Dr. Cancell but did not believe calling a doctor to testify regarding Defendant's foot injury would be helpful to the case due to Defendant's inconsistent stories. (Tr. 110:12-16, Apr. 7, 2016.) David Shapiro's testimony further indicates the consideration he gave the issue and the reason for his decision:

> . . . I did not have – did not have a factual basis from Joe for his opinion. I did not have a consistent factual basis. I had facts that were all over the place. It went from, I fell off a ladder to I was scrapping for metal. What was the factual basis that I was going to use?

---

[18] David Shapiro stated:

> I did not have a credible witness, was there a body to put on the witness stand? Probably. But was there a credible person? I made – I have to – you know as well as I do, lawyers make decisions as to credibility and perception by a jury. And that's a problem in this case. Now I didn't – I made judgments. And they were my strategic judgments. If they were wrong, they're going to be wrong. But those – that was the hand that I was dealt.

(Tr. 109: 3-16, Apr. 7, 2016.)

. . .
We can agree that I didn't speak to [Dr. Cancell].  And I didn't speak to him because I did not have, I did not have a factual basis Number 1.  And Number 2, I felt that because there was so much risk in this defense, if I put a witness on the witness stand that a jury sees through on the credibility issue, it's only going to get worse.

(Tr. 111:6-10, 111:19-24, Apr. 7, 2016.)

Additionally, expert testimony by Dr. Cancell about Defendant's foot injury was consistent with a fall from a height, which in this case occurred when the robbers of the CVS pharmacy sought to escape by jumping over a high fence.  Dr. Cancell was not able to testify as to the date of Defendant's injury.  For all the above reasons, Defendant's trial counsel exercised reasonable judgment in their strategic decision not to retain Dr. Cancell or to pursue him as a witness at trial.  Furthermore, because the evidence of guilt was overwhelming, there was no prejudice in failing to have Dr. Cancell testify.

### b.  Trial Counsel Was Not Ineffective in Failing to Call Other Witnesses Who Would Have Testified About the Injury

Defendant claims that counsel should have presented other witness testimony to corroborate Meehan's story that he hurt his foot at work or while scrapping for metal.  For example, Ms. Sabatino testified that Defendant had injured his foot in a work injury, and stated to Agent Coyle that she had seen Defendant limping the Sunday prior to the CVS robbery.  Heather Meehan also may have corroborated Defendant's work injury story.[19]  Defendant claims

---

[19]   In pretrial notes, Defendant indicated to the Shapiros that Heather Meehan would corroborate that he hurt his foot before Valentine's Day.  (Ex. G340.)  Trial counsel had an investigator interview Heather Meehan on December 20, 2012.  (Ex. G342.)  The investigator's report included the fact that Heather advised that she lied to the police when she told them Defendant hurt his foot falling off a ladder.  (Id.)  She told the investigator that the truth was that on February 14, 2011, between 8:00 p.m. and 9:00 p.m., Defendant came to her residence and she helped him take a bullet out of his shoe.  (Id.)  The bullet did not penetrate his foot, but it did cause a non-bleeding impact injury to his foot.  (Id.)  He did not tell her how he got shot, but she believed he was part of the CVS robbery.  Defendant maintains that Heather's statement was impeachable due to her dislike for Leah Sabatino and her

trial counsel should have investigated and called Joe Meehan, Jr., Jessica Pitner, "Pooh," and "Vicki" to further corroborate that his foot was injured prior to February 14, 2011.  (Doc. No. 284.)

Jessica Pitner, who was engaged to Defendant at one time, did not mention an injury to Agent Coyle when she was interviewed.  (Ex. G388; Doc. No. 280, Tr. 98:11-20, Apr. 18, 2016.) David Shapiro, Esquire, testified that he considered using her as a witness and strategically chose not to call her.  (Doc. No. 277, Tr. 93:12-17, Apr. 7, 2016.)

Regarding "Pooh," Defendant testified at a civil deposition that he hurt his foot scrapping for metal with Pooh.  Michael Shapiro, Esquire, testified that they did not have enough resources for an investigator to go searching for someone referred to as "Pooh."  (Tr. 43:1-8, Apr. 18, 2016.)   Additionally, if Pooh testified, that would have opened the door to Defendant's inconsistent statements regarding his foot injury.  (Tr. 99:3-25, Apr. 18, 2016.)  Pooh and Vicki were not listed on the April 2013 witness list that Defendant wrote out.  (Ex. G387.)  The Shapiros also made a strategic decision not to call Joe Meehan, Jr. because they felt he was not credible.  (Id.)

Collectively, the decision of trial counsel to downplay the method of injury to the ankle considering the inconsistencies in Defendant's story, Heather Meehan's statement, and other evidence, was not unreasonable.  It was a result of sound trial strategy to avoid introduction of prior inconsistent statements, which defense counsel believed would harm Defendant at trial. Defense counsel made strategic decisions on credibility and exercised reasonable professional judgment.  Again, given the evidence against Defendant in this case, no prejudice has been

---

relationship with Defendant.  (Doc. No. 292 at 17.)  Defendant further claims that her statement is inconsistent time-wise with other evidence introduced.  (Id.)

shown.  Defendant's trial counsel was not ineffective for failing to call an expert or other witnesses to testify regarding Defendant's foot injury.

