JHS

IN THE UNITED STATES DISTRICT COURT OF

THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.

JOSEPH MEEHAN

CRIM. # 2:11-CR-00440 JHS

20      921

(357)

## 2255 MOTION

    It is well established that the third circuit construe's Pro-Se filings liberally, holding them to less stringent standard's than formal pleadings drafted by lawyers. HAINES V. KERNER, 404 U.S. 519, 520 92 S.Ct. 594, 30 L.Ed 2d 652 (1972); Also see: United States v. Miller, 197, F.3d 644 (3RD CIR. 1999). Petitioner humbly requests this Honorable Court to apply Pro SE Considerations to this motion.

    Petitioner Prays this Honorable Court will take into consideration the fact that defendant's case was extremely complicated. Multiple attorney's were removed from defendant's case at critical stage's of the Trial and Post Trial hearings process. The petitioner will try to raise each issue in it's applicable place, however, due to the complexity of the case, the number of Constitutional violation's and other issue's and the defendant's lack of legal training, Petitioner ask's the Court for guidence if an "issue" and/or argument are not listed properly.

    <u>IMPORTANT NOTE</u>: Please be advised that the trial transcripts quoted by the petitioner in this motion are different from the trial transcripts quoted by the government. Both sets of transcripts are grammatically correct. However, Petitioner's copies are shrunken to four pages on one page and contains thirty lines per page. Whereas, the governments copies are one page per page and contain twenty-five line's per page.

FEDERAL CAR JACKING (18 U.S.C. § 2119) IS NO LONGER A CRIME OF VIOLENCE
For 924 (c) Purposes in Light of "DAVIS"

In Light of United States v. Davis, 139 S.Ct. 2319 (2019), Federal carjacking (18 U.S.C. § 2119) can no longer be considered as a "crime of violence" for 924(c) purposes. Section 924(c)(1)(A) provides for a separate consecutive sentence if any person uses or carries a firearm during and in relation to a crime of violence or drug trafficking crime, or possesses a firearm in furtherance of such crimes.

Section 924(c)(3)(A) and (B) define "Crime of Violence" as an offense that is a felony and:

(A) has as an element the use, attempted use or threatened use of physical force against the person or property of another, or

(B) that by it's nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

For the purposes of this motion, (A) will be referred to as the "elements clause" and (B) as the "residual clause."

In United States v. Davis, Id., the Supreme Court, using the "categorical approach" found § 924(c)'s "residual clause" unconstitutional. The defendant now contends that without the support of the 924(c) "residual clause", Federal carjacking cannot stand as a "crime of violence" under the "elements clause" alone.

The Supreme Court has told us how to determine whether a crime meets the "elements clause" definition — "By looking only to the fact that the defendant had been convicted of crimes falling within certain categories, and not to the facts underlying the prior convictions" Descamps v. United States, 133 S.Ct. 2276 (2013).

It is of course tempting to consider the facts of a particular defendants case in making this determination. But, what the defendant actually did is NOT relevant for purposes of determining whether the crime for which he was convicted of is a "crime of violence" SOLELY under § 924(c)'s "elements clause." What matters is whether his crime (here, attempted carjacking 18 U.S.C. § 2119), "has as an element the use, attempted use, or threatened use of physical force against the person or property of another", 18 U.S.C. § 924(c)(3)(A).

The Supreme Court has held that the term "physical force" as used in § 924(c)(3)(A) requires "violent force" which means "strong physical force" or force "capable of causing physical pain or injury to another person." Johnson v. United States, 130 S.Ct. 1265 (2010). If carjacking can be committed without the type of force described by Johnson, Id then that crime obviously can't have "as an element, the use, attempted use or threatened use of physical force."

Federal Carjacking CAN NOT be a crime of violence as defined by § 924(c)(3)(A) for Three (3) reasons; First, the carjacking statute under which the defendants was convicted can be violated "by force and violence or by INTIMIDATION" 18 U.S.C. § 2119. There are numerous was to intimidate someone without the use or

threatened use of force — for example; someone could be intimidated by a persons reputation, or a person's tone of voice....it's not what you say, but how you say it.

Second, the Federal car jacking statue also contains an "intent element": A person commits carjacking if he acts "with the intent to cause death or serious bodily harm" 18 USC § 2119. As the Supreme Court explained in Holloway v. United States, 526 u.s. 1 (1999), "a defendant could still be found guilty of car jacking in a case in which the driver surrendered or otherwise lost control over his car, without the defendant ever "using", "attempting to use", or "threatening to use physical force," so long as the government could seperately satisfy the intent element. The government could do so by, for example, looking outside the defendants charged conduct and looking at his prior bad acts." HOLLOWAY, Id.

In 1999, the Supreme Court interpreted the Federal car jacking statue and specifically held that car jacking could be committed without the use, attempted use, or threatened use of physical force against the victim. SEE: HOLLOWAY. Therefore, since this interpretation was decided, it is only logical to conclude that car jacking has been a "crime of violence" under 924(c)'s "RESIDUAL CLAUSE." The Supreme Court in DAVIS has now invalidated the § 924(c) "RESIDUAL CLAUSE", which essentially means Federal car jacking cannot stand as a "crime of violence" for 924(c) purpose's.

For all of these foregoing reason's, the decisions of the third circuit which hold Federal carjacking as a "crime of violence" for § 924(c) purpose's conflicts with Holloway v. United States, 526 u.s. 1 (1988); Curtis Johnson v. United States, 130 s.ct. 1265 (2010); And Now, United States v. DAVIS, 139 s.ct. 2319 (2019). (Petitioner is Pro-se and unable to locate the exact case(s) in which the 3RD circuit ruled that federal car jacking is a crime of violence for the purpose of 924(c). Petitioner humbly requests the Court to apply said case(s) to this beief). Because the Supreme Court has ruled that Federal car jacking can be committed "without proving that he used, attempted to use, or threatened to use physical force against the victim, it clearly means that a defendant can be found guilty of Federal car jacking without satisfying the definition of a "crime of violence" as defined by § 924(c)(3)(A).

Thirdly, it's also clear that Fed. car jacking is not a crime of violence for 924(c) purposes. At a minimum, it's unclear, and could be decided either way, it may be a crime of violence or it may not. It is AMBIGOUS, As the U.S. Supreme Court States, "The rule of leniety teachs that ambiguities about the breadth of a criminal statue should be resolved in the defendants favor." Bell v. U.S., 75 s.ct. 620 (1955) to United States v. Davis, 138 s.ct 2319 (2019).

For all the foregoing reasons, the defendant humbly requests this Honorable Court to find, in light of DAVIS, that Federal carjacking "cannot" be used as a predicate "crime of violence" for 924(c) purposes and VACATE the defendants 924(c) conviction that was predicated upon federal car jacking.

18 U.S.C. § 924 (c)(1) is UNCONSTITUTIONALLY VAGUE ON it's FACE if NOT AS applied.

To begin, it's important to note that all of the defendant's convictions are a result of a single multi-count indictment.

18 U.S.C. § 924 (c)(1) provides in pertinent parts: "except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm or who, in furtherance of any such crime possesses a firearm, shall, in addition to the punishment provided for such a crime of violence or drug trafficking crime —

(i) be sentenced to a term of imprisonment of not less then 5 years;

(ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less then 7 years; and

(iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less then 10 years.

(c) In the case of a subsequent conviction under this subsection, the person shall —

(i) be sentenced to a term of imprisonment of not less then 25 years;

(D) Notwithstanding any other provisions of law —

(i) a court shall not place on probation any person convicted of a violation of this subsection; and

(ii) no term of imprisonment imposed on a person under this subsection shall run concurrently with any other term of imprisonment imposed on the person, including any term of imprisonment imposed for the crime of violence or drug trafficking crime during which the firearm was used, carried or possessed. (18 U.S.C. § 924 (c)(1)).

In 1993 the United States Supreme Court interpreted § 924 (c)(1) to require a mandatory minimum, consecutive 25 year sentence for a second or subsequent conviction of 924 (c)(1). See: DEAL V. UNITED STATES, 508 U.S. 129 (1993). This meant that if an offender had four counts of § 924 (c)(1) stemming from a single course of criminal conduct, charged in a single indictment

and convicted by a single proceeding, he would receive no less than 80 years imprisonment.

However, even in the face of this Supreme Court interpretation, several courts found that the stacking of mandatory minimums under § 924 (c)(1), where, (as in the defendants case) all of the stacked sentences are a result of charges that stem from a single course of criminal conduct brought under a multiple count indictment are inappropriate. (See: U.S. sentencing Comm'n Report to Congress: Mandatory Minimum penalties in the Federal Criminal Justice System (oct. 2011)). Also, though it is understood that Dissenting opinions have no precedential value, the defendant notes two post-DEAL dissents that are relevant as a matter of perspective. The Dissent in United States v. Camps, 32 F.3d 102 (4th cir 1994) found justification for permitting multiple convictions, but took issue with the imposition of multiple and consecutive sentences based on those convictions. Then in United States v. Kahn, 2006 U.S. App. LEXIS 22791 the Dissent indicated that most circuits did not permit multiple § 924 (c) convictions for conduct in the same underlying offense.

Moreover, in published opinions courts have overwhelmingly found § 924 (c) ambiguous, (a synonym of VAGUE: The Merriam Webster Dictionary (2018)).

In United States v. Rentz, 777 F.3d 1105 (10th cir 2015) the Court found: "Few statues have proven as enigmatic as 18 U.S.C. § 924 (c). Everyone knows that generally speaking, the statue imposes heightened penalties on those who use guns to commit violent crimes or drug offenses. But the details are full of Devils. Originally passed in 1968, Today that statue says any person who, during and in relation to any crime of violence or drug trafficking crime ... uses or carries a firearm, or who in furtherance of any such crime, possesses a firearm shall in addition to the punishment provided for such crime ... be sentenced to a term of imprisonment of not less than 5 years 18 U.S.C. §924(c)(1)(A). That bramble of prepositional phrases may excite the grammer teacher but it's certainly kept the federal Courts busy. What does it mean to "use" a gun "during and in relation to" a drug trafficking crime? The question rattled around for years until Bailey v. United States, 516 U.S. 137 (1995) and even now isn't fully resolved. What does and does not qualify as a "Crime of violence"? The better part of five decades after the statutes enactment and courts are still struggling to say. United States v. Castleman, 134 S. Ct. 1405 (2014) And theres the question posed by this case: What is the statutes proper writ of prosecution? The parties before us agree that Phillip Rentz used a gun only once

but did so "during and in relation to" two seperate "crimes of violence" — By firing a single shot that hit and injured one victem but then managed to strike and kill another. In circumstances like these, does the statute permit the government to charge one violation or two"? RENTZ, Id. The Court went on to find that the language of §924 (c) was ambiguous with respect to the number of consecutive sentences to be imposed under §924 (c) where there was a single criminal episode, and applied the rule of lenity.

