E. DEFENDANT'S ATTORNEY(S) WERE CONSTITUTIONALLY INEFFECTIVE AND

TRIAL JUDGE COMMITTED JUDICIAL ERROR.

I. Trial Counsel was ineffective for not utilizing available evidence as it relates to the suspects description, and for allowing the prosecutor make false prejudicial remarks during closing arguments regarding suspects description, without objection.

II. Post-trial Counsel was ineffective for not raising "Height" and/or description issue's, in Supplemental motion, docket # 224 in preparation for post-trial hearings.

III. District Court committed Judicial error by refusing to allow defendant to argue "Height" and Dispatch tapes at post-trial hearings.

IV. The government violated defendant's Fifth and Fourteenth Amendment rights to Due Process by not correcting false testimony.

As prosecutor Lloret stated during trial (Trial Trans. 6-7-13 p146) "Height has become an issue in this case." The fact is, "Height" was a major issue from the very beginning. The Philadelphia Police, The F.B.I. and the government all agree that the suspects who robbed the CVS on 2-14-11 were the same suspects who robbed the Blue Grass Pharmacy on 2-9-11, and, one of the fore mentioned suspects also robbed a Rite Aid Pharmacy on 1-31-11. Law enforcement definitively linked all three of these robberies by suspects description and the get-a-way car.

Although Rite Aid is an uncharged crime it is the start of this crime spree (see: Trial Trans. 6-12-13 p51) Agent Coyle Testimony "yes, the Rite Aid, the Blue Grass, the CVS were all related, yes." The links which connect all three of these robberies are so obvious, but more important, so essential in aiding the defendant in proving his innocence, that no competent attorney could have omitted these "links" from their defense strategy. Also, a prosecutor who was truely seeking the truth, truely seeking justice would not manipulate the record and make false statements with such a disparity between the defendant and the description of the suspect.

HEIGHT FACTS - WEIGHT APPROXIMATIONS

(all weight approximations are from year 2011)

Joseph Meehan, Defendant. 5'6" tall 170 lbs. (see: Trial Trans. 6-10-13 p157, Agent Coyle Test.) Allegedly wore tan mask in robberies.

John Andrews, 5'11" tall 215 lbs. (see: Driver's Licence). On 6-6-13 (FBI) (p68) Andrews testified, "I'm about 5'8 or 5'9" tall" and states defendant is 5'6" tall. The Government knew, or should have known, Andrews is 5'11" tall and in a case "where height has become an issue" makes this egregious. It should have been corrected. Wore black mask. (AGENT COYLE GRAND JURY TEST. 8-4-11, p14 he CONFIRMS ANDREWS IS 5'11" TALL. SEE: EXHIBIT D-29)

Randy Parsons, 6'1" tall 200 lbs. (see: F.B.O.I. identification) co-conspirator who later pled guilty, claimed defendant was not there.

Tony Mevicuella; 6'1" tall 190 lbs. (see: Trial Trans. 6-10-13 p157) Unindicted co-conspirator, confidential informant since 2005.

Franklin "Chucky" Rhoads, 5'10" tall 200 lbs. (see: Trial Trans. 6-7-13 p43)

Brian Andrews, 5'8" tall - "chubbier then defendant" (see: Trial Trans. 6-7-13 p43)

The Rite Aid pharmacy was robbed on 1-31-11. The Multiple case Affidavit, district control #11-08-004165, for the arrest warrant filed by Philadelphia Police states, in part; "The complaining witnesses describe the offender as follows: male, white, medium complexion, 36-40 years of age, 68-72 inches in height, 205-285 lbs, medium build, wearing a dark colored ski mask, dark colored coat, armed with a black hand gun. The complaining witnesses physical description of their attacker is consistent with that of the offender Jonathan M. Andrews 38/w/m." The get-a-way car was a white Mitsubishi Galant. Witness got first three letters of license plate "HFT." (see: Attached Exhibit D-7)

The Blue Grass pharmacy was robbed on 2-9-11. The Multiple case Affidavit, district control # 11-08-005476, for the arrest warrant filed by Philadelphia Police states, in part; "The complaining witnesses describe offender #2 as follows: Male, white, medium complexion, 36-40 years of age, 68-72 inches in height, 205-215 pounds, medium build: wearing a dark-colored ski mask, dark colored coat, dark colored trousers, dark-colored footwear - armed with a Black handgun. The complaining witnesses physical description of their attacker is consistent with that of offender #2, Jonathan M. Andrews 38/w/m." The get-a-way car was a white Mitsubishi Galant. Witnesses got their complete license plate "HFT-4118"

The same offender used the same car in both the Rite Aid and Blue Grass robberies.

The CVS pharmacy was robbed on 2-14-11. Police arrived while two suspects were still in the store. A shoot-out ensued. The Third suspect, who stood by front entrance, fled before police arrived. The following are descriptions from police on the scene and witness(s) involved.

2-14-11  8:33 pm: Philadelphia Police dispatch tapes; (Track #5) "... 813 The one with the gun that fired is wearing all black"... "813 the white male with the hood in black I may have got him in the right leg"... (Track #8)... "8 box 7 I got flash on male that pointed a gun at my partner, he's gonna be a white male about 6' tall, thin build wearing a grey jacket and a black ski mask".... "We're looking for a white male, 6' tall, thin build wearing a grey jacket and a ski mask... 822 one of the males who fired at me behind the store he was wearing a black jacket, dark jeans, the 2nd white male also black jacket dark jeans, the first one did fire at me".... "We're looking for a white male, 6' foot, thin build wearing a grey jacket and a black ski mask and the second one is wearing a dark jacket black jeans"... "120 I'm on location, the one we're looking for he's the one who shot in the rear driveway, the white male... the white male, 6' foot, thin build wearing a grey jacket, he's the one that shot, alright one of the males is possibly shot in the right leg..."

(36)

(Track #9)... "Two white males, one's wearing a grey jacket, 6' foot, wearing a black ski mask, thin build, second white male... I got what the second male"... "There was one male up front, their not sure black, white or hispanic, but there was a third man they were talking to, we don't have any information on him yet, we have to check the camera's... Alright, so we got one male wearing a grey jacket... on location ... the CVS... we got white male, 6' foot tall, thin build wearing grey jacket and black mask and the other one was wearing a black jacket and dark jeans, right... correct"... (Track #13) "The number two man's gonna be a white male, late 30's, he has a large nose and he was wearing a tan mask."
(see: Attached exhibit marked D-8)

The following are the edited dispatch tapes played for the jury. Government exhibit #45 at trial.
"Male with gun in store... 8525 Frankford assist officer... Police fire radio... Radio shots fired assist officer... 701 location... Are anyone else on location... shots fired... One anyone else on location with Tom 7... Tom 7 is any cop shot... A lot of shots from rear of store... 13 I had to discharge... Alright 13 is doer shot... We're still running eastbound, street coming down to ditman... Flash on the... Can you give me Flash... 13 give me flash is anyone shot in the store... Ma'am I'm running out here... Alright do you have flash on male with gun... he's all in black, both are all in black... the males are all in black last seen going east bound... if it's up... Not up... Alright the male is in black last seen running through alley... Ma'am I discharged behind CVS he pointed a weapon at me right before he went over the fence, just keep area secured there, unless they ditched it... Alright 813 discharged in rear of CVS, alright... where's he at with the male, where did he last see the male then alright 13 where are you at now... he last seen going through alley toward ditman... Hey Barry I need cars 43-4200 Blakeston street... off Strahle... set up perimeter now, get us more people now... 2ND assist 4300 Ditman... 13 the one with the gun fired he's wearing all black... Any injury to police, any cops shot anyone shot... Nobody shot but police discharge... how many... that would be me, I don't know who else... I need cars 42-4300 Benson as well as one block south of Benson... I need some units 4200 and 4300 Benson... the white male with the... hood in black I may have got him in the right leg... _____ white male may be shot in the right leg... 811 I have an _____ here who attempted to take his vehicle they pointed a gun at him."
(see: Attached exhibit marked D-9)

In the instant case, Government witness John Andrews admittedly wore a black mask and is approximately 6 feet tall. Defendant is 5'6" tall and allegedly wore a tan mask. The government intentionally and methodically

omitted all the "FLASH" which clearly said the shooter was 6' tall wearing a black ski mask. The defendant was accused of, and found guilty of, and enhanced for, being the shooter.

2-14-11, 9:30 p.m CVS employee LACKTMAN statement: First male about 5'5 - 5'6" tall, male, white, dark mask. Second male, tan or light brown mask, maybe late 30's early 40's, 5'6" - 5'7" tall, male, white, large nose. (see: Exhibit D-10)

9-15-11, officer Snyder, I.A.D. statement: Suspect was about 6 feet tall. (approximately 20 feet away). (see: Exhibit D-11)

9-15-11, officer Loizos, I.A.D. statement: The guy with the gun was 5'8" or 6'feet tall. The second guy's height was close to the first guy's. (approximately 15 feet away). (see: Exhibit D-12)

9-23-11, officer Boccalupo, I.A.D. statement: The first male over the fence fired several shots, he was over 6' tall. The first guy was taller than the second guy. (approximately 20 - 25 feet away). (see: Exhibit D-13)


    Whats clear from all statements from police and main witness at time of crime is the shooter is six feet tall and ~~the~~ wearing a black ski mask and the second suspect is "close in height." Lacktman's description proves two things, 1) The two suspects were visually close in height and, 2) Both suspects must have been close to 6 feet tall because Andrews is the suspect in the black mask and he is 5'11" tall. Police officers I.A.D. statements prove this also. All three police involved confirm shooter is 6' tall in black mask and both suspects are close in height. Defendant is 5'6" tall.


    On 3-15-13 the government sent a letter to Trial Counsel (see: Exhibit marked D-14). The government states they will not seek to introduce evidence that defendant robbed the Rite Aid on 1-31-11. They go on to threaten the defendant stating, "if the defense attempts to introduce evidence that a third party robbed Rite Aid and/or this third party also robbed Blue Grass and CVS, then the government will attempt to rebut such an argument with testimony and evidence that Meehan did rob the Rite Aid on 1-31-11. Such evidence may include, but not limited to, Meehan's statements to witnesses bragging he robbed Rite Aid and witnesses identified the robber driving the white Mitsubishi Galant. The government would also introduce evidence of the DEA-106's and have them match to some of the drugs found in the Riveeia Motel."

    In Shapiro Memorandum dated 3-11-13 page 11 (see: Exhibit marked D15), Shapiro wrote, "if you believe Andrews and think Joe (Meehan) did this (Rite Aid)"... Next to this in the left hand column defendant's personal note in response states; "HOW THE FUCK COULD ANYONE THINK I DID IT? LOOK AT THE DESCRIPTION!" In Shapiro Memorandum dated 3-15-13 page 16 (see: Exhibit marked D16), Trial Counsel explains Government's 3-15-13 "Letter," In

the left hand column of page defendant's personal note states; "THEY ARE CLEARLY TRYING TO PROTECT THEIR RAT... WE BRING IT IN."

Andrews is a key government witness. He is a self-admitted participant in the Blue Grass and the CVS robberies. (Note: Andrews adamantly denied any participation in the BLUE GRASS and Rite Aid robberies. Then, after being shown a video of the Blue Grass Robbery which showed his face clearly, he reluctantly admitted to robbing Blue Grass. However, video camera's were inoperable during the Rite Aid robbery).

It is significant to note that the defendant's steadfast claim of innocence and his theory of defense were consistant and coherent from the start. Trial Counsel received defendant's theory repeatedly in his voluminous writings. The defendant believed all his notes to be protected by the attorney/client privilege. However, during the post-trial hearings, trial counsel, David Shapiro, turned over 1700 pages of defendants note's, most of which were defense theories and strategies. The defendant's theory (not to be confused with Trial Counsel's own, risky theory) dealt with this ⬚, as well as all other issue's, in a consistant, reasonable and effective manner, as those 1700 pages of confiscated note's attest to.

Defendant's theory in his notes NEVER changed and that's because his "Theory" is much more then a theory, it's the truth. From the beginning defendant's note's state: Andrews obviously robbed the Rite Aid. Sabatino had sex with Andrews and Andrews refused to pay her. When the defendant found out all that took place he was very mad because he had been detoxing Sabatino and trying to stop her from prostituting. Defendant refused to "help" her get money from Andrews because he is not a "PIMP." Sabatino then stole a bag of pills and some cocaine from Andrews bedroom. Eighty percent of the drugs seized from the Riveria Motel were an identical match to the DEA-106 form for the drugs stolen from Rite Aid. Ten percent could not have come from Rite Aid or Blue Grass. And Ten percent had a "possibility" of coming from Blue Grass (see: Page 65 of this motion, "sufficiency of evidence - DRUGS").

There was a plethora of evidence that could have been used at trial, all of it available for trial Counsel, but he ignored it. The Government KNEW Sabatino stole the drugs and took them to New Jersey as Sabatino's 9-19-11 phone call makes evident. On page 5 of these transcripts that Agent Coyle transcribed it states;

SABATINO: "I told them I brought the coke from Philly to New Jersey... I told them I got it from Johnny because they asked where the coke came from and I said Johnny had a whole bunch of it."

Above is Agent Coyle's transcription. However, if you listen to the audio, sabatino says crystal clear that she got it out of his bedroom but Agent Coyle omitted that from the transcription. The portion of the 9-19-11 call were so chopped up at trial, the Jury NEVER heard this. Trial Counsel KNEW but ignored it.

