EXHIBIT
D-19

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA |
|---|---|
| CONTINUATION SHEET | POLICE DEPARTMENT |

NAME | PAGE | CASE NO. **CSU 11-115**

**BALLISTICS:** (OUTSIDE — ON HWY):

① FCC 40 S&W PROJ 205'8" E/E c/l FRANKFORD AVE + 20'7" N/S c/l STRAHLE ST.

② FCC 40 FIRED 206' E/E c/l FRANK. + 16'9" N/S c/l STRAHLE

③ FCC PROJ 207'3" E/E c/l FRANK. + 14'10" N/S c/l STRAHLE

④ FCC 205'8" E/E c/l FRANK. + 12'6" N/S c/l STRAHLE

⑤ FCC 208'8" E/E c/l FRANK. + 13' N/S c/l STRAHLE

⑥ FCC 210'8" E/E c/l FRANK. + 14'5" N/S c/l STRAHLE

⑦ FCC 210'8" E/E c/l FRANK. + 14' N/S c/l STRAHLE

⑧ FCC 40 S&W FIRED 215'4" E/E c/l FRANK. + 8' N/S c/l STRAHLE

⑨ FCC FIRED 9mm 209'6" E/E c/l FRANK. + 3'9" N/S c/l STRAHLE

⑩ FCC 40 S&W FIRED CASING 213'3" E/E c/l FRANK. + 2'5" N/S c/l STRAHLE

⑪ FCC 9mm LUGER FC 216'8" E/E c/l FRANK. + 3'9" S/S c/l STRAHLE

⑫ FCC 9mm LUGER FC 214'6" E/E c/l FRANK. + 8'7" S/S c/l STRAHLE

⑬ FCC 9mm FC 211'5" E/E c/l FRANK. + 8'7" S/S c/l STRAHLE

⑭ FCC 40 S&W FIRED PROJ 61'3" S/N REAR BUILDING LINE 8525 Frankford + 18'6" E/E BUILD. LINE 8525 Frankford

⑮ FCC 40 S&W FIRED PROJ 21'5" W/E REAR Building Line 8525 Frankford + 16'9" W/W REAR BUILDING LINE 8525 Frankford

→ #14 AND #15

IN REAR DRIVEWAY BEHIND CVS AND ALONG SIDE driveway CVS    ☒☒☒    ⑯ - 4015 BENSON ST (2ND FL INSIDE BEDROOM)
↳ PROJECTILE

**CRIMINALISTICS:**

BLACK KNIT HAT — 50'5" S/S c/l STRAHLE ST + 14'5" E/E Building Line 8525 Frankford
↳ REAR DRIVEWAY AREA BEHIND STORE (CVS)

GLOVE — 39'10" W/E REAR BUILDING LINE 8525 Frankford + 17'10" W/W REAR BUILDING LINE 8525 Frankford
↳ REAR DRIVEWAY AREA BEHIND STORE (CVS)

**BALLISTICS:** (INSIDE STORE):

① FCC = FC 9mm Luger ON FLOOR REAR Pharmacy area

② FCC = FC 9mm Luger ON FLOOR REAR Pharmacy area

③ FCC = FC 9mm Luger ON FLOOR Pharmacy area

④ "AMERICAN CLASSIC" BB PELLET HANDGUN MODEL #1377  .177 caliber
= ON FLOOR REAR Pharmacy area

75-483A

EXHIBIT
D-20

D-20

V.10 (6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    08/25/2011

JONATHAN ANDREWS, white male, date of birth
████, social security account number ████, cellular
telephone number (267) 236-2071, accompanied by his attorney,
JOSEPH ZAWROTNY, was interviewed by Special Agents Thomas J. Duffy
and John David Coyle.  Also present during the interview was
Assistant United States Attorney (AUSA) Thomas Swanton.  After
being advised of the purpose of the interview and the official
identities of those present, ANDREWS provided the following
information pursuant to a signed proffer agreement:

ANDREWS has known JOSEPH MEEHAN for approximately the
last 20 years.  ANDREWS has known RANDALL PARSONS for approximately
the last 10 years.  In February 2011, MEEHAN was a fugitive, who
was wanted for driving under the influence (DUI) and a parole
violation.  MEEHAN sometimes expressed a desire to flee to Canada
to avoid arrest.  MEEHAN had previously served time in prison for
armed robbery.  PARSONS was an unemployed drug-user.  In or about
February 2011, ANDREWS was an excessive user of alcohol and Xanax
pills.  Until his arrest in February 2011, ANDREWS was employed
with the Philadelphia Water Department.  At the time of his arrest
in February 2011, ANDREWS lived with his unemployed wife, YONG
ANDREWS, at 2525 Welsh Road, unit U2, in Philadelphia.

