IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

v.

JOSEPH MEEHAN,

Defendant.

CRIMINAL ACTION
NO. 11-440-01

## TABLE OF CONTENTS

**Slomsky, J.**                                                  **March 4, 2025**

I.    **INTRODUCTION** ................................................................................................ 4

II.   **BACKGROUND** ................................................................................................ 5

   A.  **Events Leading to Defendant's Trial** ................................................... 5

   B.  **The Trial and Events Occurring During Trial** ................................... 6

   C.  **Post-Trial Procedural History** .............................................................. 14

   D.  **Sentencing** ............................................................................................... 16

   E.  **Post-Sentencing Procedural History** ................................................... 17

   F.  **The § 2255 Petitions** .............................................................................. 18

III.  **STANDARD OF REVIEW** ........................................................................... 21

IV.   **ANALYSIS** ...................................................................................................... 23

   A.  **Claims One, Two and Thirteen:  Validity of § 924(c) Charges
       in Counts II, IV and VI.** ....................................................................... 23

      1.  Count II:  Completed Hobbs Act Robbery ................................. 24

2.   Counts IV and VI:  Attempted Robbery and Attempted Carjacking ............................ 25

3.   Claim Two Will Be Denied ............................................................. 26

**B.   Petitioner's Remining Claims Fail** ...................................................... 27

1.   Claims Three, Six, and Seven Are Without Merit Because
     They Were Previously Raised on Direct Appeal ......................................... 27

   i.   Claim Three .................................................................. 27

   ii.  Claim Six .................................................................... 31

   iii. Claim Seven .................................................................. 33

2.   Claims Four and Five Are Procedurally Defaulted and Meritless ............................. 34

   i.   Claim Four ................................................................... 35

   ii.  Claim Five ................................................................... 41

3.   Petitioner's Ineffective Assistance of Counsel Claims Are Meritless ......................... 47

   i.   Claim Eight .................................................................. 51

   ii.  Claim Nine ................................................................... 56

      a. The Tan Sleeve ............................................................. 56

      b. Petitioner's Brady Claim ................................................... 57

   iii. Claim Ten .................................................................... 59

      a.   Sufficiency of the Evidence Presented at Trial ........................... 59

      b.   Petitioner's Ineffective Assistance of Counsel Argument
           in Claim Ten ............................................................ 60

   iv.  Claim Eleven ................................................................. 68

   v.   Claim Twelve ................................................................. 69

       a.     Closing Statements Regarding Leah Sabatino ...................................................... 69

       b.     Prosecutor Did Not Vouch for Officer Boccalupo
              in the Closing Argument ...................................................................................... 70

       c.     Prosecutor's Closing Argument About Petitioner's Letter
              to Leah Sabatino Was Not Misleading.............................................................. 72

**V.  CONCLUSION** ............................................................................................................. 74

## I.    INTRODUCTION

Before the Court is Petitioner Joseph Meehan's Petition to Vacate, Set Aside, or Correct his Sentence pursuant to 28 U.S.C. § 2255.[1]  (Doc. Nos. 360, 364.)  In his habeas corpus petition, Petitioner seeks relief based on thirteen (13) claims arising from matters that occurred during his trial and post-trial evidentiary hearing.  He also argues that he is entitled to a reduction in sentence based on recent changes in the law.  His claims of error include contentions that:    (1) three sentencing enhancements applied to him under 18 U.S.C. § 924(c) are unconstitutional after the United States Supreme Court decisions in United States v. Davis, 585 U.S. 445 (2019), United States v. Johnson, 576 U.S. 591 (2015) and United States v. Taylor, 596 U.S. 845 (2022);  (2) the Government violated his due process rights by granting his girlfriend immunity for her testimony against him at trial as well as allowing her to invoke her Fifth Amendment right not to testify at his post-trial evidentiary hearing;  (3) Federal Bureau of Investigation ("FBI") Agent William Shute's expert testimony on cell-site evidence violated his due process rights because the agent allegedly gave false testimony at trial;  (4) the Government changed its "theory of prosecution" regarding Petitioner's foot injury during post-trial proceedings;  (5) he was deprived of his right to testify at trial;  and (6) the failure to strike Juror 44 violated his due process rights.  Petitioner also asserts numerous claims of ineffective assistance of his trial, post-trial and appellate counsel.

For reasons set forth below, the Petition will be granted in part and denied in part.

---

[1]    Petitioner originally filed his § 2255 Petition on February 19, 2020.  (Doc. No. 357.)  On March 3, 2020, the Court ordered Petitioner to refile his § 2255 Petition on the standard form required to be used by Eastern District of Pennsylvania Local Civil Rule 9.4(B)(1) and Rule 2 of the Rules Governing § 2255 cases in the United States. (Doc. No. 358.)  On May 27, 2020, Petitioner refiled his § 2255 Petition (Doc. No. 360) and incorporated the exhibits he attached to his earlier Petition. (See Doc. No. 360.)  On June 23, 2020, the Federal Community Defenders Office, on behalf of Petitioner, filed a Supplement to his § 2255 Petition.  (Doc. No. 364.)

II.    **BACKGROUND**[2]

A.  **Events Leading to Defendant's Trial**

On December 1, 2011, the Government filed a Second Superseding Indictment against Petitioner Joseph Meehan and his co-defendant Jonathan Andrews, charging them with federal offenses for the robbery of the Blue Grass Pharmacy on February 9, 2011 and the attempted robbery of a CVS Pharmacy on February 14, 2011.  (Doc. No. 28.)  Petitioner Meehan was charged with the following nine (9) offenses:   interference with interstate commerce by robbery, in violation of 18 U.S.C. §§ 1951(a) and 2 (Count I);  attempted interference with interstate commerce by robbery, in violation of 18 U.S.C. §§ 1951(a) and 2 (Count III);  attempted carjacking, in violation of 18 U.S.C. § 2119 (Count V);  using and carrying a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c)(1) (Counts II, IV, VI)[3];  attempted witness tampering, in violation of 18 U.S.C. § 1512(b)(3) (Count VII);  possession with intent to distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), and 18 U.S.C. § 2 (Count VIII);  and being a convicted felon in possession of ammunition, in violation of 18 U.S.C. §§ 922(g)(1), 924(e), and 2 (Count IX). (Doc. Nos. 28, 163.)

Petitioner was arrested on February 17, 2011 in Pennsauken, New Jersey.  Leah Sabatino, his girlfriend, was arrested with him.  Ms. Sabatino subsequently entered a guilty plea on charges brought against her and, pursuant to a grant of immunity, agreed to cooperate with the Government against Petitioner.  She testified before the grand jury and at Petitioner's trial.  Meehan's co-

---

[2]    Background Sections A to C are adopted from the Court's Opinion Denying Petitioner's Post-Trial Motions for a Judgment of Acquittal or for a New Trial.  (Doc. No. 301.)

[3]    Petitioner was charged in three different Counts (II, IV, and VI) with using and carrying a firearm during a crime of violence.

defendant, Jonathan Andrews, pled guilty to Counts I, III, and IV of the Second Superseding

Indictment on January 11, 2013.  Mr. Andrews also testified against Petitioner at trial.

### B.  The Trial and Events Occurring During Trial

Petitioner's jury trial began on June 4, 2013 and lasted nine days, concluding on June 14,

2013.  The evidence presented against Petitioner was substantial. The Government has correctly

described the evidence presented at and during trial as follows:

> John Andrews testified that both he and the defendant robbed the Blue Grass
> pharmacy together on February 9, 2011 at 2:04 pm, (trans. 6.6.2013, p 73) and that
> he, the defendant and Randall ("Randy") Parsons robbed the CVS pharmacy
> together on February 14, 2011 at 8:30 pm.  The defendant approached Andrews to
> commit the Blue Grass robbery. Andrews explained that at the time of the robberies,
> he was using drugs, and agreed to the robbery to get drugs.  Id. at 80.  The defendant
> had gone to the Blue Grass pharmacy to scope it out.  Andrews identified
> surveillance video of the defendant scoping out the Blue Grass pharmacy, in which
> the defendant was wearing Nike sneakers.  Id. at p. 81, lns 15- 22.  The defendant
> told Andrews that this pharmacy was a good place to rob because it was small, with
> few customers.  Id. at p. 80.  Prior to the robbery, the men obtained guns.  Id. at 84.
> They also made garments to mask their identity.  The defendant cut the sleeve of a
> tan shirt and wore it around his face.  Id. at p. 83, 1-11.  The men also stole a
> getaway car to escape from the robbery.  Id. at lns 14-17.  Mr. Andrews watched
> [a] surveillance video of the robbery and explained to the jury what he and the
> defendant were doing during the robbery.  Id. at 89-93.  He also pointed out that
> the defendant wore the same sneakers during the robbery that he wore when scoping
> out the pharmacy.  Id. at p. 91.
>
> A few days after the Blue Grass robbery, the defendant approached Andrews about
> robbing a CVS pharmacy.  He needed one last robbery to get the money he needed
> to run away from parole.  Id. at p. 111, lns. 16-23.  Originally, the plan included the
> defendant, Andrews and a man named Tony.  Id. at p. 99.  However, after the stolen
> getaway car broke down on the morning of the robbery, the robbery was called off.
> Id. at p. 100, 104, 106.  Andrews testified that later in the day, the defendant asked
> Randy Parsons to be the look-out for the robbery.  Id. at pp. 99, 109.  Parsons
> agreed, but required that he had a real gun.  Andrews gave Parsons his gun. Id. at
> 114.  Meehan had the same gun he used in the Blue Grass robbery, and Andrews
> carried a BB gun.  Id.
>
> While the jury saw surveillance video of the robbery, Andrews explained what each
> robber was doing.  He again pointed out that the defendant wore the same tan mask
> and Nike sneakers that he wore in the Blue Grass robbery.  Id. at 118.

Parsons fled the scene prior to police arriving. Neither Andrews nor the defendant realized the police were in [the CVS pharmacy] until they attempted to leave through the front door and saw the police approaching. Id. at 120. Andrews and the defendant retreated to the pharmacy [area] and attempted to shoot their way through the drive through window. Id. They jumped out the window. By this time, other police officers arrived. Andrews and the defendant attempted to jump over a fence and flee down an alleyway. Id. at 123. The defendant shot at the police. [Footnote 3: Officer Boccalupo testified that one of the robbers shot at him after the defendant jumped over the fence. Trans. 6.7.2013 at p. 104.] [Defendant] was also shot in the foot by police. The bullet did not penetrate the sneaker but it hurt his foot. [Footnote 4: A childhood friend, Nancy Quinn, testified that the day after the CVS robbery, February 15, 2011, the defendant came to her house. Trans. 6.10.2013, at pp 73-74. His foot was injured. Id. The defendant was limping. Id. at 75. Ms. Quinn gave the defendant crutches to help him with the pain in his foot. Id. at 79.] Id. at 143. The men separated as they fled. Andrews got in his car that was parked at the end of the alleyway and drove around to clear his head. Id. at 126. Later, [sic] Andrews talked to the defendant, who told him that after the CVS robbery, he hid in the bushes until Chuck Rhoads [came] and picked him up. Id. at 141.

Various police officers testified about the CVS pharmacy robbery and the fact that shots were fired. Richard Smith, a civilian witness, testified that a man, who was wearing the same clothing that the jury heard the robber wore during the CVS robbery, held a gun to [Mr.] Smith's head and demanded his car.[4] See trans. 6.7.2013 at pp. 138-143. After [Mr.] Smith refused, the defendant fled over a fence in the direction of Benson Street.

Charles "Chuck" Rhoads found it so difficult to testify against his good friend Joseph Meehan that he broke down and sobbed during his testimony. See Trans. 6.7.2013, p. 170. Rhoads testified that he was very good friends with the Defendant, and friends with John Andrews and Randy Parsons. See Trans. 6.7.2013, p. 149. Rhoads lived very close to the CVS that the defendant, Andrews and Parsons robbed. Shortly after the defendant robbed the CVS, Mr. Rhoads called Andrews to ask where the defendant was. Id. at 156. Andrews responded that he thought that the defendant and Parsons "got caught." Id. In the early morning after the robbery, between 12:20 a.m. and 12:24 a.m., the defendant called Mr. Rhoads and asked him to pick him up [at] Benson Street, which is one block away from the CVS. Id. at pp. 157-159. The defendant "hopped" into Mr. Rhoads's car. Id. at 163. The defendant appeared to be "freezing," and mentioned that he was shot in the foot. Id. at 163, 169. The defendant told Mr. Rhoads that Parsons

---

[4]  The driveway to Mr. Smith's house was adjacent to the CVS drive-thru window. (Tr. 136:3- 12, June 7, 2013.) He testified that on the night of February 14, 2011, at around 8:35 p.m., he was backing out of his garage when a man approached him and told him to get out of his car. (Tr. 136:13-137:6, June 7, 2013.) He testified that the man was wearing a mask and was waving a gun at him. (Tr. 138:14-24, June 7, 2013.)

and Andrews "fucked up." Id. at 164. The defendant told Rhoads that he shot his way out of the CVS window and then jumped a fence. Id. at 165-66.

Leah Sabatino testified on June 11, 2013. She had originally been subpoenaed to testify on June 10, 2013. See Trans. 6.11.13 at p. 5. Although she came to the courthouse on June 10, 2013, Ms. Sabatino fled from the courthouse prior to testifying. Id. at pp. 5-6. The government contacted Ms. Sabatino's counsel, federal defender Felicia Sarner, for assistance in trying to locate Ms. Sabatino. The government called other witnesses out of order while FBI agents and Ms. Sarner searched for Ms. Sabatino. The government prepared a material witness warrant for the arrest of Ms. Sabatino, which was signed by the Court. Late in the afternoon, Ms. Sarner brought Ms. Sabatino back to the courthouse. The Court and the parties discussed whether Ms. Sabatino should be held overnight in the Federal Detention Center. The government requested that Ms. Sabatino be detained because she fled from the courthouse. See 6.10.2013 trans., p. 225, lns. 23-25. Ms. Sabatino's counsel argued against detention reasoning that Ms. Sabatino was simply scared. Id. at pp. 227-228. Ms. Sarner explained that she discussed the ramifications of failing to appear in court with Ms. Sabatino and attested that Ms. Sabatino could be trusted to show up to trial the next day. Id. at p. 228. The government requested that if Ms. Sabatino were permitted to leave the courthouse, that the Court place Ms. Sabatino under oath and administer warnings to her about the repercussions of failing to appear in court the following day. Id. pp. 225, lns. 22-25, 226, lns. 1-11. The Court gave Ms. Sabatino such warnings and permitted her to leave that afternoon. Both attorneys for the defense remained silent as to whether Ms. Sabatino should have been held in custody overnight. Id. at pp. 223-225. At no point did defense counsel suggest that Ms. Sabatino be detained pending her testimony.

The following day, Ms. Sabatino was driven to the courthouse by FBI agents who were not involved in the case. Neither the government attorneys, nor Special Agent Coyle, the case agent, had any communication with Ms. Sabatino prior to her testimony. Id. at p. 100, lns. 14-23.

Ms. Sabatino told the jury that as of the day she testified, she continued to view Mr. Meehan as her "superman" because he had tried to help her detoxify from her heroin addiction when they dated in January 2011. Ms. Sabatino told the jury that she still had deep feelings for the defendant, who treated her like a princess. See 6.11.13, trans., p. 71. She explained that she fled the courthouse the day prior because she was scared and nervous. See 6.11.13, trans., p. 6. Ms. Sabatino testified that she felt like "I'm putting [Meehan] away for the rest of his life" by testifying in court. Id.

Prior to any testimony about Mr. Meehan's crimes, Ms. Sabatino told the jury that she had battled a drug addiction for 17 years and that despite completing detox programs, she recently relapsed. She told the jury that she had relapsed into heroin, crack cocaine and marijuana use. Id. Ms. Sabatino then admitted that she had used

a bag of heroin that morning prior to her testimony.  Id. at p. 7.  Prior to that point, the government had no knowledge that Ms. Sabatino had used drugs that morning. The defendant did not object at any point to Ms. Sabatino's drug use or mental state. Id.  The government asked competency questions.  Id.  Ms. Sabatino explained that she could understand the government's questions.  Id.  She also explained to the jury what would happen to her if she did not take heroin, that is, she would become "dope sick."  Id.  Ms. Sabatino explained that when she is in drug withdrawal, she cannot concentrate or focus and experiences great physical pain.  Id.

On direct, Ms. Sabatino testified, among other things, (1) that the defendant told her about committing the Blue Grass and CVS pharmacy robberies; (2) that she saw Mr. Meehan's gun that he kept in his bag full of prescription pills; (3) in her journal entry that was admitted into evidence, she wrote on the night of the CVS robbery about her fears of the defendant being arrested or killed after she saw on the news that there had been a police shoot-out at the CVS during the robbery; (4) she was arrested at the Riviera motel with the defendant;[5] (5) the defendant had a large duffle bag of stolen prescription pills that was recovered from the motel room and identified in Court by Ms. Sabatino; and (6) about the various letters that the defendant wrote her from prison, in which he asked Ms. Sabatino to tell police that the pills were hers so that the defendant could avoid a lengthy jail sentence.

On cross-examination by Meehan's counsel, Ms. Sabatino explained that when using heroin "you become physically dependent on it . . . if you don't have heroin in your system you can't do anything, you're practically like dead to the world. You're willing to do anything and everything to get it. Like I never would have thought that I would be standing on the corner, selling myself for drug money or just for drugs, and that's what it does."  Id. at 73.  During Ms. Sabatino's cross, defense counsel also elicited testimony that drugs make people "do irrational things," potentially "black out" from an overdose, and create major problems within a family.  Id. at 76-77.  Ms. Sabatino explained that although she has a daughter, whom she loved "more that my life itself," she still could not stop using drugs.  Id. at 77-79.  She moved out of the house, rather than expose her daughter to her drug use.  Id.