### 7.   Trial Counsel for Defendant Was Not Ineffective in Failing to Excuse Juror Number 44

Defendant contends that his trial counsel was ineffective in failing to excuse Juror Number 44, Stewart Welker, from the jury.  Mr. Welker was questioned individually by the Court outside the presence of the entire jury panel.  The entirety of the questions asked and answers given by Mr. Welker and statements of counsel for the parties follow:

THE COURT:  Next is Juror Number 44.

(Pause.)

THE COURT:  This is Mr. Welker?

JUROR NO. 44:  That's correct.

THE COURT:  Welcome.

JUROR NO. 44:  Thank you.

THE COURT:  It says here, occupation, lead person Boldman (ph) Hat Company.

JUROR NO. 44:  Yes, that's correct.

THE COURT:  What do you do?

JUROR NO. 44:  We manufacture head wear, hats, caps, things like that.

THE COURT:  Okay and what do you do there, what's your position?

JUROR NO. 44:  I'm on the floor, the manufacturing floor.

THE COURT:  Okay, right.  And you raised your hand and said you'd have a hardship serving?

JUROR NO. 44:  Probably a little bit would pertain to work.  Since I run the floor and there's only one other person as my manager.

THE COURT:  Right.

JUROR NO. 44:  So, he's filling in while I'm gone.  You know, for the jury, two days not too bad.  But when you announced the duration, I was like, oh, that's a long time.

THE COURT:  Right.

JUROR NO. 44:  And it has a little bit to do with also my mother.  She's 78, she's got heart conditions, she's – but she's got a lot of issues.  So, the duration also, I mean, I can spend some time away, it's not that much of a big deal, but you know, the duration would be a little bit of a hardship for me.

THE COURT:  Right, how many people work for the company?

JUROR NO. 44:  Like my department in manufacturing?

THE COURT:  Yes.

JUROR NO. 44:  55 – 53 or 55 people.

THE COURT:  All right, so there's somebody that could take over?

JUROR NO. 44:  My manager, yeah, my manager.  He's the superintendent.  He would have to fill in.

THE COURT:  And as far as your mom is concerned, is she alone? Somebody with her?

JUROR NO. 44:  Yes, she is alone, she's alone.  Yes, my father passed away in '08.  So, I'm the oldest son, so.

THE COURT:  You have brother, sister?

JUROR NO. 44:  I do have, yeah, I do have a brother and sister.  A grandfather who lives next door, but he's even older and he's 89 or so.

THE COURT:  Okay, but she's pretty stable, I guess?  Based upon what you're telling me, somebody can watch her or someone be there?

JUROR NO. 44:  Somebody could check in, yeah.

THE COURT:  Right.

JUROR NO. 44:  Like my brother, after – he works later, but he can stop, because my hours are finished at 2:30 in the afternoon, but he works until like 5:00, between 5:00 and 6:00.

THE COURT:  Okay.

JUROR NO. 44:  Works in a warehouse, so, it takes him longer.

THE COURT:  I'm sure you can appreciate, Mr. Welker, we hear a lot of people have relatives that have problems.

JUROR NO. 44:  Yeah.

THE COURT:  But if they're okay, it's really not a compelling kind of a hardship.

JUROR NO. 44:  Okay, okay.

THE COURT:  But it's not to say you shouldn't have concerns.

JUROR NO. 44:  Yeah, yeah, I have concerns, but you know, it's your decision.

THE COURT:  Okay and you said you knew somebody or you may be a member of the IRA [sic] or knew somebody.

JUROR NO. 44:  NRA?

THE COURT:  NRA.

JUROR NO. 44:  NRA.

THE COURT:  For firearms.

JUROR NO. 44:  Yes, I'm a member, yes.

THE COURT:  Are you a member of the NRA?

JUROR NO. 44:  I am a member, myself.

THE COURT:  And you have firearms?

JUROR NO. 44:  Yes.

THE COURT:  Okay.  I guess the critical question is, the important question is, when you serve on a jury, if you're selected, you have to decide this case based solely upon the evidence you see and hear in court.

JUROR NO. 44:  Yeah.

THE COURT:  And you have to apply to that evidence my instructions on the law.

JUROR NO. 44:  Yes.

THE COURT:  Would you do that?

JUROR NO. 44:  Yes, I would.

THE COURT: All right.

JUROR NO. 44:   I feel like I can, yeah.

THE COURT:  All right, you know, everybody has some prejudices, some biases, you know –

JUROR NO. 44:  Yes.

THE COURT:   – you're a member of an organization.

JUROR NO. 44:  Yes, the same one, a pretty big organization.

THE COURT:  You know, obviously, you have some knowledge of firearms.

JUROR NO. 44:  Yeah.