In United States V. Phipps, 319 F.3d 177 (5ᵗʰ cir. 2003) the Court noted that the precise statutory question whether §924 (c)(1) authorizes multiple convictions for a single use of a single firearm based on multiple predicate offenses has not been addressed and went on to hold that §924 (c)(1) was ambiguous and therefore applied the rule of lenity and decided that the statute does not authorize multiple convictions for a single use of a single firearm based upon multiple predicate offenses. The Court found that the main issue was whether §924 (c)(1) authorizes multiple convictions for a single use of a single firearm based on multiple predicate offenses. According to the Court, this question is purely a question of statutory interpretation, with two parts. First, the court must ascertain the unit of prosecution for §924 (c)(1). SEE: United States V. Universal C.I.T. Credit Corp., 344 U.S. 218 (1952). The Phipps court concluded that the unit of prosecution, is the use, carriage or possession of a firearm during and in relation to a predicate offense. Second, the court must determine whether, given this unit of prosecution, if §924 (c)(1) authorizes multiple convictions for a single use of a single firearm based on multiple predicate offenses. Although the court found this question to be close, and opined that reasonable minds could disagree, this very ambiguity compelled the court to apply the rule of lenity, and answer the question in the negative. Phipps, Id.

According to the Phipps court, only two other courts circuits had addressed the precise question whether §924 (c)(1) authorizes multiple convictions for a single use of a single firearm based on multiple predicate offenses and both cases found §924 (c)(1) was ambiguous and applied the rule of lenity. SEE: United States V. Wilson, 160 F.3d 732 (D.C. cir. 1998) and United States V. Finley, 245 F.3d 199.

As described above Courts across the united states have only agreed on one thing in regards to §924 (c)(1)... it is AMBIGUOUS, which is simply another way of saying it is VAGUE. Even after the Supreme Courts interpretation in DEAL, Id, Courts still could not

figure out the correct application of § 924 (c) (1).

Then, in 2018, the United States Legislature decided to make it Absolutely clear how § 924 (c) (1) is to be applied, by it's passing of THE FIRST STEP ACT OF 2018. In § 403 (A) of said Act, the legislature made "Clarifying Amendments" to § 924 (c) (1) completely clearing up decades long controversies with the application of the statutes Mandatory consecutive 25-year Mandatory minimum and effectively Abrogating DEAL, Id.

§ 403 (A) clarified the Language concerning the mandatory consecutive 25 year minimum in § 924 (c) (1) to provide that "A § 924 (c) (1) offense must occure after the prior § 924 (c) (1) conviction has become final." The first step act Amended § 924 (c) (1) on December 21, 2018 to require a 25 year mandatory minimum sentence be imposed only for a violation of § 924 (c) (1) that occurs after a prior conviction has become final, thus preventing a defendant from receiving 25 year Minimum sentences for multiple violations of § 924 (c) (1) for the first time in a single prosecution." United States v. Aviles, 938 F.3d 503 (3rd Cir. 2019); see: First step Act of 2018, pub. L. No. 115-391, § 403 (A) 132 Stat. 5194, 5221-22.

It should be clear that § 924 (c) (1) was unconstitutionally Vague prior to the clarifying Amendments of the First Step Act of 2018. As Justice Kagan explained in Sessions v Dimaya, 138 S.Ct. 1204 (2018) "The prohibition of VAGUENESS IN criminal statutes... is AN "essential" of Due Process, required by both ordinary notions of fair play and the settled rules of law 138 S.Ct. at 1212. The void for vagueness doctrine thus ensures citizens have fair notice of prohibited (xxxxxxx xx xxxxxxxxxxx xxxxxxx xxxxxxxxx) conduct, and guards against discriminatory Enforcement of Ambiguous Laws." DIMAYA, Id. "Courts are obligated to construe a statute to avoid Constitutional problems" INS v. ST. CYR, 533 U.S. 289 (2001). However, courts can only do this if such a reading is "fairly possible", after the application of ordinary Textual Analysis Jennings v. Rodriguez, 138 S.Ct. 830 (2018) Where, as here, there is an absence of more than one plausible construction, "The CANON of CONSTITUTIONAL Avoidance simply has no application" Jennings, 138 S.Ct. at 842.

Lastly, "the vagueness doctrine represents a procedural not a substantive, demand. It does not forbid the legislature from acting toward any end it wishes, but only requires it to act with enough clarity that reasonable people can know what is required of them and Judges can apply the law consistent with their limited office." DIMAYA, 138 S.Ct. at 1233.

These insights apply here. Congress deemed it appropriate to make clarifying Admendments to § 924 (c)(1) to achieve their aims with sufficiantly definite terms. Prior to these clarifying amendments § 924 (c)(1) was AMBIGUOUS and Unconstitutionally Vague. "A vague law is no law at all." Johnson, Id.

Whereafore, this Honorable ~~court~~ Court should find that § 924 (c)(1), prior to December 21, 2018's clarifying amendment in the First Step Act, was/is Unconstitutionally Vague on it's face and VACATE the defendant's convictions and subsequent sentences that rest thereon.

## A. DEFENDANT'S DUE PROCESS RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENT'S WERE VIOLATED.

**I.** Post trial Attorney, Michael J. Farrell, was Constitutionally ineffective for not raising the Due Process violation(s) as it occured during Post Trial hearings on April 3, 2016.

**II.** The Government violated defendant's Due Process rights by granting Leah Sabatino immunity to "Prostitute, use drugs, purchase drugs and sell drugs."

**III.** The Government further violated defendant's Due Process rights by refusing to extend Sabatino's immunity during post trial hearings. Thereby, forcing Sabatino to assert her fifth Amendment privilege which denied defendant his right to question Sabatino regarding her heroin use in the Federal Courthouse immediately prior to her testifying and the governments Knowledge there of.

**IV.** The Trial Court violated Defendant's Due Process rights under the fifth and fourteenth amendments by allowing the government to be the "ARCHITECT" of the Trial and Post Trial proceedings

**V.** Defendants fifth and fourteenth amendment rights to Due Process were violated by the governments Knowledge and allowance of Sabatino's false testimony.

**VI.** Defendants fifth and fourteenth amendment rights to Due Process were violated by the governments Knowledge and allowance of F.B.I. Agent Shute's false testimony.

**VII** Appeal Counsel, Julie McGrain was INEFFECTIVE for changing "HEROIN" ARGUMENT so drastically it constituted a NEW ARGUMENT and for failing to continue to raise the ARGUMENT dealing with historical cell site location.

Defendant's trial began on June 4, 2013. Leah Sabatino, a Key government witness, met with AUSA Lloret, AUSA Freind, and Agent Cogle on May 29, 2013. Sabatino's Attorney, Ms. Sarnese, was not present at that interview (SEE: F.B.I. 302 for May 29, 2013 marked as Exhibit D-1). At that interview Sabatino told the "government team" she needed to use heroin multiple times each day, specifically noting "in the morning" to make her feel "normal." The government claims they turned the May 29, 2013 302 over prior to trial. However, the record does not support that and both Trial Lawyers dispute that claim (SEE: David Shapiro letter dated 2-28-17 marked as Exhibit D-2; also see Post Trial hearing Trans. April 18, 2016 pages 112 to 114 and April 19, 2016 pages 4 to 8).

On 11-18-13 Trial Counsel Filed a 29/33 motion charging the government with never divulging their Knowledge that Sabatino would "NEED" to inject Heroin before testifying. This Charge was due to what Agent Cogle testified to at trial. The defense and government both filed multiple motions and attended multiple hearings in regards to the governments Knowledge of Sabatino's heroin use and the NON-disclosure of that information. In the motions, all 302's were marked as exhibits and the May 29, 2013 302 has NEVER been seen or heard of until April 18, 2016 during post trial hearings. Had it been turned over, the defendant could not have argued

---

1. Petitioner is using Trial Transcripts that are shrunk to four pages on one page. The reference points will be different from the reference points of single page transcripts.

that the government failed to disclose Sabatino's heroin use, all the government needed to do was attach the May 29 2013 302, along with the other 302's, as an exhibit in one of their filings.

Sabatino was scheduled to testify on June 10, 2013. When she had not been called by 11:30 a.m. she FLED the Courthouse. A material witness warrant was issued. At approximately 4:30 p.m. Sabatino's attorney, Ms. Sarver, brought her in. The record confirms the government did not alert the Court to Sabatino's heroin use, nor did they request she be held overnight (SEE: Trial Trans. June 10, 2013 pages 188 to 197 [2]). Sabatino's warrant was lifted and she was released with the understanding that the F.B.I. would bring her to Court the following morning.

On June 11, 2013 The F.B.I. picked Sabatino up at 7:00 a.m. She was driven to the federal Courthouse. Sabatino took the stand at 9:13 a.m. She lost her balance when she raised her right hand while swearing in, arguably due to the heroin she had just injected (SEE: Trial Trans. June 11, 2013 p 6). The government tries to minimize Sabatino's heroin use claiming it was a "MAINTENANCE DOSE" so she would not be "dopesick". Sabatino's Trial testimony belies this assertion.

Trial Testimony, June 11, 2013 p 63: "Q: Have you been scared that would happen to you" (meaning overdose)?

"A: Yeah, I'm actually afraid of that right now.

Sabatino was granted immunity on 10-5-11. At trial Sabatino testified what her immunity entitled her to ...."everything I was involved in with my prostitution, the drug use, the purchase of drugs, the drug selling, I cannot get arrested for it" (SEE: Trial Trans. June 11, 2013 p 53). Due Process limits the state and federal governments power by requiring them to follow certain Procedures. Due Process dictates that a prosecutor cannot knowingly allow a witness to break the law in exchange for testimony. A federal Court should never be equated with an "opium Den."

The government argue's they had no idea Sabatino would inject heroin before she testified. They have maintained that argument at every hearing and in every motion they filed. The record does not support their argument. The record shows, Just six days before trial started Sabatino told the government team "she takes the drugs once when she gets up and once before bed to help her feel normal. Sabatino knows she needs to check herself into a detox facility in order to deal with the inevitable physical sickness she will experience when she stops taking the drugs."(SEE: May 29, 2013 302). Agent Coyle's Trial Testimony speaks volumes in regards to what the government knew about Sabatino's heroin use.

2. PAGE 188 OF TRIAL TRANS. STATE: "Jury out at 4:17 o'clock p.m." The very first thing said after that is: "THE COURT: I understand from counsel that Ms. Sabatino just arrived. I'd like the Court to direct her to be here tomorrow morning promptly at 9:00 o'clock." This statement was not made by the Court, it was made by Prosecutor Lloret. The record was corrected during Post trial hearings on April 19, 2016 page 12.

(3)

<u>Trial Testimony June 12, 2013</u>: Agent Coyle;

(p33) Q: were you worried she was out getting high? (refering to day she fled Courthouse).

A: I certainly entertained it as a possibility, yeah.

(p34) A: I knew without drugs she was going to be a mess.

(p36) Q: One of the things we learned yesterday was that before she testified she injected herself with heroin?

A: Yes

(p37) A: if she didn't get her next fix she would have become very lethargic and I don't know if she would have been able to answer questions or not.

(p38) A: she had drugs in her system, ergo she was not a mess.

Q: if she were incarcerated the night before and had no drugs would she have looked the same?

A: No. I think she would have been again in that dopesickness.

Rule 11 does not grant the government power to give, aid or otherwise pay a witness with whatever they choose, whether it be legal or not. What part of Rule 11 make's it lawful, or even acceptable, to aid a witness to possess and use heroin, a schedule II narcotic. The government allowed Sabatino to inject heroin to improve her demeanor and make her appear "normal", thereby, ultimately enhancing her credibility for the Jury. In closing arguments the government tells the Jury;

<u>Trial Trans. June 12, 2013</u>: closing arguments by the government.