Defendant expected his trial attorney to use the suspects height and over-all description in the Rite Aid robbery to impeach Andrews and to prove Andrews committed the Rite Aid Robbery and continued to lie about it. Defendant expected his trial attorney to subpoena the Philadelphia Police officers who were involved in the Rite Aid robbery to prove they did believe Andrews committed that robbery. However, Trial Counsel never called one witness at all. Not only did he allow government witnesses, Andrews and Sabatino, to testify that it was the defendant who committed the Rite Aid robbery, but he himself incriminated his own client by questioning John Andrews in a manner that allowed Andrews to convincingly deny any participation in the Rite Aid robbery while at the same time implicating the defendant.

He also allowed Sabatino to testify the defendant told her he "hit the Rite Aid and the pharmacy in the shopping center." Counsel failed to impeach Sabatino with the fact that in all her proffers and Grand Jury testimony she claimed defendant pointed at the Rite Aid on Welsh and Blue Grass roads and said he robbed that Rite Aid, which is not the Rite Aid that was robbed.

Furthermore, defendant expected his trial attorney to prove, through dispatch tapes and police statements, that it could only have been Andrews who fired his weapon at police because all three officers repeatedly confirmed the shooter was six feet tall wearing a black mask and Andrews was lying.

The following testimony incriminated the defendant in the Rite Aid robbery because the "HEIGHT" and other descriptions of suspect(s) was manipulated to make it seem like the suspect was 5'6" tall. Trial Trans. 6-6-13 (CVS Employee Lacktman): (p47)..."He was approximately my height and build. He was wearing a white or a tan mask, I couldn't see his face because of that, so I can't describe him any further. Q: And when you say he is your height and build, how tall are you, sir? A: Excuse me, I'm approximately 5'5" or 5'6" tall. (p48) Q: Did you see anyone else? A: that person was a little taller, he was about 5'6" or 5'7" tall."

There was no cross-examination. Defense Counsel should have pointed out that in earlier statements Mr. Lacktman stated the suspect in the tan mask was the taller of the two, and that Mr. Lacktman's height description could not be correct because Andrews was wearing the black mask and is 5'11" tall.

Trial Test. 6-6-13 (Andrews) (p63) "Q: what is that pharmacy? A: That's a Rite Aid pharmacy. Q: when you walk to Blue Grass pharmacy do you pass the Rite Aid pharmacy? A: yes, you would. (p66) Q: Did Meehan tell you where he got the xanax? A: yes. Q: where did he say he got it from? A: From a previous robbery he did. Q: Previous to the Blue Grass? A: yes. Q: Another pharmacy? A: yes. (p68) Q: Now, Meehan, you've known him for a long time, is he taller or shorter than you? A: A little bit shorter then me. Q: About how tall are you? A: I'm about 5'8", 5'9" tall. Q: And about how tall is Joe Meehan, if you know? A: I would guess 5'6". (p69) A:...we

disguised ourselves, I wore a blue ski mask. Q: A dark color? A: yeah, it was dark color, navy blue. (p74) Q: ... you mentioned you gave Meehan a gun, did you ever give him a gun before? A: yes, I did. Q: Before this robbery (BLUE GRASS)? A: yes, I did. Q: Had he asked you for a gun? A: yes, he did. Q: Alright, and you gave it to him? A: yes. (p75) Q: And you had that dark ski mask on right? A: yes. Q: By the way, about how much did you weigh about that time? A: About 210. (p76) Q: So JOE MEEHAN is in what color hat? A: TAN. Q: were you the one in the black ski mask? A: yes. (p79) Q: Alright, have you ever robbed a store before this (BLUE GRASS)? A: NO. (p80) A: he was selling, he was selling pills prior to that (BLUE GRASS). (p83) Q: And this guy Tony, was he suppose to be in on the robbery? A: yes he was. Q: can you describe Tony? A: TALL ITALIAN guy. Q: is he taller then you? A: yes. Q: is he over 6' tall? A: yes. Q: How much over 6 Feet? A: 6'1", 6'2". **/ START OF CROSS EXAMINATION /** (p144) Q: is it your testimony as you sit here today, that the first armed robbery you were ever involved in -- A: yes. Q: was when you were 39 years old (BLUE GRASS)? A: yes. (p147) Q: have you ever discussed any other robberies that the government thought you were involved in? A: I brought them up, yeah. Q: And that was what? A: That was the Rite Aid on the Roosevelt boulevard. (p156) Q: you don't want them to tell the judge that you were a suspect in the Rite Aid shooting, in the Rite Aid robberies, I'm sorry? A: NO I WASN'T. Q: I didn't ask you that. A: oh Q: listen to my question- your hoping that they don't say anything about the Rite Aid robberies, accusing you of doing them? A: it NEVER crossed my mind.

<u>TRIAL TRANS.</u> 6-7-13 (Andrews Test. cont.) (p6) Q: how about the Rite Aid, were you or Tony involved in the Rite Aid? A: NO. (p9) Q: Did you tell Agent Coyle that the girl (shooting) drove a get-a-way car for Joe? A: yes, I did. Q: And that was in connection with what Robbery? A: The Rite Aid. (p10) Q: Did you tell Coyle she drove the get-a-way car to make Joe seem worse? A: NO, that's not why I told him. Q: why did you tell him? A: BECAUSE that's what JOE told me. (p43) Q: IN connection with the cvs robbery -- I have to go back to something. How tall is Brian? A: About 5'7, 5'8". Q: about the same size as Joe? A: yeah. Q: same build? A: No, my nephew is a little chubby. Q: A little chubbier then Joe? A: yeah. Q: But the same height? A: same height. Q: can we agree that if they were wearing masks they would be hard to tell apart? A: possible.

<u>TRIAL TRANS.</u> 6-7-13 (officer Boccalupo) (p86) ... they came running side by side. (p87) As soon as first Robber hits the ground he immediately starts shooting at me. (p89-90) I could tell immediately one was a lot taller then the other. **/ Cross- EXAMINATION /** Trial Counsel did not ask one question about description of suspects.

<u>TRIAL TRANS.</u> 6-7-13 (officer Loizos) (p104) A second individual jumps from the top fence onto the ground, he goes down on his right leg. He gets up and both begin running down the driveway .... gave as best of a description as I can over police radio of the two suspects. **/ CROSS- EXAMINATION /** Trial Counsel did not ask one question about description of suspects.

TRIAL TRANS. 6-7-13 (SMITH - CAR JACKING VICTIM) (p116) CAN'T give a description. (p117) DOESN'T KNOW SUSPECTS height OR weight. (p118) After reading old 302 he states that suspect WAS 5'7" OR 5'8" tall, 130-140 pounds. / NO CROSS EXAMINATION.

TRIAL TRANS. 6-7-13 (Rhoads Test.) (p145) DISCUSSION held off record: PROSECUTOR: Two things your HONOR, I WAS AT SOME point during TRIAL going to ASK your HONOR -- and I had cleared this with Mr. Shyrock -- I WAS going to have Mr. MEEHAN stand up IN FRONT of the table -- I cleared it with the MARSHALS AS WELL -- Just so the JURY CAN see him standing. I WAS ALSO going to have the WITNESS, Mr. Rhoads, STAND over IN this AREA ON the floor -- And I'VE checked this out with the MARSHALLS -- so that the JURY CAN see both of them, BECAUSE height HAS BECOME AN ISSUE IN THIS CASE. (p147) Q: Mr. Rhoads, how tall ARE ya? A: About 5'10½". Q: ARE you taller then Joe MEEHAN? A: I think so. PROSECUTOR: And Just so the JURY CAN see that the SIZE OR the height of EACH of these individuals. COURT: All right. Mr. MEEHAN HAS come IN FRONT of COUNSEL table AND Mr. Rhoads is standing IN FRONT of the WITNESS stand. okay? PROSECUTOR: Nothing FURTHER. / CROSS - EXAMINATION / NO questions About Height.

TRIAL TRANS. 6-10-13 (AGENT Coyle Test) (p157) Q: Is MEEHAN taller OR shorter then Mr. GINECKI? A: Shorter Q: is he appreciably Shorter OR just AN inch OR so? A: he's 5'6". Q: Mr. GINECKI, do you have AN ESTIMATE ON his height? A: TALLER then that, 5'9" maybe, AROUND THREE. Q: Did you TALK to Tony Menichella? yes. Q: CAN you tell us how tall he is? A: Mr. Menichella is 6'1". (IN Coyle's GRAND JURY Test. 8-4-11 p14, he VERIFIES Andrews is 5'11" TALL)

TRIAL TRANS. 6-11-13 (SABATINO TEST.) (p15) Q: Did you have to go up Welsh road to go to Burger King? A: yes, Burger King is on the left hand side ACROSS the street from the Rite Aid (she could not REMEMBER Anything About the blue GRASS robbery And reads her GRAND JURY TRANS.) (p17) Q: Now, having read the GRAND JURY testimony from October of 2011, is your memory REFRESHED About what this defendant told you when you WERE walking by the shopping center on the way to Burger King? A: He said he had hit the Rite Aid And the pharmacy over IN the little shopping center. Q: SO, it's not like A Rite Aid or A CVS? A: NO.

TRIAL TRANS. 6-12-13 (AGENT Coyle Test. CONT.) / CROSS - EXAMINATION / Q: Andrews threw IN Leah Sabatino AS A get-a-way DRIVER IN the Rite Aid robbery which nobody's EVER been charged with. A: I'd have to see the STATEMENT to RECALL EXACTLY to see how he WAS phrasing that. I believe Mr. Andrews had been told that by MEEHAN, that -- Q: No question. Let's, so there's no dispute, he WAS told by -- he said he WAS told by MEEHAN that Sabatino drove the get-a-way CAR. A: yes. Andrews said that According to MEEHAN, Sabatino had been involved IN that AS A get-a-way DRIVER. Q: she WASN'T? A: she WAS not. Q: WAS not. A: SHE WAS not the get-a-way DRIVER, that's my point. Q: I AGREE with you ONE hundred PRECENT. AS that, I'm FAMILIAR with that robbery. That WAS A LONE ACTOR and the WITNESSES saw him get into A CAR IN the DRIVERS SEAT And drive AWAY. (p51) Q: And there WERE ALSO drugs found IN the Rivera Motel that could not possibly have come from the

Blue Grass because they weren't on the DEA-106? A: Right. Q: And remember a case that you were involved in to begin with, the Rite-- am I correct that you were involved in the Rite Aid, is that how you got into this case? A: Yes, the Rite Aid, the Blue Grass, the CVS were all related, yes. Q: Now, somewhere out there and maybe you have a file it says what was taken from the Rite Aid? A: Yes. Q: Is there any relationship between any of the drugs found at the rivera motel and any drugs listed on the DEA-106 for the Rite Aid? A: Yes. Q: And is there any relationship between any of the drugs found in Andrews SUV that were on the DEA-106 for the Rite Aid? A: I don't know. (p54-55) Defense counsel reads search warrant for Andrews SUV. The cop wrote the pills found were consistant with those stolen from Rite Aid and Blue Grass, and Agent Cogle answers that is accurate. Q: Okay. Now I think you've testified that no one, not Sabatino, not Meehan, not Andrew has ever been charged with the Rite Aid? A: correct.

<u>Trial Trans.</u> 6-12-13 (Government closing) (p103) Now, you heard from officer Braccolupo and he told you that the first person over the fence, he was the shorter of the two. It was the defendant. He also told you that as soon as the defendant hit the ground he turned and he opened fired on officer Braccolupo.

OFFICER Braccolupo NEVER said the first person over the fence was the shorter of the two. Braccolupo's I.A.D. statement says the first male over the fence was over six feet tall and he fired the shots, and he wore a Black ski mask. The Government knew the only person in a Black ski mask was their Key witness, Andrews. (See: Attached Exhibit D-13).

In a case where there is no physical or Trace evidence linking the defendant to the crime scene's, witness impeachment was critical. (See: Post-Trial Trans. 4-18-16 p11: Q: There was no physical or trace evidence that placed Joe at either one of these robberies, is that correct? A: No question about it. Q: With respect to the actual videos of both robberies you couldn't make an identification of the person in the Tan mask? A: That is TRUE. (p14) Q: The Governments Theory is Meehan hid in the bush's for four hours until he was picked up by Rhandi? A: Yes. Q: But there was absolutely No physical evidence-- there was snow on the ground... There was no foot points, there was no trace evidence, there was no buried gun, there wasn't any indication of anybody hiding in bush's, correct? A: NOT A THING / Post-Trial hearing Trans. 6-15-15 page 46: Government theory was defendant was shot, from a distance of less then 25 feet. Q: ... the government didn't have any evidence, nor was there any evidence of any bullet wound to Joe's foot, is that correct? A: I won't dispute that. Q: There was no evidence of bleeding in his sneaker or bloody sneaker ... There wasn't any evidence of a wound or blood was there? A: There wasn't.)

Had Trial counsel used available impeachment material on Andrews, such as witness descriptions and police arrest warrant affidavit's, it would have proven Andrews robbed the Rite Aid, continued to lie about

(43)

and blame the defendant and that the government was aware of this, but because Andrews was willing to blame someone, the government went along with it. It also would have showed Andrews blamed the women who stole his drugs for being part of the Rite Aid Robbery. Impeachment of the police officer as to shooter's height was also critical. Three police officers who were trained to observe details such as height, weight, color of masks, etc, they should have been impeached with I.A.D. statements and dispatch tapes, the original tapes. The only testimony about identification is from a pharmacist who had a gun to his head and he believed the suspect in the Black mask was 5'6" or 5'7" tall and it's a fact that was Andrews and Andrews is 5'11" tall. Impeachment evidence also would have proven both suspects were close in height. Although Mr. Lockman is way off about Andrews true height, he corroborated officers statements claiming suspects were close in height.