ANDREWS recalled being interviewed by Philadelphia Police
Department (PPD) detectives on February 17, 2011 concerning the
February 14, 2011 robbery of CVS Pharmacy on Frankford Avenue in
Philadelphia.  In a written statement, ANDREWS truthfully confessed
to his participation in the robbery and his identification of
MEEHAN and PARSONS as his accomplices in the robbery; however,
ANDREWS was not truthful with detectives concerning all of the
circumstances surrounding the CVS Pharmacy robbery or his knowledge
of other pharmacy robberies.

**Do we have this?**

✓

A few days before January 31, 2011, MEEHAN told ANDREWS
he (MEEHAN) intended to commit a robbery, and asked ANDREWS for a
gun.  ANDREWS loaned MEEHAN a 9mm semiautomatic handgun.  A few
days after January 31, 2011, MEEHAN told ANDREWS he (MEEHAN) had
robbed a pharmacy, and MEEHAN gave ANDREWS some "Oxy 10" and Xanax
pills, which MEEHAN retrieved from a black, zippered bag.  MEEHAN
said he committed the pharmacy robbery with his girlfriend, whose
name ANDREWS could not recall.  ANDREWS described the girl as a

1) Not sure if this is true - Andrews robbed Rite Aid but could be other
burglary

2) Is this Rite Aid?
3) Is Andrews referring to Leah? Did Leah ever come w/ Joe to burglary??

FD-302a (Rev.

Continuation

---

**Description of Rite Aid (72 inches) matches Andrews - Philly PD even says that in affidavit.**

**If we can prove Andrews did this and tried to put it on Joe, we can score points**

**Def accusing Sabatino of being getaway driver. If true, invalidates all her testimony. If not true, damaging to Andrews but may affect Leah. If you believe Andrews & think Joe did this, do you have to say Leah was involved since he obv heard from Joe**

---

white female with pimples on her face, approximately in her mid-twenties, thin build, approximately 5'6" in height. ANDREWS had seen the girl with MEEHAN on occasion, and the girl looked like a drug-abuser. ~~ANDREWS knew MEEHAN to occasionally stay with the girl at the HUB MOTEL in Philadelphia.~~ MEEHAN commented that the girl was "a stand-up girl," because she waited for MEEHAN outside in a car while MEEHAN robbed the pharmacy. ANDREWS believed the pharmacy to which MEEHAN referred was the RITE AID PHARMACY on Roosevelt Boulevard, which was robbed on January 31, 2011.

*[handwritten right margin]: I knew Meehan and the girl stay at the Hub on the nights of 02/13/201* → *J.A. 9-7-11*

    In February 2011, MEEHAN occasionally stayed at ANDREWS' residence on Welsh Road. ~~MEEHAN also sometimes stayed with his ex-wife, HEATHER, as well as with his aforementioned girlfriend at the HUB MOTEL.~~ *Meehan also sometimes stayed with his ex-wife Heather.*    *J.A. 9-7-11*

    On February 9, 2011, MEEHAN was staying at ANDREWS' residence. MEEHAN was supplying ANDREWS with Xanax pills, which ANDREWS consumed with such regularity that ANDREWS had begun calling in sick to work on several days. On February 9, 2011, during the day, ANDREWS' wife was at a friend's house. MEEHAN walked to a nearby pharmacy to buy a toothbrush. Upon returning to ANDREWS' residence, MEEHAN announced that the pharmacy, a "mom and pop" operation, would be an easy pharmacy to rob. ←

    ANDREWS agreed to rob the pharmacy with MEEHAN, and ANDREWS retrieved a black ski mask, provided to him by MEEHAN. ANDREWS armed himself with a black-colored 9mm handgun. MEEHAN was armed with ANDREWS' other 9mm handgun, which ANDREWS had previously loaned to MEEHAN. MEEHAN brought with him a tan-colored hat, which MEEHAN had cut to fashion a face covering. The tan-colored hat had belonged to ANDREWS. ✓

    ANDREWS drove a light-colored Mitsubishi sedan with MEEHAN in the passenger's seat. MEEHAN said he had previously stolen the Mitsubishi, which MEEHAN had found with the keys in the ignition. ANDREWS believed MEEHAN had used the Mitsubishi in the aforementioned robbery of RITE AID PHARMACY. MEEHAN directed ANDREWS to the BLUEGRASS PHARMACY on Welsh Road. Interviewing agents permitted ANDREWS to view surveillance camera video footage of the February 9, 2011 robbery of BLUEGRASS PHARMACY. ANDREWS identified himself in the video as the robber wearing black clothing with a black ski mask. ANDREWS identified MEEHAN as the robber wearing a tan-colored head covering. ANDREWS identified MEEHAN as appearing earlier in the video, purchasing a toothbrush. ←