Ms. Sabatino admitted that at the time that she dated Mr. Meehan, during which he committed the pharmacy robberies, she smoked crack, took heroin and eventually attempted to come off of heroin by using methadone that Mr. Meehan provided.  Id. at pp. 84-85.  She admitted that taking drugs can sometimes affect one's memory. Id. at 86, lns 1-5.

Defense counsel questioned Ms. Sabatino about whether she spoke with FBI agents either the day she fled from court or the day she testified.  Id. at p. 100, lns. 14-23. She explained that she did not.  Id.  Ms. Sabatino testified that during the

---

[5]    The Riviera Motel is located in Pennsauken, New Jersey.

investigation of Mr. Meehan, she had she met with the prosecutors twice.  Id. at 7-11.

After lengthy questioning, Ms. Sabatino asked for a break to speak with her attorney.  Id. p. 106, lns. 18-25.  The parties and the Court thought that she may have been getting sick from lack of drugs in her system.  Id. at pp. 107-108.  When discussing whether to allow Ms. Sabatino a break, defense counsel voiced the opinion that the jury should see the "anguish" of drug withdrawal if, in fact, that is why she was taking a break.  Id., at p. 108, lns 6-14.  When Ms. Sabatino returned to the stand, however, she explained that she needed a break only because she was "angry" at defense counsel's questions.  Id. at p. 111, lns 1-14.

\*\*\*

Defense counsel continued to question Ms. Sabatino about how drugs affect her memory.  Defense counsel also asked questions about Ms. Sabatino's knowledge of John Andrews and about the letters exchanged between Ms. Sabatino and the defendant.  After this lengthy questioning, the Court suggested a lunch break.  Id. at p. 127, lns. 7-16.  At sidebar, the government stated: "With all due respect, your Honor, earlier Counsel said he had about 15 minutes left. She said that she wasn't having physical issues, but we do know that she's a heroin addict.  I know that Mr. Shapiro[6] put on the record that he'd like the jury to see her if she has any ill effects. If they're prolonging cross to see if she has ill effects, then that's really not appropriate."  Id. at p. 128, lns. 18-24.  Defense counsel explained that he had about ten minutes of questioning left.  Id. at lns. 22-25.  The Court then proposed that defense counsel would continue with Ms. Sabatino, followed by a lunch break. Id. at p. 129, lns. 4-5.  Defense counsel did not object to the Court's proposal.

\*\*\*

[F.B.I.] Case Agent John Coyle testified about various aspects of the case.  He explained that the defendant gave what was proven to be a false alibi when arrested at the Riviera motel.  The defendant told Agent Coyle that on February 14, 2011, he spent a romantic day with Ms. Sabatino at an abandoned apartment on Hegerman Street from noon until midnight, after which he went to his ex[-]wife's place at 4922 Longshore Avenue.  See, trans. 6.10.2013, 185, lns. 2-13.  The alibi was proven false by the cell site analysis conducted by William Shute, who is an expert in cell site technology (Special Agent Shute also testified). [Footnote 9: Agent Shute testified as an expert in cell site technology. His testimony included explaining on what cell phone tower locations various, relevant cell phones were registering before, during and after the robberies.]  Using the cell site information, the jury could see that the defendant was geographically nowhere near where the defendant claimed he was during the day and night of the CVS robbery.  Id. 185-

---

[6] David Shapiro, Esquire, was trial counsel for Defendant. He was assisted by his co-counsel, Michael Shapiro, Esquire.

86. Agent Coyle also testified that the phone records showed "quite a bit of contacts and attempted contacts with Randy Parsons, with Jonathan Andrews, with Chuck Rhoads and some other witnesses." Id. at 186.

On cross-examination, Agent Coyle testified that Leah Sabatino's drug addiction was "baggage" in terms of her credibility. See 6.12.2013, p. 32, lns 15-25. Agent Coyle explained that addicts can be craving their next "fix" of drugs, but still be lucid and coherent and able to answer questions. Id. at p. 33, lns 9-14. He also explained that when a person is highly intoxicated on a drug it can interfere with his or her ability to be lucid and coherent. Id. at lns 15-16. Agent Coyle echoed Ms. Sabatino's testimony (and, later the jury instructions) when he testified that "any kind of intoxicant can affect a person's ability to recall events, to answer questions, to understand the questions that they're being asked and these are all consideration that you should bear in mind when you're dealing with a person with an addiction." Id. at p. 34, lns 7-11.

Moreover, Agent Coyle explained to the jury what Ms. Sabatino's demeanor was like during various phases of intoxication and when he saw her dope sick on a prior occasion. Id. at pp. 36-37. Defense counsel asked questions about Ms. Sabatino fleeing from the courthouse, and brought to light the fact that the government originally requested the Court to hold Ms. Sabatino in custody overnight. Id. at pp 39-40.

Agent Coyle explained that neither he nor any FBI agent had knowledge about when or where Ms. Sabatino took the heroin prior to trial. Id. at 43. Agent Coyle also testified that the Government first knew about Ms. Sabatino using heroin when Ms. Sabatino testified that she used heroin that morning. Id. at 43-44.

Agent Coyle and several other witnesses gave testimony in which they matched the names, and strengths of pills and drug patches found in the defendant's motel room with the names and strengths of pills and patches that were reported stolen from the Blue Grass pharmacy.[7]

---

[7]    Daniel Ginecki, a pharmacist at the Blue Grass Pharmacy, testified that he completed a Drug Enforcement Administration ("DEA") 106 form to report the drugs that were stolen on February 9, 2011. (Tr. 25:15-26:21, June 6, 2013.) Mr. Ginecki compared the stolen drugs on the DEA-106 to drugs shown in photographs (Exhibit #1) introduced by the Government that were recovered at the Riviera Motel when Defendant was arrested. (See Tr. 25:38, June 6, 2013.) Mr. Ginecki was shown a photograph of tablets of Hydromorphone (generic for Dilaudid), 4 milligrams, and testified that the DEA-106 form listed 87 tablets of Hydromorphone, 4 milligrams, stolen from the Pharmacy. (Tr. 27:3-28:2, June 6, 2013.) He was shown a photograph of 30 tablets of Roxicodone (a.k.a. Oxycodone), 5 milligrams, and testified that the DEA-106 form listed 30 5-milligram tablets of Roxicodone were stolen from the Pharmacy. (Tr. 28:4-29:11, June 6, 2013.) He was shown a photograph of 209 2-milligram tablets of Hydromorphone and testified that 210 2-milligram tablets of Hyromorphone were stolen from the Pharmacy. (Tr. 29:17-31:1, June 6, 2013.) He was

After both parties rested, the Court charged the jury. Not only was the jury given the routine instructions about witness credibility, but the Court also instructed the jury that: "Evidence was introduced during the trial that witnesses were using drugs, or addicted to drugs, or using alcohol when the events took place. There is nothing improper about calling such a witness to testify about events within his or her personal knowledge. On the other hand, his or her testimony must be considered with care and caution. The testimony of a witness who uses drugs, [is] addicted to drugs or using alcohol may be less believable because of the effect the drugs or alcohol may have on his ability to perceive, remember or relate the events in question." Trans. 6.13.2013, p. 22, lns. 16-25. The defendant did not object to this charge. After the Court finished the jury instructions, defense counsel asked the Court to also charge the jury about the credibility of a witness who testified while under the influence of drugs or alcohol. Accordingly, the Court instructed as follows: "You may recall I said that in deciding what to believe you may consider a number of factors, and I listed the factors, and I want to add this factor: You can consider whether the witness was under the influence of an addictive drug during his or her testimony. In addition, when I charged you on the credibility of an addict or substance abuser, I want you to consider also the following instruction: The testimony of a witness who admits to having taken drugs just prior to his or her testimony may be less believable because of the effect addictive drugs may have on his or her ability to perceive, remember or relate events in question or the witness's appearance, behavior or manner while testifying." See Id. at p. 65, lns 2-14. The defendant did not object to this charge.

(Doc. No. 195 at 3-14 (footnotes omitted).)

The defense's position at trial was that Petitioner did not commit any of the offenses charged. (Doc. No. 189 at 6.) At trial, defense counsel argued, in part, that the individuals who

---

shown a photograph of packaging for the drug Fentanyl, 12 micrograms per hour strength, National Drug Code (NDC) number 0781724055, and testified that 12 microgram patches of Fentanyl with the same NDC number were stolen from the Pharmacy. (Tr. 33:1-35:10, June 6, 2013.) Similarly, photographs of (1) Fentanyl, 25 micrograms, NDC number 0781724155, and (2) Fentanyl, 50 micrograms, NDC number 0781724255, were introduced, and Mr. Ginecki testified that the same types of Fentanyl were listed on the DEA-106 form as having been stolen from the Pharmacy. (Tr. 35:11-38:12, June 6, 2013.) Finally, Mr. Ginecki testified that methadone, a pain killer used to ease addictive issues coming off heroin, was also stolen from the Pharmacy. (Tr. 42:17-43:21, June 6, 2013.) Agent Coyle also testified that some of the drugs that were found in the Riviera Motel matched drugs that were stolen from the Blue Grass Pharmacy, as indicated on the DEA-106 form. (Tr. 60:16-61:15, June 12, 2013.) No drugs were taken from the CVS pharmacy during the attempted robbery on February 14, 2011, which was aborted due to police presence in the store. (Tr. 124:5-18, June 6, 2013.) As noted, Defendant and Andrews fled through the drivethru [sic] window.

testified lied to frame Petitioner, to protect themselves and their families and to make the best deal

they could with the Government in their own criminal cases.  (Doc. No. 184).  The following are

excerpts from defense counsel's closing argument:

> . . . You have to figure out if there was reasonable doubt as the conscience of the
> community, what kind of system do you want? Do you want a system in which, not
> them, but the criminals figure what they want to hear and they give back a story.
> Because that's what happened here.  That's what happened here. John Andrews
> knew by 9:30, at the latest, he was in deep trouble. . . . And he knew that he was
> going to take a hit and he had to figure out what's the best way to lessen that hit?
> When I say he knew he was going to take a hit, he knew he was going to do some
> time. . . . So, real fast, he concocted a scheme and that was to put it on Joe.[8] Joe
> was a good target. He's easy. A sophisticated criminal knows, a man with his
> background, that's exactly what they want. Spent a good number of years in jail.
> He's a parole violator now. He's going back to jail no matter what happens and he's
> going back for a long time. I think it was Andrews said something about 12 years.
> So, Joe was a good target. . .

> ***

> . . . . It's not whether it's true or not, it's what part of Andrews'—what part of
> Chuckie Rhodes [sic] and what part of Leah's testimony are you not comfortable
> with? And let me be specific. When I say testimony, testimony not only includes
> the explanations, blaming Joe or putting it on Joe, it's the I don't knows and I don't
> remember. It's real convenient. It's real convenient and think about it. Is I don't
> remember, so convenient, because they're trying to curry favor. . .

> ***

> . . . . But what it is that motivates, what is it that motivates people? Think about it.
> Think about your own life experiences. It's that personal stuff. It's the inability to
> take care of your children. It is the inability to be able to affect the lives of your
> family. . . . A guy like John Andrews, Chuckie Rhodes [sic] had been down long
> enough that he knows how little his life means. How his life, this is what goes on
> in prison and how to make the best of it. That, ladies and gentlemen, is probably
> something that you never thought about when you thought about the criminal
> justice system and that's how people play it. Those are the things that end up
> motivating them, those that cooperate, because life has become just prison. . .

> ***

---

[8]    "Joe" is Defendant Joseph Meehan.

> You have the right to see the real Leah Sabatino. . . . You have the right to weigh her credibility as to what it is that she said. . . . You have to decide whether she should have been in here without heroin, without a bag of heroin before she testified. That's indicative of the case. . . . If the evidence is so strong, if the evidence is so strong, why? Why did that happen? Was it to get her and make sure she was in good shape to testify? I don't blame her one iota. Not one iota. She's fighting for her life, she's fighting not to go to jail, she's fighting to keep them on her side. . . .

(Doc. No. 184, Trans. 151:4-152:6, 155:2-10, 161:19-162:9, 166:19-167:15, June 12, 2013.)

At the close of the Government's case, Petitioner waived his right to testify in a colloquy conducted by his counsel. Following closing arguments and before the jury was instructed on the law, Petitioner stated that he wanted to testify. He said that his lawyer, Michael Shapiro, Esquire, told him that a motion pending in this case to preclude prior testimony, which Petitioner gave in a civil case, was denied when that was not accurate.[9] The Court then reviewed the colloquy and found that Petitioner's decision not to testify was knowing and voluntary, and that it would be inappropriate for Petitioner to testify after the close of evidence and closing arguments. (Doc. No. 185 at 10:9-11:25.) Next, the Court charged the jury on the law, which included instructions regarding witness credibility and the effect of drug use on witness testimony.

After the nine-day trial, on June 14, 2013, the jury convicted Petitioner on all nine (9) Counts. (Doc. No. 163.)

**C. Post-Trial Procedural History**

On November 18, 2013, while still represented by his trial counsel, David Shapiro, Esquire, and Michael Shapiro, Esquire, Petitioner filed a Motion for Judgment of Acquittal or for a New Trial. (Doc. No. 189.) On April 4, 2014, the Government filed a Response. (Doc. No. 195.) On April 25, 2014, Petitioner filed a Memorandum in Support of the Motion for Judgment of Acquittal

---

[9] At the post-trial hearing, Michael Shapiro, Esquire, testified that he did not tell Defendant that the motion was denied. The Court credits this testimony over that of Defendant.

14

or for a New Trial. (Doc. No. 196.)  Thereafter, at the request of Petitioner, who was having a conflict with his trial counsel, the Court held a hearing on September 2, 2014.  (Doc. Nos. 213, 215.)  At the hearing, the Court determined that irreconcilable differences existed between Petitioner and his two trial counsel and found that the interest of justice permitted their withdrawal. Defense counsel subsequently filed a Motion to Withdraw as Attorney, which the Court granted. (Doc. Nos. 218, 219.)  On September 5, 2014, Petitioner's post-trial counsel, J. Michael Farrell, Esquire, was appointed to represent Petitioner.  (Doc. No. 217.)

On February 20, 2015, Petitioner filed a Memorandum in Reply to Government's Response, in which Petitioner raised new claims that his trial counsel, the Shapiros, were ineffective.  (Doc. No. 224.)  On June 2, 2015, the Government filed a Reply to Defendant's Motion for a New Trial. (Doc. No. 233.)   The Court held hearings on the Motion for a Judgment of Acquittal or for a New Trial on June 15, 2015, April 6, April 7, April 18, and April 19, 2016.[10] (Doc. Nos. 243, 275-281.)

At the post-trial hearing, Petitioner's trial counsel, David Shapiro, Esquire, and Michael Shapiro, Esquire, testified.  Additionally, Petitioner retained the following individuals who offered expert testimony to support the ineffective assistance of counsel claims:  (1) Dr. Steven Cancell testified about his treatment of Petitioner's foot injury, which the Government asserted was the result of Petitioner being shot in the foot while fleeing from police after the CVS robbery; (2) Dr. Kenneth Weiss testified about the effects of long term, chronic, and contemporaneous abuse of narcotics, including heroin, crack cocaine, Xanax, and Methadone, on the ability of Government witness Leah Sabatino to perceive, to form memories, and to testify about events in an accurate

_____

[10]  The hearings began on June 15, 2015. They were postponed, in part, due to the medical needs of one of Petitioner's trial counsel, David Shapiro, Esquire.

manner; and (3) Joseph Kennedy testified about cell site locations to refute Agent Shute's testimony on the same subject. In response, the Government called Agent Shute to counter the testimony of Joseph Kennedy. Finally, Agent Coyle testified once again.

After the hearings concluded, Petitioner filed on May 27, 2016 a Memorandum of Law in Supplement of Defendant's Previous Filings in Support of Motion for a New Trial. (Doc. No. 284.) The Government filed Proposed Findings of Fact and Conclusions of Law on June 17, 2016. (Doc. No. 287.) Petitioner filed a Memorandum of Law in Reply to the Government's Proposed Findings of Fact and Conclusions of Law on June 28, 2016. (Doc. No. 292.)

On September 14, 2016, the Court issued an Opinion and Order denying Petitioner's Motion for Judgment of Acquittal or for a New Trial. (Doc. No. 301). Because the Opinion and Order resolved Petitioner's post-trial challenges, Petitioner was then able to be sentenced.

### D. Sentencing

Petitioner was sentenced on December 16, 2016. He was represented by J. Michael Farrell, Esquire, at the sentencing hearing. A sentence of 151 months was imposed on Counts I, III, VII and VIII to run concurrently on each Count; a term of 120 months was imposed on Counts V and IX to run concurrently to each other and to the terms of imprisonment imposed on Counts I, III, VII and VIII; a mandatory consecutive sentence of 84 months imprisonment was imposed on the first § 924(c) count (Count II); and two consecutive sentences of 300 months imprisonment was imposed on the successive § 924(c) counts (Counts IV and VI). Thus, Petitioner was sentenced to a total term of imprisonment of 835 months (69.5 years).[11]

---

[11] The Court also imposed a five-year term of supervised release on the § 924(c) counts, and concurrent three-year terms of supervised release on the other counts.