THE COURT:  But you have to set that aside –

JUROR NO. 44:  Mm-hmm.

THE COURT:   – and just decide this case based on what you see and hear in court, could you do that?

JUROR NO. 44:  Okay.

THE COURT:  Would you do that?

JUROR NO. 44:  I believe so, yes.

THE COURT:  All right and would you give both sides a fair trial?

JUROR NO. 44:  Yes, the best I can.

THE COURT:  All right.  Well, you've got to commit to us you will, that's the important thing.

JUROR NO. 44:  Okay, yes.

THE COURT:  All right, anything further?

MR. D. SHAPIRO:  Yes, your Honor.  Mr. Welker, I have written down here that you had raised your hand that you were a victim or somebody in your family was a victim of a crime?

JUROR NO. 44:  That was myself, actually.  It was a home invasion.

THE COURT:  How long ago?

JUROR NO. 44:  A break-in.

THE COURT:  How long?

JUROR NO. 44:  Six years, possibly.  They never found who did it, but you know, there was a report.

MR. D. SHAPIRO:  Were you home?

JUROR NO. 44:  No, it was when I was, I was at work.

MR. D. SHAPIRO:  And they never found –

JUROR NO. 44:  I was at work and they never found out who – there was cash stolen from my residence.

MR. D. SHAPIRO:  This is a case involving a robbery, would that affect your ability to –

JUROR NO. 44: Well, I would say yes, beings [sic] that they never caught who did it, it didn't feel like – I mean, I felt I didn't get enough of satisfaction from the police.  You know, I tried to follow up with calls, you know, did you hear anything, are you hearing anything and nothing ever came out of it.  And you know, I got the one call back and then after I called in again, you know, a few weeks later, I never heard a word after that.  So, it was like I just felt like they didn't give me enough satisfaction with that.

THE COURT:  All right, you never went to court?

JUROR NO. 44:  No, I never heard another word after the second call, you know, that I made to the –

THE COURT:  Right.

JUROR NO. 44:  – to the police station.

THE COURT:  You said it would affect you?

JUROR NO. 44:  That bothered me, yeah, that bothered me.

THE COURT:  Okay.

JUROR NO. 44:  I wish I would have had, you know, at least a little more satisfaction out of that situation, you know.

THE COURT:  Now, you –

JUROR NO. 44:  I mean, even if they did catch him, I don't have a clue because they never contacted me.

THE COURT:  All right, being affected by invasion of your home.

JUROR NO. 44:  Yeah, that's – it was pretty scary, yeah.

THE COURT:  That's a pretty natural feeling.

JUROR NO. 44:  Yeah, yeah.  I would think everyone would feel like that.

THE COURT:  Absolutely.

JUROR NO. 44:  Yeah.

THE COURT:  But the question is that everybody who comes into the court as a prospective juror may have something in their background that we talk about.

JUROR NO. 44:  Yeah.

THE COURT:  But when you listen to the evidence in this case, you've got to put that aside, you know and you've got to decide this case based solely upon what you see and hear in court.  You can't hold it against the Government or the defendant, the fact that –

JUROR NO. 44:  Mm-hmm.

THE COURT:   – you were subject to this.  You've got to be fair and impartial and decide this case.

JUROR NO. 44:  Yeah, I understand.

THE COURT:  You see?

JUROR NO. 44:  I understand that.

THE COURT:  Will you be able to do that?

JUROR NO. 44:  I don't think I could be 100 percent impartial to that, to be honest.  I mean I really, I lock my doors.  I changed every lock on my house after that happened, so.

THE COURT:  All right, now as you hear evidence in this case and you'll be thinking about that situation?  Or are you going to concentrate on the evidence here?

JUROR NO. 44:  Well, I would concentrate on the evidence.

THE COURT:  All right, what did you mean when you said you can't be 100 percent impartial?

JUROR NO. 44:  Well, it's pretty close.  I mean, I know it's not exactly the same situation of what happened to me, you know.  Like I said, I wasn't home when it happened, but I felt like, you know, my privacy was invaded upon.  You know, I was single homeowner – and my daughter was there on the weekends, which I was glad she wasn't around.

THE COURT:  In this case, as we sit here, all you've heard about is what the charges are.

JUROR NO. 44:  Yes, yes, exactly.

THE COURT:  There's a presumption of innocence.

JUROR NO. 44:  Mm-hmm, I understand that.

THE COURT:  Everybody starts the trial with a clean slate.

JUROR NO. 44:  Okay.

THE COURT:  The Government's got to prove guilt beyond a reasonable doubt.

JUROR NO. 44:  Yes.

THE COURT:  If they don't prove that, then a defendant is entitled to be found not guilty.

JUROR NO. 44:  I understand that.

THE COURT:  Everybody has a clean slate when they walk into the courthouse.

JUROR NO. 44:  Mm-hmm.

THE COURT:  Knowing that, would you follow those instructions?

JUROR NO. 44:  I would definitely try to do that, I would do that.

THE COURT:  All right, would you put aside any notions or feelings you have?