(p115) " she (Sabatino) told you that and did you watch her demeanor on the stand"...

(p116) "... Sabatino's credibility is something you can think about and her demeanor and her love for the defendant. The government allowed Sabatino to inject heroin before she testified simply because it changed her demeanor, (artificially), and they would not have been happy with how she appeared to the Jury if she had not injected heroin. Then the prosecutor vouched for Sabatino's Artifically and illegally altered demeanor and credibility.

In defendant's original 2255 motion, Doc#189, filed on 11-18-13, it states as follows;

"ordered further, that to facilitate development of a record for said hearing, pursuant to Fed. R. Crim. P. 15, the government shall produce Leah Sabatino for purpose's of providing a deposition under oath so that counsel for each party can develope the facts regarding any discussions Sabatino and/or her counsel had with the government prior to June 10 or June 11, 2013 regarding the relapse of her addiction, her

disappearance, her heroin use on those dates, and the possible impact her
heroin addiction and withdrawal (or as the government refers to it, the
"Dopesick"), might have on her testimony and the juries evaluation
of her credibility."

Subsequent to filing document #189 David and Michael Shapiro were removed from defendant's case. Michael J. Farrel was appointed. Mr. Farrel ultimately filed document #224, which is in supplement to defendant's original 29/33 motion (Doc. #189). At post trial hearings the district court made it clear that the only viable issue's to be heard were those issue's pertaining to docket #224 (see: Post trial hearing Trans. April 6, 2016, p 4). The hearings were specifically granted so the defendant could explore Sabatino's heroin use, and the governments knowledge thereof, during trial. All other issue's raised in document #224 are ineffective assistance of counsel issue's which could only be brought in due to trial counsel's removal after trial but prior to sentencing.

Post trial hearings began on June 15, 2015, Trial Counsel, David Shapiro, began testifying, but due to medical issues the hearings were postponed until April of 2016. The hearings resumed on April 6, 2016. On April 7, 2016 Sabatino was at the courthouse and prepared to testify. The following took place at side bar at 9:11 A.M. between the Judge Ms. Sarner (Sabatino's attorney), Mr. Farrel and Prosecutor Freind:

Ms. Sarner: "As you know my client was -- intended to be here today and to testify as needed in this proceeding. It came to my attention that circumstances compel me to advise her that she should take the fifth amendment -- she should assert that privilege because she could incriminate herself if she testifies. The government wanted to have me here today to explain that the incriminating nature of what she could testify to has nothing whatsoever to do with the testimony she gave at trial in this case. She maintains that she testified truthfully at trial and would testify exactly the same way. However, unfortunately this young lady is back in the throws of a very serious addiction. She had a -- she's had a very rough couple of years. She is actually using. She could not take the stand unless she was high because she would risk going into withdrawal if she didn't.

THE COURT: unless she was what?

Ms. Sarner: High. Well, unless she had a fix before she testified.

The Court: All right.

Ms. Sarner: And, I guess that is what happened when she testified originally. We

(5)

didn't know that she was actively under the influence at the time she was testifying until it came out at trial.[3] But under the circumstances, if she is cross-examined on her current drug use, you know, when she last used, how much she used, what she paid for, does she -- this expose's her to criminal liability under Pa. law.

THE COURT: I have a question. And, assuming everything I heard up until this point in the case -- Mr. Farrell, you subpoenaed her to testify?

MR. FARRELL: I did, yes, your Honor.

The Court: Has the government subpoenaed?

Ms. Freind: No.

The Court: All right. Do you intend to question her in any way, shape, or form about her current -- would that be part of your cross-examination questioning?

Mr. Farrell: Inescapable Judge. I would have to address the issue of heroin intoxication at the time of her testimony.

The Court: you would?

Mr. Farrell: And related issue's that would bear upon issue's presented in the post trial motion.

The Court: She is a witness in front of me if she is called to testify, so certainly, like any other witness, her credibility would be in play based on what she says. So, we have four defense counsel asking questions about the subject matter that you've mentioned, so in view of that and in view of what you just said, Mr. Farrell, this invocation of the fifth amendment would be legitimate.

Ms. Sarner told the judge that Sabatino "testified truthfully at trial and would testify exactly the same way. The government was present when Ms. Sarner told the judge that and the government knew it was false and they had an obligation to inform the court of Sabatino's false trial testimony. They were obligated to fix it at trial!

Due Process of law is a fundamental principle of fairness in all legal matters, especially in the courts. All legal procedures set by statue and court practice must be followed for each individual so that no prejudicial or or unequal treatment will result. The universal guarantee of Due Process is in the fifth and fourteenth

---

3. Ms. Sarner was not present at Sabatino's interview on May 29, 2013 when Sabatino informed the government team that she needed to use heroin multiple times per day (see: May 29, 2013 302) (exhibit D-1)

Amendments. Due Process demanded that the government extend Sabatino's immunity and allow her to testify for the purpose's of correcting her Trial testimony that was "false" and "skewed" and also to develope the record regarding her heroin use at trial and the governments knowledge thereof. The government provided Sabatino with immunity to obtain her false Trial testimony but no reciprocal immunity was giving when Sabatino was subpoenaed on behalf of the defense at the post trial hearings.

In United States v. Quinn, 728 F.3d 243 (3rd Cir. 2013) The Court of Appeals stated, "Our concern is with the effect of the prosecutor's actions on the process afforded to the defendant." The Due Process clause address's the defendants right to a fair trial, not just whether the government intended to deny the defendant his right." United States v. Straub, 588 F.3d 1147, 1160 (9th Cir 2008). If the suppression of evidence results in Constitutional error it is because of the character of the evidence, not the character of the prosecutor. United States V. Agurs, 427 U.S. 97, 110, 96 S.Ct. 2392, 49 LEd 2d 342 (1976) Courts should protect against deliberate wrong doing by prosecutor, and, in those rare case's where it arise's, overzealous advocacy that distorts the fact-finding function of a criminal trial.

The governments obligation and duty to extend Sabatino's immunity is amplified severely by the following; (i) During Sabatino's Grand Jury testimony (Oct. 6, 2011 pages 19 to 21) the government questions her about the night EXHIBIT D-27 before the cvs robbery. Sabatino claimed she "overheard" the defendant and John Andrews planning the cvs robbery. The prosecutor stopped Sabatino and stated "when you met with Special Agent Coyle and myself in the past, you said you couldn't overhear." Sabatino then agree's that she never "overheard" such a conversation. At trial Sabatino testified as follows: June 11, 2013 p 23:

Q: And did he ever talk to you about whether or not anyone backed out of robbing the Pharmacy at the last minute or if they had trouble with the driver?

A: No. But I overheard them talking, him and John in the room.

Q: And what did you overhear?

A: That they had nobody, that somebody --- I don't know who I didn't hear a name. They said that somebody didn't want to do it, that they had to find somebody else. And I said, that's good because now you don't have to do it.

At the Grand Jury it was clear the government knew Sabatino never "overheard" any conversation. In a case where no physical or trace evidence links the defendant to the crime scene, Sabatino's false testimony was the only corroboration to Andrews testimony. At trial, not only did Sabatino falsely claim to "overhear" the planning, she now claimed to be part of the conversation about planning the cvs robbery. The government

Knew Sabatino was perjuring herself and, not only did they not correct her, they actually encouraged her to perjure herself by asking her; "what did you overhear?" This testimony was material and extremely prejudicial, the only link corroborating Andrews testimony. And furthermore;

(ii) During Post trial hearings on April 6, 2016 at 3:19 p.m. (p23) The government is cross-examining Dr. Weiss and entered government exhibit 374. This exhibit is Prosecutor Freind's "personal copy" of Sabatino's Trial Transcripts. Prosecutor Freind made a personal note about Sabatino's Trial Testimony on the bottom of page 84. Prosecutor Freind wrote, "HER PERCEPTION IS SKEWED." Between the government's correction of Sabatino's Grand Jury testimony and the prosecutor's personal handwritten note exclaiming Sabatino's "Perception is skewed" there can be no doubt the government knew Sabatino's trial testimony was false. The government had an obligation to the defendant, to the Court and to Justice, to correct Sabatino's false Trial testimony.

In HASKELL V. SUPERINTENDENT GREENE SCI, 866 F.3d 139; 2017 U.S. App. LEXIS 13942 NO. 15-3427 (3-27-17, The Court of Appeals for the Third Circuit held; The State (Government) violates the fourteenth Amendments Due Process guarantee when it knowingly presents or fails to correct false testimony in a criminal proceeding. Consequently, the U.S. Supreme Court has consistantly held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the Judgment of the Jury. See NAPUE, 360 U.S. at 269; Giglio, 405 U.S. at 153; See also Lambert V. BLACKWELL, 387 F.3d 210, 242 (3RD CIR 2004). United States V. Aguas, 427 U.S. 667, 105 S.Ct. 3375, 87 L.Ed 2d 481 (1985). "The same result obtains when the State (Government), although not soliciting false testimony/evidence, allows it to go uncorrected when it appears" Giglio, 405 U.S. at 153 (quoting Napue, 360 U.S. at 269); see also Lambert, 387 F.3d at 242. A conviction must be set aside even if the false testimony goes only to a witness's credibility rather than the defendant's guilt {2017 U.S. APP. LEXIS 16} NAPUE, 360 U.S. at 270.

"We favor - and therefore adopt - the Ninth Circuit's approach. As that Court recognized, Kyles suggests that for the three types of Due Process violations discussed in Aguas there is no need to perform a seperate harmless error analysis under Brecht. Hayes, 399 F.3d at 985 (citing Kyles, 514 U.S. at 436). This is because for these violations the materiality and harmless-error standards merge. See Bagley, 473 U.S. at 678-80. That is, the test for materiality supplies the test for harmlessness and there is no need to look to Brecht to supply {866 F.3d 151} a harmless-error standard. Hayes, 399 F.3d at 985.

To further prove the Government's BAD Faith, the defendant asserts; Agent Kincaid, who took over

the case for Agent Coyle, transcribed a phone call between the defendant and Sabatino on March 25, 2016, just thirteen (13) days before Sabatino was scheduled to testify at post-Trial hearings. The hearings which were ordered so "Counsel for both parties can develope the facts regarding any discussions Sabatino and/or her counsel had with the Government prior to June 10 or June 11, 2013 regarding the relapse of her addiction, her disappearance, her heroin use on those dates, and the possible impact her heroin addiction and withdrawal might have had on her testimony and the juries evaluation of her credibility."

The government team has continuely and consistantly claimed that no one on the government team had any Knowledge that Sabatino was going to use heroin prior to testifying, and no one on the government team spoke to Sabatino on June 10 or June 11, 2013 (June 10, 2013 is when Sabatino fled.) Thirteen days prior to Sabatino being called to testified about this the government Transcribed the following phone call between defendant and Sabatino. (Transcribed 3-25-16. J.M. = defendant, L.S. = Sabatino); (see: Exhibit D-3)

J.M: this is important that I need to Know, when they, remember when you ran the first day?

L.S: yeah.

JM: And you came back?

LS: Right

JM: what did you -- and they told you they were going to hold you in jail that night?

LS: yeah. They told me they were going to Keep me for a year.

JM: And, and what did you tell them, that we were...

LS: I told them I didn't want to go on the stand against you. That I loved you and I couldn't ...

JM: I Know that, but...

LS: U. I.