Ms. Freind had the ~~Ado~~ audacity to say in her closing arguments, (6-12-13 p141) "This trial is not about winning, it's about justice. The victim's in this case, they don't want just anybody to go to jail for the crimes that were committed. They want the person who violated them to go to jail. That is Justice. And has there been one shred of evidence in this case that there's some sort of vendetta going on against the defendant? NO. The evidence in this case shows you that it's the defendant who committed the robberies. That's the evidence in this case."

The government filed a 3559 (c)(1) motion to enhance the defendant's sentence to multiple life's in prison because of the horrific act of the suspect open firing on police officers. At sentencing, Ms. Freind rambled on and on about anyone who would fire at police should die in prison. The government knew, or should have known, that Andrews was the shooter behind cvs and they manipulated the suspects height to make it appear the shooter was 5'6" tall and wearing a tan mask, then ~~LET~~ **LET** their witnesses blame the defendant. Available evidence that trial counsel ignored, but the government was well aware of proved the shooter was 6' tall and wearing a black mask, which could only be Andrews, their witness.

For all the reason's stated herein, Trial counsel was constitutionally ineffective for not using available "height" evidence. Michael Farrell, Post-trial Counsel was Constitutionally ineffective for not raising this issue in Supplemental motion, Docket #224. The Trial Judge committed Judicial error by refusing to allow defendant to argue height issue's during Post-trial hearings (see: 4-6-16 p42 to 46). Also see: 4-18-16 p72 where Judge says the issue is NOT waived. It's just untimely for Post-Trial hearings. And the Government violated defendants Due Process Rights by Allowing Andrews to testify falsely as to his height and by editting dispatch tapes to cover-up the shooter's height and by making false, prejudicial statements during closing arguments.

**F.** <u>DEFENDANT'S DUE PROCESS RIGHT TO A FAIR TRIAL WAS VIOLATED.</u>

**I.** Trial Counsel was Constitutionally ineffective for failing to investigate D.N.A. evidence or request a D.N.A. expert for trial.

**II.** Post-Trial Counsel was Constitutionally ineffective for failing to raise D.N.A. issue's at proper time during Post-trial proceedings.

**III.** Trial Judge committed Judicial Error by refusing to allow defendant to argue D.N.A. issue's during Post-trial proceedings.

**IV.** The Government committed Prosecutorial Misconduct by failing to turn over key piece's of evidence for D.N.A. testing, and for failing to test said evidence.

**V.** Appellate Counsel, Julie McGrain was ineffective for failing to raise D.N.A. issue's in direct appeal. IN the instant case, where there was a plethora of physical evidence collected from multiple crime scenes, D.N.A. testing and analysis, was a critical step in the truth seeking process. The reliability of D.N.A. analysis could have definitively proven who wore, handled or otherwise used key piece's of evidence which were material to the instant case.

   Government witness, John Andrews, testified the defendant wore the "SAME TAN MASK". There has NEVER been a dispute from Law enforcement or the Government that the TAN mask recovered from Andrews apartment was the mask allegedly worn throughout the crime spree by the defendant. See the following documents:

   1. Property receipt # 2951890

   2. Affidavit of Probable Cause; warrant control No.# AFF-0001203-2011

   3. Document Search Warrant Circumstances: "Moreover, detective's recovered the FLESH-colored nose/mouth/chin covering [FASHIONED FROM AN UNDER-GARMENT] worn by Jonathan M. Andrews 38/W/M 's Conspirator"

   (See: ATTACHED, all three documents marked as exhibit D-17)

<u>Trial Trans,</u> 6-5-13; Government opening: (p20)"... Meehan runs straight to the back where the pharmacy is .... again, waving the gun, wearing the same cap and mask as he did in the first robbery."

<u>Trial Trans,</u> 6-6-13; Andrews Direct: (p94) A: "The same hat, the same tan hat as when we was at Blue Grass. Q: How about on his face? A: That's the same sleeve, same tan sleeve from the Blue Grass."

<u>Trial Trans,</u> 6-7-13; Andrews Cross: (p68) Q: "You said Joe wore a certain color mask? A: yes. Q: which color? A: TAN. Q: and does it ring a bell with you that the mask was found at your house? A: oh, it was? Q: excuse me? A: I said, was it? Q: So you don't know that? A: NO. Q: I'm done your honor. Complete. No further questions.

Andrews admittedly wore the same dark colored ski mask in all the robberies (although he denies it's him in Rite Aid.) It's alleged the defendant wore the same Tan colored mask in all the robberies, the exact SAME mask recovered in the search of Andrews apartment. The governments D.N.A. Analysis of the black mask worn by Andrews was 1 in 552.8 Quintillion (in caucasian population) times more likely to be Andrews D.N.A. then anyone else's. However, the government's D.N.A. Analysis for the Tan mask was inconclusive for defendant's D.N.A. (see: exhibit D-18)

With any evidence, but especially with a piece of evidence as critical as the mask worn in multiple robberies, the defendant should have had an expert and afforded independant analysis for trial. Said expert should have testified on the scientific reliability, that had the defendant worn that mask during multiple robberies, during a shoot-out with police, then ran hundreds of yards, while shot, and hid in a bush for five hours in Frigid temperatures, as the government theorized, what ~~would~~ his/her expert opinion is that defendants D.N.A., left by slobber or snot, would have been on the mask that covered his Nose and mouth.

Trial Counsel, David and Michael Shapiro, were Constitutionally ineffective for failing to request a D.N.A. expert for trial, for failing to have the "TAN MASK" independently tested to determine whose D.N.A. was on it, and for failing to test other material evidence. David Shapiro, whom questioned Andrews during cross, highlighted his ineffectiveness by his sudden "halt" to all questions as soon as the "TAN MASK" came up. Specifically, how did that mask get to Andrews Apartment if the defendant had it? (see: Trial Trans. 6-7-13 p 68)

During post-trial hearings (4-6-16 pgs 36-43) defense lawyer, Michael J. Farrell, attempted to raise Shapiro's ineffectiveness in relation to his D.N.A. failure's. The government objected to the defendant being able to ~~agu~~ argue D.N.A. issue's because Mr. Farrell failed to raise it specifically in his Supplemental motion, Docket #224. (although law enforcement and government witness Andrews consistently agreed that the tan mask recovered was the mask worn by the defendant, once D.N.A, or lack thereof, came into question, the government attempts to change ANOTHER ONE of it's trial theories. Now, it's D.N.A. in question. they state, "it's a remnant of the mask.") Mr. Farrell admits his failure to specifically raise D.N.A. issue's in docket #224 (4-6-16 p 39). The district court then refused to allow defendant to argue D.N.A. issue's during post-trial hearings (4-6-16 p 42).

Mr. Farrell was Constitutionally ineffective for failing to raise D.N.A. argument in time to

be heard during Post-trial hearings. Furthermore, the district Judge committed Judicial error by excluding D.N.A. arguments during Post-trial hearings because it is such a critical and proven method of finding the Truth.

The Government failed to turn over critical evidence, evidence that should have had D.N.A. analysis. The shoot-out with police happened behind the CVS, The Crime Scene Unit investigated and gathered evidence. In document labeled; "Mobile Lab No. 11-115, C.C. No. 11-08-006226" The listed ~~date~~ evidence was found;

"GLOVE - 39'10" w/E  REAR Building Line  + 17'10" w/w  REAR Building Line
                     8525 Frankford              8525 Frankford
→ REAR DRIVEWAY AREA BEHIND STORE (CVS)              (SEE: EXHIBIT D-19)

This glove was found exactly where the shoot-out occurred, just a few feet from black mask. This glove should have been turned over to defendant and should have been tested for both D.N.A. and gun shot residue. This critical piece of evidence is NEVER mentioned or otherwise identified ever again. There are two important issues with this missing glove, 1.) if D.N.A. testing proved it to be Andrews then gun shot residue testing could have proved Andrews was the shooter, and 2.) D.N.A. testing could have proven someone other than the defendant was there. There was other evidence found in the rear of CVS that the government failed to test for D.N.A. (See: Attached marked exhibit D19). "One (1) green "Blistex Medicated" lip Balm" How could this be overlooked for D.N.A. testing? It's incomprehensible to think "lip balm", which had a direct contact with somebody's lips, could have NOT been D.N.A. Tested. Had it been tested the results could have proven or disproved who was there. The government's failure to turn this evidence over, or to have it analyzized for D.N.A. constituted Prosecutorial Misconduct. (See: exhibits D-17 for Lip Balm).

For the above stated reason's, defendant's trial Counsel and defendant's Post-Trial Counsel were Constitutionally ineffective. Also, the Trial Judge Committed Judicial error which should be reviewed under plain ERROR. Furthermore, the government's misconduct was so unethical, especially when there was no physical or trace evidence linking defendant to the crime scene's. Defendant should be granted a new trial.

NOTE: The Trial Judge stated on record (4-18-16 p 72) That this issue is NOT WAIVED, it is JUST "untimely".

**G.** DEFENDANT'S DUE PROCESS RIGHT TO A FAIR TRIAL WAS VIOLATED.

**I.** Trial Judge erred In not evaluating defendant's attack on Government's sufficiency of evidence at Trial during Post Trial hearings.

**II.** Appellate Counsel, Julie McGrain, was Constitutionally ineffective for failing to "continue" raising these issue's, as advised by defendant, in Direct Appeal.

In the District Court's opinion, dated 9-14-16 (This documents first page is listed as Docket #302, but all following pages are listed as Docket #301), on page 3, Footnote 1 Judge Slomsky states: "Although defendant styles the motion to include a request for a Judgment of acquittal, his numerous attacks on his conviction do not challenge the sufficiency of the evidence to support the conviction on each count. For this reason, the Court has concentrated in this opinion on defendant's arguments on why he should be afforded a new trial....... This Court presided over defendant's trial and is well aware of the evidence presented by the government against him. The evidence was sufficient to sustain the Jury's guilty verdict on each count and is described in this opinion."

At trial, Leah Sabatino, a key government witness testified she injected heroin immediately prior to testifying (Trial Trans. 6-11-13 p6). Due to her heroin use at trial defense Counsel file a Motion for Judgment of Acquittal or for a new trial pursuant to Fed. R. Crim. P. 29 and 33 (see: Docket #189, Filed 11-18-13). The only issue raised in that motion was dealing with Sabatino's heroin use the day she "fled" the Courthouse and on the day she testified and the government's knowledge of Sabatino's heroin use during those days.

After filing that motion, but prior to the defendant being sentenced, Trial Counsel was removed. Michael J. Farrell was appointed. On 2-20-15 defense filed a response to Government's reply brief, and in Supplement of defendants original 29/33 motion (see: Docket #224). Post Trial hearings were granted. The Twelve issue's raised in Docket #224 all dealt with Trial Counsel's ineffectiveness prior to, and during, the Trial. What the Trial Courts have overlooked is that the illusion of strength in the government's evidence was due to trial Counsel's failure's and omissions, which Post Trial hearings prove.

At Post-Trial hearings (6-15-15, 4-6-16, 4-7-16, 4-18-16, 4-19-16) and in the subsequent defense motions (Doc. #284 and Doc #292) the record clearly shows defendant did challenge each of the alleged strengths of the governments evidence. The fact is, there was no physical or trace evidence that placed defendant at any crime scene (Post Trial Trans. 4-18-16 p11). There was no physical or trace evidence that defendant was shot as the government's Theory of prosecution insisted (Post Trial Trans. 6-15-15 p40). There was no physical or trace evidence that defendant hid in bush's for 5 hours as the government's Theory of prosecution insisted, no footprints in the snow, no buried gun, no indication of anyone in bushs (Post Trial Trans. 4-18-16 p14 and 4-19-16 p34).

There were seven area's of preceived strength of the governments case. To attack the sufficiency of the governments evidence the defendant had to attack these seven area's; 1) Testimony of Andrews, a cooperating witness and admitted participant in the robberies: 2) Testimony of Rhode, a cooperating witness who arguably benefited from his cooperation: 3) Testimony of Sabatino, a cooperating "ear witness" who benefited from her cooperation: 4) Testimony of Agent Shute, an "EXPERT" in historical cell site location: 5) The pills (drugs) seized at the time of defendant's and Sabatino's arrest: 6) Video(s): 7) The injury to defendant's left foot, allegedly caused by a bullet which struck the defendant during the shoot-out behind the CVS.

In the Government's reply brief, Docket #287, their position was and is, "The evidence against the defendant was so strong that it is difficult, if not impossible, to conceive that even the most brilliant, skilled attorney could have "beaten" the case." That statement is truely preposterous. There was no physical or trace evidence. The witnesses who testified against the defendant were able to do so without a shred of opposition. The error's and failures of trial counsel, which are supported by the evidentiary record, prove just how weak, or even, non-existent, the governments case was, and only due to counsels failures was there any appearence of strength.

It's somewhat bewildering that the government defends trial counsel, claiming "They worked tirelessly, meticulously, and admirably in preparing for the defendant's trial. One only has to look at defendant's note's and trial counsels answer's, under oath, at post trial hearings, they belie the governments assertion regarding trial counsels work habits.