---

**Correctly IDing same car as Rite Aid does not bolster accusation of Meehan for Rite Aid b/c Andrews would have that knowledge if he did Rite Aid**

*9-7-11*

EXHIBIT
D-21

D-21

cope 6.
2013.
3/7/13

D-21

41 University Drive, Suite 400
Newtown, PA 18940
215-493-0439
215-493-1167 (fax)
Brian.Smyth@cornerstoneconsulting.us.com

**Cornerstone
Consulting Services,
LLC**

# Fax

To: MICHAEL R. SHAPIRO, ESQ. From: BRIAN P. SMYTH

Fax: 215-689-4588          Pages: 2 (INCLUDES COVER)

Phone: 215-380-9558        Date: 8/27/14

Re: MEEHAN/RHOADES        cc:

☐ Urgent   ☐ For Review   ☐ Please Comment   ☐ Please Reply   ☐ Please Recycle

● Comments:

STATEMENT.

This message, including any attachments, is intended only for the recipient(s) named above. It may contain confidential and privileged information. The information is intended only for the use of the individual or entity named as the original addressee. If you are not the intended recipient, you are hereby notified that any disclosure, forwarding, downloading, printing, copying, distribution, or the taking of any action in reliance on the contents of this information is strictly prohibited, and that the information should be permanently deleted. If you receive this communication in error, please notify the sender immediately and destroy or delete the original message. Also, please be aware that if you are not the intended recipient, any review, disclosure, copying, distribution, or any action or reliance based on this message is prohibited by law.

US. v. JOSEPH MEEHAN

1   MY NAME IS FRANKLIN RHoads, I AM 40 yrs old
    I reside at 3608 solly ave Phila, PA 19136.

2   About a month After I was arrested I
    was contacted by an FBI agent concerning
    Joey's case. I asked the agent if he could
    Help me out with my case, the agent said
    He couldn't make any promises THAT He would
    talk to His supervisor

                                    _Franklin Rhoads_
                                    FRANKLiN RHoads
                                            8-27-14

EXHIBIT
D-22

④

Tony & I rented 2 rooms Joe gave
me $
#74

Tony - Nitdy #75

- Tues night - I saw his foot - left foot
302
Pg 3  Sun he had been limping

His foot very swollen NOT Bad yet

He said he did it working

6 yrs or 120

- Joe gave me $ to buy crack - I bought in Phil.

Nitdy bought 380

- Smoked crack Tues night

- 1 roo took Methadone today

- We just hung out at hotel.

- Tony & Nitdy left on Wed. in car

    Joe was supposed to go home

Never seen Joe w/ a gun.

Joe said he beat 2 homicides. No other crimes.

Joe stopped giving me Methadone on 2/3/2011 after
I had a bad reaction to heroin. Last used heroin 2/2/2011

SEE PG 3
of 302

Sunday he had been limping
very swollen

FD-302a (Rev. 10-6-95)

[redacted]

Continuation of FD-302 of  L█████ S█████,  On 02/17/2011 , Page  3

happened between himself and HEATHER the previous night, but MEEHAN did not elaborate regarding what had occurred.

→ When S████████ saw MEEHAN late in the day on Tuesday, February 15, 2011, he was using crutches, and his left foot was swollen and bandaged.  MEEHAN said he hurt his foot while working, but did not otherwise elaborate regarding the cause of the injury. MEEHAN changed the subject when S████ pressed him for details of how he received his injury.  S███████ recalled MEEHAN may have been limping slightly on Sunday, February 13, 2011, but he was not using crutches at that time.  MEEHAN told S████ he wanted her to find a girl for his friend, TONY LNU, and the two couples would then leave town and find a motel.  TONY is a tall, skinny white male with dark hair and a moustache.  S████ talked to a prostitute she knew, N███ LNU, and N███ agreed to be TONY's date.  Before leaving Philadelphia, MEEHAN gave S████ money with which to buy crack cocaine.  MEEHAN used the money to buy "six forties and one twenty" worth of crack cocaine.  N██ also purchased crack cocaine.

> **Compare to later GJ Testimony**

Late on the night of Tuesday, February 15, 2011, TONY, N███, MEEHAN and S████ left Philadelphia in TONY's dark grey, older-model Ford sedan.  Late on Tuesday night, the two couples arrived at the Riviera Motel in Pennsauken, New Jersey.  TONY and S████ rented motel rooms next to each other.  In renting the room, S████ used cash she had been given by MEEHAN.  TONY and N███ stayed in room 75, and MEEHAN and S████ stayed next door in room 74.  That night, MEEHAN and S████ smoked crack in their room and had sex.