### E.  Post-Sentencing Procedural History

On December 27, 2016, Petitioner appealed his conviction and sentence to the Third Circuit Court of Appeals.  See United States v. Meehan, 741 F. App'x 864 (3d Cir. 2018).  While the appeal was pending, Petitioner obtained new counsel, Julie A. McGrain, Esquire, from the Federal Public Defenders Office.  (See Appellate Doc. 16-4428.)  Petitioner raised four (4) arguments on appeal.  Id. at 871.  First, he argued "that he was deprived of his right to the effective assistance of counsel by his [trial] counsel's failure to challenge Juror 44."  Id.  Second, he argued that his trial counsel had a conflict of interest that adversely affected their representation and resulted in a fundamentally unfair trial.  Specifically, Petitioner contended that trial counsel breached their duty of loyalty to him by divulging privileged communications to the District Court, which he claimed "interfered with his right to testify."  Id. at 872-73.  Third, he "argue[d] that the District Court plainly erred in not evaluating prosecution witness [Leah] Sabatino's competency after she admitted to using heroin the morning of her testimony."  Id. at 873.  Finally, he requested that the Third Circuit "remand for resentencing in light of Dean v. United States."[12]  Id. at 874.  Notably,

---

[12]  In Dean v. United States, the Supreme Court held that § 924(c) does not prevent a sentencing court from considering a mandatory minimum imposed when calculating a defendant's overall sentence.  581 U.S. 62, 71 (2017).  In that case, the district court sentenced Dean to the thirty-year mandatory minimum under § 924(c) plus forty (40) months on the other four (4) counts he was convicted of.  Id. at 66.  Dean argued that the district court erred in calculating his sentence by finding that it could not vary from the Guideline range based on his mandatory minimum sentence.  Id.  The Government argued that the district court must consider and calculate the terms of imprisonment for each individual offense.  Id. at 68.  The Supreme Court, however, disagreed and held that the statute "simply requires any mandatory minimum under § 924(c) to be imposed 'in addition to' the sentence for the predicate offense, and to run consecutively to that sentence.  Nothing in those requirements prevents a sentencing court from considering a mandatory minimum under § 924(c) when calculating an appropriate sentence for the predicate offense."  Id. at 71.

In Meehan, the Third Circuit found Dean inapposite, holding that:

and as discussed further below, Petitioner did not raise the ineffective assistance of trial counsel claims that were raised post-trial which this Court denied in its Opinion Denying Defendant's Motion for Judgment of Acquittal, or a New Trial, nor did he raise ineffective assistance of post-trial counsel in the appeal.  (Doc. No. 301.)

On July 11, 2018, the Third Circuit found all four of Petitioner's arguments to be meritless and affirmed this Court's conviction and sentence.  Id. at 874-75.

### F.  The § 2255 Petitions

On May 7, 2020, Petitioner filed the instant Petition to Vacate, Set Aside or Correct Sentence pursuant to 28 U.S.C. § 2255.  (Doc. No. 360.)

In his pro se Petition, he asserts twelve (12) claims for relief with various sub-claims:

- Claim 1:  Following United States v. Davis, 588 U.S. 445 (2019), attempted robbery (a violation of 18 U.S.C. §§ 1951(a) and 2), and attempted carjacking (a violation of 18 U.S.C. § 2119) can no longer be considered "crimes of violence" under 18 U.S.C. § 924(c).  (See id. at 8.)  Petitioner was convicted of attempted robbery on Count III and attempted carjacking on Count V.

- Claim 2: Section 924(c)(1) is "unconstitutionally vague" in requiring mandatory minimum, consecutive sentences for multiple counts.  (See id. at 12.)  Petitioner was convicted of using and carrying a firearm during a crime of violence on Counts II, IV and VI.

- Claim 3:  The Government violated due process by allowing Leah Sabatino to invoke her Fifth Amendment right not to testify at Petitioner's post-trial proceedings.  (See id. at 8-27.)

- Claim 4:  Agent Shute's expert testimony regarding cell site location and analysis violated due process.  (See id. at 23-28.)

---

[T]he District Court never stated or even suggested that it could not consider the fifty-seven year mandatory minimum sentence on the § 924(c) counts in sentencing Meehan on the predicate counts. Rather, the record reflects that the District Court considered both the length of the mandatory sentence and the other offenses in concluding that a total sentence at the low end of the Guidelines range was appropriate given the violent nature of Meehan's offenses and his extensive criminal history.

United States v. Meehan, 741 F. App'x 864, 875-76 (3d Cir. 2018).

- Claim 5:  The Government violated due process by changing its "theory of prosecution" regarding Petitioner's foot injury during post-trial proceedings.  (See id. at 40-42.)

- Claim 6:  Petitioner was deprived of his right to testify.  (See id. at 43-46.)

- Claim 7:  The failure to strike Juror 44 violated due process.  (See id. at 47-53.)

- Claim 8:  Trial counsel were ineffective for failing to introduce "height" evidence of the robbers (and related issues).  (See id. at 54-63.)

- Claim 9:  Trial counsel were ineffective for failing to investigate DNA evidence (and related issues).  (See id. at 64-66.)

- Claim 10:  The sufficiency of the evidence shows that Petitioner is entitled to relief and his trial, post-trial and appellate counsel were ineffective.  (See id. at 67-90.)

- Claim 11:  Petitioner's trial, post-trial, and appellate counsel were ineffective.  (See id. at 91-95); and

- Claim 12:  Petitioner's trial counsel were ineffective for failing to challenge statements in the Government's closing argument and the prosecutor made false statements and vouched for Officer James Boccalupo in her closing argument.  (See id. at 96.)

On June 23, 2020, Petitioner filed a Motion to Appoint the Federal Community Defender Office as counsel.  (Doc. No. 363.)  On June 24, 2020, the Court granted Petitioner's Motion and appointed the Federal Defenders Office for the purpose of seeking § 2255 relief pursuant to Johnson v. United States, 576 U.S. 591 (2015) and United States v. Davis, 585 U.S. 445 (2019).[13] (Doc. No. 366.)  The Defenders Office then filed a Supplemental § 2255 Petition on Meehan's behalf asserting a thirteenth (13th) claim, which in part reiterates Petitioner's pro se Claim One—that none of the predicate offenses for Petitioner's § 924(c) convictions (Hobbs Act Robbery,

---

[13]  In United States v. Johnson, the Supreme Court held that the "residual clause" of the Armed Career Criminal Act, 18 U.S.C. § 924(e)(2)(B)(ii), was unconstitutionally vague.  Johnson, 576 U.S. at 597.   In United States v. Davis, 588 U.S. 445 (2019), the Supreme Court expanded on Johnson and held that the "residual" clause in 18 U.S.C. § 924(c)(3)(B) is unconstitutionally vague.  Therefore, offenses that had previously been considered "crimes of violence" under the "residual" clause in § 924(c)(3)(B) are no longer "crimes of violence" and cannot serve as predicate offenses for a § 924(c)(1)(A) conviction.

attempted Hobbs Act Robbery, and attempted carjacking) are "crimes of violence" under § 924(c) following Davis and Johnson.  (See Doc. Nos. 363, 364, 366.)

On June 27, 2020, the Federal Community Defender also filed an Unopposed Motion to Stay Proceedings pending the Third Circuit's ruling on certain cases in light of Johnson and Davis. (Doc. No. 368.)  On August 3, 2020, this Court granted the Motion and stayed the proceedings. (Doc. No. 376.)

The Court stayed proceedings on the § 2255 petition pending Third Circuit decisions in United States v. Monroe, 837 F. App'x 898 (3d Cir. 2021) and United States v. Walker, No. 22-2505, 2022 WL 17984870 (3d Cir. 2022).  (See Doc. Nos. 368, 376.)  In Monroe, the Third Circuit ultimately held that Hobbs Act Robbery is a "crime of violence" under 18 U.S.C. § 924(c)'s "elements clause" and can support a defendant's conviction for using or carrying a firearm during and in relation to crime of violence.  See Monroe, 837 F. App'x at 901.  Next, the Court in Walker sought to apply that same principle to attempted Hobbs Act Robbery.  However, Walker was vacated pursuant to the United States Supreme Court's decision in United States v. Taylor, which held that attempted Hobbs Act Robbery does not qualify as a "crime of violence" under § 924(c)(3)(A) because no element of the offense requires proof that a defendant used, attempted to use, or threatened to use force.  596 U.S. 845, 860 (2022).

On January 12, 2023, the Government filed a Response in Opposition to Petitioner's § 2255 Petition, stating that Petitioner's convictions on Count IV and Count VI, in which the underlying "crime of violence" in the § 924(c)(1) convictions were attempted robbery and attempted carjacking, should be vacated because of Taylor, but argued that all other claims should be denied, including the challenge to the § 924(c)(1) conviction on Count II in which the underlying offense was the completed Hobbs Act Robbery of the Blue Grass Pharmacy.  (Doc. No. 405 at 70.)  On

May 19, 2023, Petitioner filed a Reply.  (Doc. No. 412).

On March 17, 2023, Petitioner's counsel filed a Motion to Stay requesting that the <u>Johnson</u> claims in Petitioner's § 2255 Petition be stayed pending this Court's decision on Petitioner's other <u>pro se</u> claims.  (Doc. No. 409.)  However, the Court will deny the stay and address the twelve (12) claims brought by Petitioner in his <u>pro se</u> Petition (Doc. No. 360), as well as the additional thirteenth (13th) claim asserted by Petitioner's counsel.  (Doc. No. 364.)

On October 16, 2024, Petitioner filed a "Memorandum of Law in Supplement to Defendant's 2255 and Final Response Motion."  (Doc. No. 417.)  In the Memorandum, Petitioner reiterates many arguments made in his outstanding § 2255 Petition, including the one about Leah Sabatino's alleged perjured testimony, Agent Shute's cell site location analysis and findings, John Andrews' and Chuck Rhoads' testimony, the Government changing their theory of prosecution regarding Petitioner's foot injury, and ineffective assistance of counsel by his trial attorneys David Shapiro, Esquire, and Michael Shapiro, Esquire.

For the reasons stated below, Petitioner's § 2255 Petitions (Doc. Nos. 360, 364) will be granted in part and denied in part.

## III.    STANDARD OF REVIEW

"Motions pursuant to 28 U.S.C. § 2255 are the presumptive means by which federal prisoners can challenge their convictions or sentences that are allegedly in violation of the Constitution."  <u>Okereke v. United States</u>, 307 F.3d 117, 120 (3d Cir. 2002).  Section 2255 permits a prisoner sentenced by a federal court to move the court that imposed the sentence to "vacate, set aside or correct the sentence" where:  (1) the sentence imposed was in violation of the Constitution or laws of the United States; (2) the court was without jurisdiction to impose such a sentence; (3) the sentence was in excess of the maximum authorized by law; or (4) the sentence was otherwise

subject to collateral attack. 28 U.S.C. § 2255(a). Section 2255(b) provides the procedure for reviewing the motion:

> Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto. If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.

28 U.S.C. § 2255(b).

The district court is given discretion in determining whether to hold an evidentiary hearing on a prisoner's petition under § 2255. See United States v. Vaughn, 704 F. App'x 207, 211 (3d Cir. 2017); Gov't of the Virgin Is. v. Forte, 865 F.2d 59, 62 (3d Cir. 1989). In exercising that discretion, the court must decide whether the petitioner's claims, if proven, would entitle him to relief and then consider whether an evidentiary hearing is needed to determine the truth of the allegations. See Gov't of the Virgin Is. v. Weatherwax, 20 F.3d 572, 574 (3d Cir. 1994). Accordingly, a district court may summarily dismiss a petition brought under § 2255 without a hearing where the "motion, files, and records, 'show conclusively that the movant is not entitled to relief.'" United States v. Nahodil, 36 F.3d 323, 326 (3d Cir. 1994) (quoting United States v. Day, 909 F.2d 39, 41–42 (3d Cir. 1992)); see also United States v. Arrington, 13 F.4th 331, 334 (3d Cir. 2021); Forte, 865 F.2d at 62.

Claims raised in a § 2255 Petition may be procedurally defaulted when the petitioner failed to raise them on direct appeal unless he can show "both (1) 'cause' excusing his double procedural default, and (2) 'actual prejudice' resulting from the errors of which he complains." United States v. Frady, 456 U.S. 152, 165 (1982); see also Bousley v. United States, 523 U.S. 614, 622 (1998)

("Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either cause and actual prejudice, or that he is actually innocent.") (internal citations omitted).  However, ineffective assistance of counsel claims, although not raised on direct appeal, may be raised in a collateral proceeding such as a habeas corpus petition.  Massaro v. United States, 538 U.S. 500, 504 (2003).

## IV.    ANALYSIS

### A.  Claims One, Two and Thirteen:  Validity of § 924(c) Charges in Counts II, IV and VI

In Claim One of Petitioner's pro se § 2255 Petition (Doc. No. 360) and Claim Thirteen of his counsel's Supplemental § 2255 Petition (Doc. No. 364), Petitioner argues that his three (3) convictions on Counts II, IV and VI for using and carrying a firearm during a "crime of violence," in violation of 18 U.S.C. § 924(c)(1)(A), should be vacated following United States Supreme Court decisions United States v. Davis, 588 U.S. 445 (2019) and United States v. Taylor, 596 U.S. 845 (2022).  The convictions are as follows with their underlying "crime of violence" in brackets:

- Count II:  Using and Carrying a Firearm During a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1) [Hobbs Act Robbery].

- Count IV:  Using and Carrying a Firearm During a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1) [Attempted Hobbs Act Robbery].

- Count VI:  Using and Carrying a Firearm During a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1) [Attempted Carjacking].

(See Doc. No. 311.)

18 U.S.C. § 924(c)(1)(A) makes it an offense for "any person who, during and in relation to any crime of violence. . . uses or carries a firearm."  Id.  But it requires as part of the offense a qualifying "crime of violence."  Id.  A "crime of violence" is defined in 18 U.S.C. § 924(c)(3) as an offense that is a felony and:

(A)   has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

(B)   that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 924(c)(3).

The first clause in subsection (A) is known as the "elements" clause, and the second clause in subsection (B) is known as the "residual" clause.  In Davis, the Court held that the residual clause in § 924(c)(3)(B) was unconstitutionally vague.  588 U.S. at 470.  Therefore, an offense that had previously been considered a "crime of violence" under the "residual" clause is no longer a "crime of violence" that can serve as a predicate offense for a § 924(c)(1)(A) conviction.  In Taylor, the Court had to interpret the scope of the "elements" clause and held that attempted Hobbs Act Robbery does not qualify as a crime of violence under the "elements" clause.  596 U.S. 845, 860 (2022).  Additionally, in United States v. Stoney, the Third Circuit Court of Appeals also considered the scope of the "elements" clause and held that a completed Hobbs Act Robbery qualifies as a "crime of violence" under the "elements" clause.  62 F.4th 108, 113 (3d Cir. 2023).

Here, in view of these appellate decisions, Petitioner argues that his convictions on Counts II, IV and VI should be vacated following Davis and Taylor.  These arguments on each Count will be addressed in turn.

### 1.  Count II:  Completed Hobbs Act Robbery

In his § 2255 Petition, Petitioner argues that his § 924(c)(1)(A) conviction on Count II should be vacated because his conviction on Count II does not satisfy § 924(c)(3)'s "crime of violence" predicate requirement.

The jury convicted Petitioner "[o]n Count Two of the indictment, charging using and carrying a firearm during a crime of violence on or about February 9, 2011."  (Doc. No. 163 at 1.)

The underlying "crime of violence" in Count II is the Count I charge of Hobbs Act Robbery of the Blue Grass Pharmacy, in violation of 18 U.S.C. § 1951(a). Petitioner was convicted of this offense charged in Count I. It was a completed robbery, not an attempted one. It qualifies as a "crime of violence" under the "elements" clause of § 924(c)(1)(A). See Stoney, 62 F.4th at 114 (holding a completed Hobbs Act Robbery is a crime of violence under the "elements" clause of § 924(c)(3)(A)); see also United States v. Robinson, 844 F.3d 137, 141 (3d Cir. 2016); United States v. Hughes, No. 22-1756, 2024 WL 4020205, at *2 (3d Cir. Sept. 3, 2024). For this reason, the Count II conviction will not be overturned.

### 2. Counts IV and VI: Attempted Robbery and Attempted Carjacking

"Yet not all Hobbs Act robberies are crimes of violence. Although completed robberies are, attempted robberies are not." Hughes, 2024 WL 4020205, at *2 (internal citations omitted). For this reason, Petitioner argues, and the Government concedes, that the convictions on Counts IV and VI must be vacated because attempted offenses cannot fall under the "residual" clause of § 924(c) which is unconstitutionally vague after Davis, and they also cannot fall under the "elements" clause of § 924(c) because attempt crimes no longer qualify as "crimes of violence" under the "elements" clause after Taylor.

Here, Count IV charges Petitioner with using and carrying a firearm during a "crime of violence." The underlying "crime of violence" is the attempted robbery of the CVS Pharmacy as charged in Count III. As mentioned above, under Taylor, attempted robbery does not qualify as a "crime of violence" under the "elements" clause of § 924(c)(3)(A). Accordingly, the conviction on Count IV must be vacated.

Similarly, the Count VI offense charges Petitioner with using and carrying a firearm during a "crime of violence." The "crime of violence" is the attempted carjacking conviction as charged

in Count V.  Although <u>Taylor</u> did not involve a crime of violence predicated on attempted carjacking, but attempted robbery, attempted carjacking would have the same fate as attempted Hobbs Act Robbery.  It cannot be used as a predicate "crime of violence" under the "elements" clause in § 924(c)(3)(A).  (<u>See</u> Doc. No. 405 at 22-23.)

The Government concedes that the convictions on Counts IV and VI, which rely on the underlying offenses of attempted robbery and attempted carjacking, should be vacated but argues that Petitioner's conviction in Count II, completed Hobbs Act robbery, remains unaffected by the change in law.  (Doc. No. 405 at 21.)  For the reasons stated above, the Court agrees with the Government's position.

Therefore, the conviction on Count II shall remain and the convictions on Counts IV and VI will be vacated.