JUROR NO. 44:  Well, I would have to, yeah.

THE COURT:  Would you put aside any notions or feelings you have about the personal experience you went through and just judge this case based on what you see and hear in court?

JUROR NO. 44:  Okay, yea, I will do that.

THE COURT: All right.

JUROR NO. 44:  I mean, I know that's what I'm called upon to do.

THE COURT:  Yes, it's got to come from within you.

JUROR NO. 44:  Yes.

THE COURT:  I don't want you to just say – I don't want you to yes me or yes the lawyers.

JUROR NO. 44:  Yeah.

THE COURT:  It's got to be a situation where you feel 100 percent, not 98 percent, that everybody's entitled to a fair trial and you can't judge somebody just based upon some experience you went through.

JUROR NO.  44: Okay.

THE COURT: All right.

JUROR NO. 44:  It's difficult, it is for me.  You know, I was –

THE COURT:  I'm not saying it's not difficult.

JUROR NO. 44:  Yea.

THE COURT:  All we need you to do is to commit to us that you'll decide this case based solely upon what you see and hear in court.  Can you do that?

JUROR NO. 44:  I don't feel like I can 100 percent.

THE COURT:  Okay, all right, well, that's what we want, we want the truth.

JUROR NO. 44:  To be honest, yes.

THE COURT:  You know, voir dire means to speak the truth.

JUROR NO. 44:  Okay, yes.

THE COURT:  Okay.  Any other questions?

MR. LLORET:  No, your Honor.

MR. D. SHAPIRO:  No, your Honor.

THE COURT:  All right, thank you, that's all.

JUROR NO. 44:  That's it?

THE COURT:  Yes, that's it, thank you.

JUROR NO. 44:  All right, thanks for your time.

(Pause.)

THE COURT:  Can we strike Mr. Welker by agreement?

MR. LLORET:  No.

MR. M. SHAPIRO:  No.

THE COURT:  Wait a minute, we can only have one lawyer speaking at a time.

MR. D. SHAPIRO:  Yeah, he's in the command seat today, Judge.

MR. M. SHAPIRO:  We don't have a challenge to Mr. Welker.

THE COURT:  You want him on the jury as a prospective juror?

MR. D. SHAPIRO:  Yeah.

MR. LLORET:  I'm not going to object to him, your Honor.

THE COURT:  You're not going to object?

MR. LLORET:  No, sir.

> THE COURT:  All right, if both sides want him, he'll remain on the panel.  I mean, he could not say that he would 100 percent set aside.  I mean, at one point he said he would, he can decide the case objectively.  Then when properly questioned further, he said he could not.  So, but if both sides are satisfied with, I think he said 98 percent, if I'm not mistaken, then it's your call.  Okay?  All right, so, Mr. Welker will remain on the jury panel.

(Voir Dire Tr. 3:25-15:20, June 5, 2013.)

It is evident from the transcript that both counsel for Defendant and Government counsel were emphatic that they did not want Mr. Welker stricken from the prospective jury.  No preemptory challenges were used to strike him and he served on the trial jury.  Defense counsel had sufficient opportunity to view the juror and his demeanor, to learn about his occupation, his family background, and his other proclivities.  With the active involvement of Defendant, who was present when Mr. Welker testified, they chose to permit him to remain on the jury panel.  Defense counsels' decision was a strategic one which is entitled to great deference.

Mr. Welker was questioned on June 5, 2013.  Michael Shapiro, Esquire, who was primarily responsible for voir dire, testified at the post-trial hearing on April 18, 2016 about Mr. Welker.  His hindsight reason for not striking Mr. Welker was as follows:

> However, at the time, I know that we were having arguments about certain jurors, and we wanted to limit – we didn't want to argue every single juror, we wanted to limit it where if we thought that the Government would not agree to him being stricken, to our best possible cases.
>
> And in that situation it was clear that now Judge Lloret[20] was not going to agree to the juror being dismissed, so – and Mr. Meehan was sitting right there and we did not – we decided to not to challenge him for cause, because we didn't want -- we thought that – we wanted to kind of save our bullets, so to speak.
>
> . . .

---

[20]  Before U.S. Magistrate Judge Richard A. Lloret was appointed to his current position, he was an Assistant United States Attorney and participated in the prosecution of Mr. Meehan.

. . . we thought that if we argued on every single juror that we would reduce our credibility with the Court when we thought that it was really necessary.

And I think that it's reasonable to think that I might have made a misjudgment on that, but I think that we thought at this time – with this juror, that it was an argument we were going to lose.

(Tr. 54:4-55:5, Apr. 18, 2016.)