JM: But, about getting high? Did you tell Coyle...

LS: No. They told me they would get me help but they never did.

JM: Right, but did you tell Coyle or any of them that you needed to get high?

LS: That I was sick, yeah.

JM: That day?

LS: yeah.

JM: Because that's what the Judge is going to Ask you....

The government team acted as an Architect throughout the proceedings in this case. They gave

(9)

a "Key" witness immunity for years to "prostitute, sell drugs, buy drugs and use drugs." They allowed her to inject heroin before testifying for the purpose of altering her demeanor and enhancing her credibility for the jury. Two and a half years later, when post-trial hearings were to begin, for the purpose of the Court and the defendant to learn the truth about Sabatino's heroin use at trial and the government's knowledge thereof, the government refused to extend (or re-instate) Sabatino's immunity. The immunity with-held at Post trial would have been identical to the immunity she received at trial. The reason(s) the Government withheld immunity at Post trial was they knew A) Sabatino would testify that the government knew she planned to use heroin at trial, and; B) That Sabatino's trial testimony was false and would be exposed.

The defendant should have had the opportunity to develope the record in regards to Sabatino's heroin use and the Government's knowledge of it, in the Federal Court house. Defendant also should have been allowed to correct Sabatino's false testimony and learn exactly what part of Sabatino's Trial testimony was, as Prosecutor Freind put it, "SKEWED," or if in fact, all of Sabatino's Trial testimony was "SKEWED".

The Standard of review applicable to perjured testimony claims is strict. This is so not just because those claims involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking function of the trial process. Accordingly, in order to establish his claim, a petitioner must show that (1) the witness committed perjury, (2) the Commonwealth knew or should have known that the testimony was false, (3) the false testimony was not corrected, and (4) there is a reasonable likelihood that the perjured testimony could have affected the judgment of the jury.

Petitioner asserts, (1) Sabatino committed perjury, grand jury testimony and Trial testimony prove this, (2) The Government knew the testimony was false; again, grand jury testimony and Trial testimony prove this. Also, Prosecutor's Freind's Personal note that Sabatino's "Perception is skewed" prove's the government knew of more testimony that was false; (3) The testimony was not corrected, not only was it not corrected, the government coerced Sabatino's false testimony by asking, "what did you observe?", when they knew she didn't and (4) There is a reasonable likelihood that the perjured testimony could have affected the judgment of the jury because Sabatino is Andrews only corroboration. It must also be noted that if the defendant's Due Process rights hadn't been violated at Post trial hearings the government would have been forced to correct all Sabatino's "SKEWED" testimony, and because the government purposefully interfered with the Fact finding process, the "SKEWED" testimony must be considered highly relevant and influential to the jury's Judgment.

Defendant's fifth and fourteenth Amendment right to Due Process was further violated when Special Agent Shute Knowingly gave false testimony.[4] On June 10, 2013 Agent Shute testified as an expert for the government in Cellular telephone Historic Record Analysis. His Trial testimony was False. It was not corrected for the Jury. It was devastating to the defendant. At trial Agent Shute testified, among other things, that cell site location "sort of makes it like a fingerprint, it's unique and not duplicated anywhere else (see: Trial Trans. June 10, 2013  p 94). Then Agent Shute "Pinpointed" the defendant, placing him in a "wedge" at each crime scene. Trial Counsel for defendant did not consult a phone expert on his behalf.

Defendant's Post-Trial hearing Attorney, Michael J. Farrell, hired a phone expert (Post-Trial hearing April 7, 2016). The District Court Allowed Agent Shute to remain in the Courtroom during Mr. Kennedy's questioning. Agent Shute then testified again on April 18, 2016. Defendant asserts, that based on Mr. Kennedy's and also Agent Shute's Post-Trial Testimony, that Agent Shute Knowingly gave false testimony at Trial in June of 2013. Also, Agent Shute's Trial Testimony is grossly misleading and is crafted specifically to confuse the Lay-person. Agent Shute's Trial testimony is nothing more then a web of deception.

To fully comprehend how misleading, inaccurate and blatantly false Shute's testimony at trial was, it's imperative to be "some what" familiar with the area involved and to have a basic idea of how cell phones and cell tower's interact with each other.

CELL PHONE'S WORK AS FOLLOWS: Once a call goes out, the tower with the CLEAREST signal picks up the call. (see: Defense Expert Kennedy, April 7, 2016 pages: 41, 81-82, 86, 89; Also see: Agent Shute April 18, 2016 pages 193, 197, 203, 208, 246, 251). Many factor's determine how clear or unclear a signal may be at any giving time (see: Kennedy Test. April 7, 2016 p35: ie an overloaded tower, heavy traffic, TRAINS, Buildings or other impediments, Bridge opening, ship on river, etc...). The tower with the clearest signal picks up the call, then six more tower's (antenna's) lock onto that call as back up. This is called "RACKING AND STACKING" (see: Kennedy Test. April 7, 2016 pages 82, 86-88; see Also Shute Test. April 18, 2016 pages 193, 199-200, 203, 278). The cell phone "CAMPS" on the clearest signal and has six other towers/antenna's racked and stacked in the order of clearest signal to least clearest. This is done in case the original signal becomes unclear, in which case the phone would automatically switch to the next clearest signal, therefore there are no more "Dropped calls."

CELL TOWERS WORK AS FOLLOWS: Each tower cover's a circumference of 360 degree's. Each circumference is divided into three sector's. Each sector cover's 120 degrees of the total circumference (see: Shute Test. April 18,

---

4. Defendant's position is that the "Government's" include's Agent Shute and his Knowledge is, in fact, the government's Knowledge.

(11)

2106, page 178). Each sector has an antenna at it's center point. (NOTE: Due to heavy usage more sector's may be added to a tower, called a "Build-up". No more then three are added. In the present case there are four towers along Interstate 95 that have a "build-up". Two sector's were added to each tower. However, it's very important to understand those "build-ups" are on the west side of Interstate 95 facing east to pick up heavy traffic on Interstate 95 and technically have no bearing on the instant case).

The "RACK AND STACK" process, and the fact, that this process MUST use seven seperate tower's/antenna's is critical due to the geographical location of the area involved and the fact that all the relevant tower's involved are all approximately one mile apart. (The following diagram is NOT to scale. It is intended to give the Court an understanding of the area involved and the location of the cell towers. For more accurate maps OF AREA please see attachment marked exhibit D-4). (NOTE: D-4 is the Government's trial exhibit 148)



X = Location of CVS where robbery and shoot out occurred.

☐ = Location of defendant's two house's.

● = Cell tower location's

(All towers are approximately one mile apart) (12)

The following citations for trial and post trial transcripts show what Agent Shute testified falsely to at Trial;

<u>Trial Trans. 6-10-13</u>: (p96) "The signal of the tower has nothing necessarily to do with where the phone would select to that particular tower".

<u>Trial Trans. 6-10-13</u>: (p105) "cell phone's in this region, having done this work for over a decade, don't really use the cell site much more then the one that it is physically closest to."

At post-trial hearings, after being confronted with Mr. Kennedy's testimony, Agent Shute changes his testimony to contradict his trial testimony and proves his "so-called" science is actually guess-work at best. At post trial hearings, April 18, 2016, Agent Shute repeatedly testifies it's the clearest signal or best quality of signal that matters (p193) "...it's totally always ~~looking for~~ EXAMINING the cellular network and looking what is the best quality of signal? what is the best quality of signal? what is the best quality of signal?" (p197) "so, again, the best quality of signal at the inception of the phone call..." (p200) "...it is actually looking to examine at the particular location and time of that stacking and racking what is the best quality of signal..." (p203)... "Q: it can see seven sector's that it see's the clearest, correct? A: CORRECT." (p246)... Q: the cell phone will use the clearest tower, correct? A: CORRECT.." (This testimony came after Agent Shute listened to Mr. Kennedy's testimony, see April 7, 2016 pages 41-42, 81-83, 85-86, 89). On page 195 of Agent Shute's testimony on April 18, 2016 he solidifies just how inaccurate and imprecise his "expert" opinion really is. (p195) Q: "...how often would you say that the tower with the clearest signal is also the closest tower for the originating cell site? A: Well, in this market here I've seen it probably well over 98, 90 percent of the time."

Agent Shute's trial testimony claiming *"the signal has nothing to do with the selection of the tower and the phone use's the site it's physically closest to" changed to "the phone always use's and looks for the best quality of signal and it use's the closest tower <u>"PROBABLY"</u> well over 90 percent of the time. His claim that cell site location is "like a fingerprint" is border line criminal. The fact is, there are too many factor's to be able to say definatively, from historical cell detail records, what tower a phone was physically closest to.

<u>Trial Trans. 6-10-13</u>: (p92-93) Here, Shute is explaining government exhibit 148 and shute's, "after each call is a visual dipiction of the area where the phone was" (the "visual dipiction" is a pie shaped wedge he made).

<u>Trial Trans. 6-10-13</u>: (p122-123) Once again, while displaying government exhibit 148 shute tells the jury the defendant "MUST" be within the green wedge.

(* D-4 is government trial exhibit 148)

At post-trial hearings on April 7, 2016 (see pages 32-33, 36-37, 40, 46, 48-50) defense expert Kennedy explains how and why Agent Shute's "green pie shaped wedge's" are misleading, inaccurate and false.

Again, after listening to expert Kennedy's testimony Agent Shute testified again on April 18, 2016 and completely contradicted his trial testimony. (p171) This testimony is in reference to government exhibit 148. (see; D-4)

    Q: So, in any of the wedge's you depict on your slide, can you describe for the court what they mean?

    A: What we have here is a pie shaped wedge that appear's to be in a perfect concentric circle pattern, what that represents, your Honor, is <u>NOT</u> A) where the radio frequency ends, and it's not, B) intended to be the truest depiction of a cell site."

Agent Shute methodically went through Government exhibit 148 during trial and pointed out each of his "self-made" green pie shaded wedge's and told the Jury the defendant had to be in that wedge. While showing these colorful picture charts he states (Trial Trans. 6-10-13 p.78) "you know, pictures are worth a thousand words," but, as Shute's post trial hearing testimony prove's, those picture's in government exhibit 148 are worth only a few words, such as, inaccurate, imprecise, misleading, and false.

In post trial hearing trans. April 18, 2016 of Shute's testimony, the following pages conclusively prove Agent Shute's maps and charts in government exhibit 148 are nothing more then a fabrication of his own mind (pages 170, 181, 228-229, 233, 235, 237, 341, 254, 256-257, 264, 267, 271-273) Here, as counsel goes through each map and chart of government exhibit 148 Agent Shute admits he "made up" each radius for his maps.

At one point, in post trial hearings, Shute attemp's to argue that the radii for each tower is based on where the other towers are located. That may be True in the real world, but government exhibit 148, which Shute made himself, has different radii for identical towers on different pages of his exhibit. The real proof is in his post trial testimony, he admits over and over that he made up each radii. The Judge asks Shute specifically;

<u>Post Trial hearing 4-18-16:</u> (p272) Q: When you came up with a number for a radii, what is it based on?

    A: On training, experience, call detail records, drive testing networks and drive testing.

    (p278) Q: The charts through government exhibit 148, all these slide's that you said you didn't do a drive test to make these?

    A: correct.

    Q: Let me ask again, what is the radius based on?