(F.1) The First of the government's Alleged strength's, Testimony of John Andrews (see: Post-Trial Test 6-15-15 pgs 9 and 18; Also 4-18-16 p5). It should be noted defendant has raised Judicial error regarding issue's related to this argument. The trial Judge refused to allow Post-trial Attorney, Michael Farrell, to raise "HEIGHT" discrepancies (see: Post-Trial Trans 4-6-16 pgs 43 to 46) while defendant is 5'6" and allegedly wore a TAN mask, all three officers involved in shoot-out claim shooter was 6' tall in Black mask, which describes Andrews perfectly. Mr. Farrell attempts to raise "Height" issue again (see: Post-trial Trans. 4-18-16 pgs 69 to 72). The Trial Judge Also states (p72) The issue is NOT waived, it's an untimely request. Both issue's the Court refused defense from arguing were Attacks on Andrews and his credibility with the Jury.

Trial Test. 6-6-13: Andrews Direct (p120)

Q: Did you see Anything about the sneaker?

A: Yeah, he took it off and I felt the inside and you can actually feel where the bullet barely pinched through.

Q: I'm showing you my shoe, was it actually in the upper or was it in the sole?

A: That was in the sole.

Q: So, you could Actually feel it in the sneaker?

A: Yeah, you can feel the hump.

Post trial Trans. Shapiro Test. (p32) Mr. Farrell questions Trial counsel about the five page statement Andrews gave approximately 48 hours after the robbery and shoot-out, and points out that while Andrews tried to bury the defendant in all five pages, he never once said defendant was shot. Trial Counsel responds nonchalantly "but that came out on their cross-examination that they did not mention those things before." (p35) Shapiro states, "I thought the evidence that Andrews did not include that in his earlier statement was in this particular case the best we were going to get." (pgs 53-54) Shapiro further states, "I recall cross-examination of Rhonda and Andrews as to their credibility on that issue. If you said to me in a---in the defense case in chief did we present any evidence, no, we didn't, we did it by way of cross-examination.... And whatever the record shows, it shows." Andrews cross examination (6-6-13 pgs 140 to 222 and 6-7-13 pgs 2 to 69) proves not one single time did Shapiro ever ask Andrews anything at all about defendant's injury or defendant being shot. Also, Dr. Cornell, the podiatrist who operated on defendant's foot testified at Post-Trial hearings (6-7-16) (p25) "The injury exhibited by the defendant could not have been caused by the impact of a bullet... The injury was one hundred percent inconsistent with the impact of any high energy projectile." (p26) "Even if the bullet

had struck a sneaker and not penetrated into the foot, it could not have caused the observed and diagnosed injury." (p37) "The observed injury would be inconsistent with the government's theory."

With the introduction of expert medical testimony it could have been successfully argued that the defendant could not have been the robber and that Andrews fabricated his testimony about a bullet to fit defendant's apparent injury, not knowing that medical evidence would not support his claim. In the Government's Closing (6-12-13)(p104) Ms. Freivol states," the defendant, at this point has been shot in the foot and his foot is injured..." The government's closing corroborated the reliability of Andrews testimony.

The following Post-Trial hearing testimony proves how ill-prepared shapiro was at trial and it also shows it was shapiro's ineffectiveness that gave the false impression of strength of evidence.

Post Trial: 6-15-15 (p41) "I don't think the government put into evidence a person was shot during the robbery. (p42) "that wasn't a central part of their theory of prosecution, I didn't think that, that Joe was shot."

Post Trial: 6-7-16 (p106) Shapiro didn't believe evidence of defendant being shot was important because defendant insisted he was not there. Mr. Farrell points out that the Government claimed the defendant was there and used him being shot as proof.


Trial Trans: 6-6-13 (pgs 147 and 156) Andrews claims he "brought up Rite Aid Robbery to police" and that he was never a suspect in the Rite Aid Robbery.

Post Trial: 4-7-16 (p90-91) Mr. Farrell points out that shapiro failed to impeach Andrews and his obvious role in the Rite Aid Robbery.

Andrews lied about both issue's. Andrews denied any involvement in the Rite Aid Robbery or any knowledge of it (see: Andrews Statement Attached, marked Exhibit D). Also, as solid proof that Trial Counsel knew how critical impeachment of Andrews as he related to Rite was, he made notes on Andrews 302 dated 8-25-11 (see: Andrews 302 Attached, marked Exhibit D2o). (p1) "ANDREWS ROBBED RITE AID." (p2) "DESCRIPTION OF RITE AID (72 INCHES) MATCHES ANDREWS - PHILLY P.D. EVEN SAYS THIS IN AFFIDAVIT." (p2) "IF WE CAN PROVE ANDREWS DID THIS AND TRIED TO PUT IT ON JOE, WE CAN SCORE POINTS."

The shapiro's knew Andrews had an arrest warrant for Rite Aid and they knew he lied to police in original statement regarding Rite Aid. But they not only failed to impeach him, they allowed his lie's to go uncorrected. Andrews lied about his height. He lied about being the shooter. He lied about defendant being shot. He lied about committing Rite Aid Robbery. Impeachment on all these issue's would destroy his credibility with the Jury, thereby proving his testimony useless. Sufficiency Challenged.

(F.2) The second of the Governments alleged strength's, Testimony of Franklin "Chucky" Rhoads (see: Post Trial Test. 6-15-15 pgs 9 and 18; Also 4-18-16 p5). Rhoads was a seemingly strong witness because it appeared he had no reason to testify against the defendant, supposedly a long time friend, other then he was doing it as a "good citizen."

Rhoads N.C.I.C. was turned over two seperate times in discovery. His N.C.I.C. showed he was arrested after the CVS Robbery for numerous felony charges, including but not limited to; Aggravated assult, possession of an implement of crime, et. cetera. If convicted in the Commonwealth of Pennsylvania on these charges Rhoads faced a mandatory 10 to 20 year sentence for his third conviction for Aggravated assult. In post-Trial hearings (April 18, 2016) (p74) facts about Rhoads aggravated assult case came out. Franklin "Chucky" Rhoads asked Agent Coyle to "help him out" with his case. Although Agent Coyle did not "promise" to help, he told Rhoads he "would talk to his supervisor." After reaching out to Agent Coyle there was a favorable disposition of his case.

Trial Counsel never looked at Rhoads N.C.I.C. report. In post trial testimony David Shapiro admits (4-7-16 p62) he did not use Rhoads N.C.I.C. to impeach him. Also, (p117) Shapiro's states he is not "infallible" as his reason for not impeaching Rhoads with his N.C.I.C. Michael Shapiro testified (4-18-16) (p73) that there is no strategic reason for failing to cross-examine Rhoads about any benefit he may have received with respect to his aggravated assult arrest. On (4-19-16) (p30) Shapiro reiterates there wasn't any cross of Rhoads with respect to his aggravated assult arrest and it's being Nolle Prossed.

Agent Coyle testified at post trial hearings (4-19-16) (p80) He admits he was aware of Rhoads aggravated assult arrest, but couldn't remember how he became aware of it. The case was Nolle Prossed because the witness against Rhoads WAS in the Commonwealth's custody and never brought down to Court to testify. He admits he was never asked about this at trial. (p110) Coyle was aware Rhoads wrote an affidavit post-trial concerning his Aggravated assult arrest. (p112) Coyle states, "I certainly know that I didn't tell him the things that he apparently claims now that I said to him." (p113) Coyle states, "I do not remember the particulars of any conversation I had with him about his arrest, except for the fact that I never made him any promises of assistance in his case"...."I can tell the Court this that I did not make this man any promises of assistance in his criminal charge, if that clears it up."

However, that statement certainly does not clear it up. Coyle said he "certainly knows" he didn't tell Rhoads "the things he now apparently claims" and he never "promised" Rhoads his assistance. The Rhoads affidavit simply states (see: Attached exhibit marked D21) "I was contacted by an F.B.I. agent concerning Joey's case. I asked the agent if he could help me out with my case. The agent said he couldn't make any promise's,

and he would talk to his supervisor." There are two issues that must be cleared up, 1) Did Cogle ever speak to his supervisor with regards to Rhods's case, and 2) Rhods believed he was getting some type, and some amount of help, from the F.B.I. with regards to his case. Interestingly, Rhods case was Nolle Prossed in under three months, which is relatively unheard of, in Philadelphia county court.

Rhods testified at trial (6-7-13) (p136) that defendant was shot in the foot and he saw the sneaker after defendant hopped on one leg to his car, there was a bullet hole in his sneaker." In Post trial hearing (6-15-15) (p43) Shapiro testified he "remembered Rhods saying he felt the bullet in his sneaker". On (4-6-16) (p24) Dispatch say Police shot one of the robbers. On (p32) Shapiro is confronted with the facts that Rhods gave five statements prior to his grand jury testimony on 4-7-11 and never once mentioned defendant was shot, and that Rhods stated at the grand jury the wrong foot was shot. (p35) Shapiro testified he believed "that the evidence that Rhods and Andrews did not include that in their earlier statements was in this particular case the best we were going to get. That was my decision as a strategic matter". On (pgs 53-54) Shapiro claimed he remembered cross-examining Rhods (and Andrews) as to their credibility on the issue of defendant being shot. Rhods trial testimony was on 6-7-13 pages 123 to 177 and 6-10-13 pages 2 to 38, and never once did trial counsel bring up defendant's foot injury, never once did Shapiro cross-examine Rhods (or Andrews or anyone) in regards to defendant being shot.

On 4-18-16 Shapiro is confronted with the following; (p9) Defendant allegedly being shot was evidence that he was one of the robbers. Rhods testimony about defendant being shot corroborated not only the reliability of government witnesses, but was evidence that he was one of the robbers. (p38) It was the governments evidence at trial, through Rhods, there was the presence of a bullet in defendants sneaker after the shoot-out at CVS. Rhods gave 5 statements prior to grand jury and never mentioned anything about defendant being shot, or a hole in his sneaker, or feeling a bullet, and at the grand jury Rhods indicated the wrong foot. (p39) Shapiro admits there could be no strategic reason not to cross examine Rhods about these issues.

Much Ado was made over the fact that the defendant was picked up by Rhods approximately one block from the CVS (scene of robbery & shootout). However, the facts Shapiro left out of trial are critical. Post Trial Trans: 4-6-16; Shapiro Test (p72) Q: "The distance that we were talking about between where Joe was staying and the Blue grass or the CVS, we're talking all withing 10 miles, 8 miles, 7 miles, even less, correct? A: About four blocks. Q: Both CVS, the Blue Grass, and Vankick, Hegeman, all the places that he-- A: There all within a mile.

(53)

Q: There all within a very -- A: A mile. Q: -- within a few miles. A: yeah."

Post Trial Trans: 4-18-16: Shapiro Test. (p13) "ultimately, his house, Heather's house, Bill and Skips house, the CVS, the Blue Grass, Andrews Apartment, there all within a three or four mile radius."

The jury should have been advised that the CVS was smack dab in the middle of everything, every house, apartment, Bar and pharmacy ① Defendant's father lived less then a half mile North of CVS. Rhonda lived less then a half mile South of CVS. Heather (ex-wife) lived less then a mile East of CVS. Leah Sabatino lived less then two and a half miles South East of CVS. Fat Petes Bar, Lou's Bar, Tom's Pub are all within two miles South East of CVS. Andrews Apartment is less then two miles Northwest of CVS. Penny's Bar is less then one and a half miles Northwest of CVS. ② Rhonda picked defendant up five hours after the crime took place. ③ The government theorized defendant laid in a bush for those five hours. However, there was snow on the ground, no foot prints or any other indication of anyone in a bush. Two police dogs searched the area, along with dozen's, upon dozens of police officers. Rhonda claimed that defendant buried a gun there. However, this is a small area, the ground was frozen and no gun was ever found, with a metal detector. ④ C.S.I. was on that scene, but there are no photo's. It was claimed "city services" had to be called in to remove bush's and debris.

Trial Trans: C.S.I. Davis: (p44) The weather "was very cold, heavy winds, snow was on the ground." (p47) No gun was found. Police held the scene. (p49) Metal detector was used..... the area was limited to the lots (p51) city services were called in.

The jury needed to know that defendant was always in the area of the CVS. It was not out of the ordinary, nor was it out of the ordinary for defendant to call for a ride. Also, Police held the scene, so how would defendant have ever left the bush if Police held scene till following morning at daylight.

Rhonda speaking to Agent Coyle about help with his case is a major issue. Whether Coyle promised him any help or not is not the issue. Rhonda belief that Coyle would speak to his supervisor and he would receive help is what matters. Rhonda reasoning may very well have been, "the more helpful I am, the more helpful the F.B.I. will be." which could easily explain why Rhonda never mentions defendant being shot, a bullet in his sneaker, etc.. in five statements, then, all of a sudden he remembers at the Grand Jury. See Rhonda Grand Jury testimony 4-7-11 (pgs 19-21) Rhonda seems to not know, or forgotten about defendant being shot and must be heavily prompted by the Government to say it. (see: Rhonda G.J. Trans. exhibit D-30)

This issue is important because Rhonda is the very first person to ever claim defendant was shot. It's really, truely remarkable, John Andrews gave a five page statement trying despertly to incriminate

the defendant, but "FORGETS" the defendant was shot during the police shoot-out he's being questioned about. Next, Rhoads gave five seperate statements and "Forgot" defendant was shot. Then, Sabatino, she first claimed the defendant's foot was injured prior to CVS, it wasn't until 9 months later her story changed claiming defendant was shot. Also, Menichella, an unindicted co-conspirator, who had been a confidential informant since 2005 and also gave defendant a ride, gave two interviews and did not incriminate the defendant, until 1 year later AFTER HIS ARREST IN AN UNRELATED CASE.