On Wednesday, February 16, 2011, TONY and N███ checked out of their room.  MEEHAN encouraged S████ to go back to Philadelphia with TONY and N███, but she decided to stay at the motel with MEEHAN.  S████ extended their lease on the room through the end of the week.  During their stay at the Riviera Motel, S████ and MEEHAN did not receive any visitors, and did not leave the motel premises, other than to drink and eat at a strip club adjacent to the motel.  MEEHAN and S████ ordered Chinese food for delivery to their room at least once during their stay.

S████ knew MEEHAN's cellular phone to be a black Boost phone, which he kept on the nightstand in the motel.  Beginning on the afternoon of Wednesday, February 16, 2011, MEEHAN began making calls using S████'s cell phone.  In examining the call history

⑤

He charged the subject re: his foot injury. ⟶ Also see
                                                    pg 7 of these
                                                    Rough Notes

- we ordered Chinese food

- In my bag: black shopping bag
      ↳ methadone
      ↳ crack cocaine
      ↳ prescrip Ibuprofin
      ↳ percosets (he told them)
      ↳ I put his poss in my purse.

Franklin? No
Rhodes? No

John or Joe would talk together
      w/out me in bdroom.
      last weekend.
      Me + Joe smoked crack at John's.
      John's car = a red Truck burgundy SUV
            Leather seats, chrome
            recent model.
      he drove me home once


FD-302a (Rev. 10-6-95)

Continuation of FD-302 of    L███ S██████       , On 02/17/2011 , Page ___4___

in her cell phone, S███████ noticed MEEHAN used the *67 call
blocking feature in placing his calls. S███████ did not know why
MEEHAN began using her cell phone, but she surmised his phone may
have stopped working, or his calling plan was out of minutes.

On the afternoon of Thursday, February 17, 2011, S███████
and MEEHAN walked out of their motel room in order to get something
from the motel's vending machine. Outside, they were detained and
handcuffed by police officers. Among her possessions in the room,
S██████ had a black shopping bag, containing crack stems (glass
crack pipes), methadone pills, prescription ibuprofin pills, and
percoset pills. MEEHAN had put the pills in her bag. MEEHAN had
been taking percosets and ibuprofin pills for the pain in his foot.
Marijuana, which belonged to MEEHAN, was in her purse inside the
motel room.

S██████ knew MEEHAN's ex-fiance to be J███ LNU.
S██████ did not know how recently MEEHAN may have had contact with
J███. S██████ did not recognize the name F██████ R██████.

The interview ended at approximately 3:15 p.m.

**Administrative Note:** S████████ was shown a photograph of
JONATHAN ANDREWS, date of birth ███████████████, PPN 715299, PA
driver's license number 25 719 923. S███████ said the photograph
was identifiable as JOHN, as referenced in the interview. S████████
was also shown a photograph of ████████████████████, date of birth
█████████████████████ PA driver's license number ██████████
S██████ did not recognize the individual in the photograph.

*[handwritten note:]* NO WAY ARE THESE
Rough Notes LiKE this 302
look how "they were detained"
LEAh told About ARREST & beatings !

EXHIBIT
D-23

D-23

STATE OF NEW JERSEY,
PLAINTIFF,

SUPERIOR COURT OF NEW JERSEY
CAMDEN COUNTY/LAW DIVISION
CRIMINAL PART

Vs.

_JOSEPH MEEHAN_
DEFENDANT,

**AFFIDAVIT**

(State of New Jersey)
(County of Camden)

I, _LEAH ANNE SABATINO_, am of full age being duly sworn upon my oath according to law deposes and say's.

1.) I am the Affiant producing the following statement.

2.) The statement made herein is a true and correct recollection of facts as described to the best of my knowledge, and this Affidavit is submitted in good faith.

_On the day of Feb 17 when I was arrested with Joseph Meehan I heard Joseph hollering in pain and out of fear I told them that I had a bag of narcotics in my douffle bag. And they got a warrant to raid the hotel room. I was arrested but not read my miranda rights until after I already told them things in the police station._

(FOR ADDITIONAL SPACE ATTACH PAGES AS NEEDED)

Sworn and Subscribed before me
This ___ day of _____ 20 11

_____
(Notary Public of New Jersey)
My commission Expires: _____

Richard Cafarelli
Notary Public, New Jersey
My Commission Expires 9-29-14

Respectfully Submitted,

_Leah Sabatino_

EXHIBIT
D-24

FD-302a (Rev. 10-6-95)

192B-PH-108387

Continuation of FD-302 of _____LEAH ANNE SABATINO_____ , On 09/01/2011 , Page ___5___

ANDREWS had been too high on drugs, and things went badly.  MEEHAN
did not mention the name of anyone else who participated in the
robbery.  MEEHAN never told SABATINO what he had done with his gun,
following the robbery.