### 3.  Claim Two Will Be Denied

In Petitioner's second claim, he argues that 18 U.S.C. § 924(c)(1) is unconstitutionally vague because his three § 924(c)(1)(A) convictions as charged in Counts II, IV and VI were "stacked" from a single course of criminal conduct.  (Doc. No. 360 at 12-16.)  He makes this stacking argument based on the provision in 18 U.S.C. § 924 (c)(1)(C)(i) for enhanced mandatory penalties for subsequent § 924(c)(1) convictions.  However, his three § 924(c) convictions were based on separate acts involving a firearm committed by Petitioner during the robbery of the Blue Grass Pharmacy, the attempted robbery of CVS, and the attempted carjacking after the CVS robbery of the car driven by Richard Smith.

In any event, Petitioner's convictions on Counts IV and VI are for conduct committed on the same day as the CVS robbery, and both convictions being vacated for the reasons noted above.  Petitioner's completed Hobbs Act Robbery conviction on Count II involves the Blue Grass

Pharmacy robbery and is the only § 924(c) conviction that remains.  As a result, the stacking provision of § 924(c)(1)(C) no longer applies in his case.  Therefore, Claim Two will be denied.

### B.  Meehan's Remining Claims Fail

In addition to Claims One, Two and Thirteen, Petitioner raises ten (10) other claims in his § 2255 Petition.  The Court will address each claim in turn, beginning with Claims Three, Six and Seven.

### 1.  Claims Three, Six, and Seven Are Without Merit Because They Were Previously Raised on Direct Appeal

Claims Three, Six and Seven asserted in Petitioner's § 2255 Petition are without merit because they were previously considered and rejected on direct appeal.  And "Section 2255 may not be employed to relitigate questions, on collateral attack, which were raised and rejected on direct appeal." United States v. Smith, 235 F. Supp. 2d 418, 428 (E.D. Pa. 2002) (citing United States v. DeRewal, 10 F.3d 100, 105 & n. 4 (3d Cir. 1993)).  But there are exceptions to this rule. As the court explained in Smith:

> The Third Circuit has identified four exceptions to this general rule: (1) newly discovered evidence that could not reasonably have been presented at the original trial; (2) a change in applicable law; (3) incompetent prior representation by counsel; or (4) other circumstances indicating that an accused did not receive full and fair consideration of his federal constitutional and statutory claims.

(Id.) (citing United States v. Palumbo, 608 F.2d 529, 533 (3d Cir. 1979)).  Here, Claims Three, Six and Seven were raised and decided against Petitioner on direct appeal, and no exception applies.  Claims Three, Six and Seven are discussed next.

### i.  Claim Three

In Claim Three, Petitioner argues that his girlfriend, Leah Sabatino, should have not been permitted to testify at trial because she was under the influence of heroin on the day she testified. (Doc. No. 360 at 24.)

However, the Third Circuit previously found that this Court did not err in allowing Leah Sabatino to testify:

> [T]he District Court committed no error in permitting Sabatino to testify. The Court was in the best position to observe her demeanor and to determine her ability to comprehend the questions posed to her. Furthermore, the record reflects she understood the questions posed and provided responsive answers. Moreover, the Court allowed defense counsel to probe Sabatino's drug addiction and recent heroin use at length, and there is no indication that counsel's questioning of Sabatino on this issue crowded out its ability to question her on other pertinent subjects. Finally, the Court specifically instructed the jury about the effect of drug use on a witness's credibility, stressing that drug use may impact a witness's "ability to perceive, remember or relate events in question." App. 556. Because the Federal Rules of Evidence did not require the District Court to do anything further—let alone, as Meehan contends, conduct a competency evaluation—Meehan's argument fails.

United States v. Meehan, 741 F. App'x 864, 874 (3d Cir. 2018).

Furthermore, Petitioner's assertion that the Government knew Sabatino was under the influence of drugs prior to her testimony was rejected by this Court in its Opinion Denying Defendant's Motion for Judgment of Acquittal.[14]  (Doc. No. 301 at 22-23.)  Similarly, Petitioner re-asserts his position that the Government never supplied the F.B.I. 302 report of interview from a May 2013 interview with Sabatino about her drug addiction.  Again, this Court found credible

---

[14]  See United States v. Meehan, No. CR 11-440-1, 2016 WL 4901128, at *12 (E.D. Pa. Sept. 14, 2016), aff'd, 741 F. App'x 864 (3d Cir. 2018).  This Court noted the following:

> Defendant and his trial counsel knew beforehand that Ms. Sabatino had a drug addiction.  They knew, therefore, that it was possible that Ms. Sabatino would use drugs before she testified.  The credible evidence shows that the Government was not privy to any confidential information not disclosed to the defense that Ms. Sabatino would use drugs before she testified.

(Doc. No. 301 at 22-23.)

Agent Coyle's testimony that defense counsel Michael Shapiro, Esquire, received the F.B.I. 302 report prior to trial and acknowledged receipt.[15]

Petitioner also argues for the first time that when the Court allowed Sabatino to invoke her Fifth Amendment right to remain silent at the post-trial hearing, an error was committed. He further argues for the first time that by her invoking Fifth Amendment privilege, the Government prevented her from testifying at the post-trial hearing, depriving Petitioner of his ability to prove that Sabatino gave false testimony at his trial. (Doc. No. 360 at 24.)

First, because these arguments were never raised on appeal or at the post-trial hearing, they are subject to plain error review. See e.g., United States v. Jones, 404 F. Supp. 529, 539 (E.D. Pa. 1975) ("[W]hen the Court permitted [the witness] to assert his Fifth Amendment right at the post trial hearing, no objection was made by the defendant. . . In the absence of plain error, matters not called to the attention of the trial judge cannot be subsequently raised in the post trial stages of the proceeding.") (internal citations omitted).

To show plain error, Petitioner must prove "(i) an error; (ii) that was plain; (iii) that prejudiced him; and (iv) that if uncorrected, would seriously affect the fairness, integrity, or public reputation of judicial proceedings." United States v. Lingala, 91 F.4th 685, 697 (3d Cir. 2024) (internal citations omitted).

Here, there was no error regarding Sabatino's invocation of her Fifth Amendment right, let alone any plain error. This Court previously determined at the post-trial hearing that Sabatino's

---

[15]  Meehan, 2016 WL 4901128, at *11. This Court previously found that:

> Agent Coyle testified that Mr. Shapiro received the F.B.I. 302 report prior to trial and acknowledged receipt. (Trans., 47:4-20, Apr. 19, 2016.) Agent Coyle's testimony was credible on this point.

(Doc. No. 301 at 20-21, n. 12.)

invocation was legitimate based on the proposed line of questioning of Sabatino by Petitioner's post-trial attorney.[16]  (See Doc. No. 279 at 4.)  Her drug use would inescapably lead to questions about her acquisition of the drugs.  This questioning therefore would expose her to criminal liability, albeit under Pennsylvania law, and her Fifth Amendment privilege was properly invoked.

Because the Court finds no error in allowing Sabatino to invoke her Fifth Amendment privilege, the other elements under the plain error standard also fail.  Moreover, there was no prejudice to Petitioner about Sabatino's drug use because it was heavily discussed at trial and Petitioner's trial counsel conducted extensive cross-examination on this issue.  Thus, there is no merit to Petitioner's contention that had defense counsel been able to question Sabatino at his post-trial hearing, he could have proved that Sabatino committed perjury, the Government knew of the perjury and the false testimony would have affected the verdict.

Accordingly, no error was committed in allowing Leah Sabatino to invoke her Fifth Amendment right and decline to testify at the post-trial hearing.  For this reason, Claim Three fails and no exceptions warrant reconsideration of any claim previously raised.

---

[16]  At the post-trial hearing, Leah Sabatino's attorney, Felicia Sarner, Esquire, informed the Court that if Sabatino were to testify again regarding her drug use it would expose her to criminal liability under Pennsylvania law.  (Doc. No. 279 at 3.)  Petitioner's post-trial counsel, J. Michael Farrell, Esquire, then stated that his intended line of questioning would "inescapabl[y] relate to Sabatino's drug use."  To this effect, the Court found:

> So, we have four defense counsel asking questions about the subject matter that you've mentioned, so in view of that and in view of what you just said, Mr. Farrell, the invocation of the Fifth Amendment would be legitimate. . . .

(Doc. No. 279 at 4-5.)

ii.    **Claim Six**

In Claim Six, Petitioner contends that his "constitutional right to testify. . . was taken from

him due to faulty reasoning of counsel."  (Doc. No. 360 at 43.)  Specifically, he alleges that his

trial counsel threatened to withdraw if Petitioner chose to testify because he had made prior

inconsistent statements.  (Id. at 44-46.)  In his Reply, Petitioner also avers that his trial counsel

divulged confidential attorney-client communications.  (See Doc. No. 412 at 22.)  These arguments

were raised and rejected on direct appeal.  Specifically, the Third Circuit found that:

> [C]ounsel did not paint Meehan in an unfair light to the District Court, label him a
> liar, or bar him from testifying.  Counsel simply informed the Court that Meehan's
> deposition testimony was inconsistent with other statements he had made, most
> specifically about persons who could provide an alibi, and whose identities are not
> privileged.  See Fed. R. Crim. P. 12.1(a).  Second, counsel reasonably advised
> Meehan not to testify, given his prior record and many inconsistent statements.
> Third, the District Court found that Meehan was apprised of his right to testify and
> knowingly and voluntarily waived that right, and we see no reason to disturb the
> Court's finding.

Meehan, 741 Fed. App'x at 873.

Petitioner also re-argues that his trial counsel were ineffective in their decision to advise

the jury of Defendant's history of prior bad acts.  Again, this Court has already overruled this claim

in its Opinion Denying Defendant's Motion for Judgment of Acquittal.[17]  (Doc. No. 301.)

---

[17]  See Meehan, 2016 WL 4901128, at *16.  The Court found that:

> David Shapiro, Esquire, testified at the post-trial hearing that the theory of defense
> was that Defendant was framed by the participants of the robberies, and that his
> prior criminal history provided a reason for why they chose to frame him, i.e., that
> he made for a believable "fall guy."  (See Doc. No. 243, Tr. 36:16-38:5, June 15,
> 2015.)  Trial counsel acknowledged that the strategy of introducing Defendant's
> prior bad acts was risky and unconventional.  David Shapiro, Esquire, stated, "This
> was a case that he – if he got – if Joe got convicted, he's getting a mandatory life
> sentence and that responsibility weighed on me greatly, and I had to find a way,
> anything.  Did I know it was risk laden?  Absolutely, but that's all I had."  (Doc.
> No. 276, Trans. 145:21-25, Apr. 6, 2016.)  He further testified that his strategy had

Similarly, Petitioner asserts his trial counsel lied when he stated that Petitioner never told counsel

about "Pooh" and "Vicki," his alibi witnesses who would have testified at trial.  This Court has

already addressed this assertion and did not find this argument compelling.[18]

---

to "embrace and account for [the] worst evidence in order come up with a theory that the jury is going to believe . . . [because] you can't run away from bad evidence." (Doc. No. 276, Trans. 140:11-17, Apr. 6, 2016.)  Trial counsel knew that the Government had substantial evidence against Defendant, and decided to embrace this approach to attempt to create reasonable doubt.  Under Strickland, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." 466 U.S. at 690.

David Shapiro further testified that Defendant approved their theory of defense before trial. (Doc. No. 277, Tr. 42:6-20, Apr. 7, 2016; Doc. No. 243, Tr. 37:17-38:5, June 15, 2015.)

 (Doc. No. 301 at 27.)

[18]  Meehan, 2016 WL 4901128, at *29:

Regarding "Pooh," Defendant testified at a civil deposition that he hurt his foot scrapping for metal with Pooh.  Michael Shapiro, Esquire, testified that they did not have enough resources for an investigator to go searching for someone referred to as "Pooh."  (Tr. 43:1-8, Apr. 18, 2016.)  Additionally, if Pooh testified, that would have opened the door to Defendant's inconsistent statements regarding his foot injury.  (Tr. 99:3-25, Apr. 18, 2016.)  Pooh and Vicki were not listed on the April 2013 witness list that Defendant wrote out.  (Ex. G387.)  The Shapiros also made a strategic decision not to call Joe Meehan, Jr. because they felt he was not credible.  (Id.)

Collectively, the decision of trial counsel to downplay the method of injury to the ankle considering the inconsistencies in Defendant's story, Heather Meehan's statement, and other evidence, was not unreasonable.  It was a result of sound trial strategy to avoid introduction of prior inconsistent statements, which defense counsel believed would harm Defendant at trial.

(Doc. No. 301 at 54.)

Accordingly, the arguments addressed in Claim Six were either already raised on direct appeal and denied or denied by this Court. No exceptions warrant reconsideration of these claims.[19]

### iii.    Claim Seven

In Claim Seven, Petitioner avers that his due process rights were violated when the trial judge failed to remove, and his trial counsel failed to strike, Juror 44, a juror he claims was biased. (Doc. No. 360 at 47.) This claim was raised and decided against Petitioner on direct appeal. In addressing this claim on appeal, the Third Circuit stated:

> Here, Meehan has not shown Juror 44 was actually biased against him. First, Juror 44 never expressed an impression of or partiality against Meehan himself. See Murphy, 421 U.S. at 803, 95 S.Ct. 2031. Second, the break-in at Juror 44's residence occurred six years before Meehan's trial and was sufficiently dissimilar to the pharmacy robberies at issue. Third, we agree with the District Court that it is not entirely clear in which direction Juror 44's alleged bias pointed. On the one hand, he expressed frustration at the police's lack of response to the burglary, which he theoretically could have held against law enforcement, and by extension, the Government. On the other hand, his answers showed that the break-in was a difficult experience and that he "felt like ... [his] privacy was invaded upon," but he acknowledged that this case, which involved armed pharmacy robberies, was "not exactly the same situation of what happened to [him]." App. 241. Finally, although Juror 44 at times wavered about whether his prior experience would impact him, the District Court conducted an extensive voir dire, reminded him of the importance of putting aside any lingering feelings he had from that experience, and received adequate assurances that he would consider the evidence and follow the Court's instructions. See Murphy, 421 U.S. at 802, 95 S.Ct. 2031; Patton, 467 U.S. at 1039, 104 S.Ct. 2885. In fact, the juror maintained that he understood the presumption of innocence and the Government's burden of proof and

---

[19] In construing Petitioner's pro se allegations liberally, he appears to argue that exceptions (3) incompetent representation and (4) other circumstances, allow him to raise this claim. Specifically, Petitioner argues that his post-trial and appellate counsel were ineffective "for not evaluating and arguing the facts as to why defendant's right to testify was taken." (Doc. No. 360 at 43.) However, this argument is meritless because "[c]ounsel is not ineffective for failing to raise meritless issues." United States v. Hilts, No. 11-cr-133, 2018 WL 1960948, at *2 (W.D. Pa. Apr. 26, 2018) (citing Parrish v. Fulcomer, 150 F.3d 326, 328 (3d Cir. 1998)). Here, both this Court and the Third Circuit found that Petitioner "was apprised of his right to testify and knowingly and voluntarily waived that right." Meehan, 741 F. App'x. at 873. Thus, this argument is without merit.

acknowledged that his oath required him to apply the Court's legal instructions to the facts of the case. His answers do not demonstrate that his experience would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. 412, 424, 105 S. Ct. 844, 83 L.Ed.2d 841 (1985) (internal quotation marks omitted). Thus, even if another counsel may have asked to excuse Juror 44 for cause, the record does not show that the juror's prior experience impaired his ability to decide the case based only on the facts and law. Therefore, because Meehan has not shown Juror 44 harbored an actual bias, his first claim for ineffective assistance of counsel fails.

Meehan, 741 F. App'x at 872.

Thus, Claim Seven was raised and rejected on direct appeal and no exception warrants reconsideration of this claim.

### 2. Claims Four and Five Are Procedurally Defaulted and Meritless

Claims Four and Five are procedurally defaulted because Petitioner failed to raise these issues in his appeal to the Third Circuit. See Reed v. Farley, 512 U.S. 339, 354 (1994) (quoting Wainwright v. Sykes, 433 U.S. 72, 84 (1977)) ("Where the petitioner —whether a state or federal prisoner—failed properly to raise his claim on direct review, the writ is available only if the petitioner establishes 'cause' for the waiver and shows 'actual prejudice resulting from the alleged. . . violation.'"). To establish cause, a petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the. . . procedural rule" or failure to raise the claim on appeal. Murray v. Carrier, 477 U.S. 478, 488 (1986). To show actual prejudice, Petitioner has the burden of proving "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." United States v. Frady, 456 U.S. 152, 170 (1982) (emphasis in original).

### i.    Claim Four

In Claim Four, Petitioner alleges that his due process rights were violated by "F.B.I. Agent Shute's false testimony."[20]  (Doc. No. 360 at 28.)  First, Petitioner argues Agent Shute's testimony at trial that the cell site location "sort of makes it like a fingerprint, it's unique and not duplicated anywhere else" was "false" and was "devastating to the [D]efendant."  (Id.)  Shute's testimony related to Government's Trial Exhibit 148, which was a Cellular Analysis Survey Team Presentation prepared by Agent Shute along with his analysis of Petitioner's and John Andrews' cellphone data from February 9, 2011 to February 16, 2011, covering the two days the robberies occurred.  (See Gov't Ex. 148.)  At trial, Agent Shute was asked:

> Q:  Can you explain to the jury the analysis that you conducted about records from
>       February 9th, 2011?
>
> A:  So what you see here is just a small snippet at the top of the call detail records,
>       as well as a map below.  This—if you take a look at the box in red, you see that

---

[20]  An overview of Agent Shute's trial and post-trial testimony can be found in this Court's prior Opinion Denying Defendant's Motion for Judgment of Acquittal.  Meehan, 2016 WL 4901128, at **24-26; (Doc. No. 301 at 45-47.)  Moreover, the law applicable to the contention that the Government used false testimony to secure a conviction— which did not occur here— is as follows:

> A "[government] may not knowingly use false evidence, including false testimony, to obtain a tainted conviction." See Napue v. Illinois, 360 U.S. 264, 269 (1959). It is "fundamentally unfair to the accused where 'the prosecution knew, or should have known, of the perjury.'"  See Lambert v. Blackwell, 387 F.3d 210, 242 (3d Cir. 2004) (quoting United States v. Agurs, 427 U.S. 97, 103 (1976)).  "The same is true when the [G]overnment, although not soliciting false evidence, allows it to go uncorrected when it appears at trial."  United States v. Biberfeld, 957 F.2d 98, 102 (3d Cir. 1992).  "[T]he conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."  Lambert, 387 F.3d at 242 (quoting Biberfeld, 957 F.2d at 102).