Although with the benefit of hindsight and the jury convicting Mr. Meehan, both defense counsel, David and Michael Shapiro, felt that they should have moved to strike Mr. Welker, it is evident from the June 5, 2013 transcript that they felt otherwise. They made the strategic decision to limit their strikes to "our best possible cases" to "save our bullets." [21]

At the time, it was not entirely clear where Mr. Welker's bias lie. Mr. Welker was a member of the NRA and had firearms. He also said he was the victim of a break-in at his home about six years earlier. He was dissatisfied with the police and the investigation because of lack of follow-up phone calls to him by the police. He also felt his privacy was invaded and he changed the lock on his house, where his daughter resided on weekends. And although he said he could not be 100 percent impartial because of the break-in, he was responding to a question

---

[21] During voir dire, a total of 51 jurors were interviewed. A total of 22 jurors were struck or excused by agreement, 3 of which were not interviewed. In total, defense counsel challenged 7 jurors for cause; 3 challenges were granted and 4 were denied by the Court. The Government did not challenge any jurors for cause. There were no objections to 25 jurors who were interviewed, including Mr. Welker. Prior to interviewing Juror Number 44, Mr. Welker, 20 jurors were interviewed. 10 of these jurors were struck by agreement. Defense counsel challenged 2 jurors for cause, and the Court denied both motions. An additional 3 jurors were excused without interviews for health reasons. There were no challenges to 8 jurors.

Subsequent to the interview of Juror Number 44, 30 jurors were interviewed. Nine of these jurors were struck or excused by agreement. Defense counsel challenged 5 of these jurors for cause. The Court granted 3 of these motions, and denied 2. There were no challenges to 16 jurors.

about not holding the break-in against the Government or Defendant.  He said his impartiality would be "pretty close" to 100 percent because this case "is not exactly the same situation to what happened to me."   From the transcript, it is clear that Mr. Welker had an unpleasant experience arising from the break-in.  The parties evaluated these answers and were certain that Mr. Welker should remain on the jury.

Influencing all counsel's decisions not to strike Mr. Welker was Mr. Welker's responses that he would concentrate on the evidence, and would apply to the evidence the instructions of the Court on the law.  He understood that a defendant begins a trial with a clean slate, is presumed innocent, and the Government must prove guilt beyond a reasonable doubt or else a defendant is to be found not guilty.  He said he would put aside any notions or feelings he had about his personal experience because he has to.  And although he waivered as to whether he could decide the case 100 percent on what he sees and hears in Court after committing to doing so earlier, he said he would follow the instructions of the Court on the law.

The Sixth Amendment guarantees criminal defendants the right to an impartial jury.  This Sixth Amendment guarantee ensures that every criminal defendant is "entitled to a determination of his or her guilt by an unbiased jury based solely upon evidence properly admitted against him or her in court."  United States v. Lloyd, 269 F.3d 228, 237 (3d Cir. 2001) (quoting Virgin Islands v. Dowling, 814 F.2d 134, 138 (3d Cir. 1987)).  Trying a criminal defendant with a partial jury would be "akin to providing him no trial at all."  Johnson v. Armontrout, 961 F.2d 748, 755 (8th Cir. 1992).

The Supreme Court has held that, to show that a juror is partial or biased, the defendant "must show that the juror had such a fixed opinion that he or she could not judge impartially."  Hale v. Gibson 227 F.3d 1298, 1319 (10th Cir. 2000) (citing Patton v. Yount, 467

U.S. 1025, 1035 (1984)).  A juror is not considered partial simply because he or she had a preconceived notion as to the guilt or innocence of the accused.  Id.  "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."  Irvin v. Dowd, 366 U.S. 717, 722-23 (1975).

In Patton v. Yount, the Supreme Court held that ambiguity in the testimony of jurors during voir dire was not fatal to finding that the jurors would be impartial.  467 U.S. 1025, 1035-36 (1984).  In Patton, an individual juror gave ambiguous answers to questions regarding his impartiality during voir dire.  Id.  In response to a later question of whether the juror could "set his opinion aside before entering the jury box," the juror responded:

> I think I could enter it [the jury box] with a very open mind.  I think I could . . . very easily.  To say this is a requirement for some of the things you have to do every day.

Id. at 1039.  Although the juror had given contradictory testimony about his impartiality during voir dire, on review, the Supreme Court held that the trial court was correct in allowing the juror to participate in the criminal trial.[22]  The Court explained that trial courts are given "special deference" in making this determination because such a decision is made at the bequest of the parties, and after an extensive voir dire proceeding, which is designed to assess the demeanor

---

[22] In Patton, the Supreme Court noted that another juror's impartiality was challenged.  The Court stated:

> Similarly, in the case of alternate juror Pyott, we cannot fault the trial judge for crediting her earliest testimony, in which she said that she could put her opinion aside "[i]f [she] had to," rather than the later testimony in which defense counsel persuaded her that logically she would need evidence to discard any opinion she might have.

> Id.  at 1039-40.  The Supreme Court's discussion of juror impartiality demonstrates that, although jurors may give ambiguous statements during voir dire, they may still be permitted to participate in the criminal trial provided that they agree to consider only the evidence presented and to follow the law.

and credibility of each potential juror.  Id. at 1038.  In essence, trial courts are equipped to determine, from the facts presented before them, whether a juror will set aside any preconceived opinions he might hold and decide the case based on the evidence.