    A: It's based on the placement of the towers in this area, our understanding that typically

(14)

in a geographical area such as this in an urban area that a cell tower will not -- a cell phone rather -- because remember, it's all about the cell phone reselecting and stacking and racking and choosing...

Shute's response is gobbledygook. He did not use a drive testing network, he did not do a drive test. His assertion that the radii is based on the placement of the tower's fails because tower's do not move (at least these one's do not) so the radii for each tower should never really change. But in government exhibit 148 identical towers have different radii. Agent Shute used the call detail records to find the originating cell site, then he drew a radii around that tower, making the smallest possible pie that incorporated the crime scene within it. There was nothing used to gauge the radii's frequency. The Jury saw Agent Shute, not just as an EXPERT, but as a SPECIAL AGENT FOR THE F.B.I, combine those and the Jury believed every word he said, and this "JUNK-SCIENCE" is what he used as "irrefutable evidence," as the prosecutor's final question avails: (Trial Trans. 6-10-13)

   (p113) Q: Special Agent Shute, are all the opinions and conclusions that you've shared with the Jury today held to a reasonable degree of professional certainty?
         A: Oh, Absolutely, yes.


Trial Trans. 6-10-13: (p105-106) Shute testifies it is "IMPOSSIBLE" for a phone on Vankirk street or Longshore Av. to use a cell phone tower near the CVS.

From Vankirk street to CVS is 2.5 miles (see: Kennedy Test. 4-7-16 p51), which would make the distance from Longshore to CVS a little over 1 mile. Cell tower's, in this area, are approximately 1 mile apart (see: Shute Test. 4-18-16 pages 182 and 199). Also, shute claims the coverage area could not be a 2 mile radius in the city of Philadelphia (see: Shute test. 4-18-16 p254).

Nextel set up a network so if a phone is too far away it will send a rejection message because it doesn't want to accept calls from too far away. In urban area's such as Philadelphia they set their rejection message's at anywhere from 3 to 5 miles (see: Shute Test. 4-18-16 p192). And once again, his testimony changed when faced with evidence that contradicts his previous testimony. Now, when asked if a cell phone can utilize tower's 3 to 4 miles apart in the same call, he answer's, "POSSIBLY" (see: Shute test. 4-18-16 p252). Shute is confronted again with the fact that defendants phone used a tower in New Jersey while he was in Philadelphia, at a distance of approximately 4 miles (see: Shute Test. 4-18-16 pgs 259-262).

This next part is technical, but it is also critical. The following maps are only intended as a guide to help, or Aid, the Court in understanding "sector's, clearest signals, racking and stacking and the Area involved." This will put in perspective how the technical workings of tower's and phone's make Shute's trial testimony impossible. Ideally, the Court could use defendant's maps as a guide to follow along with government exhibit 148. (D-4)



● = Approximate cell tower locations. Each cell tower is about one mile from other tower. In the diagram above, at the tower marked number "5" there are dotted line's and Arrows. The dotted lines represent each 120 degree sector and the Arrow's represent the antenna's in the center of each sector. The principle tower's in this case are number's 1 through 7, each HAVE 3 sectors per tower, which equals 21 sectors. Plus, on tower's 1, 2, 3, and 4 there is a "build up" of 2 sector's on each of those four tower's, which give's a total of 29 sector's. These "build-ups" Are pointing towards Interstate 95 and therefore, Technically have no real bearing on this case.

TRIAL TRANS. 6-10-13: (p106) Shute testified there are 40 "sector's" between Vankirk street and the CVS. He claimed, due to so many resource's it is "IMPOSSIBLE" for someone on Vankirk street or Longshore Av to use a tower by CVS.

Post-Trial hearing 4-18-16: (pages 181 and 205) Shute testifies there are 29 sector's inbetween Vankirk street and CVS

The night CVS was robbed this defendant claimed he was at VANKIRK street and at Longshore Ave and because defendant's phone "pinged" off a tower "NEAR" CVS Shute claimed defendant was lying.



although there are 29 sectors in this area, the antenna's are directional. If a person made a call from "🗵", the only sector's that could possibly pick up the call are the Antenna's marked "A, B, C, D, E, F, G, H." This is where "RACKING AND STACKING" becomes critical. Remember, once a call is made, the clearest signal picks it up and six more antenna's "RACK and STACK" the call. No one can predict, to any degree of certainty, which tower's are the clearest at any giving moment. Agent Shute told the Jury it's "IMPOSSIBLE" for someone on VANKIRK St. or on Longshore Av. to use a tower by the CVS. However, once "sector's" and "racking and stacking" are properly explained and understandable it becomes crystal clear that it is "IMPOSSIBLE" for that call NOT to use a tower by the CVS. The phone must pick up seven different antenna's that must be pointing in the direction where it makes it possible, the antenna's must be pointing towards the phone. Which would mean there are only 10 viable antenna's that phone could use and must use 7 of them, the seven clearest at that time.

Agent Shute repeatedly gave false testimony and grossly misleading data to the Jury. The false testimony and the misleading data (ie maps and charts) were designed to be detrimental and prejudicial to the defendant. All the

(17)

area's involved in this case are within a 3 to 4 mile radius (see: Post trial test. 4-6-16 p72; Also see: 4-18-16 p13). Due to the Train tracks, interstate 95, and the Delaware River there are no tower's east. The tower's depicted in the diagram(s) above are the only tower's the defendants phone could use and every call he made had to pick 7 different towers/antenna's, making it absolutely impossible for defendant's phone NOT to to connect with a tower by CVS when he was on Vankirk street or Longshore AV.

Agent Shute use's a perfect circle in all his maps and charts (see: Government exhibit 148). Attached AS D-4 Defense expert Kennedy testified Shute's maps and charts are "idealistic circles circles around the tower" and that these specific antenna's will project a signal out in a more of an oval shape (see: Post trial Test. Kennedy 4-7-16 pgs 33 and 54). Agent shute testified that "a pie shaped wedge that appear's to be in a perfect concentric circular pattern... is not where the radio frequency ends and it's not intended to be the truest depiction of a cell site," (see: 4-18-16 p 171). He goes on to say, "I'm very familiar with the fact that a true depiction of a cell site, it looks very much like an amoeba," (p 171). He testifies there is "Absolutely, no way" the true oval shaped depiction is more accurate then the pie shape depiction he made (see: 4-18-16 p273).

The maps, charts and Data in government exhibit 148 were not correct and the government knew, or should have known, they were incorrect. Although Agent Shute claimed he knows a "perfect circle" is not correct he still tried to argue that the pie shape circle is more accurate then the correct, true shape, which is an oval. Remarkably, right after testifying that the "pie shape" was "absolutely" more accurate he changed all his future maps and charts to the correct, true depiction of the oval shape (see: Attached exhibit marked D-5). In his C.A.S.T. exhibits he now show's the Juries maps and charts with the correct oval depiction.

Trial Trans: 6-10-13: (p104) Shute displayed page 13 of government exhibit 148 and testified as follows: "So, we have four different cell sites, 22224, 21666, 14262, 14263, in this order as I'm showing them". During cross examination (p130) in reference to the exact same exhibit he states, "I mean, you can't show cell phone evidence, sir, when it's convenient, you got to show it all and that's what you see there." That was False! He did not show all the evidence, in fact, he showed the Jury only what was "convenient" for the government's case.
Shute highlighted the following sectors: 22224, 21666, 14262, 14263
The actual sector's in order are as follows: 22224, 21666, 21667, 14262, 21667, 14263, 14262. This is the true order of the sector's, during those calls. Along with omitting 3 sector's he conveniently omitted 3 phone calls that immediately proceeded the above 4 calls. With the evidence Shute chose to display he deliberately

mapped out a route leading away from the cvs. If, as he claimed, he showed all the evidence, then the mapped sequence changes dramatically, making the mapped route have a wide berth around the cvs.

Defendant claimed he left Sabatino at Vankirk street and went to his ex-wife's Longshore address, where he slept from 12:30 a.m. until 2:00 p.m. on Feb.15, 2011. On 6-10-13 pg.111, Shute testified that from 12:40 a.m. until 2:30 p.m on Feb.15, 2011 "the defendant is not getting a lot of rest because there's pretty much a call every hour." He stated this while displaying defendant's call detail records on page 20 of government exhibit 148. Shute highlighted the dates and times in bright green. On 6-10-13 (p86) he explained each column of the call detail records and "conveniently skipped over the column marked "FWD."

Post-Trial hearings on 4-18-16 (p274) he was asked to explain the "FWD" column. He stated if there is a "YES" marked next to the call it meant it was "Forwarded" to voicemail. What he conveniently failed to tell the Jury WAS that every single call he pointed out was forwarded to voicemail (there are 3 calls out of those 42 that ARE marked "NO". These are 3 calls the defendant made to his voicemail service at 10:24 a.m, 12:34 p.m and 1:18 p.m) (see: Government exhibit 148 D-H page 20). Shute intentionally omitted the "FWD" column and told the Jury "defendant is not getting a lot of rest..." to make it appear the defendant lied when he said he was sleeping at his ex-wife's.

Agent Shute testified falsely about other material facts that went directly to his knowledge and expertise regarding historical detail records. On 6-10-13 (p99) Shute claimed a phone contact does not necessarily mean a conversation took place. He explained, it depends "if the phone is on or not. If the phone is off it wouldn't go through. The call detail record would show on my phone but not on yours....if your phone is off and I call you, your not going to see the call detail record on your end, I would see it on my end because I called you."

A big issue in the instant case are phone calls under two minutes long and whether they were actual calls or just phone contacts.

Trial Test. 6-7-13: Rhoads test (p165): Prosecutor objects to defense counsel referring to them as "calls" and says they are only "contacts." (p176) Prosecutor tells the Judge to make defense counsel stop calling them "those calls".

Trial Test. 6-10-13: ~~Shute Test~~. RHOADS (p14) Prosecutor states all it shows is contacts between phone's, not actual calls. (p18) Prosecutor objects and says "there's an indication many of the calls are short," and doesn't want them called "calls."

Trial Trans. 6-10-13: Shute Test. (p101) "I'm testifying as an expert"... and claims he cannot say anything less than two minutes is an actual call, "no one can." (p116) Shute reiterates that by looking at call detail records you cannot tell if a conversation took place.

On 6-10-13 (p20) Rhoads testified police had his phone records during his interviews. Also, (p34) he confirms police had his phone records. The government had defendant's and Andrews phone records. An expert knows all that is needed is to look at "WHO" made the call, then see if that call registered on the call detail records of who the person that was called. If it registered on the records of the person called, and it was NOT forwarded to voicemail, then the call was answered, whether it was a 10 second call or a 10 minute call, there was a conversation.

Starting less than 5 minutes after the shoot-out and for the next 35 minutes, Andrews, Rhoads and Menichella made over 25 calls to each other, all under 2 minutes. Rhoads phone records were never turned over to defense. Also, not once during all these back and forth calls did anyone of the above attempt to call defendant's phone. Although Andrews testified he called Rhoads looking for defendant and Rhoads testified he called Andrews looking for defendant, no one called the defendant. Shute testified falsely by claiming "NO ONE" could tell by call detail records if a call was answered or not.