On 4-7-11 Rhoads testifies at Grand Jury that defendant was shot, bullet did not penetrate his sneaker but he could feel it, it broke defendants foot. Rhoads states the wrong foot was shot (the right) like it says in dispatch tapes. Then on 9-1-11 Sabatino story changes and it was verbatim to Rhoads Grand Jury testimony, even claiming the "right" foot was shot, which was the wrong foot. It was defendant's left foot, INJURED, on 8-23-11 Andrews statement changes and was also verbatim to Rhoads Grand Jury testimony. And finally, Menichella, a government informant was arrest in 2012 and contacted his handler and his new statement was verbatim to Rhoads Grand Jury testimony.

It's hard to believe that one witness, who was trying to "save" themselves by cooperating with police, could "forget" someone they know was shot during a police shoot-out they are being questioned ABOUT and they actually felt the bullet. But the odds are astronomically impossible that four government witnesses all "forgot" defendant was shot and then all four seemed to remember it verbatim, at the same time, over six to twelve months later.

Rhoads was, in part, the governments evidence. Rhoads credibility was attacked during Post-trial hearing and Shapiro was exposed for all his blatant failures relating to Rhoads cross-examination. Any competant attorney would have impeached Rhoads and proven him to be exactly what he is, someone who was trying to score points with the government to receive help for himself, so he embellished his story to incriminate the defendant.

(55)

**(F.3)** The third of the Government's alleged strengths, Testimony of Leah Sabatino (see: Post Trial Test. 6-15-15 p 10 and 4-18-16 p 5). Sabatino was the Government's "Cinch Pin", connecting the defendant and Andrews by corroborating some of Andrews testimony. However, Sabatino's testimony could not have stood up to the slightest adversarial questioning.

<u>Post Trial Test.</u> 4-18-16 (p24) Shapiro is confronted with the fact that he allowed the Government to continually ask leading questions. (There's literally too many examples to list. see Trial Trans. 6-11-13 pages 12 to 59)

<u>Post Trial Test.</u> 4-18-16 (p25) Shapiro is confronted as to why he "would allow the Government to refresh Sabatino's recollection without having developed a foundation that her recollection was exhausted." (It should be noted; every major issue in the case she could not answer without first reading her Grand Jury test.) The following are some examples taken from Sabatino's Trial testimony on 6-11-13;

(p12) Q: Describe that for the Jury Ms. Sabatino. What does he tell you about where he's getting money?

A: He just -- at first, he just told me that he gets the money, you know, I didn't have to worry about it, and then when -- I forget how it went down, but one night he told me that he -- you know, he gets pills from pharmacies that aren't open in Philly -- They weren't in Philadelphia, and he sold the pills, thats...

Q: Does he ever tell you anything else about where he's getting the pills?

A: Not right away

Q: Well, you say you didn't remember, correct?

A: yes.

Q: All right. Do you remember testifying at the Grand Jury?

A: yes.

Without any objection from defense counsel the Government had Sabatino read her Grand Jury testimony. After reading that testimony she tells the Jury defendant was doing armed robberies in Northeast Phila.

(p16) Q: while your walking to Burger King with the defendant does he ever talk about any robberies he committed?

A: yes

Q: Describe that for the Jury, Ma'am?

A: The little shopping centre where the Rite Aid is, there's a little shopping center like on the left side of the Rite Aid and I think there's a wine and spirits in there and a little pharmacy. I don't even know what kind of pharmacy it is, it's like a little no-name place.

Q: And what did --

A: He supposedly --

Q: -- the defendant say?

A: -- he hit that place too.

Q: what did the defendant say about the robberies he committed? when your walking there, what did the defendant say about the robberies he committed?

A: He said that he hit the -- about the -- the guy, the fat guy. I don't remember.

Q: really, you don't remember?

A: Right.

Q: is that your testimony?

A: No, I'm like trying to think.

Q: If you don't remember, I can refresh your recollection?

Again, without any objection from defense counsel the government has Sabatino read her Grand Jury Testimony. And once again, after reading it Sabatino tells the jury what the government wanted (and needed) her to.

Trial counsel also allowed Sabatino to testify about things she had never mentioned in any of her numerous interviews. He failed to cross-examine her on contradictions in her previous statements and her Grand Jury testimony between her Trial Testimony.

(p26) Q: Did he tell you where he spent the night?

A: He was hiding somewhere, in bush's somewhere.

Q: Did he tell you where he went after he was hiding in the bushes?

A: I think he went back to John's.

In her previous statements she never says anything about defendant hiding in bushes and she always said defendant spent that night at his ex-wife, Heather's, house. There was no cross about these new details.

(p28) Q: Did defendant ever tell you what happened during the robbery?

A: Not detail for detail. He just told me he had to shoot out the pharmacy window to get out and John dropped the friggin B.B. gun.

Again, never once has Sabatino ever said anything about Andrews dropping a B.B. gun. There was no cross regarding these new found details.

In the following instance trial counsel goes beyond being merely ineffective and becomes extremely detrimental to the defendant. He is questioning Sabatino about the night of the cvs robbery. The defendant

has continually maintained he was detoxing Sabatino from about 8:00 p.m. until midnight, at the Hegerman street house. Sabatino claims she took xanax that night (XANAX ARE KNOWN AS "FORGET-ME-NOTS" due to the fact they make you forget everything (SEE Post-Trial Testimony 4-18-16 p 16 and 4-19-16 Coyle test. p 109).

Trial Trans: 6-11-13 (p83) CROSS-EXAMINATION by Shapiro's

Q: However, you did tell the grand Jury you don't remember everything because you were high on methadon at the time, do you remember that?

A: yes.

Q: okay, but in that-- when you met with them that night they asked you where-- if you WERE WITH JOE the night of the robbery, you told them "NO", right? you told them you were not with Joe the night of the robbery, the night of the cvs?

A: wait.

Q: okay?

A: Hold on, wait, you just--

Q: when Agent Coyle interviewed you the first time--

A: yes.

Q: correct?

A: I lied to him, yes.

Q: No, wait, you told him that-- you told him that JOE WAS NOT with you the night of the robbery, right?

A: Right. I told him I wasn't.

Q: And that was the Truth?

A: yes.

Here, Sabatino admitted she lied to Coyle in her interview. She admitted she was with the defendant on the night of the cvs robbery. Then, for reason's only known to himself, shapiro force's Sabatino to change her testimony so it incriminated defendant and helped the government.

From the very start the defendant has consistantly maintained he hurt his foot days before the cvs robbery. In Sabatino's first interview on the day of her arrest Sabatino claimed defendant's foot was hurt before the cvs robbery, she saw it swollen, ace bandaged and defendant was limping badly. (There are major discrepancies between the Agents Rough Notes and his actual 302 for 1st interview on 2-17-11. SEE: Attached exhibit marked D22). The cvs robbery was on a Monday. The rough notes clearly state defendant's foot was

"very swollen, ace bandaged" and "He had been limping" on Sunday. The Cvs Robbery was on video and no one was either limping or had any noticable injury to these feet. Agent Cogle's 302 states; "on Tuesday defendant was using crutches, his foot was swollen and bandaged". At the end of that paragraph Cogle wrote, "Sabatino recalled Meehan may have been limping slightly on Sunday."

<u>Post Trial Test.</u> 6-15-15: Shapiro Test. (p42) He is confronted with the fact that the Government elicited testimony from Sabatino that the defendant was not hurt prior to cvs and he was hurt AFTER the cvs.

<u>Post Trial Test.</u> 4-6-16: Shapiro Test. (pgs 47 to 53) He's confronted with the fact that Cogle's rough notes say injury occured prior to cvs and Shapiro did not use it to impeach Sabatino.

Defendant has always maintained Sabatino stole the bag of drugs from Andrews because she had sex with him and he refused to pay her. Defendant's note's, which the government confiscated 1700 pages of, are replete with defendant telling trial counsel this fact. On June 15, 2015 (p38) David Shapiro acknowledges this. On 4-6-16 (pgs 79-80) Shapiro acknowledges this again, but claims he felt he needed more and that's why he told the jury of defendants prior violent armed robberies "just like this one." (p84) Shapiro acknowledges he could have used defendant's strategy and kept priors out. (p99) Defendant's "note's" telling Shapiro that Sabatino and Andrews having sex is the most important piece of the puzzle and it must be put in place from the very start, because it's the reason she stole his drugs. On 4-18-16 Michael Shapiro acknowledges "AT ALL TIMES" the defendant said Andrews fingered him because Sabatino stole his bag of drugs. On 4-19-16 (p30) Shapiro is confronted with the attempt he made with Sabatino regarding the drugs she stole because of money owed her.

<u>Trial Trans.</u> 6-11-13: Sabatino cross (pgs 98-99)

    Q: Did you—do you remember ever—do you remember maybe other then that having a dispute with Andrews at all or arguments?

    A: Yeah.

    Q: And did you ask Joe to kind of—did you ever ask Joe to get money from Andrews for you? I guess you don't remember, okay.

On 6-15-15 (pgs 11 and 12) Shapiro acknowledged Sabatino's "so-called" journal, which the government believed to be strong evidence was actually written when she learned of the robbery from the news and because defendant had been to prison for Robbery, she thought he may be involved.

On 4-18-16 (pgs 33 and 34) M. Shapiro was confront with the fact that Sabatino wrote in the "so-

called "Journal after Bill woke her and told her all about the cvs robbery. Trial Counsel allowed the government to make this, lets call it what it is, A notebook, into some all-important Journal. It was only due to Trial counsels failures that made this evidence appear to have any strength at all.

On 6-15-15 (p10) Shapiro Acknowledged he was aware Sabatino would testify she "overheard" Andrews and the defendant planning the cvs robbery. On 4-18-16 (p25) M. Shapiro is confronted with the fact that AT TRIAL Sabatino not only overheard the planning, but when she did overhear it she jumps into the conversation and became an actual participant in the planning.

On 10-6-11 (pgs 19-31) Sabatino's Grand Jury testimony prove's the government Knew she never over heard the defendant and Andrews planning cvs robbery. At trial, 6-11-13 (p23) the government and Trial Counsel allowed Sabatino to commit perjury. On 6-12-13 (p44) during closing arguments the prosecutor use's this False testimony, testimony the Government Knew was false, as evidence in closing; "And at some point, she over-hears Andrews and the defendant talking about needing a get-a-way driver," this enhanced Sabatino's credibility.

The district Court further prejudice's the defendant by instructing the Jury (6-13-13 p17) "In deciding what to believe, you may consider a number of factor's: one, the opportunity and ability of the witness to SEE OR HEAR or Know the things about which the witness testified."

NOTE: Also SEE: DUE Process VIOLATION, pages 2 to 10 of this motion for more about attack on the Sufficiency of evidency as it related to Sabatino.

**(F.4)** The fourth of the Government's alleged strength's, Testimony of Agent Shute, who testified as an expert in historical cell site location and call detail records. A majority of defendant's argument as it relates to challenging Agent Shute's cell site evidence and historical call detail records can be found on pages 11 to 20 of this motion in defendants Due Process argument.

The Governments cell site evidence appeared so strong due to two facts, 1) Agent Shute gave false and grossly misleading testimony at trial, and 2) Trial Counsel failed in their duty to investigate an area of expertise they knew nothing about. Trial Counsel testified at Post-Trial hearings as follows:

4-6-16: (p68) "cell site stuff didn't-- I'm not an expert. It didn't mean anything to me in the preparation of the defense"... (p69) Shapiro agree's he "didn't conduct any research on the reliability of cell site location testimony based on historical call detail records".... Shapiro believed, "it did not infringe on the theory of defense"... (p74) Shapiro did not believe "cell site evidence was devastating" and thats why he "did not bother to do any research about the reliability of the expert opinion."

4-7-16: (p73) Shapiro claims "it was a strategic decision" not to hire a cell site expert because "he did not think cell site was a big part of the Governments Theory."

4-18-16: (p47) "We (David and Michael Shapiro) felt it was unnecessary strategically", that's why "we did no research."

The challenge of the cell site evidence through-out Post-Trial hearings is overwhelming (see: 4-6-16 pgs 62 to 74; 4-18-16 pgs 46 to 50; 4-19-16 pgs 18 to 21). However, preamount to the challenge of the sufficiency of evidence as it related to historical cell site location and call detail records is the Post-Trial testimony of defense expert Joseph Kennedy on 4-7-16 (2:04 p.m.). Mr. Kennedy refuted most of Agent Shute's trial testimony. As undisputable proof that the governments cell site evidence was sufficiently challenged Agent Shute completely changed his testimony at Post trial so that it completely contradicts his trial testimony (see: Due Process Argument of this motion, pages 11 to 20). Even the District Court was astonished when he personally questioned Agent Shute (4-18-16 p276) and Agent Shute freely admitted he "made up" all the radii on his maps and never did any drive tests.

To prove defendant sufficiently attacked the phone evidence, one only needs to look at how Agent Shute completely contradicted his trial testimony when he testified at post-trial hearings (see: section "A" of this motion, pages 11 to 20)

(41)

(F.5) The fifth of the Government's alleged strengths was the Drugs found in the motel room (SEE: Post-Trial Trans. 6-15-15 p 13; 4-18-16 p11). Defendant's Post-Trial Attorney, Michael Farrell, attacked Trial Counsel's blatant failures as they related to the Drugs found in the motel room. Trial Counsel failed to use defendant's theory which thoroughly accounted for the drugs found in the motel room. Trial Counsel failed to investigate and itemize exactly where the recovered drugs came from. Trial Counsel failed to identify the writing on the labels that were attached to each bag of pills.