MEEHAN told SABATINO a friend of his, TONY LNU, would
drive him and SABATINO to the RIVIERA MOTEL in New Jersey, but
SABATINO needed to find a prostitute for TONY.  At approximately
9:30 p.m. on February 15, 2011, SABATINO found a prostitute, NICKI
LNU, who agreed to be TONY's date.  With SABATINO's help, MEEHAN
bought crack cocaine before leaving Philadelphia.  MEEHAN gave
NICKI $150-worth of heroin and $100 cash as her payment for being
TONY's date.  TONY then drove MEEHAN, NICKI, and SABATINO to the
RIVIERA MOTEL in New Jersey.  SABATINO had never met TONY before,
and recalled he was a tall, "Italian-looking" male.

MEEHAN and SABATINO checked into a motel room, and TONY
and NICKI stayed the night in a room next door.  The following day,
TONY and NICKI left the motel, and drove back to Philadelphia.
MEEHAN and SABATINO remained at the motel, and never left the
property of the motel.  MEEHAN and SABATINO had no visitors and
received no deliveries while at the motel.

In the motel room, MEEHAN removed a white plastic bag, a
yellow plastic bag, and a black plastic shopping bag from MEEHAN's
black duffel bag.  The yellow bag and white bag contained plastic
baggies containing pills.  The black bag contained both pills and
cocaine.  MEEHAN reviewed the contents of the bags, and labeled
some of the baggies.  MEEHAN and SABATINO flushed down the toilet
antibiotics and other pills that had no street value.  MEEHAN took
the plastic bags containing the drugs into the bathroom, and hid
them.  MEEHAN later asked SABATINO to retrieve from the bathroom
ceiling the black bag, which contained Percocet pills.  MEEHAN said
he needed to take some Percocets to relieve the pain in his injured
foot.  SABATINO reached above the ceiling panel in the bathroom,
and retrieved the black bag for MEEHAN.  SABATINO later placed the
black bag into her own luggage, in order to keep it out of sight,
in case a maid entered the room.

MEEHAN was worried his cellular phone could be tracked by
police, so he removed the SIM card, and placed the phone in a
bucket of water.  Later, MEEHAN gave the phone to SABATINO, and she
threw it in a creek adjacent to the motel property.  In the event
they were arrested, MEEHAN told SABATINO to tell investigators that
on the night of the CVS PHARMACY robbery, MEEHAN and SABATINO had

Exhibit 1 Sabatino 302s        Exh. 1, Pg 5 USA002076

EXHIBIT
D-25

Meehan, Heather - Investigator 122412.pdf

D-25

**CONFIDENTIAL ATTORNEY/CLIENT WORK PRODUCT**

**MEMORANDUM**

To: Michael R. Shapiro, Esq.
From: Brian P. Smyth, Cornerstone Consulting Services, LLC
Subject: Joseph Meehan – Interview of Heather Meehan on 12/20/12
**Date: 12/24/12**

I interviewed Joe Meehan's former wife, Heather Meehan, at her residence – 4712 Van Kirk St., Philadelphia, PA. Heather and I were the only persons present for the interview. Heather can be contacted at cell phone 215-839-4652. In the interview I addressed the topics you highlighted in your summary memorandums.

Heather met and started dating Joe when she was 14 and he was 17. They started living together in 1987. They were married in 1990 and divorced in 2002. Joe was imprisoned from about 1992 to 1994, and again from 1997 to 2007, for armed robbery of convenience stores along Torresdale Ave. Joe was a crack addict and abused alcohol – these two facts were the drivers for the armed robberies. When Joe was not in prison he worked two construction jobs for contractors "Dave Lehman" and "Gaspar" (or "Gasper").

Heather said Joe was a good father to their daughter and son, born 1990 and 1992, respectively. He treated her and the kids "good." He did homework with the kids , took them to the park, and sometimes they all went to church. Joe did not drink or use drugs at home. Heather said "Joe is very generous. He would give you the shirt off his back."

**Heather advised that she lied when she told the police and Feds that before the CVS robbery Joe had hurt his foot falling off a ladder. She said the truth is that on the night of the CVS robbery, 2/14/11, between 8:00 pm and 9:00pm, Joe came to her residence at 4922 Longshore Ave., 1B, Philadelphia, PA, 19135. Prior to his arrival she had seen on TV the news about the CVS robbery. When Joe arrived, Heather helped him take a bullet out of his shoe (she has since thrown the bullet away). According to Heather, the bullet did not penetrate through the shoe to the foot, but the bullet did cause a non-bleeding impact injury to Joe's foot. Joe did not tell her how he got shot in the foot, however, she believed then and still believes now that Joe was involved in the CVS robbery.**

GOVERNMENT
EXHIBIT
342

Heather said that Joe was at her residence for no more than 15 minutes that night. Joe's father telephoned her residence and told her that the police had just been at his home looking for Joe. Joe changed his shoes, put some clothes in a bag, and left. Heather said that approximately one month before the pharmacy robberies that Joe and Jon Andrews are accused of committing, Joe moved in with Andrews. About two months prior to the pharmacy robberies, Joe started helping Andrews collect payments from Andrews' "coke" customers. Heather knows of this from Joe.