Chase v. Supt., State Corr. Inst. at Albion, No. 4:18-CV-101, 2021 WL 5044833 at *17 (M.D. Pa. Sept. 8, 2021), report and recommendation adopted sub nom., Chase v. SCI Albion, No. 4:18-CV-00101, 2021 WL 5039029 (M.D. Pa. Oct. 29, 2021).

it's February 9th, 2011, and the window of time there is 2:16, 2:52 and 2:53 p.m. Over to the right you'll notice where it says, "Originating cell site," it shows highlighted in green a set of numbers and that indicates the cell phone tower. The numeric sequence, alphanumeric sequence, NPA1318R, that is an internal number to Nextel, Sprint Nextel, that tells them the cell phone tower. But later on in that numeric sequence where you see 2640-21667, that is the numeric sequence that indicates the global cell ID. And what that means is, 2640 is the LAC, that grouping of towers, sort of like we're a group of people in this courtroom, but the 21667 is the actual cell site and sector. So that numeric sequence that you see there is not duplicated anywhere else in the cellular network. There could be a cell site 21667 somewhere else in the country, but not with the same location area code. So that number sort of makes it like a fingerprint, it's unique and not duplicated anywhere else.

(Doc. No. 182 at 112-113.)

The Court does not find Agent Shute's above testimony "false," nor does Petitioner explain how it is false, other than to say that Agent Shute "pinpointed" him and placed him in a "wedge" at each crime scene. (Doc. No. 360 at 29.) Shute's testimony described how a cellular network is located based on geographic location by a number sequence that represents the cell phone tower and cell site and sector. Agent Shute's reference to a "fingerprint" was to reinforce that this number sequence cannot be duplicated by another cell site in the same geographic area.

Petitioner also claims that Agent Shute contradicted himself numerous times between his trial and post-trial testimony. (Id. at 31-37.) For example, Petitioner references in part the testimony below from Agent Shute at trial:

Q:  Now, does the range of a tower, of a cellular tower, does that vary based on geographical location?

A:  It could. I mean, it has to do with where the other placement of the other towers are in the geographical area. And the signal of the tower has nothing to necessarily do with where the phone would select to that particular tower, meaning there's a certain attractiveness value that these cell towers emit and, you know, cell phone towers are made to have overlap so that they provide you with the best possible coverage.

(Doc. No. 182 at 115.) And at the post-trial hearing, Shute testified:

Q:  Now, can you describe briefly what a neighbor list is?

A:  Sure.  A neighbor list is a list of potential cell phone towers in the geographical area that the phone gets as a result of the list on the tower.  So the list of tower -- or the towers within a particular LAC that are networked together generate something called a base station allocation list.  It's just a list of other towers that are networked with that particular cell phone tower and sector.  As a result of interacting with the tower the phone generates a neighbor list and then does what I think I've said before in previous testimony which is stacking and racking.  It takes the towers and sectors and it stacks them in order and racks them in order of the best quality of signal.  Meaning the one at the best quality of signal would be at the top of the list and that becomes the serving cell site.

Q:  So a cell phone at any given time is— is interacting and finding which signal that it sees the clearest from the sector of the tower?

A:  That's correct.  It's surveying the cellular network.  And the cell phones are programmed to do this approximately every second or two depending upon the device and the network . . . .

    ***

Q:  Now, in your practical experience as you've discussed, you're finding fugitives or finding children, how often would you say that the tower with the clearest signal is also the closest tower for the originating cell site?

A:  Well, in this market here I've seen it probably well over 98, 90 percent of the time.

(Doc. No. 280 at 193-194, 196.)

Petitioner argues that this testimony is conflicting because Agent Shute first states that the signal of the tower has nothing to necessarily do with the phone that selects the tower, and then in the post-trial hearing he states the cellular networking looks for the best quality signal from the towers.  However, Petitioner misinterprets the testimony.  At trial, Agent Shute testified that in the geographical area of Philadelphia where the robberies occurred, there are many cellphone towers and increased coverage so that the cellphones do not need to use cell sites other than the one they are closest to.  (See Doc. No. 182 at 125-26.)  Shute stated that between Van Kirk Street, where Petitioner claimed he was during the CVS robbery, and the location of his cellphone, there were

at least forty (40) cell site sectors in between the two areas. (Id.) Thus, Petitioner's cellphone could not have been pinging off the cell sites described if it was located on Van Kirk Street. (Id.) This is consistent with Shute's post-trial testimony where he affirms that the tower with the clearest signal is the closest tower for the originating cell site approximately 90% to 98% of the time. (Doc. No. 280 at 196.)

Petitioner asserts as the next contradiction that Agent Shute's "green pie shaped wedges" on Government's Exhibit 148 maps are "misleading, inaccurate, and false" because after listening to the testimony of Petitioner's expert, Joseph Kennedy, at the post-trial hearing, Agent Shute contradicted his trial testimony in stating that the perfect circular path was not where the radio frequency ends and was not intended to be the truest depiction of a cell site. (Doc. No. 360 at 32.) In this regard, Agent Shute testified at trial regarding Exhibit 148:

> A:  . . . So just the round circle is just a way to utilize a radius tool inside of the mapping program. The wedge that you see is the cell site and the sector. If you notice consistently over here on this column under "Originating cell site" that's in green, you see the number 21667 show up three different times on all three calls. And so what that represents is that represents, like I said, a cell site and a sector. Well, what we have here and highlighted in green is that depiction of 21667. As you notice from the balloon that's popped up it says, "Azimuth of 270." An azimuth is basically the direction of the cellular antenna. . . It's basically the direction at which the antenna is pointing the cellular resources.
>
> Q:  So based on the call detail from this, based on the call detail records, did you capture information about where this cell phone was making calls between 2:16, approximately 2:16 p.m., through 2:53 p.m. on that day?
>
> A:  Yes, it's approximately in that green highlighted area. And it was just of note to me through the investigation that the Bluegrass Pharmacy was located in that same geographical region, as well as the residence of Jonathan Andrews.

(Doc. No. 182 at 113-114.) Then, Agent Shute testified at the post-trial hearing:

> Q:  Okay. So in any of the wedges that you depict on your slides, can you please describe for the Court what they mean?

A:    Sure. In this particular slide, at the time I was using a program known as Microsoft MapPoint and one of the tools that they had within the program was a radius tool, and what we have here depicted is a radius from the base of the tower that goes out approximately one mile.

And what you have here is a—a pie shaped wedge that appears to be in a perfect concentric circular pattern.  Now, what that represents, Your Honor, is not (a), where the radio frequency ends and it's not (b), intended to be the truest depiction of a cell site.

In essence, based on my training and experience having conducted what's called drive testing of cellular networks, you know, I'm very familiar with the fact that a true depiction of a cell site, it looks very much like an amoeba.

It looks sort of like a—not a rounded sort of perfect concentric circle. But what this is, what I've depicted here is actually way more gracious to the defense than what would actually be in the real world.

And what I mean by that is this is an approximate area that if I was looking for that phone right now in the real world, it allocates a geographical area based on my training and experience of where I would look for the phone so that I would absolutely positively not miss it, meaning I was looking for the phone right now.

So this approximation is my interpretation of where I believe the phone was in the furthest possible distance.  In reality, the pattern of this and when I've conducted drive tests of cell sites, this is what I would call the theoretical area.

The actual area is actually much tighter and smaller than what you see here. So, this is actually way more generous to the defense than what it normally—what it normally really looks like in the real world.

(Doc. No. 280 at 171-72.)

Here, again, the Court finds Agent Shute's testimony was consistent and credible both during trial and at the post-trial hearing.  And as previously held in the Opinion Denying Defendant's Motion for Judgment of Acquittal:

Agent Shute was a founding member of CAST [Cellular Analysis Survey Team], which provides historical cell site analysis in investigations, case consultation, and training to law enforcement.  He assists with active ongoing cases involving violent crimes and missing children. (Doc. No. 280, Tr. 142:2- 23, Apr. 18, 2016.)  He also

has received extensive training from major cell phone companies almost every year for the past six years, and teaches courses on historical cell site analysis. (Id. at 145:6-149:25.) He has been accepted as an expert over a hundred times, and CAST Agents in general have qualified as experts over 900 times. (Id. at 142:25-143:5.) At the time Agent Shute testified in 2013, he had been accepted as an expert in cell phone location over 50 times and testified at criminal trials. (Doc. No. 233 at 28.) See also United States v. Allums, 2009 WL 806748 (D. Utah 2009) (holding Agent Shute was qualified as an expert in historical cell site analysis and his methodology was reliable); United States v. Machado-Erazo, 950 F. Supp. 2d 49, 53 n.4, 56 (D.D.C. 2013) (citation omitted) (holding that a member of the CAST team had qualifications which were "robust and establish[ed] him as well educated, well practiced, and well trained in the proffered area of expertise," and that "the use of cell phone location records to determine the general location of a cell phone has been widely accepted by numerous federal courts.").

(Doc. No. 301 at 45, n.16).

Next, Petitioner claims that his two trial counsel were ineffective because they failed to hire an expert to rebut the Agent Shute's testimony at trial. (Id.) As previously noted above, this Court held post-trial evidentiary hearings to examine Petitioner's ineffective assistance of trial counsel claims. Defendant's trial counsel, David Shapiro, Esquire, and Michael Shapiro, Esquire, testified at the hearing. After the hearing, the Court found that "Defendant's trial counsel made a strategic decision not to call an expert to testify at trial regarding cell site location evidence, and Defendant was not prejudiced by that decision." (See Doc. No. 301 at 47.) Petitioner is referring to David and Michael Shapiro's post-trial testimony about the decision not to obtain a phone expert. Again, this Court found that trial counsel were not ineffective for failing to retain an expert:

In fact, Michael Shapiro, Esquire, testified at the post-trial hearing that he and co-counsel David Shapiro "discussed the possibility of an expert, and I know [David Shapiro] discussed it with Joe, and we discussed it on several occasions. And we thought strategically that it was – that we could discount [Agent Shute's] testimony on cross-examination, and that an expert would probably only serve to confuse the jury." (Doc. No. 280, Tr. 50:1-9, Apr. 18, 2016.)

(Doc. No. 301 at 47-48.)

Petitioner did not raise this issue in his appeal to the Third Circuit. And given the overwhelming evidence of Petitioner's guilt, there was no prejudice in failing to present a rebuttal cell site expert. Moreover, the decision by counsel not to do so was a strategic one that counsel discussed with Petitioner. Thus, there is no need to revisit this argument.

Finally, as noted, the issues discussed above regarding Agent Shute's testimony were not raised on appeal and thus are procedurally defaulted. Accordingly, Claim Four is without merit.

### ii.   Claim Five

In Claim Five, Petitioner alleges that the "trial judge violated Defendant's right to a fair trial by his acquiescence of the Government's change in [t]heory of [p]rosecution during [p]ost-[t]rial hearings." (Doc. No. 360 at 40.) He makes this allegation regarding the injury to his foot after the attempted robbery of the CVS Pharmacy on February 14, 2011. Specifically, he claims that although this Court did not allow the Government to change its theory of prosecution during post-trial hearings, it did so in its Opinion Denying Acquittal and New Trial. (See Doc. No. 360 at 42.) This claim is meritless.

Petitioner's "change in theory" allegation involves whether Petitioner was shot in the foot or whether he injured his foot while jumping over a fence to escape the CVS robbery. Petitioner maintains that the Government's theory at trial was that Petitioner's foot injury was from a gunshot wound, and then, at the post-trial hearings, the Government claimed his foot injury was caused by Petitioner jumping over the fence. Insofar as the trial evidence is concerned, Petitioner points to the Government's opening statement (Doc. No. 179 at 24-25), John Andrews' testimony (Doc. No. 180 at 143-44), Chuck Rhoads' testimony (Doc. No 181 at 163, 166), and the Government's closing statement to show that the Government's theory at trial was that Defendant's foot injury was solely related to a gunshot wound. (See Doc. No. 194 at 124-126, 129.)

41

Petitioner claims the Government changed its theory on the source of the foot injury after Petitioner's medical expert, Dr. Steven Cancell, testified about Petitioner's injury at the post-trial hearing. (Doc. No. 360 at 42.) Specifically, Dr. Cancell testified that Petitioner's foot injury was "[o]ne hundred percent inconsistent with the impact of any high energy projectile" (a bullet). (Doc. No. 277 at 26.)

Regarding the Government's alleged change of theory, "[t]he Fifth Amendment requires that a defendant be tried only for crimes for which he has been indicted." United States v. Scarfo, 41 F.4th 136, 193 (3d Cir. 2022) (citing Stirone v. United States, 361 U.S. 212, 217 (1960)). A defendant can claim the government changed their theory of prosecution either through constructive amendment of the Indictment or a variance. United States v. Whoolery, 579 F. App'x 78, 80-81 (3d. Cir. 2014).

"An indictment is constructively amended when, in the absence of a formal amendment, the evidence and jury instructions at trial modify essential terms of the charged offense in such a way that there is a substantial likelihood that the jury may have convicted the defendant for an offense differing from the offense in the indictment returned by the grand jury actually charged." United States v. Vosburgh, 602 F.3d 512, 532 (3d Cir. 2010) (quoting United States v. Daraio, 445 F.3d 253, 259-60 (3d Cir.2006)). "The key inquiry is whether the defendant was convicted of the same conduct for which he was indicted." Daraio, 445 F.3d at 260 (quoting United States v. Robles-Vertiz, 155 F.3d 725, 729 (5th Cir. 1998)).

Alternatively, "[t]here is a variance 'where the charging terms [of the indictment] are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment.'" Daraio, 445 F.3d at 261 (quoting Castro, 776 F.2d at 1121). A defendant alleging a variance also must establish prejudice from the variance. See id. at 262. Therefore, "[t]o

demonstrate prejudice from a variance, a defendant 'must show (1) that there was a variance between the indictment and the proof adduced at trial and (2) that the variance prejudiced some substantial right.'" Id. (quoting United States v. Balter, 91 F.3d 427, 441 (3d Cir. 1996)). As the court in Daraio explained:

> A variance does not prejudice a defendant's substantial rights (1) if the indictment sufficiently informs the defendant of the charges against him so that he may prepare his defense and not be misled or surprised at trial, [or] (2) if the variance is not such that it will present a danger that the defendant may be prosecuted a second time for the same offense.

Id. (quoting United States v. Schoenhut, 576 F.2d 1010, 1021-22 (3d Cir. 1978)). The Third Circuit has held that a variance has three purposes:

> First, it protects a defendant's right "not to be tried en masse for the conglomeration of distinct and separate offenses committed by others." Id. (quoting United States v. Schur, 775 F.2d 549, 553 (3d Cir. 1985)). In that way, it seeks to prevent a jury from "transfer[ring] guilt from one alleged co-schemer to another" or permitting evidence of other defendants' actions in a separate conspiracy to spill over into its consideration of the evidence against the defendant. Id. (cleaned up). Second, "the rule ensures that a defendant has adequate notice of the charges being brought against him." Id. (citing Perez, 280 F.3d at 345). Third, it "helps to minimize the danger that the defendant may be prosecuted a second time for the same offense," based on "a principle akin to double jeopardy." Id. (quoting Schurr, 775 F.2d at 554).

United States v. Sherman, No. 23-2996, 2025 WL 209879, at *5 (3d Cir. 2025).

At trial, the Government did present evidence showing that Petitioner may have been struck in the foot by a bullet while escaping from the CVS robbery. However, there was conflicting testimony as to whether his foot injuries resulted from the bullet or whether it resulted from him jumping over the fence fleeing from the police after the CVS robbery. For example, the Government's opening statement merely stated that Petitioner was "hit in the sneaker" by a bullet; there is no mention of a foot injury resulting from a gunshot wound. (Doc. No. 179 at 24-25.) On the other hand, co-Defendant John Andrews testified at trial not only that Petitioner told him he

was shot in the sneaker and his foot was broken, but also that the bullet only reached the sole of his shoe.  "It never went all the way through the sneaker."  (Doc. No. 180 at 144.)  Similarly, Chuck Rhoads testified at trial that Petitioner also told him he was shot in the foot and showed him the sneaker, but stated the sneaker was intact.  (See Doc. No. 181 at 166.)  Rhoads further testified that Petitioner told him that he fell from the fence trying to flee the CVS.  (Id.)

But most importantly, the evidence presented at trial, much of which is described above, was consistent with the essential elements of the charges for which the Petitioner was indicted, including robbery, attempted robbery, attempted carjacking, using and carrying a firearm during a crime of violence (Hobbs Act Robbery), and possession of a firearm by a convicted felon.  And, as the Government correctly indicates, Petitioner's foot injury is not mentioned in either his initial Indictment, Superseding Indictment, or Second Superseding Indictment.  (See Doc. Nos. 1, 16, 28.)  For this reason, Petitioner's foot injury was not an essential part of the Government's case, and as discussed supra, the jury heard conflicting testimony as to the cause of the foot injury. Ultimately, Petitioner was convicted by the jury for the same conduct he was indicted for, with ample physical evidence and corroborating testimony placing him at the robberies as one of the perpetrators.  Thus, no constructive amendment has occurred.  See Vosburgh, 602 F.3d at 531. Nor was there a variance, as the evidence at trial was not materially different from what was alleged in the Indictment.  Id.