In the instant case, although Mr. Welker's testimony during voir dire was to some extent ambiguous, he committed to following the instructions of the Court on the law, including that he would remain impartial.  The jury was instructed as follows:

> My role now is to explain to you the legal principles that must guide you in your decision. You must apply my instructions carefully. Each of the instructions is important and you must apply all of them. You must not substitute or follow your own notion or opinion about what the law is or ought to be. You must apply the law that I give to you whether you agree with it or not.
>
> In our judicial system, it is important that you are not influenced by anything or anyone outside of this courtroom. Perform these duties fairly and impartially. Do not allow sympathy, prejudice, fear or public opinion to influence you. You should also not be guided – not be – I'm sorry, you should also not be influenced by any person's race, color, religion, national ancestry or gender, sexual orientation, profession, occupation, celebrity, economic circumstances, or position in life or in the community. You must make your decision in this case based only on the evidence that you saw and heard in the courtroom. Do not let rumor, suspicion or anything else that you may have seen or heard outside of court influence your decision in any way. The evidence from which you are to find the facts consists of the following: The testimony of the witnesses, documents and other things received as exhibits, and any fact or testimony that was stipulated; that is, formally agreed to by the parties.

(Doc. No. 185, Tr. 13:9-15, 14:17-15:9, June 13, 2013.)  Thus, given the above, it is evident that defense counsel made a critical, strategic decision based on all this information not to excuse Mr. Welker.

For all these reasons, trial counsel was not ineffective in the treatment of this juror. Based on all of these considerations, trial counsel's decision not to move to strike Juror Number 44 was not objectively unreasonable and did not rise to the level of a Strickland violation.

In addition, the evidence in this case was overwhelming.  Defendant's guilt was clearly established on all counts.  Mr. Welker considered the evidence, applied the law, and performed his duties like the other jurors who were convinced of Defendant's guilt.  Under all these circumstances, Mr. Welker's responses to questions during voir dire did not result in any prejudice to Defendant.

### 8. Trial Counsel for Defendant Was Not Ineffective in Explaining to Defendant His Right to Testify

Defendant next argues that trial counsel was ineffective in failing to adequately explain Defendant's right to testify, in giving Defendant false or misleading information regarding the dangers of testifying, and in failing to adequately explain to Defendant that by giving up his right to testify, his theory of the defense would go largely unsupported by the evidence in the record.[23] (Doc. No. 224 at 42; Doc. No. 284 at 31.)

### a. Defendant's Right to Testify Was Adequately Explained

A defendant has a constitutional right to testify at his criminal trial.  See Rock v. Arkansas, 483 U.S. 44, 49-53 (1987).  The right is personal and only the defendant may waive it.  Jones v. Barnes, 463 U.S. 745, 751 (1983) ("the accused has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal").  A defendant's waiver of the right to testify must be knowing and intelligent.  Schneckloth v. Bustamonte, 412 U.S. 218, 241 (1973).

On June 12, 2013, at the close of the evidence, the following exchange took place on the record between David Shapiro, Esquire, and Defendant regarding Defendant's decision not to testify:

---

[23]  Defendant did not testify at the evidentiary hearing.  Defendant does not explain how trial counsel failed to adequately explain to him that by giving up his right to testify, his theory of the defense would go largely unsupported by the evidence in the record.

MR. D. SHAPIRO: Mr. Meehan, I guess Michael and I have represented you for the better part of the last two years or so?

THE DEFENDANT: Yes.

MR. D. SHAPIRO: And we've spent a lot of time together, haven't we?

THE DEFENDANT: Yes.

MR. D. SHAPIRO: And we have debated many times about the various issues in your case, have we not?

THE DEFENDANT: Yes.

MR. D. SHAPIRO: And among the issues we debated most strenuously was your right to testify or not testify.

THE DEFENDANT: Yes.

MR. D. SHAPIRO: And we've discussed the pros and cons of that on many occasions?

THE DEFENDANT: Yes.

MR. D. SHAPIRO: And I've explained to you that it's your right and your decision as to whether or not you want to testify?

THE DEFENDANT: Correct.

MR. D. SHAPIRO: And without going into a whole bunch of details you have decided after discussions with myself and Michael not to testify?

THE DEFENDANT: Yes.

MR. D. SHAPIRO: And you understand that the Judge will instruct the jury that they are not to hold that against you?

THE DEFENDANT: Yes.

MR. D. SHAPIRO: And you understand that that is your constitutional right?

THE DEFENDANT: Yes.

MR. D. SHAPIRO: And you've decided, as we said, not to testify, is that correct?

THE DEFENDANT: Yes.

(Doc. No. 184, Tr. 73:8-74:16, June 12, 2013.)   The Court found that this waiver was made knowing and voluntary.   (Doc. No. 185 at 10:9-11:15.)   This colloquy demonstrates that Defendant's trial counsel adequately explained to him his right to testify at trial.