Additionally, the Court instructed the Jury to consider the testimony of someone who had the "opportunity and ability" to hear what was testified to. Sabatino claimed to "overhear" the defendant planning the car robbery. The Court also instructed the Jury to consider the witnesses ability to "know" the things they testify about. Agent Shute testified as an expert, The Jury was told to consider "the quality of the witnesses knowledge." TRIAL TRANS. 6-13-13: Jury Instructions, page 17:

> "In deciding what to believe, you may consider a number of factors: one, the opportunity and ability of the witness to see or hear or know the things about which the witness testified. Two, the quality of the witnesses knowledge."...

These Jury instructions acted as a hammer, driving the false testimony deeper into the minds of the Jury. The trial Judge violated defendant's 5th and 14th amendment right to due process by allowing the government to be the "Architects" of the proceedings. While the Judge could not force the government to extend Sabatino's immunity for post-trial hearings, he was obligated to protect defendant's Due Process rights. In lieu of reciprocal immunity the Judge should have ordered, A) A new trial or, B) All Sabatino's Testimony stricken from the record. Mr. Farrell was Constitutionally ineffective for not raising this Constitutional violation as it occured on 4-7-16. The government violated defendant's Due Process rights by A) granting Sabatino immunity to commit future crimes, B) not extending Sabatino's immunity, C) allowing Sabatino to testify falsely and, D) allowing Agent Shute to knowingly testify falsely. (United States V. Quinn, 728, F.3d 243 (3RD cir. 2013); United States V. Straub, 538 F.3d 1147, 1160 (9th cir. 2008); United States V. Agurs, 427 U.S. 97, 110, 96 S.Ct. 2392, 49 L.Ed 2d 342 (1976); Haskell V. Superintendent Green SCI, 866, F.3d 139 2017 U.S. APP. LEXIS 13942 No. 15-3427 (3-27-17); Napue, 360 U.S. at 269; Giglio, 405 U.S. at 153; Lambert V. Blackwell, 387 F.3d 210, 242 (3RD cir 2009).

**B.** DEFENDANT'S DUE PROCESS RIGHT TO A FAIR TRIAL AS GUARANTEED BY THE FIFTH AMENDMENT WAS VIOLATED.

**I.** THE TRIAL JUDGE VIOLATED DEFENDANT'S RIGHT TO A FAIR TRIAL BY HIS ACQUIESCENCE OF THE GOVERNMENT'S CHANGE IN THEORY OF PROSECUTION DURING POST TRIAL HEARINGS.

**II.** DEFENDANT'S DIRECT APPEAL ATTORNEY, JULIE MCGRAIN, WAS CONSTITUTIONALLY INEFFECTIVE FOR FAILING TO RAISE THIS ISSUE IN DEFENDANT'S DIRECT APPEAL, UNDER PLAIN ERROR REVIEW.

At trial the government had only one theory of how the defendant allegedly injured his foot. They claimed he was shot in his foot during an exchange of gun fire between him and the Philadelphia Police behind the CVS pharmacy. The government continually stressed to the Jury that defendant's injury was caused "by a bullet" shot from a police officers gun. The only evidence to corroborate the government's theory was the testimony of two witnesses who claimed to have "Felt the bullet". One witness was John Andrews, whose testimony reduced his life sentence to 15 years, the other, Franklin "Chucky" Rhonds testified so his wife would not be charged with harboring a fugitive and possible consideration with an open state case he faced. To substantiate their theory of prosecution the government put forth the following testimony to the Jury:

TRIAL TRANS. 6-5-13; government's opening: (p21) "There's a gunfight. There's shots fired. Police return fire. Joe Meehan gets hit, but in the sneaker, one of his sneaker's gets hit and he hightail's it down the driveway behind the CVS"...

TRIAL TRANS. 6-6-13; Andrews Test: (p119) "He was hopping on one leg..... he said a bullet struck the bottom of his sneaker and broke his foot.... He took his sneaker off and I felt the inside and you can actually feel where the bullet had just barely pinched through.... it was in the sole of his shoe.... it never went all the way through the sneaker, you could actually feel it in the sneaker, you could feel the hump"...

TRIAL TRANS. 6-7-13; Rhonds Test: (p136) Q: Did he show you anything about being shot in the foot?

A: His sneaker, his foot like -- the sneaker.

Q: Did he show it to you?

A: he showed me his sneaker."

TRIAL TRANS. 6-10-13; Rhonds Test. cont: (p8) Q: "you told them your wife's friend called your house?

A: yes.

Q: Did she say something happened at CVS?

A: Oh yeah, she said somebody got shot."

TRIAL TRANS. 6-12-13; Gov. closing: (p104) "The defendant, at this point, has been shot in the foot and his foot is injured." ...(p105)..."he told you defendant hopped into his car..... then he started to inspect his sneaker and

the bullet hole that was in his sneaker"

On 6-9-13 during trial the defendant sent his trial attorney's an e-mail (see: Post-Trial hearing 4-6-16 p27), stating his surgeon should be subpoenaed to prove what the government is saying is impossible. Trial Counsel refused to even speak to defendant's surgeon claiming "he is not a credible witness." (E-mail entered in Post trial hearing as def. exhibit).

TRIAL TRANS. 6-14-13; Defendant addresses the Court: (p 7-8) "There's things in this trial totally wrong, government witnesses claim I was shot. I should have had an expert, my surgeon should have been here to say I wasn't shot. There's no evidence I was shot. No witnesses ever said I was shot until six months later"...

Approximately three years later Defendant's Post-Trial attorney, Michael J. Farrell, subpoenaed defendant's surgeon, Dr. Cancell, to testify at Post-Trial hearings, in part;

POST TRIAL TRANS; 4-7-16 (9:25a.m.): Dr. Cancell testified (p25) "Direct injuries are suffered in situations like a fall from a height or an automobile accident while the indirect cause could be stepping in a pot hole." (p26) "The injury was one hundred percent inconsistant with the impact of any high energy projectile." (p25) "The injury exhibited by the defendant could not have been caused by the impact of a bullet." (p27) "Even if the bullet had struck a sneaker and not penetrated into the foot, it could not have caused the observed and diagnosed injury." (p37-38) "The observed injury would be inconsistant with the government's theory." (p38) "That theory remained one hundred percent inconsistant with the diagnosis of the observed injury."

(NOTE: The government did not call their own podiatrist or orthopedic surgeon to attempt to refute Dr. Cancell's assertions.)
Trial Counsel was called back to the stand after Dr. Cancell testified (Post-Trial hearing 4-7-16). Mr. Farrell questioned Trial Counsel about the "Government's theory as to the mechanism of injury being one hundred percent inconsistant with the injury that Dr. Cancell observed and operated on" (6-7-16 pgs 109-110). The government objected and the following exchange took place;

Prosecutor Freind: (p110) "An objection to his recharacterization of the testimony where the doctor also said that it could have been caused by jumping off a high fence like after the robbery.

THE COURT: Wait a minute, you can argue that now

Prosecutor Freind: Well, Mr. Shapiro --

The Court: Can you answer the question? I'll over rule the objection."

(IT MUST BE NOTED: (p110 line 7) The transcriber wrote "CAN". The Judge Told the prosecutor, "you CAN'T

(22)

argue that post-trial." The judge went on to overrule the objection. The Transcription is obviously wrong, it is a TYPO. The fact that the Judge stopped the Prosecutor and overruled the objection attest's to this. It is contrary to NATURE or REASON that the government, or the defendant for that matter, could change their Theory, their only theory used at trial, outside the presence of the Jury three years later).

Although the Trial Judge stopped the government from changing their theory of prosecution during the post trial hearings, in his opinion, Docket #301 Filed 9-14-16 page 53, the trial Judge adopts the "Theory change" that he banned the prosecution from using during post trial hearings, stating, "Expert testimony by Doctor Cancell about defendant's foot injury was consistant with a fall from a height, which in this case occured when the robbers of the CVS pharmacy sought to escape by jumping over a high fence."

Petitioner humbly request's this Honorable Court to apply any CASE LAW available to this issue. Due to petitioner's lack of legal training and lack of access to legal material he is unable to locate case law that directly pertains to this issue. Petitioner was able to locate some case law which substantiates his claim that the prosecution cannot change their theory (especially not 3 years later outside the presence of the Jury), whether it be their "Theory of Prosecution" or "theory as to the mechanism of injury." (see: United States v. Whoolery, 579 Fed. Appx. 78 (3rd cir. 6-3-14); see also: United States v. Vosburgh, 602. F.3d 512 (3rd cir. 1-12-10). In the instant case the jury relied, arguably heavily, on the prosecutor's opening and closing statements and the testimony of both witnesses who claimed they "felt the bullet." That testimony essentially placed the defendant in the shoot out. The Government NEVER so much as hinted to the Jury that the defendant's injury could have happened any other way than him being shot.

The District Court violated defendants Due Process rights and committed Plain error, by first admonishing the government at Post Trial hearings that they "could not argue that Post Trial, but then in his "opinion" he accepts and adopts this Theory change. The fact that their is no physical or Trace evidence linking defendant to the crime scene's and it's solely the testimony of Government witnesses who benefitted from that testimony, that place defendant at the cvs robbery and shootout, one cannot overlook or overemphasize the devastating nature of Dr. Cancell's testimony and how it would have effected the jury's Judgment regarding Andrew and Rhonds testimony. The government attempted to change their theory because they KNEW how devastating Dr. Cancell's testimony was. Dr. Cancell single handedly disproved the governments theory conclusively. If the Jury believed Dr. Cancell as opposed to Andrews and Rhonds they could have chosen to disbelieve everything. It was plain error for the district Court to acquiesce and adopt the governments Post trial theory change.

## C. DEFENDANT'S CONSTITUTIONAL RIGHT TO TESTIFY IN HIS OWN DEFENSE WAS TAKEN FROM HIM DUE TO FAULTY REASONING OF COUNSEL.

I. Trial Judge committed plain error by not evaluating post-trial hearing testimony of David Shapiro and the alleged inconsistencies which lead to Trial Counsel taken defendant's Constitutional right to testify in his own defense away from him.

II. Post Trial Attorney, Michael J. Farrell, was Constitutionally ineffective for not evaluating and arguing the facts as to why defendant's right to testify was taken.

III. Trial Attorney's, David and Michael Shapiro, were constitutionally ineffective for faultily taken defendant's right to testify in his own defense away, due to their mistaken belief.

IV. APPELLATE COUNSEL, Julie McGenin, was constitutionally ineffective for changing defendants argument so drastically it constituted a NEW ARGUMENT.

On 2-7-13 defendant was deposed for his federal lawsuit. Shortly thereafter trial counsel, David Shapiro, filed a motion to reschedule the trial date or seek to withdraw and requested an in-camera ex parte hearing. Counsel expressed concerns that the substance of their pre-trial motion and a lot of their strategies were going to be inconsistent based on all of defendant's statements. (NOTE: As the record proves, the defendant only gave two statements, one on 2-17-11 at the time of his arrest and one two years later on 2-7-13 at the lawsuit deposition).

As proven in post-trial hearings, the only inconsistency in defendants two statements is; In the statement on 2-17-11 during his arrest the defendant claimed he "hurt his foot falling off a ladder at work." And, during the law suit deposition on 2-7-13 defendant acknowledged he lied during his arrest and wanted to correct his prior statement. He then said "he was breaking into an abandoned house to scrap copper and hurt his foot going over the fence and he lied because he didn't want to get into trouble for breaking into the house." At post-trial hearings Trial Counsel made clear that the above inconsistency is <u>NOT</u> the inconsistency that prompted him to file the motion and request an incamera ex-parte hearings and to withdraw as counsel or refuse to question defendant if he testified.