The defendant's theory, which should never be confused with Trial Attorney's theory, was, "Andrews had sex with Sabatino and he refused to pay her. In retaliation, Sabatino stole a bag of pills (and also some cocaine). The pills were from Rite Aid (worth approximately $50,000.00). The drugs recovered from Sabatino's bag and the drop ceiling were a near perfect match for the DEA-106 describing what drugs were stolen from Rite Aid. The F.B.I knew only one person robbed Rite Aid. Eye witness descriptions match Andrews perfectly. The same get-a-way car was used in Rite Aid and Blue Grass robberies. There was an arrest warrant sworn out for Andrews for the Rite Aid robbery. The drugs found in Andrews Jeep matched the DEA-106's of both Rite Aid and Blue Grass.

Post Trial hearing 4-7-16: (p47) Trial Counsel's being cross-examined by the government. He is being questioned about a "Chronology of Events" memorandum, dated 3-11-13. On page 16, number 18 Shapiro's Note's state, in part:

"GOVT POSITION - RITE AID: The government will not seek to introduce evidence that Meehan robbed the Rite Aid"..."however, if defense attempts to introduce evidence that a third party robbed the Rite Aid and/or this unknown third party also robbed the Blue Grass and CVS, the government will attempt to rebut such an argument with testimony and evidence that Meehan did rob the Rite Aid."

In the "Chronology of Events" (see: attached marked Exhibit D16), in the left hand column next to the above note's the defendant made a hand written note of his own, stating: "They are clearly trying to protect their rat. Fuck them. Andrews did it, he denied all others until proof and then told. No proof on Rite Aid so he held tight." Then, the last part of Shapiro's note (above) state's in part:

Such evidence may include, but not limited to, Meehan's statements to witnesses saying he did Rite Aid and witnesses identified the robber... evidence of DEA-106's and have them match to some of the drugs found in the Riviera motel."

also in the left hand column defendant's note continued and said, "WE BRING IT IN." what the Government is trying to do is manipulate those note's and claim they meant the defendant knew and wanted the Shapiro's to use "their theory" to use all defendant's prior's as the theory of defense.

However, by attempting this underhanded tactic the government highlights Trial Counsels ineffectiveness. On page 11 of the "Chronology of events", dated March 11, 2013, a note authored by trial counsel states, in part: (Referring to Rite Aid): (Exhibit D-15)

      **b.** "3-10-11 Multiple Case Affidavit. Description matches Andrews"

Down at the bottom of said page by letter "C.", number "3", Trial Counsel wrote, in part:

      "if you believe Andrews and think the defendant did this"....

Next to this note of Trial Counsel's the defendant made a note back to them, stating:

      "How the Fuck could anyone think I did it. look at the description!"

The Multiple Case Affidavit describes the robber as six feet tall, 205-215 pounds, wearing a black ski-mask. The Philadelphia Police had a sworn arrest warrant for Jonathan M. Andrews 38/w/m. (the defendant is 5'6" tall and weighed 170 pounds. Trial Counsel was aware of all these facts, but still allowed the government's witness, Sabatino, to claim defendant robbed the Rite Aid, they also let John Andrews "insinuate" it so strongly that no one could deny it.

It's obvious when defendants Theory is taken as a "whole", and also incorporated with many other notes defendant prepared for Trial that the defendant not only wanted his Trial Counsel to use the Rite Aid Robbery and description of pills taken to aid in his defense, he stress he needed the Rite Aid info to be brought in to prove his theory was true. (see: Post Trial hearing 4-7-16 p89 to 90).

The following is a list of personal notes drafted by the defendant for Trial Counsel to use at trial. Defendant gave these notes to trial Counsel over and over because it was/is the truth. These note's were also used as exhibits in Post Trial hearings to prove Trial Counsel failed in his duty to attack Government evidence.

    **1.)** 11-2-12 "NOTES FOR P.I."

        **#4**... she will hopefully admit she stole drugs from Andrews.

    **2.)** 4-1-13 "NOTES" Hopefully she will admit she stole the drugs from Andrews.

    **3.)** 4-12-13 "SABATINO G.J. TESTIMONY PROVED UNTRUE"

        (p3) she was there with John, 6 or 7 hours. Those 2 had sex while I was gone. Leah stole bag of pills when we left at 7:00 p.m. on Sat. 12th b/c he refused to pay her for sex.

4) 4-16-13 "The Black Bag"

    (p2) She labeled most drugs....it's her writing

    (p3) "IN HIS BEDROOM" thats where she stole the shit from.

    (p6) she admits pills with the coke. She brought it all from Philly to N.J.

5) 4-18-13 "ANDREWS PROFFERS PROVED UNTRUE"

    (p1) #3 ... He had sex with her

    (p5) #1... she was there with him having sex, she was scared over the bag. (Shapiro wrote a personal note back saying: "We have discussed many times that we cannot confront them about having sex, they are both going to deny it and what is the benefit?")

6) 4-20-13 "MEEHAN LETTERS - PHONE CALLS"

    (p5) The pills and the coke all came over in the black duffle bag. She admits to the coke, if the pills and coke are together, she had to bring all of it. She says (9-19-11 phone call): I told them I got it from Johnny because they asked where the coke came from and I said Johnny had a whole bunch of it "IN HIS BEDROOM"... She says "in his bedroom" but Coyle left that out of the transcriptions. Mike, I told you a long time ago about her coming out of his bedroom when I came back to his apartment and her bitching for me to make him pay for sex and I told her "I ain't a pimp, handle it yourself." She stole that fucking bag out of his bedroom.

7) 5-3-13 NOTE: did she tell the truth about stealing drugs?

8) 5-12-13 "ADDED TO NOTES." This is most important piece of puzzle, must be put in place from the start. We have to get them to admit sex and he refused to pay her.

Before Trial the defendant gave a clear and consistent defense theory that accounted for the drug evidence in this case. Trial Counsel chose not to use defendants theory and instead relied upon an extremely risky theory, he made up, that did not take drug evidence into account. (Trial counsel's theory was formed due to his mistaken belief that the defendant told him INCONSISTANCIES (see: Argument "C" pages 24 to 27 of this motion). During Post-Trial hearings Trial Counsel admits his failure to use defendant's theory.

6-15-15: (p38) Shapiro was asked if defendant told him his theory, "yes, Joe told me that, but that had to do with -- that had to -- A) Joe told me that. B) that fit into another part of the strategy. But Joe told me that, I understood".

4-6-16: (pgs 79-80) Asked again about defendant's theory, "the statement about Leah and the sex was -- that was Joe's argument. I understood that. But I really needed more ... I thought Joe needed more ... I had to tell the story of Joe's life and thats what I thought the trial was about, Joe's life...To me, sex with Leah did not fit in."

Trial Counsel's Aborted attempted to use the "DEFENDANT'S" theory amplifies his ineffectiveness.

Trial Trans: 6-11-13 (p98-99) "Q: And did you ask Joe to King of -- did you ever ask Joe to get money from Mr. Andrews for you? I guess you don't remember, okay."

At Post Trial hearings (4-6-16 pgs 84-85) Shapiro agrees that he "could have argued that" but he chose a very risky defense theory because, in his mind, he believed the Jury would want more. Shapiro decided to forgo the defendant's theory, which was/is coherent and supported by evidence that could have easily been marshalled in. The fact that Trial Counsel refused to use defendant's theory was bad, but Trial Counsel actually allowed the government to use the Rite Aid robbery and the drugs from that Rite Aid against the defendant, without any defense. In Post Trial testimony (4-18-16 p53) Trial Counsel admits defendant's theory explained everything for the Jury. It's clear from defendant's notes and Trial counsels own testimony that they knew the Defendant's theory and chose not to use it. And it certainly cannot be overlooked that trial counsel used his own theory because he mistakenly believed the defendant told him two inconsistent things (see: Argument "C" of this motion).

At Post trial hearings (4-18-16 p52) Trial Counsel admitted they made absolutely no attempt to identify the writings on the labels attached to the drugs, even though defendant repeatedly told them it was her writing (see: Defendants Notes 4-16-13, page 2: "she labled most bags -- it's her writing"). Trial Counsel also failed to show that a "considerable amount of pills" were seized from her personal bag.

Mr. Farrell, defendant's attorney for Post-Trial hearings was Constitutionally ineffective for failing to develop the record even further by not continuing his attack on the drug evidence at Post-Trial hearings.

- 75 different types of pills and patches were stolen from Rite Aid. (no one ever charged).
- 45 different types of pills and patches were stolen from Blue Grass.
- 44 different types of pills and patches were recovered from the Riviera Motel. (also, cocaine and marijuana)

Subtract the cocaine and marijuana and it leaves 42 different types of drugs at motel. Of that 42 types 29 could NOT have come from Blue Grass, and 7 others could NOT have come from Blue Grass or Rite Aid. That leave's only 13 possibilities that could have come from Blue Grass, of those remaining 13 three are 5 which are highly more probable to match Rite Aid. That leave's only 8 "possible" matches to Blue Grass. However, 20 of 42 types found in Motel matched Rite Aid's DEA-106 perfectly. So, out of all those pills 27 matched Rite Aid, 7 came from source's other then Rite Aid or Blue Grass, and there are only 8 possibilities, and none of those 8 match perfectly to Blue Grass. There was no attempt made to check manufacter's to eliminate more from Blue Grass's DEA-106's.

Prior to trial, in multiple documents that trial counsel and Post Trial counsel had, Sabatino admitted

the drugs were in her bag, which happened to be a "BLACK DUFFEL". Sabatino also admitted, in the 9-19-11 phone call that she brought the drugs from "Philly to New Jersey."

1. Agent Coyle's rough notes from 2-17-11 interview state:

    — In my bag, black shopping bag
        L-METHADON
        L-CRACK STEM       (SEE: ATTACHED document MARKED Exhibit **D22**)
        L-PRESCRED IBUROFIN
        L-PERCOSETS (he took them)
        L-I PUT HIS POT IN MY PURSE

(it should be noted that the corrosponding 302 states "MEEHAN put the pills in her bag". However, Sabatino has <u>NEVER</u> said defendant put pills in her bag. All her personal notes and Grand Jury Test. say she did it).

2. Sabatino Affidavit, dated 7-26-11: "I told them I had a bag of narcotics in my duffel back" (SEE: ATTACHED document MARKED Exhibit ~~D14~~ **D-23**)

3. Agent Coyle 302 dated 9-1-11: "... she placed the pills in her bag to keep them safe" (SEE: ATTACHED document MARKED Exhibit **D24**).

4. 9-19-11 SABATINO PHONE CALL: Sabatino admits she brought coke from philly to N.J. She admits she claimed it was HER bag (BLACK DUFFEL BAG). She admits the drugs were from "John Andrews" BEDROOM. (in the transcription Agent Coyle did ~~@~~ intentionally omit ~~@~~ "IN HIS BEDROOM". In the audio those words are crystal clear.) (SEE: Attached document MARKED Exhibit ~~@~~).

5. Agent Coyle 302 dated 5-29-13: "Sabatino admitted to the agent she had been in the room with MEEHAN and she had pills in her bag in the room." (This 302 was not available at trial because the government failed to turn it over until Post Trial hearings on 4-18-19)(SEE: Attached MARKED Exhibit **D1**).

Neither Attorney's used any of these documents to impeach any witnesses as it related to drug evidence.

<u>TRIAL TRANS:</u> 6-11-13; D.E.A. Agent DAVIS (pgs 157 to 168): he describes a drug "ledger" and how important it is to a drug dealer. He states someone who had drugs for personal use is not going to keep a drug ledger. What trial Counsel and Post Trial Counsel failed to show/prove is that this "ALL IMPORTANT" ledger was found in a TRASH CAN.

    Another major issue at trial was the "BLACK DUFFEL BAG". Multiple witnesses referred to it throughout the trial and during interviews. Somehow, the black duffel bag was attributed to the defendant, where available evidence proved the black duffel bag, which contained a large portion of the drugs seized, actually belonged to Sabatino. The government manipulated the photo's and Government witnesses testimony to deflect blame away from Sabatino and shift it to the defendant. Picture's of the initial search of room 74 show two bags

which belonged to the defendant, one was purple (light purple) and one was Grey and Black. There is too much grey in it for someone to call it a Black bag. Sabatino had one bag, a completely "BLACK" duffel bag, in which thousands of pills and cocaine were found. (Defendant's bag had 17 motrins and 6 vicoden)

AGENT COYLE
Trial Trans: 6-10-13 (p160) Q" when you searched the room what did you find? A: A large stash of prescription drugs, pills, Fentanyl patches and other drugs that were located above the drop ceiling in the bathroom".

Here, agent Coyle failed to mention the thousands of pills, cocaine and marijuana that were located in Sabatino's Black duffel bag, and Trial Counsel never brings it to the Jury's attention, nor did Post-Trial Counsel.

(p169) Coyle was shown Gov. exhibit 26.32, which is 209 Hydromorphone pills, he stated "they were found in the room". Shown Gov. exhibit 26.37 is a bag of 5mg Roxy's with Lable's clearly showing Sabatino's handwriting, he stated, "they were found in the room".

The fact is, all those drugs were found, along with many, many, more, in Sabatino's Black duffel bag.