Concerning Andrews, Heather stated that he "did a lot of coke" and sold "coke." According to Heather, Andrews always had a gun on him (Heather actually saw Andrews with a gun only 1 time). Joe first met Andrews in the mid 1990s and lost contact with Andrews when Joe went to prison. About two months prior to the pharmacy robberies, Franklin (aka Chucky) Rhoades re-introduced Andrews and Joe to one another.
Concerning Randall Parsons, Heather said that he is very tall and has a history of night-time burglary.

Concerning the search and her arrest, Heather said that at about 5:00am on 2/15/11, the police came to her Longshore Ave. residence looking for Joe. She referred to this residence as a "rooming house." The police were going door to door banging on the doors. She heard them coming down the hall and figured that they must be looking for Joe. Heather went to open her door but before she could do so the police kicked in her door and told her she had to come with them. Heather said that in her presence the police did not enter her room or search her room. Because she did not know when she would be returning to her residence she handed her purse and keys to another resident of the building – Robert Colazzo, aka "Musky." A police officer grabbed the purse from Colazzo and searched it. Morphine was found in Heather's purse. Heather explained to me that she got the morphine pills from Joe. According to Heather, sometime in late January or early February 2011, prior to 2/14/11, Joe brought a bag of pills to her Longshore Ave.residence, where he sorted them. He told her they were from a robbery he was involved in. Without Joe's knowledge she took some of the morphine pills.

Heather was arrested for the possession of the morphine pills. Andrews was arrested around the same time. She saw him at the 15th police district being finger printed. She assumes that because Andrews was the first arrested that he "got the deal" from the police and prosecutor.

Heather said that Joe Meehan Jr. lives on Torresdale Ave., between McGee and Unruh, and can be reached at cell phone 267-444-2965. According to Heather, Joe Jr. told the police the same lie of Joe Sr. falling off a ladder at his girlfriend's Coatesville residence.

Heather believes that Franklin (Chucky) Rhoades lives off of Frankford Ave., off of Rhawn, and can be contacted at cell phone 267-231-3085. Heather thinks that Rhoades will be agreeable to interview.

Heather believes that Lea Sabatino lives with her mother, around the corner from Heather. She had been living in an abandoned house in the same area; Heather assumes that Joe fled to this place on the night of 2/14/11. Sabatino is a crack addict.

Heather said that Kevin Courtney is her niece's husband. Kevin had been buying pills from Joe. She has no idea where he lives.

Heather said that Randall Parsons lives somewhere in the same area as she. A few months ago she saw him with his daughter at a playground.

Mike, if any of the above needs to be explored further with Heather, she is agreeable to re-contact by me and/or you.

Page 2 (last page)

EXHIBIT
D-26

D-26

My name is Heather Meehan and I've been clean & sober for 4 months. There are things I need to write to set the record strait.

1. I've had the opportunity to read over the 8 Bcl-302 and it is inaccurate and very misleading.

2. The interview I gave to the private investigator in 12-03 I did tell him that stuff, but I lied. I lied for 2 reasons the first is, I was mad because Leah Sabatino showed me a picture of Joe w/ our grandson. I took that picture on Halloween of 2012. Leah said Joe sent it to her from jail & he promesed he was comeing home to her. The second reason is - I was hurt I thought Joe would love me forever.

3. Joe made me feel like a fuel. All the times he said he was going to Leah's for her dog, he was really going for her I wanted him to feel how bad her hurt so I lied to his investigator I did speak to one of Joe's lawyers Michael Shapiro befor the trial and told him I lied. He told me no one would call me as a witness, mainly because of my drug problem.

Heather Meehan

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Cheryl Fetko, Notary Public
City of Philadelphia, Philadelphia County
My Commission Expires March 26, 2320
MEMBER, PENNSYLVANIA

2/17/17

EXHIBIT
D-27



Page 1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

— — —

BEFORE THE FEDERAL GRAND JURY

— — —

Stenographic transcript

proceeding of and evidence presented before

the Federal Grand Jury of the United States

District Court for the Eastern District of

Pennsylvania, 900 Market Street, Room 4,

Philadelphia, Pennsylvania, on Thursday,

October 6, 2011, commencing at 2:00 p.m.,

before Deborah Millian, Court Reporter and

Notary Public.