In addition, the Government avers that Petitioner cannot prove either a constructive amendment or a variance because these principles only apply to a change in theory at trial, not in post-trial hearings, and the Court agrees.  (Doc. No. 405 at 43-44.)

Moreover, Petitioner claims that the Court enjoined the Government from alleging a new theory as to how Petitioner's foot was injured during the post-trial hearing, but then allowed such

in its Opinion Denying Petitioner's Motion for Judgment of Acquittal.  Specifically, he points to

an exchange between Petitioner's post-trial counsel J. Michael Farrell, Esquire, witness David

Shapiro, Esquire, Petitioner's trial counsel, Government attorney Alicia Freind, Esquire, and the

Court.  This exchange came after Dr. Cancell testified at the post-trial hearing, and while

Petitioner's former trial counsel David Shapiro, Esquire, was testifying:

| | |
|---|---|
| J. MICHAEL FARRELL: | Now Dr. Cancell, what about the surgeon who could testify that the Government's theory as to the mechanism of injury was a hundred percent inconsistent with the injury that he observed and operated him for, would that have been a credible witness? |
| DAVID SHAPIRO: | In my view, it wasn't, but— |
| MS. FREIND: | And objection to his recharacterization of the testimony where the Doctor also said that it could have been caused by jumping off a high fence like after the robbery. |
| THE COURT: | Wait a minute. You can['t] argue that post trial. |
| MS. FREIND: | Well, Mr. Shapiro— |
| THE COURT: | Can you answer the question? I'll overrule the objection. |
| DAVID SHAPIRO: | In my mind, in my mind, I did not think that Cancell was a good witness, a credible witness to maybe help get an acquittal in this case. If I was wrong, I was wrong. I made a strategic decision. That was the decision I made. |

(Doc. No. 277 at 109-10.)

Here, no error was committed by the Court.  As noted above, there was conflicting

testimony at trial as to how Petitioner injured his foot after the CVS robbery.  The Government

presented evidence that Petitioner was hit in the sneaker by the bullet but did not suggest that his

foot injury was solely caused by the bullet.  There was evidence presented that Petitioner jumped

over the fence attempting to flee the CVS, and that he told his friends the bullet never went fully

through his sneaker.  The evidence therefore provided another explanation of how Petitioner

injured his foot.  The above exchange during the post-trial hearing represents the Court overruling

the Government's objection that Petitioner's post-trial attorney recharacterized Dr. Cancell's

testimony.

Finally, Petitioner contends once again that his trial counsel were ineffective for failing to

call Dr. Cancell at trial.  This matter was raised at the post-trial evidentiary hearing.  In this regard,

this Court has already determined that trial counsel were not ineffective in failing to use Dr.

Cancell at trial:

> Given the evidence in this case, trial counsel was not ineffective in failing to retain
> and call Dr. Cancell to testify at trial.  Trial counsel made sound strategic decisions
> in this regard.
>
> Counsel knew that if they presented evidence regarding how Defendant injured his
> foot, the Government would have introduced rebuttal evidence on Defendant's
> inconsistent statements about how he injured his foot.  This would have included
> the fact that he originally told Agent Coyle he injured his foot while working, but
> then during a civil deposition admitted he lied to Agent Coyle and actually hurt it
> when he was burglarizing buildings for scrap metal.  (Doc. No. 126; Doc. No. 233,
> Ex. F at 148-49.)  Therefore, David Shapiro, Esquire, stated that he made a
> conscious decision to "stay[] away from that issue" as part of the defense.  (Tr.
> 26:12-24, Apr. 6, 2016.)  In addition, he did not believe that Mr. Meehan having
> been shot in the foot was a central part of the Government's case (id.), and testified
> that he did not believe there were any credible witnesses available to testify that
> Defendant's injury predated the robbery. (Tr. 109:3-22, Apr. 7, 2016.)

Meehan, 2016 WL 4901128, at *27; (Doc. No. 301 at 51-52.)

In his Supplement to the § 2255 Petition, Petitioner admits that he gave "separate

statements" as to the cause of his foot injury.  (Doc. No. 417 at 16.)  He agrees that he told the

F.B.I. he hurt his foot at work by falling off a ladder.  (Id.)  Then, at his civil deposition, he told

his attorney he rolled his ankle coming over a fence.  (Id. at 17.)  Petitioner's own admissions show

conflicting testimony that supports his attorneys' decision to avoid presenting evidence that could lead to an unfavorable cross-examination about how he injured his foot.

In sum, while Petitioner claims his post-trial and appellate counsel were also ineffective for not pursuing this change in theory of prosecution claim, "[c]ounsel is not ineffective for failing to raise meritless issues."  United States v. Hilts, No. 11-133, 2018 WL 1960948, at *2 (W.D. Pa. Apr. 26, 2018) (citing Parrish v. Fulcomer, 150 F.3d 326, 328 (3d Cir. 1998)).  Therefore, Claim Five also fails.

### 3.  Petitioner's Ineffective Assistance of Counsel Claims Are Meritless

In Claims Eight, Nine, Ten, Eleven, and Twelve, as well in arguments already dealt with above, Petitioner asserts various ineffective assistance of counsel claims against his trial, post-trial and appellate counsel.

To evaluate claims of ineffective assistance of counsel in violation of the Sixth Amendment, the court must apply the two-prong test articulated by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984).  Under this standard, counsel is presumed to have been effective unless a defendant can show that:  (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defendant.  Id. at 687.

Under the first prong, a defendant must show that counsel fell short of "reasonably effective assistance" by overcoming the presumption that counsel's decisions were "sound trial strategy." Id. at 687, 689.  The appropriate measure of attorney performance is reasonableness under prevailing professional norms.  See id. at 688.  There is a strong presumption that counsel rendered adequate assistance and that all significant decisions were made while exercising reasonable professional judgment.  Id. at 689.

If a defendant meets his burden on the first prong, the defendant must then show that his "counsel's errors were so serious as to deprive the defendant of a fair trial. . . ." Id. at 687.  Under this second prong, a defendant must be able to show that his counsel's deficient performance caused prejudice to his defense.  Id. at 692.  But as the Supreme Court noted:

> Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction and adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.

Id. at 689.  Moreover, the Strickland standard applies to Petitioner's trial, post-trial, and appellate counsel.  See United States v. Cross, 308 F.3d 308, 315 (3d Cir. 2002).

As noted above, Petitioner filed a Motion for Judgment of Acquittal asserting ineffective assistance of trial counsel.  (See Doc. Nos. 196, 204.)  In response to this Motion, and after trial counsels' (the Shapiros) Motion to Withdraw as Counsel was granted (Doc. Nos. 218, 219), and post-trial attorney J. Michael Farrell, Esquire, was appointed to represent Petitioner, post-trial evidentiary hearings were held on June 15, 2015, and April 6, April 7, April 18 and April 19, 2016 regarding Petitioner's claims of ineffective assistance of trial counsel.  (Doc. Nos. 243, 275-281.)  On September 14, 2016, the Court issued an Opinion and Order denying Petitioner's Motion for Judgment of Acquittal or for a New Trial finding, in relevant part, that Petitioner's ineffective assistance of trial counsel claims were meritless.  (See generally Doc. No. 301.)

Thus, this Court has already addressed many of Petitioner's claims of ineffective assistance of his trial counsel in its prior Opinion.  (See generally Doc. No. 301.)  For example, this Court found that Petitioner did not overcome the strong presumption that his trial counsel exercised reasonable professional judgment in framing its defense theory and in presenting it to the jury. (See id. at 31 ("It is clear from David Shapiro's testimony [at the post-trial hearing] that trial

counsel considered the evidence against Defendant in this case and put substantial effort into choosing a sound trial strategy.").)  Further, as mentioned above, this Court also found that trial counsel were not ineffective for failing to retain an expert witness to testify at trial about the effects of drug use to refute Leah Sabatino's testimony:

> Trial counsel for Defendant made a strategic decision not to call an expert to testify on the effects of drug use.  Rather, he reasonably believed that it was in the best interest of Defendant to extensively cross-examine Ms. Sabatino to support the defense theory that she was fabricating the story to make a better deal with the Government, and to allow the jury to hear about the effects of prolonged drug use on her memory. This trial strategy of cross-examining Ms. Sabatino extensively, instead of calling an expert witness, was reasonable and did not prejudice Defendant.

(Id. at 38.)  Next, trial counsel were found not ineffective for failing to retain a cell site expert to refute Agent Shute's testimony.  (See id. at 47-49 ("Given Agent's Shute's testimony on direct and cross-examination, Defendant's trial counsel made a reasonable strategic decision not to retain an expert on cell site analysis.").)  And the same principle applied to Petitioner's meritless claim that trial counsel were ineffective for not calling an expert regarding Petitioner's foot injury.  (See Doc. No. 301 at 49-52.)  Lastly, the Court found that trial counsel were not ineffective for failing to excuse Juror 44.  (See Doc. No. 301 at 55-68. ("With the active involvement of Defendant, who was present when [Juror 44] testified, they chose to permit him to remain on the jury panel. Defense counsels' decision was a strategic one which is entitled to great deference.").)  Together, this Court found the following regarding trial counsel's efforts:

> In light of the overwhelming evidence establishing guilt, Defendant has not met his burden of showing that defense counsels' decisions fell below an objective standard of reasonableness, nor has Defendant shown a reasonable probability that, but for the trial counsel's contested decisions, the outcome of the trial would have been different.  In short, Defendant has not shown under Strickland that trial counsels' decisions prejudiced him at trial.  See Padilla v. Kentucky, 559 U.S. 356, 371 (2010) ("Surmounting Strickland's high bar is never an easy task."); Strickland, 466 U.S. at 693 ("Attorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial."); see also United

States v. Shabazz, No. CIV. A. 10-3882, 2011 WL 2453496, at *14 (E.D. Pa. June 20, 2011) (where evidence of petitioner's guilt was overwhelming, the court held that "[e]ven if Petitioner's claims of unprofessional conduct were arguable, which they are not, Petitioner cannot establish the severe prejudice required by the second prong of Strickland.")

(Doc. No. 301 at 75-76.)

As mentioned above, Petitioner filed a Notice of Appeal of this Court's Opinion Denying Defendant's Motion for Judgment of Acquittal, which was affirmed by the Third Circuit.  (See Doc. Nos. 301, 313, 338.)  In his Appeal, where he was represented by a new attorney, Julia McGrain, Esquire, Petitioner only argued the ineffective assistance of his trial counsel on two issues.  He did not argue the ineffective assistance of his post-trial counsel.  The only ineffective assistance of counsel claims he made on appeal related to his trial counsel:  (1) failing to exercise a peremptory challenge to exclude Juror 44 from the jury; and (2) failing to adequately advise him of his right to testify.  The Third Circuit held that both claims were without merit.  See Meehan, 741 F. App'x at 867-70.

In this § 2255 Petition, Petitioner raises ineffective of assistance claims again, arguing in Claims Four, Five, Six, Seven, Eight, Nine, Ten and Eleven that his trial, post-trial, and appellate counsel were ineffective.  Sometimes he argues that his trial counsel were ineffective—sometimes his post-trial counsel—sometimes he conflates all three counsel as being ineffective.  It is difficult at times to tie the claims of ineffective assistance of counsel to each issue Petitioner raises, but the Court has done so when it appears appropriate.[21]  These new claims are meritless for many of the same reasons discussed above and in this Court's prior Opinion.  (See generally Doc. No. 301.)  In

---

[21]    In his Petition, Petitioner vaguely alleges claims of ineffective assistance of counsel.  The Court has done its best to decipher when the ineffective assistance of counsel claims are raised with specific allegations or just generally stated without being tied to specific facts of this case.

addition, the trial evidence showing Petitioner's guilt was overwhelming. Therefore, there was no prejudice to Petitioner on the claims he makes.

Moreover, regarding his new claims of ineffective assistance of counsel, Petitioner is not entitled to an evidentiary hearing on these issues. Section 2255(b) requires courts to hold an evidentiary hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief . . . ." 28 U.S.C.A. § 2255. Specifically, when evaluating ineffective assistance of counsel claims under Strickland, the Court "must determine whether the nonfrivolous facts conclusively fail to show ineffective assistance of counsel." United States v. Valenta, No. 20-1673, 2022 WL 265876, at *2 (3d Cir. Jan. 28, 2022) (internal citations omitted). If the facts do not conclusively fail the Strickland test, then a hearing must be held. Id. (quoting United States v. Dawson, 857 F.2d 923, 928 (3d Cir. 1988)). As discussed further below, Petitioner's claims of ineffective assistance by his trial, post-trial and appellate counsel are without merit and the facts and record of this case conclusively show that he is entitled to no relief. Therefore, no further evidentiary hearing is warranted. The ineffective assistance of counsel arguments in Claims Four, Five, Six and Seven have already been discussed above and were found unavailing. The Claims made in Claims Eight, Nine, Ten and Eleven will next be discussed seriatim.

### i.    Claim Eight

In Claim Eight, Petitioner makes various claims regarding "height" evidence produced at trial and at post-trial hearings. First, he argues that his trial counsel were ineffective for failing to use evidence of the robbers' heights described by a witness in 911 tapes and for failing to use certain witness statements at trial. (See Doc. No. 360 at 57; Doc. No. 357-8.) He also avers that

his post-trial and appellate counsel were ineffective in failing to raise these issues post-trial and on

appeal.  (Id.)  He contends the following evidence was never produced at trial:

- A statement to the police by CVS pharmacist Dante Lackman stating that the second robber, who was claimed to be Petitioner, was 5'6" to 5'7" tall, white male with "large nose."  He further stated that the first robber, claimed to be John Andrews, was 5'5" to 5'6" inches tall, thus showing that the robbers were similar in height.  (Doc. Nos. 360 at 57; 357-7, D-10.)

- The statement of Officer James Snyder, Philadelphia Police Department.  He identified the suspect (Petitioner) as being 6 feet tall.  (Doc. Nos. 360 at 57; Doc. No. 357-7, D-11.)

- The statement of Officer Dimitrios Loizos, Philadelphia Police Department.  He responded to the CVS on the date of the robbery and that said the robber with the gun (Petitioner) was 5'5" to 5'8".  He also stated that he was unsure about the second robber's height (John Andrews), but it was "close to the other guy."  (Doc. Nos. 360 at 57; 357-8, D-12).

- The statement of Officer James Boccalupo, another responding officer to the CVS on the date of the robbery.  He stated that the first robber jumping over the fence (Petitioner) fired several shots and was over 6 feet tall.  (Doc. Nos. 360 at 57; Doc. No. 357-8 at D-13.)

(Doc. No. 360 at 57-63.)  Petitioner also references 911 tapes that he alleges the Government

"intentionally and methodically" omitted parts of the recordings that stated the shooter was six (6)

feet tall wearing a black ski mask.  (Id. at 56-57.)  From this evidence, Petitioner concludes that,

had his trial counsel introduced all this evidence, it would prove that he did not commit the two-

armed robberies because he is only 5'6" and John Andrews is 6 feet tall, and therefore they are not

close in height.  He also maintains this evidence would prove that John Andrews was the one who

fired a gun at the police during the CVS robbery.

Petitioner's argument, however, fails on the first Strickland prong because, contrary to his

assertions, Petitioner's trial counsel introduced "height" evidence at trial.  For example,

Petitioner's trial counsel cross-examined both Jonathan Andrews, the testifying co-Defendant, and

Agent Coyle about whether the other robber (Petitioner) could have been Andrews's nephew

Brian, whom they argued was close in height to Petitioner.  (See, e.g., Doc. No. 181 at 52; Doc. No. 184 at 58-60.)  During the cross-examination of John Andrews by defense counsel, David Shapiro, Esquire, asked whether the robber in the tan mask could have been Brian, and not Petitioner:

> Q:  In connection with the CVS robbery. . . How tall is Brian?
>
> A:  About five seven, five eight.
>
> Q:  About the same size as Joe?
>
> A:  Yeah.
>
> ***
>
> Q:  Can we agree, can we agree, that if they were wearing masks they would be hard to tell apart?
>
> ***
>
> A:  Possible.

(Doc. No. 181 at 53.)

And when Petitioner's trial counsel cross-examined Agent Coyle regarding his knowledge of Andrews's cousin Brian, he testified:

> Q:  Did you learn for the first time during the trial that two weeks or so after Andrews was arrested for the CVS robbery his cousin, Brian, was also arrested for violent robberies, is that the first time you heard that?
>
> A:  That his cousin was arrested I think for a knifepoint robbery of a story, wasn't it?
>
> Q:  Yeah, does that sound violent to you?
>
> ***
>
> A:  Yeah, the first I heard of that I didn't—didn't know anything about Brian Andrews until you brought it up at trial.

Q:  Then there is no, no possibility that you would know Brian Andrews' description, physical description, am I right?

A:  No, that's incorrect.

***

A:  . . . Because counsel mentioned this name and earlier in the trial I took it upon myself to figure out who this guy was.  So I pulled up his information in the Police Department imager and he was 30 years old at the time of his arrest in March of 2011, his height is five foot eight and his weight was 200 pounds.

***

A:  . . . I can also tell you that I also looked in Andrews' phone again to see if there was a phone number for a Brian Andrews.  There's not.  He has a lot of safe contacts, I guess he had a lot of friends. I found four Brians, none of which had the last name Andrews associated with them but just to be, you know, in deference to the defense's case here I looked through the phone records that we have for Andrews' phone from January 31st until February the 17th, I looked for any calls to any of those numbers for those four Brians and he had no telephone contact with any of those Brians in his phone.

(Doc. No. 184 at 58-60.)

Moreover, as the Government correctly points out, Petitioner's post-trial counsel attempted to argue at Petitioner's sentencing hearing that the varying accounts of the robbers' heights could show that Petitioner was not the individual who fired a gun at the police.  Specifically, J. Michael Farrell, Esquire, stated:

I believe that the testimony of the police officers at the scene was that the shooter was wearing the black mask and was the taller of the two, which would exclude my client and identify the other individual.