### b. Trial Counsel Did Not Misinform Defendant Regarding the Motion to Preclude Prior Testimony

Prior to trial, Defendant had filed a civil rights lawsuit under 42 U.S.C. § 1983 alleging that he sustained injuries as a result of law enforcement's actions during his arrest on February 17, 2011 and during his incarceration prior to transfer to the Federal Detention Center.   (Doc. No. 121 at 5-6.)   In connection with that lawsuit, Defendant's deposition was taken on February 7, 2013 without criminal counsel present.   On March 22, 2013, defense counsel in the instant criminal case filed a Motion to Preclude Prior Testimony, seeking to preclude in the criminal case Defendant's testimony from the February 7, 2013 deposition in the civil case, as well as any evidence that the Government procured as a result of the investigative leads originating from the deposition.   (Doc. No. 121.)   This Motion is referred to as a <u>Scrushy</u> Motion and was not ruled on prior to trial.   On June 12, 2013, following closing arguments, the Court granted the Motion as moot.[24]   (Doc. No. 155; Doc. No. 184 at 178:7-12.)

The next day, June 13, 2013, before the jury was charged, Defendant made a statement on the record that he felt he had been misinformed about the status of the Motion, and wanted to

---

[24]  On June 12, 2013, on the record following closing arguments, the Court reviewed the open motions.  Regarding the Motion to Preclude Prior Testimony, the Court stated, ". . . This is the testimony given at the deposition and the Government never attempted to introduce any of this evidence, so, this motion is moot.  All right, so, we'll deny the motion as moot.  All right, just for purposes of the record. . . .  or should I grant the motion as moot?"  (Tr. 177:19-178:12, June 12, 2013.)  The Government stated that it did not matter which way it was phrased because the Government never presented the evidence.  The Order ultimately granted the motion and ordered that it was moot because Defendant did not testify at trial.  (Doc. No. 155.)

testify.  (Doc. No. 185 at 5:18-9:14, June 13, 2013.)  Defendant stated and continues to assert

that Michael Shapiro, Esquire, told him that the Motion had been denied, when in fact no ruling

had yet been made.  (Id.)  As noted, the Court reviewed the colloquy that took place on June 12,

2013, between David Shapiro, Esquire, and Defendant regarding Defendant's decision not to

testify, and found that his decision not to testify was made knowingly and voluntarily after

serious discussion with counsel.  (Doc. No. 185 at 10:9-11:15.)  The Court further found that it

would be inappropriate for Defendant to testify after the close of evidence and closing

arguments.  (Id. at 11:16-25.)  Defendant argues that he made his decision not to testify based in

part on counsel's misinformation regarding the Motion.

Michael Shapiro testified at the post-trial hearing that he did not tell Defendant that the

Motion was denied:

> THE COURT:  And the one question I have is before Mr. Meehan made a
> decision not to testify, did you tell him that the [Scrushy] motion had in
> fact been denied?
>
> THE WITNESS:  No.
>
> . . .
>
> . . . I told [Mr. Meehan] that . . . I thought it would be denied and I thought
> that it was highly likely to be denied.  I did not tell him that it was denied.

(Tr. 44:10-45:3, Apr. 19, 2016.)  Michael Shapiro further testified that, "Mr. Meehan asked many

times whether the [Scrushy] motion had been decided, and our position was continually that it

had not been decided and – but that it would almost certainly be denied because it was a

voluntary deposition and we were – and we found no case law that would allow it to be barred –

prohibited completely."  David Shapiro, Esquire, testified that he told Defendant that the motion

had been "tabled" but that the motion almost certainly would be denied. [25]   (Tr. 87:12-19, Apr.

18, 2016.)  The Court credits the Shapiros's testimony on this issue.  Trial counsel did not tell

Defendant the Motion had been denied by the Court prior to Defendant's decision not to testify.

Thus, Defendant was not misled by counsel.  Therefore, Defendant was not influenced in not

testifying on his own behalf at trial by counsel's statements that Defendant considers misleading.

### c.  Defendant's Trial Counsel Exercised Reasonable Judgment in Advising Defendant Not to Testify

Defendant also argues that trial counsel's recommendation that Defendant should not

testify was based on faulty reasoning and deprived Defendant of the right to make a decision

based on all of the evidence and the Court's rulings.  He argues that the risk that his prior

convictions would be introduced if he testified was not present in this case because defense

counsel already advised the jury of Defendant's prior convictions.

Michael Shapiro, Esquire, testified that counsel discussed the question of whether

Defendant would testify with him for months prior to the trial.  (Tr. 122:25-123:19, Apr. 18,

2016.)  Specifically, Michael Shapiro testified:

> We had recommended – there were ongoing discussions between Mr. Meehan where he would – there were periods where he would express interest in – in testifying and we strategically did not think that he would make an effective witness on his own behalf, but it's ultimately his decision.  But that strategically prior to the deposition, we had not – we hadn't decided anything, but that was what our recommendation was at that point.  There wasn't a decision to be made though obviously until the time of trial.

(Id. at 123:10-19.)