Post-Trial hearing: Shapiro 6-15-15; (p78)"... But that was not -- that is not what-- what was inconsistent with what Joe told me" ... (p79)"... That wasn't what I was focused on"... (p80)".. But that's not what prompted the filing in this court of the other motion... that's not -- that's not what prompted it at all"...

David shapiro then goes on to explain specifically, what he believed "ROSE to ETHICAL levels", what the two inconsistancies were, that the defendant made.

Post Trial hearing: 6-15-15 continued; ...(p80)" He said "WE" meaning he and Pooh. I think you'll find that on, like 148 (page 148 of lawsuit depo). And that was the inconsistency under oath, that and another one, that were really material to me in my representation of Joe and eventually framed and contributed to a big part

of the theory of defense ... And everything Joe wrote, he never used the word "WE".... So, what really disturbed me, and why I made a filing with the Court, and why we had an ex-parte in-camera hearing, was we were confronted now, not with just the typical kind of inconsistent statement you get when your representing a defendant in a criminal case and why people go to trial, now I had a statement under oath, in a case he brought, where he's talking about "WE" and he's talking about Pooh and he's talking about Vicki. He never told me about any of that stuff, not before or after."

Trial Counsel's testimony leave's no doubt that, one of the two alleged inconsistencies, that were material to him in his representation of the defendant and what prompted his filing for the in-camera ex-parte hearing and what formed "a big part" of his defense theory and what was ultimately the deciding factor in refusing defendant's Constitutional right to testify, was that he believed the defendant "never told him about Pooh or Vicki before or after the deposition". And during the law suit deposition the defendant stated "WE" referring to Pooh as his alibi witness. Trial Counsel believed defendant was making up Pooh and Vicki at the deposition. Approximately ten months later David Shapiro testified again;

Post trial hearings: Shapiro test. 4-6-16'; (p54)"When asked if he remembered saying he never heard of Pooh or Vicki; before or after the deposition, he changed his testimony: "yes, I looked at some of my notes and let me be more specific. Joe gave us handwritten notes in which he talks about Pooh and Vicki before the deposition. It's after the deposition, he never gave us anything to follow up on Pooh or Vicki."

After David Shapiro's 6-15-15 testimony is proven to be false he attempts to justify himself by stating, "It's after the deposition, he never gave us anything to follow up on Pooh or Vicki." First, the record is clear, he could easily have found Pooh and Vicki from defendant's notes and law suit depo transcripts. After Shapiro's false testimony was exposed, Michael J. Farrell allows Shapiro to shift his argument and try to defend why he did not look for Pooh and Vicki. However, this issue is **NOT** about Trial counsel failing to follow up on witnesses.

The issue is, Trial Counsel took away defendant's Constitutional right to testify, due to his own faulty reasoning. Shapiro was adament in his 6-15-15 testimony about his reason's for filing the motion and requesting the in camera ex parte hearing. Where, at said hearing, he told the Judge if defendant took the stand he would refuse to question him because he felt his client was lying because his client mentioned two alibi witnesses during his law suit deposition who would verify defendant hurt his foot prior to the cvs robbery.

<u>Post trial hearing</u>: Shapiro test. 4-7-16; (p99)... "If defendant elected to testify I was going to withdraw as counsel"... (p103)...

"I had told Joe time and time again, if he wanted to testify after the deposition, if he insisted on his

right to testify, I would withdraw."

In Shapiro's 6-15-15 Testimony, page 80, he alludes to, "ANOTHER ONE" (inconsistency) that was material in his

decision Not to allow his client to take the stand.

<u>Post trial hearing</u>: Shapiro test. 4-6-16; (p112) "Q: Mr. Shapiro, you've been testifying that there's something in this document

that essentially was of so inconsistent nature with what was said to Coyle or what was said in the

deposition that it reached the level of some ethical concern, did you not testify to that? A: yes.

Trial Counsel gave the government 1700 pages of defendant's personal notes, most of which are defense strategies

and theories. He gave them to the government so they could use them against the defendant during post trial hearings.

From those 1700 pages the government and Shapiro try to manipulate this one document into proof that defendant

lied. This is the document referred to above. (See: Attached document marked exhibit D-6).

   "MEEHAN Chronology additions  9-25-12"

   (p.3)  <u>2-11-11</u>: Meehan rolls his ankle while working. It turned black and blue.

      * Meehan returns to Heathers and stays in with foot up rest of day.

      * Meehan talks to son on phone & tells him his ankle is messed up.

      <u>2-12-11</u>: Meehan meets Leah at Bills and skips, go to bar".

   The CVS robbery occured on <u>2-14-11</u>. Why the government and Shapiro would attempt to use these note's to prove

the defendant claimed only Heather Meehan saw him prior to the cvs robbery is ludicrous. These note's, along with the

1699 other pages of notes prove the defendant told Shapiro both women saw him prior to 2-14-11. Shapiro claimed

at the deposition the defendant "latched" onto Leah Sabatino as the one who saw him prior to 2-14-11.

"Lawsuit depo. Trans: (p207) "I was at different girls house's, like my ex-wife, Leahs house" (ex-wife is Heather Meehan and

   Leah is Leah Sabatino).

   (p113) "I might have stopped in my ex-wifes house".

   These transcripts prove defendant told ~~David Shapiro~~ the attorney's at the lawsuit deposition that both women

saw him prior to 2-14-11.

   While David Shapiro indicated he had "ethical concerns" about allowing the defendant to testify, he was

unable to point to anything which showed the defendant lied about anything. Moreover, the government and trial counsel have repeatedly stated that the defendant's "inconsistencies" in his writings, statements and deposition was a reason for refusing to continue to represent the defendant if he chose to testify. Shapiro stated that initially the defendant told him he had been with Heather while injured and in his deposition he stated he was with Leah. It was Shapiro's conclusion that the defendant was lying. The truth is the defendant had always stated he was with both women prior to the cvs robbery. (see: page 3 of the Chronology and pages 154-155, 207-211 and 213 of the law suit deposition where he indicates consistently that he was with both women.)

Post trial hearing: 4-6-16 (p117) "Q: you indicated that in the deposition he indicated that it was Leah who saw him after the injury and before the valentine cvs robbery, but in the document we just marked as 129 the chronology additions, he indicated that heather saw him, is that the inconsistancy we're discussing?

A: yes, among -- that was among the inconsistancies.

Q: okay, well, could it possibly be that both -- he was in the presence of Leah between the 11th and the 14th, isn't that correct? Didn't he tell you that over and over?

A: yeah. I mean, I -- yeah.

Q: okay. All right. So, Frankly, there isn't anything inconsistant about Leah seeing the injury as well as Heather, isn't that true?

A: yeah.


The record is clear that Trial Counsel "Threatened" defendant that he would be "Lawyerless" for his trial or defendant's Lawyer would "refuse to question him if he took the stand." The faulty reasoning for Counsel's threats were proven to be just that, "Faulty." The record is one hundred percent clear that both alleged inconsistancies turned out to be not true.

In the district Courts opinion (Doc.#301 Filed 9-14-6 page 71) The court states; "The court found this waiver was made knowingly and voluntary. This colloquy demonstrates that defendant's trial counsel adequately explained to him his right to testify at trial." while the colloquy (p70) may show that defendant knew he had a "right" to testify, it fails to show the reason "why" he chose not to. Trial Counsel obviously did not want the Judge to know why because in the colloquy they state: "without going into a whole bunch of details you have decided after discussions with myself and Michael (shapiro) not to testify?" Defendant chose not to testify because to do so would have rendered him Lawyerless, and that is the details Trial Counsel did not want Defendant to put into the colloquy; and at hearing on 9-2-14, when Judge appoint Mr. Farrel, he stated No more Lawyers for defendant.

## D. DEFENDANT'S DUE PROCESS RIGHTS UNDER THE SIXTH AMENDMENT WERE VIOLATED.

**I.** The District Judge violated Defendant's Due Process rights by not removing a biased Juror. He also committed Plain Error.

**II.** Trial counsel violated Defendant's Due Process rights by allowing a biased Juror to remain on the Jury Panel.

The Sixth Amendment expressly guarantees a criminal defendant the right to be tried by an "impartial Jury." Due Process requires that the Jury should impartial and indifferent to the extent commanded by the Sixth Amendment. The impaneling of a biased Juror is a structural Error and defies harmless error review. Trial counsel's failure to remove Juror #44 constituted ineffective assistance of counsel and deprived defendant of his Constitutional right to a fair trial. The District Court's failure to remove Juror #44 was Judicial error which constituted a Structural error.

The trial Judge was in the best possible position to view Juror #44, to evaluate his demeanor and responses. One only has to look at the record, at the District Judges own words, to know that the Judge was fully aware that Juror #44 was biased (see: Trial Trans. 6-5-13 pgs 3 to 13).

TRIAL TRANS. 6-5-13: VOIR DIRE page 11, LINE 21 to page 12, Line 9)

THE COURT: "I don't want you to Just say-- I don't want you to yes me or yes the Lawyers.

JUROR #44: yeah.

THE COURT: It's got to be a situation where you feel one hundred percent, not ninety-eight percent, that everybody's entitled to a fair trial and you can't Judge somebody Just based upon some experience you went through.

JUROR #44: OKay.

The Court: All right.

JUROR #44: It's difficult, it is for me, you know, I was--

The Court: I'm not saying it's not difficult.

JUROR #44: yeah.

<u>The Court</u>: All we need you to do is to commit to us that you'll decide this case based solely
      upon what you see and here in Court. Can you do that?

<u>Juror 44</u>: I don't feel ~~can~~ like I can be 100%.

<u>The Court</u>: Okay. All right, well that's what we want, we want the truth.

<u>Juror 44</u>: To be honest, yes.

<u>The Court</u>: You know, voir dire means to speak the truth.


      At that point the District Judge was prepared to Strike Juror 44 by agreement, but the
Prosecution and defense lawyer wouldn't agree. In astonishment the Judge then asked defense
lawyres; "you want him on the jury as a prospective Juror?" The District Judge is Perplexed
over this and further state's; "your not going to object?" The prosecution responded in the
negative and the Judge state's;

<u>The Court</u>: All right, if both sides want him, he'll remain on the panel. I mean, he could not
      say that he would 100% set aside, I mean, at one point he said he would, he can
      decide the case objectively. Then when PROPERLY QUESTIONED FURTHER, he said
      he could not. So, but if both sides are satisfied with, I think he said 98%, if
      I'm not mistaken, then it's your call. Okay? All right, Mr. Welker will remain on the panel.


      It's clear from the Judge's own words he believed Juror #44 should have been removed. Judicial
error occured because the district Judge placed the full responsibility of picking a fair and
impartial Jury on the lawyers, after he, himself, rooted that bias out. The District Court failed
in his responsibility when he stated to the lawyers," It's your call." However, it is NOT
the sole responsibility of the lawyers. The Judge is the Gate Keeper and ultimately bears as
much, if not more, responsibility to make sure the accused is tried by an impartial Jury.
      The voir dire process was established so biased Juror's could be rooted out. The District
Judge heard and saw things that made him "PROPERLY" re-question Juror 44. After rooting
out Juror 44's bias the Judge stated, "THATS WHAT WE WANT, WE WANT THE TRUTH," and
The truth was that Juror 44 could not decide the case based solely on what he saw
and heard in Court.
      The District Court further reveals his knowledge and awareness of Juror 44's
bias in his OPINION;

(Judge's opinion page 65) The District Judge wrote; "AT THE TIME, IT WAS NOT ENTIRELY CLEAR WHERE MR. WELKER'S BIAS LIE."