Trial Trans: 6-11-13 SABATINO TESTIMONY: (p33) She is shown Gov. exhibit 26, 166 and 168, she tells them three pills from the drop ceiling. Then they show her †Gov. exhibit 167, which is her "BLACK DUFFLE BAG" opened up with all the drugs removed, she admitted it was her bag. Then, without showing a picture they ask her what color the defendant's bag was, she says "BLACK".

Trial Trans. 6-11-13 DET. WHEELER TESTIMONY: (p124) He is shown Gov. exhibit 164, which is thousands of pills that were taken from Sabatino's bag, he only tells the Jury "they were taking that day". He fails to mention they were taking from Sabatino's BLACK DUFFEL BAG. (p131) He's shown Gov. exhibit 167 which is Sabatino's Black DUFFEL BAG with all drugs removed and Det. Wheeler state's, "this is the bag officer's and myself attribute to Sabatino". (p132) He's shown Gov. exhibit 170, this a photo of the defendants two bags, one sitting atop of the other and the baggie of 17 motrins is sitting on top of them. The motrin's are not crushed. That particular picture was taking at a small distance and det. Wheeler tells the Jury the baggie if full of "an unknown white powder, a controlled dangerous substance." The next Gov. exhibit is 171, This is an extreme close up of Sabatino's bag, opened with the drugs still inside it. However, because they just showed the defendant's bags, it appears to be the defendant's bag. The picture only shows the "rim" and the inside of the bag. This was a deliberate manipulation, which is underhanded and unethical.

Trial Counsel never corrected this alleged evidence, nor did he impeach any witness and Post Trial Counsel failed to raise it. It was a simple task to prove the defendant's theory was true. Defense Lawyer's knew, or should have known the photo array displayed by the government was false and misleading, they never once

objected or tried to disproved the government's false evidence. With all the available documents and access to the photo's it would have been easy to prove Defendant's theory. If the facts of the case had been treated and dealt with, without distortion or manipulation then a preponderance of the evidence would have shown Defendant's theory was absolutely correct, the "Black Duffel bag" actually belonged to Sabatino, it was her writing on a majority of drug labels, there was no "unknown white powder, a controlled dangerous substance" found in defendant's bag, Sabatino brought the drugs from Philly to New Jersey, and Sabatino stole the pills, which match only Rite Aid, from Andrews because he owed her money.

**(F.6)** The sixth of the Government's alleged strength's was video evidence. (See: Post Trial Trans. 6-15-15 p16: 4-18-16 p5). There are three relevant to the instant case, they are as follows:

1) 2-9-11, 10:30 a.m. defendant's buying a toothbrush at Blue Grass pharmacy.

2) 2-9-11, 2:16 p.m. Blue Grass pharmacy being robbed.

3) 2-14-11, 8:33 p.m. CVS pharmacy being robbed.

**1) Defendant buying a toothbrush.** Defendant's note's, which the government confiscated, are consistent in their explanation of why the defendant was buying a toothbrush at that particular time, in that particular pharmacy. A prostitute staying at Andrews apartment used the defendants toothbrush. Defendant's note's also state that Jonathan and Brian Andrews drove him to that pharmacy and defendant went to buy a toothbrush while Andrews went to beer distributer. Andrews always denied driving there and claimed the defendant walked and intentionally passed a Rite Aid, where he could have bought a toothbrush, and continued on to Blue Grass to scope it out.

<u>Trial Trans. 6-6-13:</u> Andrews Test (pgs 207 to 216) video evidence actually proved defendant's note's were correct and that Andrews was lying. Video shows Andrews there, in the Jeep.

Andrews also claimed defendant "came back to the apartment and announced it was a good place to rob." Then, they immediately prepared to rob it. They got the gun's loaded and ready, they got the mask's ready and went out to his parking lot to where the white Mitsubishi was parked (same car Andrews used in Rite Aid robbery). Defense could have marshalled in through available evidence that A) thirty minute's prior to Blue Grass robbery defendants phone was in Andalushia Pennsylvania, over five miles away.

Also, the government suggest's that the actual robber and the defendant were wearing identical sneakers, white with a black Nike symbol. There was absolutely nothing about these extremely common sneaker's which made them identifiable as "identical." It should also be noted that the Government never turned over any photo's of the search of Andrews apartment. Andrews had approximately two dozen pairs of sneaker's in his walk in ~~closet~~ closet where they sat on a "wall shelf" made for sneakers. Most of those sneaker's were Nike brand.

**2) Blue Grass Robbery.** Even after Andrews began cooperating he adamantly denied robbing Blue Grass. Then, he was shown the robbery video, in which his face is clearly visible until he pulled his black ski mask down. Identification of the suspect in the tan mask is impossible.

<u>Post Trial Trans</u>: 4-18-16; (p11) In both robbery video's no one can identify the person in the tan mask. (p12) In Blue Grass Andrews was identified, but no one could identify suspect in the tan mask.

Andrews was the only person claiming the suspect in the tan mask was the defendant. Then, six months into the government office's a heroin addict has freedom to inject heroin if she'll testify against the defendant, the government allowed her to use heroin at the grand jury and they allowed her to inject heroin for trial, and as Grand Jury and Trial Testimony prove, she had to be told what to say in regards to all major issues in the case.

3.) CVS robbery. Andrews claimed the defendant is the suspect in the "same" tan mask as the one from Blue Grass. While D.N.A. in the black mask was 1 in 552.8 quintillion times more likely to be Andrews than anyone else, there was NO D.N.A. link of the defendant to the tan mask. Randal Parsons was the third suspect. Parson's eventually admitted his role in the CVS robbery but told the Judge verbally and in a letter that the suspect in the tan mask was not the defendant, it was Andrews nephew, Brian. (However, Parsons was not arrested until 2.5 years after the crime was committed.)

At trial the government claimed the suspect in the tan mask had the identical sneakers on as the suspect in the Blue Grass robbery. A video comparison of those sneaker's, along with the one's in "Toothbrush" video should have been done. There are literally million's of white nike's sold in the philadelphia area alone. Andrews nephew was arrested by philadelphia police two weeks after the CVS robbery for other violent armed robberies.

<u>Post Trial Test</u>: 6-15-15 (p44) Shapiro admits agree's the suspect in the tan mask is not limping during CVS robbery. Agent Coyle and Sabatino should have been questioned about Sabatino's original statements claiming defendants left foot was swollen, ace bandaged and he was limping the day before CVS robbery.

The video evidence in this case is only as good as the witnesses. Had defense counsel impeached Andrews and Sabatino with facts available it would have destroyed both their credibilities with the jury. When Andrews and Sabatino's trial testimony is compared, it completely contradicts each other at critical points, making it impossible for both testimony's to be true.

(20)

**(F.7)** The seventh of the Government's alleged strength's was their theory of defendant's foot injury. The government claimed the defendant was shot by police during his escape from the CVS robbery.

This issue has been adequately addressed earlier in this motion (see: section "B" pages 21-23). The sufficiency of this evidence was attacked and proven to be false. The government solidifies this assertion when, during Post-trial hearings, they attempt to "Change" this theory. If the evidence hadn't been sufficiently attacked and overwhelmingly defeated they would have had no reason to try to change their trial theory.

**G.** DEFENDANT'S COUNSEL'S PERFORMANCE AS A WHOLE DEPRIVED THE DEFENDANT OF HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL AND EFFECTIVE ASSISTANCE OF COUNSEL

**I.** Trial Counsel's Performace in preparation for Trial, and during Trial, failed in every area of his duty rendered him Constitutionally Ineffective, including Trial preparation.

**II.** Post-Trial Counsel, Michael J. Farrell, was ineffective for failing to raise "some" issue's

**III.** Appellate Counsel, Julie McGrain, was Constitutionally Ineffective for failing to raise All Trial Counsel's failure's and how they cumulatively related to his Ineffectiveness.

A proper prejudice Analysis must consider "whether the result of the proceeding was fundamentally unfair or unreliable." Lockhart v. Fretwell, 506 U.S. 364, 122 L.Ed 2d 180, 113 S.Ct. 838 (1993). In making this showing, a petitioner may demonstrate that the cumulative effect of counsel's individual Acts or omissions was substantial enough to meet Strickland's test. United States ex rel. Kleba v. McGinnis, 796 F.2d 947, 958 (7th Cir. 1986); Montgomery v. Peterson, 846 F.2d 407, 412 (7th Cir 1988), 846 F.2d at 416. See Also, Rodriguez v. Hoke, 928 F.2d 534, 538 (2nd Cir 1991) (noting that a "claim of Ineffective Assistance of counsel can turn on the cumulative effect of All of counsel's action's"). A defendant may prove that he has suffered Ineffective Assistance of counsel based on the cumulative effect of error's. See Wade v. Calderon, 29 F.3d 1312, 1319 (9th Cir. 1994), cert. denied, 513 U.S. 1120, 130 L.Ed. 2d 802, 115 S. Ct. 923 (1995). In evaluating a defendant's claim, the Court must ask whether the "multiple deficiencies have the cumulative effect of denying a fair Trial to the petitioner...." Ewing v. Williams, 596 F.2d 391, 396 (9th Cir 1979). In United States v. Cronic, 466 U.S. 648, 104 S. Ct. 2039, 80 L.Ed. 2d 657 (1984) The Supreme Court found that there are "Circumstance's that are so likely to prejudice the Accused that the cost of litigating their effect in a particular case is unjustified." 466 U.S. at 658. An Ineffective Assistance of counsel claim should be analyzed under Cronic, rather than Strickland, if the defendant either "is denied counsel at a critical stage of his trial or if counsel entirely fails to subject the prosecution's case to meaning ful adversarial testing." Hunter v. Moore, 304 F.3d 1066, 1069 (11th Cir 2002).

Some circuits hold that Strickland itself requires a cumulative analysis, while other circuits hold that aggregating claims is proper only if it shows a fundamentally unfair trial. Compare Kubat v. Thieret, 867 F.2d 351, 370 (7th Cir 1989) [*6] (relying on "errors" language from Strickland to find that "Strickland clearly Allows the court to consider the cumulative effect of counsel's errors in determining whether A defendant was prejudiced."); Dugas v. Coplan, 428 F.3d 317, 335 (1st Cir. 2005) (adopting the reasoning from Kubat); Lindstadt v. Keane, 239 F.3d 191, 199 (2nd Cir. 2001) (finding that "totality of the Circumstance's"

language from Strickland mandates an aggregate error analysis"); Richards v. Quarterman, 566 F.3d 553, 564 (5th Cir. 2007) ("We will address each aspect of Davis's performance the district court found deficient before considering whether Richards was cumulatively prejudiced thereby."); and Gonzales v. McKune, 247 F.3d 1066, 1078 n.4 (10th Cir. 2001), vacated in part on other grounds, 279 F.3d 922, 925-26 (10th Cir. 2002) (en banc) (noting that language from Strickland "makes it clear that all acts of inadequate performance may be cumulated in order to conduct the prejudice prong.")

The cumulative effect of multiple errors may so prejudice a defendant's right to a fair trial that a new trial is required, even if the errors considered individually are non-reversible." United States v. Thomas, 62 F.3d 1332, 1343 (11th Cir 1995). The third circuit has found that the unified consideration of the claims in the petition well satisfies the interests of justice because the cumulative effect of the alleged errors may violate Due Process, requiring the grant of the writ, whereas any one alleged error considered alone may be deemed harmless. United States ex rel Sullivan v. Cuyler, 631 F.2d 14 (3rd Cir 1980) "we recognize that errors that individually do not warrant habeas relief may do so when combined." Albrecht v. Horn, 485 F.3d 103, 139 (3rd Cir 2007). See also Marshall v. Hendricks, 307 F.3d 36, 94 (3rd Cir 2002) (evaluating prejudice in light of cumulative errors); Berryman v. Morton, 100 F.3d 1089, 1097-1102 (3rd Cir 1996) (evaluating the reasonableness of trial counsels strategy with respect to each alleged error, then determining whether the combined errors constituted prejudice).

Trial Counsel testified, with the government's prompting (post-trial trans 4-7-16 p.4), that the defendant's mandatory life sentence weighed heavily on his conscious. He also testified (p127) "I had an investigator that could do anything that we wanted to do. Joe knew that. But I could not do a lot of these things because Joe's stories would change." However, the record belies Trial counsels assertions. The government took 1700 pages of the defendant personal notes he drafted in preparation for trial, most of which are defendants trial strategies and defense theories (see: Governments motion Docket #287 Filed 6-17-16 p2 Footnote 3). Trial counsel turned these Attorney-client privileged notes over so the Government could use them against the defendant. These notes span over a year and never once did the defendants "story change". Out of thousands of pages of notes the government make a feeble attempt to manipulate two pages to use against the defendant (see: Section "C" page "26" of this motion and, section "E" pages "38-39" of this motion).

The following is a list of the notes, which the government had for post-trial hearings. (Also, between 7-12-12 and 6-9-13 there are 29 emails specifically requesting certain things be done by private investigator, which the

Government also has copies of;

1) 11-2-12 : See Pooh and Vicki to verify injury happened prior to 14th

2) 12-8-12 : Why hasn't P.I. done anything yet?

3) 12-30-12 : need dates me and Sabatino stayed at hub hotel and Models credit card receipts. They prove I was not at Andrews apartment when she claims to have "overheard" the planning of CVS.