— — —

TESTIMONY OF: ███ ███████

— — —

APPEARANCES:

THOMAS SWANTON, ESQUIRE
Assistant United States Attorney

KNIPES COHEN
1801 MARKET STREET PHILADELPHIA, PA 19103          215-241-1000

USA000773



1   Q.    All right.

2                   Let's go back to the night

3   before Valentine's Day.

4                   Can you please tell us --

5   A.    We stay -- we were --

6                   That weekend we stayed at

7   John's apartment.  And we spent most of the

8   night in the bedroom, smoking crack, and just

9   hanging out.  And just like, you know, bull

10  shitin.

11                  I'm allowed to curse?

12  Q.    I'm not allowed to.

13                  But you can.

14  A.    Well, like we just spent the night

15  hanging out in there.

16                  And on the morning of February

17  14th, we had went to the WalMart.  And I had

18  bought my daughter some stuff for Valentine's

19  Day.  And stuff like that.

20  Q.    And had you discussed robbing the CVS

21  before?

22  A.    Yeah, yeah.

23                  They -- they were talking

24  about it.  And they're -- they were talking

25  about how there's a chance that they weren't

USA000791

1    going to do, because they didn't have a

2    driver, because apparently the guy that they

3    had lined up, like chickened out or whatever.

4    So they were talking about not -- not going

5    through.

6    Q.    Okay.

7                Who -- who's they?

8    A.    John and Joey.

9    Q.    Okay.

10               Now, when -- when you met with

11   Special Agent Coyle and myself in the passed,

12   you had said that you had not been able to

13   overhear -- you --

14               You had seen them speaking.

15               Is that correct?

16   A.    Yeah.

17               They would go in John's

18   bedroom and shut the door or they would send

19   me in the back bedroom.

20   Q.    Okay.

21               But that was actually the

22   first time you mentioned you actually heard

23   them discussing --

24   A.    Well, Joey -- Joey mentioned it to me.

25   Q.    Okay.

L█ S█

1   A.    Like how they might not be doing it.

2  And stuff like --

3   Q.    Okay.

4   A.    They were having second thoughts of it.

5   Q.    All right.

6           So you never heard Jonathan

7  Andrews say that?

8   A.    No.

9   Q.    So -- but you're saying --

10           I'm not trying to put words in

11  your mouth.

12           But you're saying that the day

13  before this robbery or the day before that

14  robbery, they would go off and speak with each

15  other and try to exclude you from the

16  conversation?

17   A.    A lot.

18   Q.    Okay.

19           So what happened on

20  Valentine's Day?

21   A.    Well, like I said, we went to the

22  WalMart.  And then after we left the WalMart,

23  we went back to the John's apartment for a

24  little while.  And then we went back to

25  B██'s.  He brought me home to B██'s

USA000793

EXHIBIT
D-28

Hey, Princess

How is my Girl? I miss you so damn much. And I need to talk to you so bad. I got my courage today and it took

Real bad for me. I'm gonna ask you something and I want you to think real hard about it once in the End I'll do what you want. I do love you.

If I take the case I am looking at a minimum of Ten years, but most Likely Twenty because this is my third strike. Then I will have to go to pa and do another 5 to 10 for what I owe them. My courage said

Adds "For me"

if you make the code $10 (B)
will not get more then a
5 flat and you would be
home in 12 months because
it is your first conviction.
So, our options are, you
do 1 year or I do years.
And by the line we go to
court you'll have point 3
months in. And if you take
it, then all I owe PA is
about 2 years and I'll be
home right after you. Then
we get our apartment and
move on with life. If you
do this I'll make sure you
have plenty of cash to go to
the store, I'll make sure
you've got a little apartment

# EXHIBIT
# D-29

Petitioner was unable to have the Administration at Administrative U.S. Penitentiary down-load and print Agent Coyle's Grand Jury Testimony off the Disk's in Petitioner's property. The Administration is in possession of 39 of Petitioner's disk's.

# EXHIBIT
## D-30

D-30

---

**Page 1**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
- - -
BEFORE THE FEDERAL GRAND JURY
- - -

Stenographic transcript
proceeding of had and evidence presented
before the Federal Grand Jury of the United
States District Court for the Eastern District
of Pennsylvania, 900 Market Street, Room 1,
Philadelphia, Pennsylvania, on Thursday, April
1, 2011 commencing at 2:30 p.m., before
Deborah Millian, Court Reporter and Notary
Public.