***

Your Honor, if I might?  Just so that I'm precise, the actual officers themselves identified the taller with the black mask, and it was always the government's consistent position that my client was the shorter with the tan mask.  So I—that's our position, Your Honor.

(Doc. No. 312 at 9-12.)

But all the evidence at trial and the statements of witnesses, taken together, merely show that witnesses had varying accounts of the suspects' heights.  Contrary to Petitioner's contentions, the 911 calls and witness statements do not conclusively show that Petitioner did not commit the robberies.  Notably, the CVS pharmacist's statement that Petitioner argues was never introduced identified the robber as being 5'6" inches tall, which matches Petitioner's height.  The pharmacist also testified at trial to this effect.  (See Doc. No. 180 at 56 ("[H]e was approximately my height and build. . . 5'5", 5'6".))  John Andrews also testified at trial that he is approximately 5'8"-5'9" tall, not 6 feet tall as Petitioner suggests.  (Doc. No. 180 at 82).  Accordingly, Petitioner is unable to overcome the presumption that his trial counsels' decision not to introduce the statements and tapes noted by Petitioner was "sound trial strategy" especially when the majority of the "height" evidence contradicted itself.   Moreover, the Court already noted that the issue regarding "height" evidence was not raised in the post-trial motions and any objection to it was sustained when raised in court at a hearing on the post-trial motion.[22]  (See Doc. No. 276 at 43-46.)  Therefore, Claim Eight fails because Petitioner has not shown that his counsel were constitutionally ineffective.

---

[22] At the post-trial hearing, J. Michael Farrell, Esquire, questioned Petitioner's trial counsel David Shapiro, Esquire, about the availability of evidence that showed discrepancies of the CVS shooters' heights.   While Mr. Farrell attempted to relate this questioning to the ineffective assistance of counsel claims raised in Defendant's Motion for Judgment of Acquittal, the Government objected to this questioning because the specific issue of height evidence was not raised in that Motion.  To this point, the Court noted:

> Mr. Farrell, one—a lawyer can read a record of a trial and in his mind come up with many different avenues that in hindsight a lawyer should pursue, and it's counsel's, you know, obligation to let us know what you're raising specifically in terms of ineffective assistance of counsel.
>
> ***
>
> But, you know, to now start to go through every little point that you're contending should have—the lawyer should have done this or that at trial as defense counsel

### ii.    Claim Nine

In Claim Nine, Petitioner first argues that his trial counsel failed to retain a DNA expert to test the tan sleeve that was found in Andrews' apartment as well as "other material evidence." (See Doc. No. 360 at 64-65.)  He further argues that his post-trial and appellate counsel were ineffective for failing to raise this issue post-trial and on appeal.  (Id.)  Second, he argues that the Government violated Brady by failing to turn over evidence of a lip balm and a glove found behind the CVS.  (Id. at 66.)

### a. The Tan Sleeve

Petitioner's claim that his various counsel should have had the tan sleeve found at John Andrews' apartment is meritless.  First, this issue was addressed and denied during the post-trial hearing.  (See Doc. 276 at 41 ("[T]here has been no request at this point for a DNA analysis.  It's not raised. . . as a post-trial reason for ineffective assistance of counsel."))  Second, as the Government correctly pointed out, there was no evidence to show that this sleeve found in Andrews' apartment was the one used as a mask during the robberies.  (See Doc. No. 276 at 42.) Moreover, the DNA results could have tested positive to Petitioner's detriment.  The Government on its own did a DNA test of the tan sleeve found at Andrews apartment.  It was inconclusive for

---

when it's not raised in these memorandums is just beyond the scope of this hearing at this point and I'm going to sustain the objection.

***

And again, we can—we can go through every line of every—of the transcript of the trial and probably put our finger on something, which you can do in any trial in any case, but you've got to give notice of what the claim is so I'm going to sustain any cross-examination that doesn't include subject matter that is raised of ineffective assistance of counsel in the—in the motion.

(Doc. No. 276 at 44-46.)

both Andrews' and Petitioner's DNA.  (See Doc. 357-9 at 3.)  This testing was turned over to Petitioner before his trial.

      Under Strickland, Petitioner's trial counsels' decision not to further test the sleeve/mask cannot be said to have been unreasonable.  Nor were his post-trial and appellate counsel ineffective for failing to raise this meritless issue.  And even if this Court were to find counsels' actions unreasonable, Petitioner cannot satisfy the second Strickland prong.  The jury's verdict would not have been different based upon further testing of the tan sleeve given the overwhelming other evidence introduced against Petitioner, including at the very least his co-conspirator John Andrews' testimony admitting that he and Petitioner committed the Blue Grass Pharmacy and CVS robberies together, and all the other witness testimony in which Petitioner informed them that he committed one or more of the robberies, as well as the drugs from the Blue Grass Pharmacy found in his motel room.  The extensive evidence introduced at trial against Petitioner has been set forth earlier.

### b.  Petitioner's **Brady** Claim

      Second, Petitioner argues that the prosecution violated Brady by "failing to turn over KEY pieces of evidence for DNA testing."[23]  (Doc. No. 360 at 64 (emphasis in original).)  The only item Petitioner points to that the Government failed to turn over was a glove found behind the CVS building that was referenced in a crime scene investigator's note.  (Id. at 66 (citing Doc. No. 357-10 at 2).)  And he further argues that the Government failed to conduct DNA testing on the glove as well as on a Blistex lip balm also recovered near the CVS pharmacy.  (Doc. No. 360 at 66.)

      Under Brady and its progeny, "prosecutors have an affirmative duty to disclose evidence that would 'tend to exculpate' the defendant or 'reduce the penalty' to be imposed upon him."

---

[23]  See Brady v. Maryland, 373 U.S. 83 (1963).

United States v. Santos-Cruz, No. 99-505-1, 2003 WL 22657128, at *6 (E.D. Pa. Nov. 5, 2003) (quoting Brady, 373 U.S. at 87-88).  However, the duty to disclose "permit[s] the government to make information within its control available for inspection by the defense," but "impose[s] no additional duty on the prosecution team members to ferret out any potentially defense-favorable information from materials that are so disclosed."  United States v. Pelullo, 399 F.3d 197, 212 (3d Cir. 2005).  Further, "[a]lthough the prosecution has the obligation to disclose to the defense evidence that either is exculpatory or impeachment, they are not required to use any particular investigatory tool, including quantitative testing, to secure exculpatory evidence." Martin v. Glunt, No. 2:15-cr-3394, 2018 WL 1620983, at *5 (E.D. Pa. Apr. 4, 2018) (citing Arizona v. Youngblood, 488 U.S. 51, 58–59 (1988)); see also Paddy v. Beard, No. CIV.A. 03-5312, 2008 WL 8971156, at **19–20, report and recommendation adopted, 2012 WL 5881847 (E.D. Pa. Nov. 20, 2012) (rejecting the petitioner's Brady claim based on the prosecution's decision not to test the petitioner's car for the decedent's blood and fingerprints, which the petitioner argued would show he was not at the scene of crime.).

Here, the prosecution properly followed the requirements of Brady.  First, turning to the glove, this was properly disclosed to defense counsel in an August 17, 2012 letter to defense counsel:

> The government intends to introduce as evidence any physical evidence confiscated during the investigation into this case.  These items are available for inspection.  If you would like to inspect them, please let me know and I will make them available to you at a mutually convenient time.

(Doc. No. 405 at 80.)  Accordingly, "physical evidence confiscated during the investigation," included the glove found behind the CVS Pharmacy.  It was available for inspection by the defense. Second, contrary to Petitioner's contentions, Brady does not impose a requirement on the prosecution to test the lip balm found at the CVS and the glove for DNA.  Like the glove, the lip

balm evidence was made available to defense counsel who could have made use of this evidence if they felt it would have been helpful to Petitioner.

Therefore, Claim Nine is without merit.

### iii.    Claim Ten

In Claim Ten, Petitioner raises a sufficiency of the evidence argument as well as additional ineffective assistance of trial counsel claims.  (Doc. No. 360 at 67-91.)

### a.    Sufficiency of the Evidence Presented at Trial

Regarding his sufficiency of the evidence claim, Petitioner again raises several arguments previously covered, including Leah Sabatino's testimony, issues regarding "height" discrepancies at trial, his foot injury, John Andrews' and Chuck Rhoads' testimony as well as Agent Shute's testimony.  (See id. at 67-90.)  He further claims that the evidence was insufficient because his convictions resulted from the testimony of witnesses granted immunity or given plea deals.

When evaluating the sufficiency of evidence supporting a conviction, courts must apply the standard of review set forth in Jackson v. Virginia:

> [T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction . . . does not require a court to ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.  Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

443 U.S. 307, 318-19 (1979) (citations omitted).  "Moreover, the government may defeat a sufficiency-of-the-evidence challenge on circumstantial evidence alone." United States v. Iglesias, 535 F.3d 150, 156 (3d Cir. 2008).  The Third Circuit has held that substantial deference is given to a jury's finding of guilt.  See United States v. Sherman, No. 23-2996, 2025 WL 209879, at *3 (3d Cir. 2025).

As noted, the Court has already addressed many of these issues above and in its Opinion Denying Acquittal and New Trial.  (See Doc. No. 301 at 3 n.1 ("This Court presided over Defendant's trial and is well aware of the evidence presented by the Government against him.  The evidence was sufficient to sustain the jury's guilty verdict on each count . . .") .) To this effect, the Court found:

> [t]he evidence against Defendant was overwhelming. The Government presented testimony from co-conspirator Jonathan Andrews, childhood friend Charles Rhoads, and girlfriend Leah Sabatino, all of whom implicated Defendant in the pharmacy robberies. Their testimony was corroborated by, among other things, other testimony or physical evidence, such as the drugs found in the hotel room where Defendant was arrested after the robberies, the clear photographs of Defendant in the Blue Grass Pharmacy the day it was robbed, wearing the same shoes that the robber wore in two robberies, the cell site location evidence, the prison tape recordings between Defendant and Ms. Sabatino, Defendant's letters from prison, and Ms. Sabatino's diary entries.

(Doc. No. 301 at 43.)  Petitioner fails to bring forth any new evidence that would affect this outcome.  Thus, contrary to Petitioner's contention, the Government's evidence was not solely based on witnesses who were given immunity or plea deals, such as witnesses like Leah Sabatino and John Andrews.  Even if that were true, the jury was made aware of their agreements during the Government's opening argument, Defense counsel's opening argument, direct examination and defense counsels' cross-examination.  It was for the jury to weigh their credibility.  (See Doc. Nos. 179 at 30, 36; 180 at 174; 183 at 63; 180 at 134-35; 181 at 193.)

### b. Petitioner's Ineffective Assistance of Counsel Argument in Claim Ten

As to Petitioner's ineffective assistance of trial counsel claims in Claim Ten, he asserts that his trial counsel were "ill-prepared" at trial and that "it was the Shapiros' ineffectiveness that gave the false impression of [the] strength of [the] evidence."  (Id. at 70.)  In this regard, he argues the following:

1. Trial counsel failed to cross-examine John Andrews regarding Petitioner's foot injury in view of Dr. Cancell's testimony;

2. Trial counsel generally failed to inform the jury that the CVS was "smack dab in the middle of everything" including his father's house, Chuck Rhoads' house, Leah Sabatino's house, and John Andrews' apartment.  Therefore, "defendant was always in the area of the CVS" and "[i]t was not out of the ordinary. . . for defendant to call for a ride" in that area;

3. Trial counsel failed to cross-examine Leah Sabatino "on the contradictions in her previous statements and her grand jury testimony between her trial testimony;"

4. Regarding Agent Shute's cell site testimony, trial counsel failed to "investigate an area of expertise they knew nothing about."  And Agent Shute changed his post-trial testimony after hearing the testimony of Joseph Kennedy at the post-trial hearing;

5. Trial counsel failed to cross-examine Chuck Rhoads about any benefit he may have received in exchange for his testimony at trial;

6. Trial counsel failed to investigate and itemize exactly where the recovered drugs at the Rivera Motel Room came from.  Petitioner maintains that the drugs recovered were a "perfect match" to the DEA-106 report describing the drugs that were stolen from the Rite Aid Pharmacy robbery, which Petitioner claims only Andrews committed.  He also avers that trial counsel and post-trial counsel failed to raise the fact that the black duffel bag where the drugs were found at the Rivera Motel belonged to Leah Sabatino, not Petitioner; and

7. Trial counsel failed to impeach John Andrews regarding the video evidence of the person at CVS purchasing a toothbrush, who was alleged to be Petitioner, and later the person robbing the CVS wearing the same shoes, a white shoe with the Nike swoosh symbol, because John Andrews had "two dozen sneakers in his walk in closet" and many of those sneakers were the Nike brand.  He further claims that a video comparison between the person purchasing the toothbrush and the CVS should have been done by trial counsel.

(Id. at 70-90.)

The first four (4) arguments have been addressed previously, including that trial counsel were not ineffective for failing to retain Dr. Cancell to testify at trial, or relatedly to cross-examine Johnathan Andrews about the injury to Petitioner's foot, or for failing to cross-examine Leah Sabatino on her contradictory testimony, which it was not, or that Agent Shute's testimony was

found to be consistent and credible during both trial and the post-trial hearing.  This Court also

found that trial counsel cross-examined Agent Shute about other places that fell within the cell

sectors of Petitioner's cellphone location, including bars, Petitioner's father's house, and John

Andrews' house, where Defendant may have been at the relevant times.  (Doc. No. 301 at 48

(quoting Doc. No. 182 at 146).)  Additionally, regarding the Shapiros' representation of Petitioner

at trial, this Court held:

> Present defense counsel's post-trial efforts on behalf of Defendant Meehan have
> been considerable and the post-trial expert testimony presented was certainly
> informative.  It is abundantly clear that new counsel, Mr. Farrell, would have tried
> this case differently.  However, the <u>Strickland</u> standard is highly deferential.  Even
> if in hindsight new counsel developed a better trial strategy, it does not mean that
> defense counsel at trial was constitutionally ineffective.  Individually or
> cumulatively, it is not apparent to a reasonable degree of certainty that had trial
> counsel made different decisions in line with the present motion that the outcome
> of the trial would have been different.  The evidence against Mr. Meehan was
> substantial.  Given that evidence, the Shapiros made sound strategic decisions
> pretrial and during trial.

(<u>Id.</u> at 75.)

Petitioner asserts that his trial counsel were ineffective for failing to cross-examine Chuck

Rhoads about the dismissal of his aggravated assault charge before giving his testimony and about

Rhoads' statement that he had no reason to testify against Petitioner.  (Doc. No. 360 at 71.)  But

at trial, Chuck Rhoads testified that he cooperated against Petitioner because he was afraid the

police would arrest his wife for harboring a fugitive, who was Petitioner, after the CVS robbery.[24]

Specifically, Rhoads met with the police on three (3) separate occasions.  During his first

encounter, he lied to the police and told them that Petitioner, John Andrews or Randy Parsons did

not discuss the robberies with him, and that Petitioner had not been in his car since the last time

they hung out together.  (Doc. No. 181 at 182-183.)  He later testified that these statements were

---

[24] Rhoads maintains that Petitioner did not stay at his house the night after the CVS robbery.

lies, and therefore he needed to correct his statements to prevent his wife from being arrested. The following testimony ensued during trial counsel's cross-examination of Chuck Rhoads:

> Q:      . . . You met with [the police] around 6:00 p.m. on [February]16th?
>
> A:      Yes.
>
> Q:      You felt you needed to tell them a different version, correct?
>
> A:      Yes.
>
> Q:      One of the reasons was because you were afraid they would prosecute your wife?
>
> A:      Yes.
>
> ***
>
> Q:      At that point did you believe your wife might be prosecuted if you didn't give the police information about Mr. Meehan and the CVS robbery?
>
> A:      Yes.
>
> Q:      And you believed your wife—did you believe your wife would not be prosecuted if you gave them information about where Mr. Andrews lived?
>
> A:      Yes.
>
> Q:      So you believed by giving them information that night that your wife would avoid prosecution?
>
> A:      Yes.
>
> ***
>
> Q:      And in your mind would you or your wife get some benefit by helping the police that night?
>
> A:      The reason—yeah, that's the reason why—I didn't want her to get in any trouble, that's why I called the cops.
>
> Q:      Okay. And you were going to get some benefit by cooperating against Joe?
>
> A:      Uh, yes.

(Doc. No. 182 at 30-32.)   This testimony shows that Rhoads admitted at trial that he was cooperating with police to prevent him and his wife from being arrested for their alleged conduct after the CVS robbery.   Therefore, Petitioner's assertion that Chuck Rhoads "had no reason to testify against the defendant . . . other than he was doing it as a 'good citizen'" fails.   (See Doc. No. 260 at 71.)   The jury was aware that Chuck Rhoads was cooperating in order to prevent his wife from potentially going to jail and that he would get some benefit by testifying.

The benefit apparently alleged by Petitioner related to Chuck Rhoads' arrest for aggravated assault.   This arrest occurred before he testified at Petitioner's trial.   Petitioner claims that Rhoads' aggravated assault charge was dismissed because he testified against Petitioner.   (Doc. No. 360 at 71.)

At the post-trial hearing, Petitioner's trial counsel David Shapiro, Esquire, testified that he was not aware of Rhoads' arrest at the time of trial and that after trial he sent an investigator to speak with Rhoads.   (Doc. No. 280 at 74-75.)   Further, when Agent Coyle was asked about the dismissal of Rhoads' assault charge, he testified that it was nolle processed (dropped) because a witness was never brought to court:

> Q :   Okay. Now, ultimately you did become aware, after Mr. Rhodes had provided information in this case, that he had been arrested and was in custody for an aggravated assault, correct?
>
> A:   I became aware that at some point, and I believe it was 2012, he had been arrested and charged with an aggravated assault. I don't recall specifically how I became aware of it, but I do remember becoming aware of it.
>
> Q:   Okay. And you also are aware that those charges were nolle prossed?
>
> A:   Yes.  The DA's office dismissed the charge.
>
> Q:   And they were nolle prossed because the witness that was in the custody of the Commonwealth was not brought from [State Correctional Institution] Graterford to the [court, Center for Criminal Justice] CJC?