---

[25]   David Shapiro, Esquire, also testified that he knew that the Motion would be denied because he "knew that a defendant could not get on the witness stand and give inconsistent testimony and that that item establishes the inconsistency could not be used."  (Tr. 104:19-24, Apr. 7, 2016.)  He further did not believe the Motion was relevant unless Defendant elected to testify.  (Tr. 99:1-25, Apr. 18, 2016.)

The Shapiros testified that they recommended that Defendant not testify at trial for several reasonable, strategic reasons.  Michael Shapiro, Esquire, testified that he and David Shapiro had concerns about inconsistencies between Defendant's deposition testimony, what he told Agent Coyle, and what he told the Shapiros.  (Tr. 120:21-121:3, Apr. 18, 2016; Ex. G305-309 ("Deposition Contradictions"); Ex. G-310.)  The inconsistencies included the manner of the ankle injury and the drugs in the motel room.  (Tr. 122:13-18, Apr. 18, 2016.)  Additionally, David Shapiro, Esquire, testified that, "it's a problem with what my client said to me, that his stories were constantly changing.  And in my view, created all kinds of ethical issues for me." (Tr. 115:23-25, Apr. 6, 2016.)  In particular, David Shapiro, Esquire, testified that at first Defendant told him he was with Heather Meehan in her apartment with an injured foot prior to the robbery, and then the investigator's report revealed that Heather said she took a bullet out of Defendant's shoe the night of the CVS robbery.  (Tr. 114:11-115:9, Apr. 6, 2016.)

Trial counsel was so concerned about these inconsistencies that David Shapiro, Esquire, made clear to Defendant that if he wanted to testify, the Shapiros would withdraw.  (Tr. 122:19-24, Apr. 18, 2016.)  David Shapiro, Esquire, testified that he told Defendant repeatedly that he would withdraw as counsel if Defendant elected to testify, because he believed there were inconsistencies in his statements and counsel was concerned about Defendant perjuring himself. (Tr. 103:10-16, 104:5-15, Apr. 7, 2016.)

The evidence does not show that the decision to recommend that Defendant not testify fell below an objective standard of reasonableness.  Given the Shapiros' testimony, Defendant has not met his burden of overcoming the strong presumption that defense counsel's decisions were "sound trial strategy."  See United States v. Lore, 26 F. Supp. 2d 729, 732 (D.N.J. 1998)

("While a criminal defendant often has good reasons not to testify during trial, after conviction, the impulse to claim that his attorney 'would not let him' becomes compelling.")

Finally, there is not a reasonable probability that had trial counsel requested the Court to rule on the <u>Scrushy</u> Motion to Preclude prior to Defendant's decision whether to testify, the ruling would have favored Defendant.  In his civil rights case, Defendant voluntarily gave the deposition and there was no basis to prevent the Government from using his inconsistent statements in the deposition on cross-examination in the criminal case.  Even if Defendant's testimony would have "humanized him and evoked sympathy from the jury," as Defendant argues in the present motion, he has not shown that the outcome would have been different. There was significant evidence implicating Defendant and testimony from Defendant raising inconsistencies in his story would not have changed the outcome here.

### 9. Defense Counsel's Decisions at Trial Do Not Rise to the Level of Constitutionally Ineffective Assistance Under <u>Strickland</u>

Present defense counsel's post-trial efforts on behalf of Defendant Meehan have been considerable and the post-trial expert testimony presented was certainly informative.  It is abundantly clear that new counsel, Mr. Farrell, would have tried this case differently.  However, the <u>Strickland</u> standard is highly deferential.  Even if in hindsight new counsel developed a better trial strategy, it does not mean that defense counsel at trial was constitutionally ineffective. Individually or cumulatively, it is not apparent to a reasonable degree of certainty that had trial counsel made different decisions in line with the present motion that the outcome of the trial would have been different.  The evidence against Mr. Meehan was substantial.  Given that evidence, the Shapiros made sound strategic decisions pretrial and during trial.

In light of the overwhelming evidence establishing guilt, Defendant has not met his burden of showing that defense counsels' decisions fell below an objective standard of

reasonableness, nor has Defendant shown a reasonable probability that, but for the trial counsel's contested decisions, the outcome of the trial would have been different.  In short, Defendant has not shown under Strickland that trial counsels' decisions prejudiced him at trial.  See Padilla v. Kentucky, 559 U.S. 356, 371 (2010) ("Surmounting Strickland's high bar is never an easy task."); Strickland, 466 U.S. at 693 ("Attorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial."); see also United States v. Shabazz, No. CIV. A. 10-3882, 2011 WL 2453496, at *14 (E.D. Pa. June 20, 2011) (where evidence of petitioner's guilt was overwhelming, the court held that "[e]ven if Petitioner's claims of unprofessional conduct were arguable, which they are not, Petitioner cannot establish the severe prejudice required by the second prong of Strickland.").

## V.    CONCLUSION

For the foregoing reasons, Defendant Joseph Meehan's Motion for Judgment of Acquittal or for a New Trial (Doc. No. 189) will be denied.

An appropriate Order follows.