Because the District Judge was not sure who Juror 44 was biased against cannot be an excuse not to remove the bias. Where any bias was found, whether against the defendant or the Government, the Judge was obligated to remove that Juror. The Judge rooted out Juror 44's bias, he advised the lawyer's of that bias. The lawyer's were ineffective for not agreeing to strike Juror 44, but ultimately the District Judge failed in his duty to remove Juror 44. The Judge had the knowledge of Juror 44's bias, he had the power to act, and he was obligated to do so. The District court erred by failing to act on his own findings and created a structural error in the process. This structural error defies harmless error review and most should result in a new trial.

United States v. Cunningham, 694 F.3d (3RD cir. 2012) voir dire examinations serve the duel purpose of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges. United States v. Thompson, 744 F.2d 1065 (4cir 1984) Juror stated he was not sure he could be fair totally fair. The Judge had an obligation to remove this Juror.

United States v. Calabrese, 942 F.2d 218 (3RD cir. Court of Appeals, 1991) (U.S. ex rel De Vita v. McCorkle, 248 F.2d 1 (3RD cir) implied bias justified exousal for cause of juror who was a victim of same types of crime being tried)... "Nor do we disturb the substantial amount of discoration granted a trial Judge in determining whether a Juror is likely to be biased, has the benefit of observing the Juror during voir dire as well as evaluating the Juror's answers. For this reason the Supreme court has recognized that "The trial court has a serious duty to determine the question of actual bias and a broad discretion in its rulings on challenge's therefore. (Quoting Dennis v. United States, 339 U.S. 162, 168, 94 L.Ed 734, 70 S.Ct 519 (1950). See Also; Murphy v. Virginia, re-affirming trial Judges substantial discretion over the conduct of voir dire.)

United States v. McNally, (1972, CA8 MO) 485 F.2d 398, cert den (1974) 415 U.S. 178, 39 L2d 2d 874, 94 S.Ct 1560 It is the duty of Appellate court to independently evaluate voir dire testimony of empaneled Jury in order to determine whether impartial Juror was selected.

Justus v. Commonwealth, (1980) 220 VA 971, 266 SE 2d 87 any reasonable doubt as to whether a Juror comes to trial free from partiality or prejudice must be resolved in favor of accused.

In the instant case the District Court rooted out Juror #44's bias and made it clear to the defense lawyers and the Prosecutors and wanted to STRIKE FOR CAUSE. The Judge told them, "WHEN (he) PROPERLY QUESTIONED FURTHER, HE SAID HE COULD NOT "decide this case based solely upon what he saw and heard in court." The District Court errors by giving his broad discretion to the lawyers by telling them "It's your call." It was NOT the lawyer's call. It was the Judge's obligation and duty to remove any Juror he believed to be impartial and/or biased, as he clearly states Juror #44 was. (SEE Judge's opinion pg 65)("AT THE TIME (of trial), IT WAS NOT ENTIRELY CLEAR WHERE MR. WELKER'S BIAS LIE.") He didn't insinuate Mr. Welker was NOT biased, he clearly stated he wasn't sure exactly who Mr. Welker was biased against.

<u>Marshall Dwayne Hughes v. United States</u>, 258 F.3d 453; 2001 U.S. App. Lexis 15392; 2001 FED App 0211 p. (6TH CIR. 2001) A Juror with actual bias must be removed. If counsel did not strike or challenge he was clearly ineffective. (SEE ALSO) <u>Gomez v. UNITED STATES</u>, 490, U.S. 858, 876 (1989)(deprivation of the right to an impartial Jury can never be harmless error). Allowing a client to proceed before a structural deficient Jury is "something no competent attorney would ever do." <u>McKERNAN v. Superintendent Smithfield S.C.I.</u>, 849 F.3d 557, 567 (3RD CIR. 2017). As the 6TH circuit held in <u>Hughes</u>:

> If counsel's decision not to challenge a biased venireperson could constitute sound trial strategy, then sound trial strategy would include counsel's decision to waive, IN EFFECT, a criminal defendant's right to an impartial Jury. However, if counsel cannot waive a criminal defendant's basic 6TH Amendment right to trial by Jury "without the fully informed and publicly acknowledged consent of the client," then counsel cannot so waive a criminal defendant's basic 6TH Amendment right to trial by an impartial Jury. Indeed, given that the presence of a biased juror, like the presence of a biased Judge, is a "structural defect in the constitution of the trial mechanism" that defies harmless error analysis to argue sound trial strategy in support of creating such a structural defect seems brazen at best. We find that no sound trial strategy could support counsel's effective waiver of Petitioner's basic 6TH Amendment right to trial by impartial Jury.

<u>Hughes</u>, 258 F.3d at 463.

<u>Virgil v. Dretke</u>, 446 F.3d 598, 609-10 (5TH CIR. 2006) After two venire persons stated they could

(31)

not be impartial, defendant's counsel was "obligated... to use a "peremptory" or "for cause" challenge on these Juror's. Not doing so was deficient performance under _Strickland_.

_Johnson v. Armontrout_, 961 F.2d 748, 755 (8ᵗʰ Cir. 1992) "under _Strickland_, petitioner prejudiced by counsel's failure to attempt to remove biased Jurors because trying a defendant before a biased Juror is akin to providing him no trial at all. It constitutes a fundamental defect in the trial mechanism itself."

_Hughes_, 258 F.3d at 463 (quoting _Taylor v. Illinois_, 484 U.S. 400, 417 N. 24 (1988) forfeiting a defendant's right to be tried by twelve impartial Juror's by failing to exercise an available peremptory challenge to remove a venire member who has announced his bias simply cannot be sound trial strategy.

The Government claims that Petitioner's trial lawyers made a strategic choice to "save their bullets," ~~for~~ for the "best possible case's," the appellate court only need to look at the record, look at all challenges and peremptory's not used and, more importantly, look at some of the one's used and one's they tried to use on Juror's that should NOT have been challenged. Towards the end of voir dire, defense lawyer's were making frivilous (useless) challenge's just to use them up.

Juror 44 was the (2ⁿᵈ person) but first person interviewed on day 2, what could be a more applicable "Best possible case" then a Juror who admits bias. Not one Juror challenged was more deserving to be removed then Juror 44. Michael Shapiro was left in charge of day two's Jury picks by his father (See Trial Trans.) that was Michael Shapiro's VERY FIRST trial EXPOSURE EVER (see Post Trial hearing Trans. 4-18-16 pg 4) _Harris By & Through Ramseyer v. Wood_, (1995, CA9 Wash) 64 F.3d 1432, 95 CDOS, 7193, 95 Daily Journal DAR 12284; defendants counsel was ineffective for failing to conduct proper voir dire of prospective Juror's where counsel was absent during part of voir dire, leaving inexperienced and unprepared associate to conduct it.

David and Michael Shapiro were ineffective for leaving a Juror on the panel that they knew was biased, because the judge told them he was biased. It's really a travesty of justice that a lawyer can cover up and be shielded from his mistakes by simply uttering the words "I made a strategic decision," especially when there is no strategic benefit (why else would the Government keep ~~saying~~ defending the defense

(32)

Lawyers by arguing to the Court they (defense Lawyers) did it for strategic reason's.) David Shapiro testified on April 7, 2016 and proves that Keeping Juror 44 was NOT a strategic decision; (Post trial hearing trans. 4-7-16, page 50)

Q: ... you discussed with Joe part of the reason you wanted to put the information (404(B)) in front of the Jury ahead of time was so that people could essentially say that they "COULDN'T BE FAIR" if they heard that information, so it was a strategic move, correct?

A: YES.

David Shapiro told potential Juror's during voir dire about all of defendants past crime's. At post trial hearings he claims he did that so he could get rid of any Juror's who claimed they couldn't be fair. However, because he made two critical mistakes, 1.) he let his inexperienced, unprepared son handle voir dire on day 2, and number 2.) he knowingly allowd a biased Juror, one who stated his bias, on the jury panel. He cannot have it both ways. He claims he did certain things to bring out Jury's bias, but then kept a biased Juror. How can anyone claim these are not complete contradictions.

<u>Szuchon v. Lehman</u>, 273 F.3d 299, 331 (3RD Cir. 2001) holding that the presence of a biased Juror in the sentencing phase of a capital case is a structural defect requiring resentencing despite defendants failure to object.

<u>Austin v. Davis</u>, 647 Fed.Appx. 477(2016) claims based on actual bias are not waived by a failure to object during voir dire.

The defense Lawyers (Post trial trans. 4-18-16 pgs 53-55) blame the defendant for not removing Juror 44 because... "Mr. Meehan (defendant) was sitting right there."... and the Judge also blames the defendant (Judges opinion pg 64) for not removing Juror 44 ... "with the active involvement of defendant, who was present when Mr. Welker testified (Juror 44), they chose to permit him to remain on the jury panel." This argument fails for multiple reasons, 1.) It was the Lawyers and the Judge's duty to remove biased Juror's. and 2.) Michael Shapiro state's (post trial hearing trans 4-18-16 pg 53-55) ... "At the time, I know that we were having arguments about certain Juror's."... The date day was Day 2 and the time was 9:04 A.M. The 1st Juror of that day was #43 and was struck within one minute. Juror #44 was the only Juror questioned and thus, the argument could only be about Keeping him.

<u>Hughs v. United States</u>, 258, F. 3d 453, 463 (6th cir. 2001) The impanaling of a biased Juror, like the presence of a biased Judge, is a Structural (error) defect in the constitution of the trial mechanism that defies harmless error analysis.

<u>Gomez v. United States</u>, 490 U.S. 858, 876 (1989) deprivation of the right to an impartial jury can never be harmless error.

    Juror #44's bias is clear, so clear in fact, the Judge emphasized it to trial counsel during voir dire. Furthermore, the trial Judge acknowledged Juror #44's bias in his opinion. Both Trial Attorney's, David and Michael Shapiro, admitted in post trial hearings that Juror #44 should have been removed (see: post trial trans. 4-18-16 p 53). There can not be a strategic reason for allowing a biased Juror to remain on the Jury panel, especially one who was the victim of a violent crime, in a case where Trial Counsel foolishly brought in all of his client's 404 (B) evidence himself, which included violent crime's.

    Defense Counsel's purported concern about "arguing about every Juror would reduce their credibility with the court" is completely overstated. There were twenty Juror's interviewed when Juror #44 was under consideration and only two Juror's had been challenged for cause. At the end fifty-one Juror's were interviewed and only seven challenged for cause. The very first question the Court asked when Juror #44 left the room was "can we strike Mr. Weiker by agreement?" If the Court looks at the Juror's who were challenged for cause, especially the one's after Juror #44, it's obvious that none of them warrant removal like Juror #44.

    It's unethical and unjust for a lawyer to be permitted to hide behind an "untruth" such as "strategic reason's" and it's a true travisity of justice to allow this blatant falsity to be used to deny defendant his sixth amendment right to a fair and impartial jury.

(34)