4) 1-5-13 : need P.I. to get dates at hub. Prove I was not at Andrews Sunday night.

   need P.I. to get credit card receipts.

   need P.I. to get exact date Mitsubishi was stolen.

   need P.I. to get all dates me and Leah (Sabatino) stayed at Riveria Motel.

   Witness list is attached.

5) 1-26-13 : Witness list

6) 2-7-13 : Depo transcripts - witnesses to be seen.

7) 2-20-13 : Send P.I. to hub hotel for dates and also get credit card receipts for Models.

8) 4-12-13 : (This is 5 pages of things P.I. needed to do, plus a witness list)

9) not dated : 15 things listed for P.I. to do, plus witnesses for him to see.

10) 4-22-13 : witness list of 21 people to see

11) 5-8-13 : witnesses to see.

12) 6-7-13 : Make sure Tony M. testifies

13) 6-8-13 : List of 20 witnesses

14) 6-9-13 : I want eye witness (neighbor) called

15) 6-9-13 : Subpoena surgeon to prove I was not shot.


   Although Shapiro claims his conscious was heavily weighed down because his client was facing mandatory life sentence(s) and he had an investigator that "could do anything", he did nothing. Because of the badgering of his client, the defendant, he sent his private investigator to see only three people, as follows:

1. Franklin "Chucky" Rhoads : Gave a statement that contradicted his F.B.I. 302's. But Trial Counsel only used his statement about a "scanner" in his cross, failed to impeach him on contradictions.

2. Jessica Pitner : Gave a very helpful statement (see: Post trial trans. 4-6-16 p.54). Never called as a witness. No one saw.

3. Heather Meehan : She gave, unexpectedly, an incriminating statement (see: exhibit D-25). However, she also spoke to Shapiro before trial and told him she lied to Private Investigator (see: Affidavit D-26) (also: 6-7-16 pgs 119-122)

It's evident just how much trial counsel's "conscious" was bothering him, out of the dozen's of witnesses on numerous witness lists made by defendant, trial counsel called absolutely NONE.

Trial Trans. 6-11-13 (p108) : (SIDE BAR)

The Court: any anticipated --

Shapiro: we served one witness this morning, I don't know if the government has spoken to him or not, but if we can't --

The Court: All right, Now, I assume that both sides are going to rest.

This conversation was held at side bar. It's unclear why the Government would need to speak to the defense witness before testifying, and it's unclear why the Trial Judge would "ASSUME" both sides were going to rest at such an early stage in the trial.

Trial Trans: 6-12-13 (p59) (SIDE BAR)

The Court: Mr. Shapiro, do you have any witnesses to call?

Shapiro: NO.

Again, this conversation was held at sidebar.

Trial Trans. 6-14-13 (pgs 7 to 9)

DEFENDANT: (in part): There are things totally wrong. Like government witnesses claim I was shot. I was never shot, my surgeon should have been here to prove I was never shot... I've been asking for like two dozen things to get done, I got 20 witnesses I wanted called and they called NO ONE...

At Post-trial hearings defendant's trial counsel admitted he did nothing, but all this "nothing" was based on his strategic decisions. It's a travesty of justice that an attorney can justify his incompetence by simply claiming his incompetence was a strategic matter. (DAVID SHAPIRO testified 6-15-15, 4-6-16, 4-7-16 & Michael Shapiro test. 4-18-16, 4-19-16)

Post Trial Hearing 6-15-15: (6-15-15 p45) Shapiro agree's that any strategy that he "adopted would have to include bringing to the attention of the jury that the injury occured, not the way the government said, by being shot, but by some other means prior to the cvs." (p50) he never called the surgeon... he never asked the surgeon anything, (p53) he never called civil lawyer. (p80) defendant gave "a long list of people to be interviewed." (p82) he never sent private investigator to find Pooh or Vickie at Fatpete's bar.

Post-Trial Trans. 4-6-16: (p12) never investigated the use of expert. (p27) Shapiro received e-mail 6-9-13 from defendant to subpoena surgeon. (p30) He did not conduct any investigation into the injury. (p33) Never called the surgeon. (p34) He did not think the surgeon would testify persuasively whether or not the injury could have been caused by a bullet. (p53) he did not present any evidence to contest defendant was shot. (p54) Admits his 6-15-15 was untruthful regarding Pooh

and Vickie. (p56) No request to Private Investigator to locate Poch or Vicki. (p59) Jessica Pitner's statement was consistent with defendant's statement. (p64) No research on cell site expert. (p68) states "I'm not an expert", cell site evidence meant nothing to me." (p74) Felt he did not need to undermine cell site expert, didn't do research, did not ask court for expert. (p97) defendant wanted experts for everything. (p98) Jessica Pitner would have been a good witness.

<u>Post trial hearing</u> 4-7-16: (p87) Admits, "I did nothing." (p93) claims "strategic reasons" for not calling Jessica Pitner to testify. (p107) He did not challenge Government's injury theory because defendant said he was not there. (p109) he believed surgeon was not a credible witness (p111) Admits he "never, ever spoke to the surgeon." (p117) Admits he did have Rhonds NCI N.C.I.C. but did not use it, claimed "I'm not infallible." (p114) Admits Joe Jr. could have corroborated injury occurred prior to CVS. (p121) Letter from Sabatino pointing why Heather Meelan lied to investigator. (p123) He knew Poch and Vicki could be found at Fat Pete's but did not send investigator. (p125) <b>HERE</b>, he claims he does not know if someone can be a witness until after he speaks to them (if that's true, how did he discredit surgeon without ever speaking to him). (p130) He had a letter from Government witness Sabatino stating Poch could be found at Fat Pete's. (p132) Heather Meelan's statement to investigator proved false.

<u>Post Trial hearing</u>- 4-18-16 (p18) Did not consult drug expert. (p21) In Motion (Doc 189) Shapiro claim expert was needed. (p28-29) he did not cross-examine Sabatino about False testimony of "overhearing" planning of CVS, nor did he cross her about two inconsistent statements of when injury occurred. (p31-32) did no research on injury and never consulted a doctor. (p35) defendant request a lot to contact surgeon, but no one did. (p41) never requested an expert on injury. (p42) Jessica Pitner indicated defendant cancelled appointment on Valentine's day (day of CVS robbery) because of injury, he cancelled days in advance. (p42) Poch and Vicki at Fat Pete's Bar. (p43) he never tried to contact them (p43) one time he drove pass the Bar but did not go in to check. (p46) No research on expert for cell site (p44) An expert would have helped but they didn't request one. (p50) No cell site research at all. (p52) No attempt was made to identify handwriting on drug labels. (p68) No request for Brady notes, no Brady motion ever filed (p73) he didn't know about Rhonds N.C.I.C. (p78) he did nothing with civil Lawyers. (p85) he admits the defendant could have testified and been helpful.

<u>Post trial hearing</u> 4-19-16: (p18) didn't do any research of Sabatino heroin usage. (p20) Did no research on cell site. (pgs 24 to 27) List's all the witnesses who could have gave evidence defendant's injury occurred prior to CVS, he called none. (p32) he never cross-examined Sabatino about her false testimony, named Jury and Trial contradicted each other.

(76)

**H.** TRIAL COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE FOR FAILING TO OBJECT TO FALSE AND PREJUDICIAL STATEMENTS GOVERNMENT MADE IN CLOSING ARGUMENTS.

**I.** Post trial Counsel, Michael J. Farrell, was Constitutionally Ineffective for failing to raise this issue During post trial hearings.

**II.** The Government committed Prosecutorial misconduct By stating Knowingly false statements during closing arguments that were Not supported by the evidence.

During closing arguments The prosecutor made several highly prejudicial statements they Knew, or should have Known, were false. These statements were Not supported by the evidence, and Trial Counsel made no objections.

TRIAL TRANS. 6-12-13: (pg 99) the government states, "at some point she (SABATINO) overhears John Andrews and the defendant talking about needing a get-a-way driver." The government Knew this was false and still prompted sabatino to say it. (SEE: SECTION "A" pages 7 and 8 of this motion).

(p102) The Prosecutor states, "He asked for Suboxone, do you remember that He specifically asked for suboxone, and you've heard from Sal Davis, the drug expert, that suboxone isn't a street drug. It's a drug that's use by doctor's to help heroin addicts get off their addiction. This is telltale evidence that it's the defendant who is robbing the CVS and specifically asking for the pills that's he's giving to Leah Sabatino." No one has ever said, not in any Proffer, not in any Grand Jury proceeding, and certainly not at Trial, that the defendant gave Sabatino Suboxone. The only drug SABATINO took for detoxing is Methadon. (SEE: TRIAL TRANS. 6-11-13 SABATINO Test. pg 19 Lines 18 to 23).

(p103) Prosecutor states, "Now, you heard from Officer Boccolupo and he told you that the first PERSON over the fence, he was the Shorter of the two. It was the defendant. He also told you that as soon as the defendant hit the ground, he turned and opened fired on officer Boccolupo. Now, how do you Know that's Credible? Well, you heard from the C.S.U. examinee".... (SEE: SECTION "E" pages 35 to 38 of this motion) (also see: Trial Test. officer Boccalupo 6-7-13 pgs 82 to 101). Not only is the Prosecutor's statement Knowingly false and prejudicial, she Re-enforced this false statement by vouching for the credibility of it.

(p114) Prosecutor states, "These ~~letters~~ ARE some of the strongest evidence ~~in this case~~ of defendant's guilt in this entire case.... we got the letters from the defendant from person March 9, 2011, it says, ".....if you take this case for me". This "letter" does not say "FOR ME" (SEE: attached exhibit marked D-28). By the prosecutor "adding "FOR ME" at the end of that sentence it changed the meaning to give the appearence that the defendant is admitting guilt. The prosecutor was holding the letter up as if she were quoting from it in front of the Jury.

<u>CONCLUSION</u>

Wherefore, for all the abovestated reasons the defendant respectfully requests this Honorable Court to find that the claims and allegations set forth herein have violated the defendants right to a fair and unbiased trial before a Jury of his peers under the fourth, fifth, sixth, and fourteenth Amendments of the United States Constitution.

Said Constitutional Violations, each standing alone, infected defendants trial to the degree that a New Trial must be ordered. However, when said violation's cumulative effect is taken into consideration, as Third circuit precedent demands it must, then the Constitutional Violations during Pre-Trial, Trial and Post-Trial hearings raise to a level of prejudice and misconduct that polluted said proceedings to an extent that it has made a mockery of the judicial process and requires a NEW Trial to be GRANTED.

For all the Aforementioned reasons this Honorable Court should <u>VACATE</u> the defendants convictions and order a New Trial.

Respectfully Submitted

CERTIFICATE OF SERVICE

I, Joseph Meehan #67675-066, Hereby swear that on FEBRUARY 3, 2020 (MONDAY), I sent copies of the foregoing motion to the following parties; via certified mail, united states Postal service.

The Honorable Judge Slomsky
United States District Court
U.S. Courthouse, room 5614
601 Market st.
Phila. Pa. 19106

AUSA MS. FREUND
615 Chestnut st.
Suite 1250
Phila. PA. 19106
J.M.
2-1-20
NOT ENOUGH STAMPS

Mr. Andrew G. Meehan
3820 Harvard Pl.
Phila. Pa. 19136

DATE: 2-3-2020

Sincerely
Joseph Meehan #67675-066
Administrative United States Penitentiary
P.O. Box 1002
Thomson, IL 61285

## INDEX OF EXHIBITS

D-1: Leah Sabatino's May 29, 2013  302

D-2: David Shapiro's Letter regarding May 29, 2013  302

D-3: F.B.I Transcription of Sabatino's phone call (3-26-16)

D-4: Agent Shute's cellular Telephone Analysis (Formerly Gov. ex. 148)

D-5: Agent Shute's cellular Telephone Analysis format after post-trial hearings in 2016.

D-6: Meehan Notes; Chronology Additions 9-25-12

D-7: Rite Aid multiple case Affidavit: Arrest warrant for John Andrews

D-8: Defendant's Transcription of original dispatch tapes for 2-14-11.

D-9: Transcription of dispatch tapes Government played at trial

D-10: Lacktman statement, CVS employee 2-14-11

D-11: Officer Snyder I.A.D. Statement 9-15-11

D-12: Officer Loizos I.A.D. Statement 9-15-11

D-13: Officer Boccalupo I.A.D. Statement 9-23-11

D-14: Government letter to Trial Attorney's 3-15-13

D-15: Shapiro Memorandum, page 11: 3-11-13

D-16: Shapiro Memorandum page 16: 3-15-13

D-17: Phila. Police property receipt #2951890; Aff. of Probable Cause #AFF-0001203-2011; warrant application

D-18: Phila. Police DNA lab report

D-19: Phila. Police crime scene unit investigation notes; #CSU 11-15

D-20: John Andrews 302  8-25-11

D-21: Franklin Rhoads (Chucky) Affidavit  8-27-14

D-22: Agent Coyle's Rough notes and corrosponding 302 for 2-17-11 (Sabatino)

D-23: Sabatino Affidavit  7-26-11

D-24: Leah Sabatino 302  9-1-11

D-25: Heather Meehan statement to Investigator  12-24-12

D-26: Heather Meehan Affidavit  2-17-17

D-27: Sabatino Grand Jury Transcripts 10-6-11

D-28: Meehan letter to Sabatino 3-9-11

D-29: Agent Coyle's Grand Jury Transcripts  8-4-11 (page 14)(unable to print off disk)

D-30: Franklin Rhoads Grand Jury Transcript  4-7-11

# EXHIBIT
# D - 1