- - -

TESTIMONY OF:  F███████ R███████

- - -

APPEARANCES:

THOMAS SWANTON, ESQUIRE
Assistant United States Attorney

ORIGINAL

F███ R███████

KNIPES COHEN
1801 MARKET STREET PHILADELPHIA, PA 19103          215-241-1000

---

**Page 2**

F███████ R███████, after having
been first duly sworn by the foreperson, was
examined and testified as follows:

- - -

EXAMINATION

- - -

BY MR. SWANTON:

8
9    Q.    Mr. R███  I just want to remind you.
10         Even though you stepped out,
11   you're still under oath.
12   Q.    Okay.
13              You understand that?
14   A.    Okay.
15   Q.    Mr. R███, can you please introduce
16   yourself to the Members of the Grand Jury?
17   A.    Yes.
18         My name is F███████
19   R███████
20   Q.    And what -- what name do you go by?
21   A.    C███████.
22   Q.    And how old are you, sir?
23   A.    Thirty-six.
24   Q.    What do you do for a living?
25   A.    █████████

F███ R███████

KNIPES COHEN
1801 MARKET STREET PHILADELPHIA, PA 19103          215-241-1000

## Page 19

```
 1              And where -- where was he
 2  sitting in your car?
 3  A.    In the passenger seat.
 4  Q.    Front passenger seat?
 5  A.    Front passenger seat, yeah.
 6  Q.    Okay.
 7              What, if anything, did he say
 8  to you when he got in the car?
 9              What did you say to him?
10  A.    Maybe, are you all right.
11              I don't -- I don't know how
12  the conversation exactly kicked off.
13  Q.    Okay.
14              Describe as best you can.
15  A.    Well, he got in my car.  He was -- he
16  was freezing.  And told me he'd been laying in
17  the bushes -- in the snow for the last, maybe,
18  four hours, five hour or something like that.
19  And that he was freezing.
20              And conversation came to the
21  point where he told me that -- that he had a
22  gun -- that he buried a gun that will never be
23  found.
24  Q.    Okay.
25  A.    And that John -- or excuse me, R▮ --
```

## Page 20

```
 1  R▮ messed up -- maybe, both -- maybe, they
 2  both messed up.  They don't know what they're
 3  doing.
 4              But I know F▮ for sure, he
 5  said messed up.
 6  Q.    I don't you feel uncomfortable using
 7  this language.
 8              But didn't he actually say --
 9  A.    He fucked -- he fucked up.
10  Q.    I -- I understand.
11              I understand.
12              But thank you.
13              What else did he say --
14              When you say, they may have
15  messed up, who was he referring to?
16  A.    R▮ and John.
17  Q.    Okay.
18              What else did he say?
19              Did he do -- did he do
20  anything with his --
21              Okay.
22              Did he say anything about
23  either one of his feet?
24  A.    Oh, his -- his ankle was scattered.  And
25  he thought he was shot in the foot:  He swore
```

## Page 21

```
 1   he was shot in the foot.
 2              So I asked him was he
 3   bleeding.  He said he didn't know and he took
 4   his shoe off and felt his foot and said, oh,
 5   I'm not shot.  The bullet never penetrated
 6   through his sneaker.
 7   Q.   Okay.
 8              Did he actually take his
 9   sneaker off?
10   A.   Yes.
11              He took the sneaker off and
12   felt it, like inside -- put his hand inside
13   where the foot goes and felt the bullet inside
14   there.
15   Q.   Did he explain how that could have --
16   how he could have gotten shot like that?
17              Did he -- did he try to give
18   you an explanation as to why that happened,
19   like jumping or something like that?
20   A.   Over the --
21              He said when he was, like,
22   climbing over the fence, I guess, when his
23   feet kicking over, he felt his foot get, you
24   know, kicked over by the bullet.
25   Q.   Okay.
```

## Page 22

```
 1   Did he say -- did he remark --
 2              Did he explain who was
 3   shooting him or how the shooting had come
 4   about?
 5   A.   I don't think he did.
 6              I mean, the cops were shooting
 7   at him.
 8   Q.   All right.
 9              You said -- you said when you
10   first saw him, he was freezing.
11              Could you please explain that?
12   A.   He was freezing, like from being in the
13   bushes and in the snow all that time.
14   Q.   Was his body shaking?
15   A.   Yeah.
16              He wasn't --
17              Yeah.
18              He was in pretty much bad
19   shape.
20   Q.   I'm sorry to back -- go back.
21              When he first called you, how
22   would you characterize his tone of voice?
23   A.   Like -- pretty much like life or death
24   cold.
25   Q.   Okay.
```

Joseph Meehan #67675-066
Amister Five United States Penitentiary
P.O. Box 1002
Thumson, IL-61285

To: The Honorable Judge Slomsky
c/o The Clerk of Court
United States District Court
U.S. Courthouse, Room 5614
601 MARKET ST.
Phila. PA. 19106

USSP Thomson
Received in CSD

INMATE
IDENTIFICATION
CONFIRMED

U.S.M.C.
X-RAY

U.S.M.C.
X-RAY

CERTIFIED MAIL

7019 1640 0002 0916 9948














U.S. POSTAGE PAID
PM 2-DAY
THOMSON, IL
61285
FEB 11, 20