A:      That is what the docket sheet reflected, yes.

Q:      Okay.  And you were not cross-examined at the time of trial with respect to the timing of those events?

A:      Correct.

(Doc. No. 281 at 80.)

Petitioner was not prejudiced by trial counsels' failure to cross-examine Rhoads about his aggravated assault arrest.  There is no evidence that any promise was made by the prosecution to seek dismissal of this charge in exchange for his testimony.  It was dismissed by the District Attorney because a critical witness against Rhoads did not appear in court.  And even if Petitioner's trial counsel had known about the arrest, the failure to refer to it did not prejudice Petitioner. Rhoads' testimony was cumulative and corroborated by Andrews, Sabatino and by other overwhelming evidence presented at trial against Petitioner.  Thus, regarding Rhoads, there was no ineffective assistance by any of Petitioner's counsel.

Next, Petitioner's argument that trial counsel failed to investigate the drugs found at the Rivera Motel is also meritless.  Contrary to Plaintiff's contention, there was ample evidence presented at trial that some of the drugs found at the motel were drugs stolen from the Blue Grass Pharmacy.  The evidence included the testimony of the Blue Grass Pharmacy pharmacist, Daniel Ginecki, who testified that he gave the robbers Schedule II drugs which included Hydromorphone, Roxicodone, Methadone as well as 12 microgram, 25 microgram and 50 microgram fentanyl patches.  (Doc. No. 180 at 13-14, 27-44.)   Officer William Wheeler then testified that Hydromorphone and other pills as well as varying doses of fentanyl patches were found at the Rivera Motel.  (Doc. No. 183 at 165-186.)  Agent Coyle also testified to the same.  (Doc. No. 182 at 191.)  As an aside, Agent Coyle was extensively cross-examined by David Shapiro, Esquire, and stated that while some of the drugs found at the motel were matches for those stolen from the

Blue Grass Pharmacy, there were also other drugs found that matched drugs stolen during an uncharged robbery of a Rite Aid Pharmacy. (Doc. No. 184 at 61-62.) This cross-examination was part of an effort by trial counsel to show that John Andrews committed the robberies of all three pharmacies, including the Blue Grass Pharmacy and Rite Aid.

And Petitioner's attempt to even shift the blame and argue that the drugs found in the motel belonged to Leah Sabatino fails. In this regard, Petitioner maintains that his trial counsel failed to use one of his defense theories at trial, which was that Leah Sabatino had sex with John Andrews and, after he refused to pay her, she stole from Andrews the drugs found at the Rivera Motel. (Doc. No. 360 at 81.) But David Shapiro, Esquire, covered this point when he cross-examined Agent Coyle:

> Q: Okay, now one of the things that we learned from Leah was that she said that she had arranged some prostitutes for Andrews?
>
> A: Yes, I think she did say that, yes.
>
> Q: And one of the things that was not clear, I thought, from her testimony was that whether—was whether or not she believed that Andrews owed her any money.
>
> A: Okay.
>
> ***
>
> Q: Okay. And did you ever hear that she referred to him as Swine because she was fighting with him over money?
>
> A: No.

(Doc. No. 184 at 62-64.)

And most importantly, as discussed further below, while incarcerated, Petitioner had phone calls with and wrote a letter to Sabatino asking her to take the blame for the drugs found at the motel because she would receive a lighter sentence as a first-time offender. Thus, the evidence presented at trial, including John Andrews' testimony that he and Petitioner robbed the Blue Grass

Pharmacy and then split the drugs taken between themselves to sell, all pointed to the conclusion that Petitioner participated in the robbery of the Blue Grass Pharmacy and that the drugs found in his hotel room came from that robbery. (See Doc. No. 180 at 95-96.) Moreover, there was also the testimony of William Callahan, who stated that he bought pills from Petitioner in February 2011 and Petitioner told him that he stole them from a drugstore. (Doc. No. 182 at 159-160.) Therefore, trial and post-trial counsel were not ineffective for failing to raise these further meritless claims.

Lastly, Petitioner claims that although a video showed him wearing Nike sneakers at the Blue Grass Pharmacy earlier on the day of the robbery when he purchased a toothbrush, and then later on that same day another video showed one of the robbers wearing the same pair of Nike sneakers, he did not commit the robbery because the Nike sneakers are a common pair of shoes. (Doc. No. 360 at 88.) Alternatively, he maintains that John Andrews owns a lot of Nike shoes. Even if that were true, with this circumstantial evidence and the abundant additional evidence showing that Petitioner committed the robberies, there was no prejudice to Petitioner. At trial, for example, Daniel Ginecki, the Blue Grass pharmacist, testified that the person who purchased the toothbrush, i.e., Petitioner, was the same height and build as the person wearing the Nike sneakers during the robbery. (Doc. No. 180 at 20.) Further, Officer Wheeler testified that Nike sneakers were found in Petitioner's motel room with the same Nike swoosh as the shoes used in the robbery. (Doc. No. 183 at 163.) Again, the overwhelming evidence showed that Petitioner was the robber who wore the Nike sneakers.

Furthermore, the Court finds no merit in Petitioner's claims that his post-trial counsel and appellate counsel were ineffective for the same reasons Petitioner claims the Shapiros were

ineffective.  Defense counsel cannot be held ineffective for not raising meritless arguments. Therefore, Claim Ten is without merit.

<h4 style="text-align:center">iv.    Claim Eleven</h4>

In Claim Eleven, Petitioner asserts a general and conclusory ineffective assistance of trial, post-trial and appellate counsel claim.  (Doc. No. 360 at 91.)  Again, he re-argues the ineffective assistance of trial counsel claims as described above.  Petitioner fails to explain in Claim Eleven how his post-trial and appellate counsel were ineffective other than to say that his post-trial counsel was ineffective for failing to raise "some" issues, and his appellate counsel was ineffective for "failing to raise all trial counsels' failures and how they cumulatively related to [counsels'] ineffectiveness."  (Doc. No. 360 at 91.)

Assuming Petitioner's assertions at least relate to his sufficiency of the evidence argument in Claim Ten, this argument is meritless.  Again, under the standard in Jackson v. Virginia, when viewing the evidence in the light most favorable to the prosecution, there was sufficient evidence for any rational trier of fact to have found Petitioner guilty in this case.  Jackson, 443 U.S. at 318-19.  The trial court record contains ample evidence of Petitioner committing the robbery of the Blue Grass Pharmacy and attempted robbery of the CVS with John Andrews, as well as the attempted carjacking outside the CVS pharmacy.

Thus, while Petitioner attempts to conjoin all of his issues into a generalized ineffective of trial counsel claim, all his underlying claims have been addressed and separately found to be meritless on each claim.  Further, Petitioner's post-trial and appellate counsel could not have been ineffective for failing to raise these meritless claims.  And for the same reasons, Petitioner is not entitled to a hearing because the record conclusively shows that he is not entitled to relief. Therefore, Claim Eleven is meritless.

### v.    Claim Twelve

In his last pro se claim, Petitioner claims his trial counsel were ineffective for failing to object to "false" and "prejudicial statements" the prosecutor made in her closing arguments. (Doc. No. 360 at 96.) He also asserts that post-trial counsel was ineffective for failing to raise this issue during post-trial hearings. (Id.) He further argues prosecutorial misconduct occurred during the closing statements made by the prosecutor. (Id.)

### a.  Closing Statements Regarding Leah Sabatino

First, Petitioner claims the prosecutor lied in her closing statement when she stated Leah Sabatino "overhear[d] John Andrews and [Petitioner] talk[ing] about needing a get-a-way driver." (Id.) But, as described above, the Court does not find Sabatino's grand jury and trial testimony conflicting or "false" as Petitioner repeatedly insists in his Petition. Rather, the Government adequately summarized her trial testimony in its closing argument.

Second, Petitioner claims that the prosecutor's argument on the attempted theft of Suboxone from the CVS pharmacy being proof that Petitioner committed the robberies is false because "no one has ever said, not in any proffer, not in any grand jury testimony, and certainly not a trial, that the defendant gave Sabatino Suboxone. The only drug Sabatino took for detoxing is Methadon[e]." (Id.) Petitioner, however, leaves out an earlier part of the prosecutor's statement. The pertinent part of the closing argument is as follows:

> What else do you know about the CVS Pharmacy robbery? You know that when the defendant and Jonathan Andrews went to the pharmacy area, they asked the pharmacist to clean out the safe. But what did he ask for specifically? He specifically asked for Xanax, which you heard is a street drug. But he also asked for Suboxone, do you remember that? He specifically asked for Suboxone. And you heard from Sal Davis, the drug expert, that Suboxone isn't a street drug. It's a drug that's used by doctors to help heroin addicts get off their addiction. This is telltale evidence that it's the defendant who is robbing the CVS and specifically asking for the pills that he's giving to Leah Sabatino.

(Doc. No. 184 at 122-23.)  Leah Sabatino testified she was taking Methadone which she got through Petitioner.  (See Doc. No. 183 at 11, 23-24, 84-85, 104, 123).  She also expressed that she would sell Xanax for him.  (Id. at 22-23.)  And the Government's expert Sal Davis stated that Suboxone is a drug that helps with withdrawal symptoms of addicts.  This evidence raises the inference that Sabatino sold Xanax for Petitioner and, in return, was given Methadone to help her overcome her addiction.  It also raises the inference that Petitioner would use Suboxone for the same purpose.  In this regard, the Government's closing statement was not false or misleading.  Rather, it allowed the jury to infer that because the robber demanded Suboxone, which is a drug to help addicts, as well as Xanax, which Sabatino admitted she sold on behalf of Petitioner, the robber was Petitioner.

### b.  Prosecutor Did Not Vouch for Officer Boccalupo in the Closing Argument

Next, Petitioner avers that the prosecutor vouched for Officer James Boccalupo's testimony in her closing statement.  (Doc. No. 360 at 96.)  At trial, the prosecutor argued the following regarding Officer Boccalupo in her closing argument:

> Now, you heard from Officer [Boccalupo] and he told you that the first person over the fence, he was the shorter of the two.  It was the defendant.  He also told you that as soon as the defendant hit the ground, he turned and he opened fire on Officer [Boccalupo].  Now, how do you know that that's credible?  Well, you heard from the CSU examiners and firearms examiner and they told you that the FCCs, the shell casings that were found on the opposite side of the fence, that shell casing, it matched the three shell casings that were inside the pharmacy robbery when the defendant shot out the window.  That's how you know that it's credible.

(Doc. No. 184 at 124.)

The prosecutor's closing argument was sourced in part from trial testimony of the officer:

> . . . So when I got back here to the sidewalk—as you can see, this is a fence right here, on this side of the fence is obviously the CVS driveway and on this side is a common driveway—so when I would position myself right here, alls I had to do was take just two steps about to my left and now I'm on—now I'm looking down

70

at the common driveway where they're going to come over the fence. So the first offender comes over the fence and I'm ordering him on the ground. On this side of the fence it's very dark, there's no lighting really getting through from the CVS because the trees are blocking the light here. So as soon as the first offender hits the ground, he immediately starts shooting at me. I didn't even see the gun in his hand, I see the muzzle flashing, he's firing right at me. . .

(Doc. No. 181 at 104.)  The prosecutor's summation also was based on the testimony of Officer Jacqueline Davis and Officer Donna Jaconi, the Crime Scene Unit officers, and Officer Ronald Weitman, from the Firearms Identification Unit.  Their testimony showed that the shell casings near the fence matched those that were found inside the pharmacy.

For a court to find vouching, "two criteria must be met: (1) the prosecutor must assure the jury that the testimony of a Government witness is credible; and (2) this assurance is based on either the prosecutor's personal knowledge, or other information not contained in the record." United States v. Walker, 155 F.3d 180, 187 (3d Cir. 1998).  "Thus, it is not enough for a defendant on appeal to assert that the prosecutor assured the jury that a witness' testimony was credible.  The defendant must be able to identify as the basis for that comment an explicit or implicit reference to either the personal knowledge of the prosecuting attorney or information not contained in the record."  Id.; see also Lawn v. United States, 355 U.S. 339, 359 n.15 (1958).

Here, the trial evidence shows that the prosecutor based her closing argument on the credibility of Officer Boccalupo from evidence in the record.  While she argued that the witness was credible, satisfying the first element of vouching, she was not giving this assurance based on her personal knowledge or on information not contained in the record.  See Lawn, 355 U.S. at n.15. ("The Government's attorney did not say nor insinuate that the statement was based on personal knowledge or on anything other than the testimony of those witnesses given before the jury, and therefore it was not improper.")  Thus, for this reason, Petitioner has not met the second element of the vouching test.

71

### c. Prosecutor's Closing Argument About Petitioner's Letter to Leah Sabatino Was Not Misleading

Lastly, Petitioner asserts that the prosecutor misled the jury in her closing argument regarding Petitioner's letter to Sabatino.  The prosecutor argued as follows about Petitioner's apparent attempt to coach Sabatino in his letter to her written from prison:

> I saw my lawyer today and it looks real bad for me.  I'm going to ask you something and I want you think real hard about it.  And I'm talking about if you take the case for me.  Because, Baby, our options are you do one year or I do 20.  And by the time we go to court, you'll have put in three months. And if you take it, then all I owe is PA about two years.  I'll be home right after you. We can get an apartment and move on with our life. And I make sure we have plenty of cash to go to the store, I'll make sure you got a little apartment.

(Doc. No. 184 at 136.)  Petitioner argues that because the prosecutor added "for me" in their statement, which was not in Petitioner's letter to Sabatino, "it changed the meaning to give the appearance that the defendant is admitting guilt."  (Doc. No. 360 at 96.)  The Court does not find this argument convincing.  The letter is a plea by Petitioner to Sabatino asking her to take the blame for the drugs so Petitioner would not go to prison for an extended period.[25]  Sabatino even admits this in her trial testimony:

---

[25] The letter from Meehan to Sabatino, dated March 9, 2011, reads in relevant part:

> Hey Princess,
>
> How's my Girl? I miss you so damn much.  And I need to talk to you bad.  I saw my lawyer and it looks real bad for me.  I'm gonna ask you something and I want you to think real hard about it cause in the end I'll do what you want, I do love you. If I take the case I am looking at a minimum of ten years, but most likely twenty because this is my third strike.  Then I will have to go to PA and do another 5 to 10 for what I owe them.  My lawyer said if you take the case you will not get more than a 5 flat and you would be home in 12 months because it is your first conviction. Baby, our options are; you do 1 year or I do twenty.  And by the time we go to court you'll have put 3 months in.  And, if you take it, then all I owe PA is about 2 years and I'll be home right after you, then we get our apartment and move on with life.

Q:    Let me ask you, what did you think Mr. Meehan was saying to you when he said, "if you take the case"?

A:    What I mean it to say? I did it, it was all mine.

Q:    Were the drugs all yours?

A:    No.

\* \* \*

Q:    . . . When he's talking about you doing one year or him doing 20, what is he referring to?

A:    Since it's my first time ever being arrested and I would only get like a slap on the wrist, which it wasn't.

\* \* \*

Q:    And is he telling you that he would give you money to go to the store if you took the charges for the Defendant?

A:    Yeah.

\* \* \*

Q:    What did you think the Defendant was telling you there, living happily ever after? Why would you be living happily ever after if you took the case for the Defendant?

A:    That if I take the case he'll be home to me sooner, we'll be able to get married and everything that I dream of, I guess.

Q:    So he'll marry you and you'll live happily ever after if you plead –

A:    Take the case.

Q:    —guilty to the drugs that the Defendant had?

A:    Yep.

---

If you agree I'll make sure you have plenty of cash to go to the store, I'll make sure you got a little apartment.

(Doc. No. 357-10 at 30-31.)

***

Q:      Why do you think he's saying this to you in the letter?

A:      I think he was trying to manipulate me.

Q:      What do you mean by that?

A:      Telling me that he really loved me when he really didn't, so that I would take the case for him.

(Doc. No. 183 at 48-56.)  Thus, the Government adding the words "for me" in their summation did not change the context of the letter.  Petitioner's letter and Sabatino's trial testimony support the Government's theory that Petitioner was asking Sabatino to take the blame for him.  Thus, Claim Twelve will be denied for the reasons set forth above.

Finally, Petitioner argues that his post-trial counsel, J. Michael Farrell, Esquire, was ineffective for failing to assert the arguments made in Claim Twelve in his post-trial motions. However, a lawyer is not ineffective when he fails to raise arguments that are without merit. Accordingly, this claim too will be denied.

## V.      CONCLUSION

For the foregoing reasons, Petitioner's § 2255 Petitions (Doc. Nos. 360, 364) will be granted in part and denied in part.  Pursuant to Unites States v. Davis and United States v. Taylor, Petitioner's Claim One in his pro se Petition (Doc. No. 360) and Claim Thirteen in the Petition filed by the Federal Community Defenders Office (Doc. No. 364) will be granted in part. Accordingly, Petitioner's convictions for the offenses in Counts IV and VI will be vacated.  His convictions on Count II will not be vacated.  Petitioner shall be re-sentenced.

Petitioner's pro se Claims Two through Twelve are without merit and will be denied without an evidentiary hearing because the record shows conclusively that he is not entitled to relief.

When a court issues a final Order denying a § 2255 petition, the Court must also decide whether to issue or deny a certificate of appealability.  <u>See</u> 28 U.S.C. § 2255, R. 11(a).  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The Court will not issue a certificate of appealability as to Petitioner's <u>pro</u> <u>se</u> Claims Two through Twelve in this case because Petitioner has failed to "demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).  An appropriate Order follows.